No. 26-2262

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

KRIS WARNER, in his Official Capacity as
West Virginia Secretary of State,

Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT
CHARLESTON

# BRIEF FOR THE UNITED STATES AS APPELLANT

*(See inside cover for continuation of counsel)*

*(Continuation of cover)*

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
MICHAEL T. HAYES
BENJAMIN E. SACHRISON
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 805-7671

# TABLE OF CONTENTS


**PAGE**

INTRODUCTION ........................................ 1

STATEMENT OF JURISDICTION ........................................ 3

STATEMENT OF THE ISSUES ........................................ 3

STATEMENT OF THE CASE ........................................ 4

SUMMARY OF ARGUMENT ........................................ 10

STANDARD OF REVIEW ........................................ 13

ARGUMENT

I. The United States' written demand satisfied Section 303. ........................................ 14

A. Courts play a limited role in assessing the Attorney General's demand under Title III. ........ 14

1. Administrative subpoena requirements do not apply to a Section 303 demand. ........ 16

2. In any event, the United States' demand satisfied any applicable requirements. ........ 19

B. The Section 303 demand stated the basis for the demand. ........................................ 21

1. Section 303 does not require a "factual" basis. ........................................ 21

2. The Section 303 demand stated its basis. ........ 24

**TABLE OF CONTENTS (continued):** **PAGE**


C. The Section 303 demand stated a proper purpose for the demand. .......... 27

1. Title III does not limit the purposes for which a demand may issue. .......... 27

2. The Attorney General's demand satisfied even the district court's interpretation of Section 303. .......... 29

3. The NVRA and HAVA neither narrow Section 303 nor limit the records the Attorney General may inspect. .......... 32

4. Arguments regarding pretext provide no basis to affirm. .......... 36

II. West Virginia's SVRL is a record subject to Sections 301 and 303. .......... 41

A. The SVRL is a "record" or "paper" "relating to" registration. .......... 41

B. The SVRL "come[s] into" the Secretary's possession. .......... 42

C. Treating the SVRL as a record creates no conflict with Section 302, the NVRA, or HAVA. .......... 48

III. No privacy law bars production. .......... 51

A. The United States' demand does not create a constitutional concern. .......... 52

B. The United States is complying with the Privacy Act. .......... 53

**TABLE OF CONTENTS (continued): PAGE**


C. The United States is complying with the E-Government Act. .......... 57

D. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining data supporting its claims. .......... 60

E. Federal law preempts West Virginia's redaction statute .......... 62

CONCLUSION .......... 63

STATEMENT REGARDING ORAL ARGUMENT .......... 65

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**CASES:** **PAGE**


*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961) ........ 14, 46

*Alphin v. United States*, 809 F.2d 236 (4th Cir. 1987) ........ 17, 37, 40

*American Oversight v. United States Dep't of Just.*,
45 F.4th 579 (2d Cir. 2022) ........ 56

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ........ 62

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........ 13

*Bates v. United States*, 522 U.S. 23 (1997) ........ 27

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) ........ 30, 56-57

*Bryan v. United States*, 524 U.S. 184 (1998) ........ 50

*Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052 (2026) ........ 41

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) (per curiam) ........ 23, 26, 28

*Common Cause v. United States Dep't of Just.*,
No. 1:26-cv-1352 (SLS), 2026 WL 3033772 (D.D.C. Oct. 9, 2026) ........ *passim*

*Dean v. United States*, 556 U.S. 568 (2009) ........ 27-28

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
601 U.S. 42 (2024) ........ 49

**CASES (continued):** **PAGE**

*Department of Com. v. New York*, 588 U.S. 752 (2019) .................... 38, 40

*Department of Homeland Sec. v. League of Women Voters*, No. 26A308, 2026 WL 2879700 (S. Ct. Sept. 25, 2026) (per curiam) .................... 39-40

*Doe v. Chao*, 540 U.S. 614 (2004) .................... 53

*Donaldson v. United States*, 400 U.S. 517 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 .................... 17

*Electronic Priv. Info. Ctr. v. United States Dep't of Com.*, 356 F. Supp. 3d 85 (D.D.C.), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019) .................... 59

*Equal Emp. Opportunity Comm'n (EEOC) v. Maryland Cup Corp.*, 785 F.2d 471 (4th Cir. 1986) .................... 16

*EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110 (4th Cir. 1997) .................... 20, 33

*EEOC v. Shell Oil Co.*, 466 U.S. 54 (1984) .................... 20

*Fischer v. United States*, 603 U.S. 480 (2024) .................... 48

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) .................... 42

*Foster v. Love*, 522 U.S. 67 (1997) .................... 62

*Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916 (11th Cir. 2023) .................... 43

*Giarratano v. Johnson*, 521 F.3d 298 (4th Cir. 2008) .................... 38

**CASES (continued): PAGE**

*Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771 (2023) .......... 62

*Greidinger v. Davis*, 988 F.2d 1344 (4th Cir. 1993) .......... 52-53

*Hannah P. v. Coats*, 916 F.3d 327 (4th Cir. 2019) .......... 24

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......... 21

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) .......... 26

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) .......... 15, 26, 32

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) .......... *passim*

*King v. Burwell*, 576 U.S. 473 (2015) .......... 25

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......... 22

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) .......... 47

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) .......... 41

*Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993) .......... 13

*Neitzke v. Williams*, 490 U.S. 319 (1989) .......... 22

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014) .......... 21

*Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186 (1946) .......... 19

*Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601 (2019) .......... 35

**CASES (continued):** **PAGE**

*Project Vote/Voting for Am., Inc.* v. *Long*,
682 F.3d 331 (4th Cir. 2012) .................................................. 36, 49

*Public Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......................................................... 36

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) ............................... 30

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .................................................................... 50

*Reno v. Condon*, 528 U.S. 141 (2000) ................................................... 61

*Reynolds v. Sims*, 377 U.S. 533 (1964) ................................................. 30

*Ronnow v. City of Las Vegas*, 65 P.2d 133 (Nev. 1937) .......................... 43

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ........................... 4, 31

*Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239 (4th Cir. 2009) ......... 13

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ...................... 59

*Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992) .................................. 22

*United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989) ......... 47

*United States v. American Target Advert., Inc.*,
257 F.3d 348 (4th Cir. 2001) ........................................ 18-20, 37, 41

*United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich.),
*aff'd*, 179 F.4th 470, *reh'g en banc denied*,
187 F.4th 462 (6th Cir. 2026) ................................................ *passim*

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) ........................ 16, 24

**CASES (continued):** **PAGE**

*United States v. Maine*, No. CIV. 06-86-B-W,
2007 WL 1059565 (D. Me. Apr. 4, 2007) .......................................47

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) .......................51

*United States v. Mississippi*, 380 U.S. 128 (1965) .................................47

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950).....................26, 54

*United States v. Newport News Shipbuilding & Dry Dock Co.*,
837 F.2d 162 (4th Cir. 1988) .........................................................16

*United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026),
*appeal pending*, No. 26-1231 (9th Cir.) ..........................................39

*United States v. Powell*, 379 U.S. 48 (1964) ...................................*passim*

*United States v. Raffensperger*, No. 1:26-cv-485-VMC,
2026 WL 3002013 (N.D. Ga. Sept. 30, 2026).................................63

*United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026),
*appeal pending*, No. 26-1232 (9th Cir.) ..........................................39

*Voter Reference Found., LLC v. Torrez*,
160 F.4th 1068 (10th Cir. 2025)....................................................49

*Webster v. Doe*, 486 U.S. 592 (1988).......................................................21

**CONSTITUTION:**

U.S. Const. Art. VI, Cl. 2 .......................................................................61

**STATUTES:**

Civil Rights Act of 1960 (CRA)
52 U.S.C. 10101(e) ........................................................................27

**STATUTES (continued): PAGE**


52 U.S.C. 20701 *et seq.* .......... 3
52 U.S.C. 20701 .......... *passim*
52 U.S.C. 20702 .......... 5, 44, 48, 54
52 U.S.C. 20703 .......... *passim*
52 U.S.C. 20704 .......... *passim*
52 U.S.C. 20705 .......... 5, 18
Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) .......... 27

Civil Rights Cold Case Records Collection Act of 2018,
44 U.S.C. 2107(note) .......... 46
Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) .......... 46

Driver's Privacy Protection Act (DPPA)
18 U.S.C. 2721 .......... 60
18 U.S.C. 2721(a) .......... 60
18 U.S.C. 2721(b)(1) .......... 60-61
18 U.S.C. 2721(c) .......... 60
18 U.S.C. 2725(1) .......... 60
18 U.S.C. 2725(3)-(4) .......... 60

E-Government Act of 2002
44 U.S.C. 3501 .......... 57
44 U.S.C. 3502(3)(A)(i) .......... 57, 60
44 U.S.C. 3502(3)(B) .......... 58
§ 201 .......... 58
§ 208(b)(1)(A)(ii) .......... 59-60
§ 208(b)(1)(B)(i) .......... 58-59
Pub. L. No. 107-347, 116 Stat. 2899 .......... 51

Help America Vote Act of 2002 (HAVA)
52 U.S.C. 20901 *et seq.* .......... 1, 6
52 U.S.C. 20901 .......... 1, 6
52 U.S.C. 21083(a) .......... 59
52 U.S.C. 21083(a)(1)(A) .......... 6, 60
52 U.S.C. 21083(a)(1)(A)(i)-(ii) .......... 34
52 U.S.C. 21083(a)(1)(A)(viii) .......... 6

**STATUTES (continued): PAGE**

52 U.S.C. 21083(a)(2)(A) .......... 6
52 U.S.C. 21083(a)(2)(A)(i)-(iii) .......... 7
52 U.S.C. 21083(a)(5)(A)(i) .......... 8, 34
52 U.S.C. 21083(a)(5)(A)(i)-(ii) .......... 7
52 U.S.C. 21083(a)(5)(A)(iii) .......... 7
52 U.S.C. 21111 .......... 7-8, 35, 61
Pub. L. No. 107-252, 116 Stat. 1666 (2002) .......... 30

Internal Revenue Code
26 U.S.C. 7602(a) .......... 17
26 U.S.C. 7602(a)(1) .......... 17
26 U.S.C. 7605(b) (1954 ed.) .......... 17

John F. Kennedy Assassination Records Collection Act of 1992,
Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 .......... 46

National Voter Registration Act of 1993 (NVRA)
52 U.S.C. 20501 *et seq.* .......... 1, 5
52 U.S.C. 20501 .......... 1
52 U.S.C. 20501(a)(3) .......... 6, 29-30
52 U.S.C. 20501(b) .......... 12
52 U.S.C. 20507(a)(4) .......... 6
52 U.S.C. 20507(i)(1) .......... 6, 36
52 U.S.C. 20510(a) .......... 8, 19, 54, 61
52 U.S.C. 20510(d)(1) .......... 12

Privacy Act of 1974
5 U.S.C. 552a(e)(4)(B) .......... 56
5 U.S.C. 552a(e)(7) .......... 53-54
Pub. L. No. 93-579, 88 Stat. 1896 .......... 51, 53

28 U.S.C. 1291 .......... 3

28 U.S.C. 1331 .......... 3

28 U.S.C. 1345 .......... 3

**STATUTES (continued):** **PAGE**

31 U.S.C. 5314(a) .......... 58

44 U.S.C. 3518(c)(1) .......... 58-59

44 U.S.C. 3518(c)(1)(B) .......... 58

Ga. Code Ann. § 21-2-225(b) (West 2026) .......... 63

W. Va. Code § 3-2-30(a) (2026) .......... 62

**REGULATIONS:**

28 C.F.R. 0.50(a) .......... 55

68 Fed. Reg. 47,610 (Aug. 11, 2003) .......... 55

68 Fed. Reg. 47,611 (Aug. 11, 2003) .......... 55-57

70 Fed. Reg. 43,904 (July 29, 2005) .......... 55

82 Fed. Reg. 24,147 (May 25, 2017) .......... 55

90 Fed. Reg. 14,005 (Mar. 25, 2025) (Exec. Order No. 14,248) .......... 39

**LEGISLATIVE HISTORY:**

106 Cong. Rec. 6392 (1960) .......... 11, 28

106 Cong. Rec. 7767 (1960) .......... 28

**RULES:**

Fed. R. App. P. 2 .......... 64

Fed. R. App. P. 4(a)(1)(B) .......... 3

**RULES (continued):** **PAGE**

Fed. R. App. P. 41(b) .......... 64

Fed. R. Civ. P. 12(b)(6) .......... 3, 8-9

Fed. R. Civ. P. 81(a)(5) .......... 9, 16, 18

**MISCELLANEOUS:**

1 *New Shorter Oxford English Dictionary* (4th ed. 1993) .......... 43

Authority to Obtain & Share Statewide Voter Roll Data,
50 Op. O.L.C. (May 12, 2026),
https://www.justice.gov/olc/media/1440346/dl .......... 46, 58-59

*Black's Law Dictionary* (4th ed. 1968) .......... 43

*Black's Law Dictionary* (5th ed. 1979) .......... 41

*Black's Law Dictionary* (8th ed. 2004) .......... 56

*Black's Law Dictionary* (12th ed. 2024) .......... 22

*The American Heritage College Dictionary* (4th ed. 2002) .......... 59

Report of the United States Commission on Civil Rights (1959),
https://www.usccr.gov/files/historical/1959/59-001-U.pdf .......... 31

U.S. Dep't of Just., Civil Rights Division, Voting Section,
https://www.justice.gov/crt/voting-section
(last visited Oct. 22, 2026) .......... 55

U.S. Dep't of Just., Just. Manual § 9-11.151 (2020) .......... 56

**MISCELLANEOUS (continued): PAGE**

U.S. Election Assistance Comm'n,
*Celebrating 20 Years of HAVA*,
https://www.eac.gov/sites/default/files/HelpAmerica
VoteDay/HAVA_1-Pager_10-27-22_508.pdf
(last visited Oct. 22, 2026) ....................................................... 30

*Webster's New World Dictionary of the American Language*
(8th coll. ed. 1960) ....................................................... 22, 42

*Webster's Third New International Dictionary*
(1966 ed. unabridg. Vol. I)....................................................... 42-44

*Webster's Seventh New Collegiate Dictionary* (1967 ed.) ........................ 42

## INTRODUCTION

Title III of the Civil Rights Act of 1960 (CRA) gives the Attorney General a "sweeping" power to inspect federal election records. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962); *see* 52 U.S.C. 20703. He exercised that authority here. The Attorney General asked West Virginia's chief election official for a copy of the State's statewide voter registration list (SVRL). The purpose of the request was to see whether West Virginia is keeping the list as the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. 20501 *et seq.*, and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq.*, require—two statutes Congress charged him with enforcing.

The United States filed a Motion to Compel production of the SVRL and Secretary Warner (the Secretary, or West Virginia) filed a Motion to Dismiss. In denying the United States' Motion to Compel and granting West Virginia's Motion to Dismiss, the district court concluded that the United States failed to provide an adequate basis and purpose for the demand, as required by Title III. *See* 52 U.S.C. 20703. That was error. Title III creates a special statutory proceeding under which a district court may not second-guess the sufficiency of the Attorney General's

statement of the basis and purpose for the demand. And the Attorney General's demand—which explained that it was made pursuant to Title III, and that it sought West Virginia's SVRL to ascertain the State's compliance with the NVRA's and HAVA's list-maintenance requirements—stated a basis and purpose sufficient to require production. West Virginia's other arguments—that Title III does not require West Virginia to produce an unredacted SVRL, and that the demand violates federal and state privacy laws—provide no alternative basis to affirm.

This Court should reverse the district court's judgment and remand with instructions for the district court to order West Virginia to produce the unredacted SVRL.[1]

---

[1] A district court has "set[] aside and vacate[d] DOJ's" so-called "Voter List Maintenance Policy." *Common Cause v. United States Dep't of Just.*, No. 1:26-cv-1352 (SLS), 2026 WL 3033772, at *36 (D.D.C. Oct. 9, 2026). The Department of Justice (DOJ) "has appealed [this] decision" and sought "a stay of th[e] decision pending appeal." Motion to Stay at 2, *Common Cause*, *supra* (Oct. 16, 2026). The "DOJ does not interpret [that] decision as pretermitting or requiring dismissal of ongoing" appeals, including this one, related to "obtain[ing] voter rolls." *Id.* at 13.

## STATEMENT OF JURISDICTION

The United States brought this action under Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. 20701 *et seq*. The district court had jurisdiction under 28 U.S.C. 1331 and 1345. JA28-29.[2]

On July 13, 2026, the district court granted defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) and denied the United States' Motion to Compel Production. JA16. The United States filed a timely Notice of Appeal on September 9, 2026. JA279; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1. Whether Title III of the CRA permits a court to scrutinize the sufficiency of the Attorney General's written statement of the basis and the purpose for the demand, and if so, whether the Attorney General's statement was sufficient here.

2. Whether West Virginia's SVRL is a record that "come[s] into" an election officer's "possession" within the meaning of Title III of the CRA, 52 U.S.C. 20701.

---

[2] "JA__" refers to the page number of the cited document within the Joint Appendix filed concurrently with this brief.

3. Whether federal or state privacy laws prevent the United States from demanding and obtaining the full, unredacted copy of West Virginia's SVRL.

## STATEMENT OF THE CASE

1.a. Congress passed the CRA to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). The CRA "permitted the joinder of States as parties defendant" and "authorized courts to register voters in areas of systematic discrimination." *Ibid.* Title III "gave the Attorney General access to local voting records." *Ibid.*

Section 301 of Title III imposes a "sweeping" obligation on election officials. *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962). "Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. Section 302 makes it a crime

for any person to "willfully steal[], destroy[], conceal[], mutilate[], or alter[]" a record covered by Section 301. 52 U.S.C. 20702.

Section 303, which is the provision at issue here, provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703.

Section 304 bars the Attorney General and his representatives from disclosing any record produced under Title III, except to Congress and its committees, to governmental agencies, and in the presentation of a case before a court or grand jury. 52 U.S.C. 20704. Section 305 provides that the district court where the demand is made, or where the records are located, "shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

b. Congress has since enacted two statutes that govern the records now at issue. The NVRA, 52 U.S.C. 20501 *et seq.*, requires each State to conduct "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason

of . . . the death of the registrant" or a "change in the residence of the registrant." 52 U.S.C. 20507(a)(4). It also requires each State to make available for public inspection, for at least two years, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). Congress enacted the NVRA after finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation" and "disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3).

HAVA, 52 U.S.C. 20901 *et seq.*, requires each State to implement "a single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. 21083(a)(1)(A). That list "shall serve as the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. 21083(a)(1)(A)(viii). HAVA mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(2)(A). This process includes removing "individual[s]," "registrant[s]," and "ineligible voters" who should not

appear on the lists. 52 U.S.C. 21083(a)(2)(A)(i)-(iii). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers, such as a driver's license number or partial Social Security number. 52 U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii). "The Attorney General may bring a civil action against any State or jurisdiction" to enforce these requirements. 52 U.S.C. 21111.

2. On September 8, 2025, the Assistant Attorney General for the Civil Rights Division wrote to defendant Kris Warner, West Virginia Secretary of State and the State's chief election official. JA31; JA42-44. The letter opened by identifying its subject: West Virginia's "compliance with the statewide voter registration list maintenance provisions of the [NVRA] . . . and [HAVA]." JA42. It asked the Secretary to provide an electronic copy of West Virginia's SVRL with all fields, including each registrant's full name, date of birth, residential address, and driver's license number or the last four digits of his or her Social Security number, "as required under HAVA to register individuals for federal elections."

JA42 (citing 52 U.S.C. 21083(a)(5)(A)(i)). The letter explained that the request was made "pursuant to Title III of the Civil Rights Act of 1960," which authorized the Attorney General to request records "related to voter registration and other acts requisite to voting for any federal office," and it noted that records inspected under Title III are covered by Section 304's non-disclosure provisions. JA43. It stated that "[t]he purpose of this request is to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA," and it invoked the Attorney General's enforcement authority under Section 11 of the NVRA, 52 U.S.C. 20510(a), and Section 401 of HAVA, 52 U.S.C. 21111. JA42-43.

The Secretary refused. JA32. The DOJ renewed its request by email on December 10 and December 19, 2025, and again on January 13, 2026. JA32. On February 11, 2026, the Secretary confirmed in writing that he would not produce the list. JA32.

3.a. The United States filed this action on February 26, 2026, and subsequently moved to compel production. JA27-41; JA35; JA79-99. The Secretary moved to dismiss under Rule 12(b)(6). JA100. He argued that the demand stated no adequate basis or purpose, that an SVRL is not a record or paper covered by Section 301, that production would violate

three federal privacy statutes, and that West Virginia law forbids unredacted disclosure. JA111-125.

b. On July 13, 2026, the district court granted the Motion to Dismiss and denied the Motion to Compel. JA16.

The court first rejected the United States' position that Title III establishes a special statutory proceeding in which the court's role is limited. JA3-4. Relying on Federal Rule of Civil Procedure 81(a)(5) and on footnote 18 of *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964), the court held that the Federal Rules apply in full and that Rule 12(b)(6) supplies the governing standard. JA3-5.

The court then held that the demand failed Section 303's basis-and-purpose requirement for two reasons. JA6. As to "the basis," the court held that Section 303 requires "a statement providing some factual support as to why the Attorney General demands production." JA8. It rejected the position that a legal basis suffices, reasoning that a citation to Title III itself would be "circular" and would read "basis" out of the statute. JA8-11. It found the September 8 letter "devoid of any factual basis" because the letter did not say that West Virginia was "suspected to be noncompliant" and did not "point to any anomalies in West

Virginia's voter registration data." JA7. Rejecting the United States' argument that ascertaining compliance with the NVRA and HAVA was the basis for the request, the court held that the United States was improperly conflating the "basis" and "purpose" requirements, which are "separate" and "non-overlapping." JA10 (citation omitted).

As to "the purpose," the court held that a Title III demand must "relate to a purpose of investigating violations of individuals' voting rights," and that ascertaining compliance with the NVRA's and HAVA's list-maintenance requirements does not qualify. JA13-14 (citation omitted). The court further reasoned that, even if that purpose were proper, the United States had not explained why it needs "highly sensitive voter data," and that the NVRA and HAVA contain their own enforcement mechanisms. JA14-15.

Without reaching defendants' remaining arguments, the district court dismissed the case.

## SUMMARY OF ARGUMENT

Title III gives the DOJ access to a specific, though broad, set of election-related records. The DOJ must provide election officers with notice of its basis and purpose for seeking the records, but Title III places

no limits on that purpose, imposes no guidelines for determining the sufficiency of the basis, and requires no showing of relevance to a particular purpose. Title III thus does not contemplate full-scale judicial proceedings, nor even proceedings in the nature of subpoena enforcement. But even under this Court's administrative subpoena precedents, the DOJ would be entitled to the SVRL: the DOJ seeks the SVRL for an authorized purpose, the SVRL is relevant to that purpose and adequately described, and the DOJ has followed the statutory procedures.

Under the appropriate framework, the district court erred by holding that the demand failed to state the basis for the request. Nothing in Section 303 says that "the basis" must be factual rather than legal. Courts use the word both ways, and Congress used it here to require notice of "what law or what constitutional provision, right, or immunity might be involved." 106 Cong. Rec. 6392 (1960) (statement of Rep. Cramer). But in any event, the letter rested on a fact: West Virginia bears federally enforceable list-maintenance obligations under the NVRA and HAVA, and the Attorney General is authorized to ensure compliance with those obligations.

Contrary to the district court's holding, the Section 303 demand also stated a proper purpose. Title III nowhere limits the purposes for which the Attorney General may demand records, and Congress showed in the same Act that it knew how to impose such a limit. Even accepting the district court's atextual test, ascertaining compliance with the NVRA and HAVA protects individual voting rights. Congress listed accurate rolls and enhancing the participation of eligible citizens as voters among the NVRA's purposes, 52 U.S.C. 20501(b), and it adopted HAVA's standards so that eligible voters would not be turned away. A list that wrongly omits an eligible registrant costs that person a vote; a list that carries registrations it should not dilutes the votes of everyone else. That the NVRA and HAVA also supply enforcement tools does not repeal the one Congress placed in Title III, which the NVRA expressly preserved. 52 U.S.C. 20510(d)(1).

Finally, any alternative grounds for affirmance must be rejected. First, West Virginia's SVRL is a "record" or "paper" "relating to" registration, and it "come[s] into" the Secretary's possession. That phrase fixes when an officer's duty attaches; it does not ask where the record came from. And second, no privacy law bars production. The cited federal

privacy statutes do not apply on their own terms, and any contrary state law is preempted.

## STANDARD OF REVIEW

This Court "review[s] a district court's dismissal under Rule 12(b)(6) *de novo*." *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a motion to dismiss under Rule 12(b)(6), courts must "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Ibid.* A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). Facial plausibility is achieved "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* In addition, statutory interpretation is a question of law reviewed *de novo*. *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 242-243 (4th Cir. 2009).

## ARGUMENT

### I. The United States' written demand satisfied Section 303.

Section 303 entitles the Attorney General to inspect the records Section 301 requires election officers to preserve, on a single condition: his written demand must "contain a statement of the basis and the purpose therefor." 52 U.S.C. 20703.

The September 8 letter satisfied that condition. It identified the CRA, the NVRA, and HAVA as the basis for the demand, and it stated that "[t]he purpose of this request is to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." JA42-43. The district court held otherwise—but only after holding that it could review the statement's sufficiency. Both rulings were error.

#### A. Courts play a limited role in assessing the Attorney General's demand under Title III.

Section 303 gives the Attorney General an investigative tool, not a cause of action to be tried. The Attorney General's authority under Title III is "purely investigative." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the U.S.*, 285 F.2d 430 (5th Cir. 1961). And an "investigative process

could be completely disrupted if investigative hearings were transformed into trial-like proceedings." *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By seeking records required to be maintained under Section 20701 in court under Title III, the DOJ initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962) (*Lynd II*). Such a proceeding "does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-226. The Attorney General need make only "a simple statement" that he issued a written demand and that the custodian refused to comply. *Id.* at 226. "There is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Ibid.* (quoting 52 U.S.C. 20703). Accordingly, a state official responding to the Attorney General's demand for federal election records may not utilize litigation tools ordinarily available under the Federal Rules of Civil Procedure to challenge "the reasons why the Attorney General considers the records essential." *Ibid.*

Nor is "the factual foundation for, or the sufficiency of," that statement "open to judicial review or ascertainment." *Ibid.*; *see United States v. Lynd*, 301 F.2d 818, 821 (5th Cir. 1962) (*Lynd I*).

### 1. Administrative subpoena requirements do not apply to a Section 303 demand.

The district court held that the United States' recommended procedure was foreclosed by Rule 81(a)(5) and by *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). JA3-4. It concluded that *Powell* applied because it concerned "identical language in a similar statute" and held that the Federal Rules of Civil Procedure applied because the statute "contain[ed] no provision specifying the procedure to follow in invoking the court's jurisdiction." JA4 (quoting *Powell*, 379 U.S. at 58 n.18). The district court further reasoned that this Court "has applied *Powell* to other demands for records in the context of federal agencies." JA4 (citing *United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 165-166 (4th Cir. 1988); *Equal Emp. Opportunity Comm'n* (*EEOC*) *v. Maryland Cup Corp.*, 785 F.2d 471, 475-476 (4th Cir. 1986)). But the *Powell* approach should not be applied to Section 303.

*Powell* construed the Internal Revenue Code (IRC), which expressly limits the summons power in ways Title III does not. The Code forbids

"unnecessary examination or investigations" and reaches only material that "may be relevant or material" to the inquiry. *Powell*, 379 U.S. at 52-53 (quoting 26 U.S.C. 7605(b) (1954 ed.)); 26 U.S.C. 7602(a)(1). Indeed, the relevant portion of the IRC explicitly limits the purposes for which a request can be made. 26 U.S.C. 7602(a) (limiting purposes to ascertaining correctness of tax returns, determining tax liability, and the like). Those limits gave the *Powell* Court something to review, but Section 303 contains no analogue.

Moreover, the Supreme Court later narrowed the *Powell* footnote, explaining that the Civil Rules "are not inflexible in th[eir] application." *Donaldson v. United States*, 400 U.S. 517, 528-529 (1971), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520. Rather, it held that "the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Ibid.*; *see also Alphin v. United States*, 809 F.2d 236, 239 (4th Cir. 1987) ("Courts may limit [Rules of Civil Procedure] application when to apply them literally would impair the summary nature of the proceeding."). As such, enforcement proceedings "are designed to be

summary in nature," and "[t]he [review] process is not one for a determination of the underlying claim on its merits." *United States v. American Target Advert., Inc.*, 257 F.3d 348, 353 (4th Cir. 2001) (second brackets in original; citations omitted).

Thus, *Powell* does not nullify the summary nature of Section 305 proceedings. Nor does Rule 81(a)(5) require the full trappings of the Federal Rules of Civil Procedure; it merely states that the Rules apply to subpoena-enforcement proceedings "except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5). Title III is such a statute. Section 305 directs the district court to compel production "by appropriate process," 52 U.S.C. 20705, and Section 303 specifies the only showing the Attorney General must make. Even if the Rules apply, they do not supplant Section 303's minimum-notice standard.

Appropriate process merely requires that the responding State election official "ha[s] been given reasonable notice of the pendency of the proceeding" and the opportunity to challenge "whether or not any specified particular paper or record comes within [Title III's] broad statutory classification." *Lynd II*, 306 F.2d at 226. There is no dispute

that Secretary Warner received the DOJ's written demand for West Virginia's SVRL, and that he also has received—and will continue to receive—access to the court to resolve disputes as to Title III's coverage or to seek a protective order.

### 2. In any event, the United States' demand satisfied any applicable requirements.

A district court asked to enforce an administrative subpoena need discern only "(1) [that the agency] was authorized to undertake such an investigation; (2) [that] the applicable statutory requirements of due process had been met; and (3) [that] the materials requested were relevant." *American Target*, 257 F.3d at 351 (citing, *inter alia*, *Oklahoma Press Publ'g Co. v. Walling*, 327 U.S. 186, 216-217 (1946)). Each is satisfied here.

First, the Attorney General is authorized to investigate. Congress charged him with enforcing the NVRA and HAVA's list-maintenance requirements. 52 U.S.C. 20510(a), 21111. Title III supplies the inspection power. 52 U.S.C. 20703. The district court thought otherwise, concluding that neither the NVRA nor HAVA "contemplates 'the line-by-line audit of each state's computerized SVRL.'" JA14 (citation omitted). But that reasoning decides the scope of the Attorney General's substantive

authority, which is not what a summary enforcement proceeding is for. *See American Target*, 257 F.3d at 353. "So long as the agency's assertion of authority is not 'obviously apocryphal,'" the first requirement is met. *Id.* at 354 (citation omitted).

Second, the statutory requirements were met. Section 303 asks for a written demand stating the basis and the purpose. 52 U.S.C. 20703. As discussed below (Argument I.B-C, *infra*), that requirement was satisfied. The Attorney General served the demand, gave the Secretary 14 days to respond, followed up three times, and filed suit only after a second written refusal. JA31-32; JA42-44.

Third, the SVRL is relevant. The relevance requirement is "not especially constraining": it reaches "virtually any material that might cast light" on the matter investigated. *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68-69 (1984); *see EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997) ("Courts defer to an agency's own appraisal of what is relevant so long as it is not 'obviously wrong.'" (citation and internal quotation marks omitted)). The NVRA and HAVA require States to keep accurate voter lists, and the SVRL is direct evidence of whether West Virginia is doing so.

### B. The Section 303 demand stated the basis for the demand.

The September 8 letter cited HAVA, the NVRA, and Title III as the basis of its request. *See* JA43 ("Pursuant to [HAVA, NVRA, and the CRA], the Attorney General is requesting an electronic copy of West Virginia's complete and current VRL."). The district court erred by requiring something more.

#### 1. Section 303 does not require a "factual" basis.

Section 303's text controls. *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014) ("Our analysis begins and ends with the [statutory] text."). And that text nowhere authorizes a court to weigh the sufficiency of the Attorney General's statement. Indeed, the statute provides no meaningful standards that would permit such judicial review. *See United States v. Benson*, 187 F.4th 462, 480 (6th Cir. 2026) (Thapar, J., dissenting from the denial of reh'g en banc) (*Benson III*). *Cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The district court erred at this first step.

Section 303 simply requires "a statement of the basis and the purpose therefor." 52 U.S.C. 20703. It does not require a "*factual* basis." JA8 (emphasis added). The district court supplied that word itself,

drawing on a definition of "basis" as "an underlying fact or condition." JA8 (quoting *Basis*, *Black's Law Dictionary* 185 (12th ed. 2024) (*Black's*)). But "basis" carries a broader sense that the district court passed over. Dictionaries—including *Black's* and those contemporaneous with the CRA—also define "basis" as a "fundamental principle," *Basis, Black's, supra*, at 185, a "basic principle or theory," or a "chief supporting factor." *Webster's New World Dictionary of the American Language* 122 (8th coll. ed. 1960). This can be contrasted with the definition of "purpose," which is "[a]n objective, goal, or end," *Purpose*, *Black's*, *supra*, at 1495, or the "intention; aim" or "object for which something . . . is done; end in view." *Purpose*, *Webster's New World*, *supra*, at 1182. On this understanding, the purpose of a demand is its aim; its basis is its justificatory principle.

Legal usage runs the same way. Courts routinely speak of a "basis" in law. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 641 (1992) (no "statutory basis" for a claimed exemption (citation omitted)); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 389 (2024) (agency determination must have a "reasonable basis in law" (citation omitted)); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989) (a claim is frivolous if it lacks "an arguable basis either in law or in fact").

The district court suggested that if Congress wanted the Attorney General to provide the legal authority behind a Section 303 demand, it would have done so. JA9. But that argument works equally the other way—Congress never specified the type of "basis" that must be included in the Attorney General's statement. Nothing in the dictionaries or in legal usage compels the district court's reading that "basis" means "a statement providing . . . factual support as to why the Attorney General demands production." JA8. As *Lynd II* explained, the requirement is a notice provision, not a substantive check on the Attorney General's investigative authority. *See Lynd II*, 306 F.2d at 226.

The early cases construing Section 303 do not maintain that a "basis" must be factual; they found the basis and purpose requirements satisfied without any factual showing. The Attorney General need only "identify in a general way the reasons for his demand." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating possible violations of a Federal statute." *Ibid.* "No showing even of a prima facie case of a violation of Federal law need be made." *Ibid.* (citation omitted). And there

is "no justification" for requiring the United States to "allege specific details." *Lynd I*, 301 F.2d at 821. Title III likewise does not require the Attorney General to use the word "basis" or any other magic words. *Cf. Hannah P. v. Coats*, 916 F.3d 327, 345 (4th Cir. 2019) ("Proper notice does not require 'any magic words.'" (citation omitted)). Yet the district court counted it against the United States that the letter "contains the term 'purpose' but does not use the word 'basis.'" JA7.

**2. The Section 303 demand stated its basis.**

The September 8 letter satisfies Title III's "basis" requirement. By citing the NVRA, HAVA, and the CRA as the authority for the demand, the letter made the basis clear—that West Virginia had specific statutory duties subject to the Attorney General's enforcement powers—and so put Secretary Warner on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226.

As explained above, Section 303 does not require the Attorney General to provide a "factual" basis for his request. But in any event, the basis of the Section 303 request is the *fact* that Congress imposed on West Virginia federally enforceable obligations to maintain an accurate

statewide list under the NVRA and HAVA, and that the Attorney General is charged with enforcing those obligations. JA42-43.

The distinction between the request's aim and its justification answers the district court's redundancy concern. The court held "basis" and "purpose" to be "separate, non-overlapping requirements" and rejected the possibility that the clause states a single notice requirement. JA10-11 (citation omitted); *cf. King v. Burwell*, 576 U.S. 473, 501 (2015) (Scalia, J., dissenting) (noting that lawmakers "sometimes repeat themselves . . . out of . . . a lawyerly penchant for doublets (aid and abet, cease and desist, null and void)"). Yet in any event, the United States provided both a basis and a purpose. The basis of the Section 303 request is West Virginia's existing federal list-maintenance obligation. The purpose of the request is to ascertain whether the State is meeting it. That the basis and the purpose are related, as they usually will be, does not make them the same.

The United States was not required to expressly state that it "suspected" West Virginia was "noncompliant" or point to "anomalies in West Virginia's voter registration data." JA7. Section 303 imposes no such requirement. Moreover, federal investigators may "investigate

merely on suspicion that the law is being violated, or even just because [they] want[] assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950).

The Attorney General's practice in the 1960s is not contrary to this approach. The district court cited Section 303 demand letters from the early 1960s, which it described as "includ[ing] an express statement of facts to support the grounds of the demand." JA9-10 (citing quoted demands in multiple cases). To the contrary, none of the cited demands stated the facts underlying the Attorney General's requests but rather stated in conclusory fashion that the demands were "based upon information in the possession of the Attorney General tending to show" racial discrimination "with respect to registration and voting within your jurisdiction." *Lynd II*, 306 F.2d at 229 n.6; *Bruce*, 298 F.2d at 861 (verbatim); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962) (verbatim). None of these demands disclosed what this information was, yet each demand was sufficient. *In re Coleman*, 208 F. Supp. at 201; *Lynd II*, 306 F.2d at 231; *Bruce*, 298 F.2d at 864. In any event, the Fifth Circuit did not state that these demands provided the necessary template for all future demands. *See Coleman*, 313 F.2d at 868.

### C. The Section 303 demand stated a proper purpose for the demand.

#### 1. Title III does not limit the purposes for which a demand may issue.

The district court held that a Section 303 "purpose" "must relate to a purpose of investigating violations of individuals' voting rights." JA13 (citation omitted). No such limitation appears in the statute. *See* 52 U.S.C. 20701-20706. Because courts ordinarily should "resist reading words or elements into a statute that do not appear on its face," *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)), there is no call to impose an extratextual limit on Section 303's purpose requirement.

"[N]othing" in the statutory text "limits the purposes for which the DOJ may request the records" under Title III. *Benson III*, 187 F.4th at 467 (Murphy, J., concurring). When Congress wants to limit permissible investigative purposes, it knows how. *See* pp. 16-19, *supra* (discussing administrative-subpoena statutes). And elsewhere in the CRA, Congress limited remedies to particular harms (namely, racial discrimination). *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (52 U.S.C. 10101(e), and applying Title VI of the CRA to violations of rights "on account of race or

color"). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean*, 556 U.S. at 573 (brackets in original; citation omitted). Under Title III, it is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868 (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)).

The district court reasoned that unless "purpose" limits the demands the Attorney General may make, "the requirement of stating the demand's purpose would serve no function." JA12 (citation omitted). To the contrary, the requirement serves a vital function by supplying notice to the custodian of the records. *See Lynd II*, 306 F.2d at 226; 106 Cong. Rec. 6392 (1960) (statement of Rep. Cramer). A demand that states its purpose tells an election officer what the Attorney General is looking into, so the officer knows what he is being asked to produce and why.

This does not mean that Title III is boundless. The statute reaches only a particularized set of documents "specifically identified by Congress." *Lynd II*, 306 F.2d at 226. It commands confidentiality for

whatever the Attorney General obtains. 52 U.S.C. 20704. And it applies only to records relating to federal elections during a defined time period. 52 U.S.C. 20701. There are therefore enforceable limits to the scope of the Attorney General's authority under Title III—but there is no explicit limitation on the purposes for which he can make a Section 303 demand. *Benson III*, 187 F.4th at 467 (Murphy, J., concurring).

### 2. The Attorney General's demand satisfied even the district court's interpretation of Section 303.

Even accepting the district court's test, the demand satisfies it. The NVRA and HAVA are voting-rights statutes. An investigation into a State's compliance with those statutes is an investigation into whether its voters' rights are secure. By broadly authorizing the Attorney General to demand election records from States, "[t]he CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights." *United States v. Benson*, 819 F. Supp. 3d 753, 767 (W.D. Mich.) (*Benson I*), *aff'd*, 179 F.4th 470 (*Benson II*), *reh'g en banc denied*, 187 F.4th 462 (6th Cir. 2026).

Congress passed the NVRA to combat "discriminatory and unfair registration laws and procedures" that "disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C.

20501(a)(3). HAVA likewise protects voting rights. It "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting systems and voter access that were identified following the 2000 election."[3]

By mandating list maintenance, the NVRA and HAVA also protect against fraudulent voting, which "dilute[s] the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). Indeed, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). A demand aimed at whether a State

[3] U.S. Election Assistance Comm'n, Celebrating 20 Years of HAVA 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1-Pager_10-27-22_508.pdf (last visited Oct. 22, 2026).

is meeting these obligations is therefore a demand aimed at individual voting rights.

The district court's historical premise does not point the other way. The court reasoned that Title III was enacted in the Jim Crow era "to help end voting discrimination," and inferred from that history a limit on the demands the Attorney General may make. JA12-13 (citation omitted). The court's history is correct, but that does not excuse imposing an atextual limit on the Attorney General's inspection authority under Section 303. Congress in 1960 created an inspection power because registration records were proof of how officials were treating voters, and because States were destroying such records. *See South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966); *see also Benson II*, 179 F.4th at 479 (discussing Report of the United States Commission on Civil Rights (1959), https://www.usccr.gov/files/historical/1959/59-001-U.pdf). Title III secured access to that proof. Registration records have changed since the 1960s, and Congress has imposed federal standards on how States keep them. The Attorney General's authority to *see* those records to ensure compliance with federal voting laws has not.

The district court also misread *Kennedy v. Bruce*, quoting a footnote that described evidence about voters who had died or moved as "a matter which does not bear any particular importance to the present [Title III] inquiry." JA14 (brackets in original) (quoting *Bruce*, 298 F.2d at 863 n.2). That observation concerned the relevance of evidence to the racial-discrimination investigation in *Bruce*, 298 F.2d at 863, 863 n.2—not whether an investigation into list-maintenance obligations falls outside Title III. Neither the statute nor the early cases limits the purposes for which the United States may demand records.

**3. The NVRA and HAVA neither narrow Section 303 nor limit the records the Attorney General may inspect.**

The district court added that, even if compliance with the NVRA and HAVA were a valid purpose, the United States had offered no "reasonable explanation for why obtaining highly sensitive voter data serves those purposes." JA14. Just as with the basis for the demand, *see* pp. 21-26, *supra*, the CRA does not leave "open for determination" the "scope of the order to produce insofar as it concerns the nature of the records or papers." *Lynd II*, 306 F.2d at 226. "This is so because the papers and records subject to inspection and demand have been

specifically identified by Congress." *Ibid.* Nothing in Title III imposes a relevance requirement or obliges the Attorney General to explain how the records he demands serve his purpose. "Questions of relevancy or good cause or other like considerations which must be evaluated in the injunction suit are completely foreign to the summary proceeding" under Title III. *Lynd II*, 306 F.2d at 228. Nor does the relevance requirement of this Court's administrative-subpoena cases apply here. *See* pp. 17-18, *supra*. Nevertheless, the connection between the "sensitive voter data" and the purpose is straightforward: by using that data, the United States can better verify compliance with the NVRA and HAVA.

The Complaint plausibly explained why the DOJ believed the unredacted SVRL to be "relevant" or "necessary" to its enforcement obligations under the NVRA and HAVA. *See Lockheed Martin*, 116 F.3d at 113 ("Courts defer to an agency's own appraisal of what is relevant so long as it is not 'obviously wrong.'" (citation and internal quotation marks omitted)). The Complaint alleged that the September 8 letter requested an electronic copy of West Virginia's SVRL and "stated that the purpose of the request is to ascertain [West Virginia's] compliance with the list maintenance requirements of the NVRA and HAVA." JA31. The

Complaint further alleged that the September 8 letter requested that the SVRL "contain all fields," including the registrants' "full name, date of birth, address, and driver's license or last four digits of social security number, as required under HAVA to register individuals for federal elections." JA32; JA42 (citation and internal quotation marks omitted).

HAVA makes the SVRL the official list of "every legally registered voter," 52 U.S.C. 21083(a)(1)(A)(i)-(ii), and forbids a State to accept or process a registration application that omits the applicant's driver's license number or the last four digits of his Social Security number. 52 U.S.C. 21083(a)(5)(A)(i). Whether West Virginia is complying with that requirement is answered by the contents of those fields.

To tell whether a State is maintaining its SVRL in accordance with HAVA and the NVRA, the Attorney General must see the voter rolls themselves. *See Lynd II*, 306 F.2d at 228 ("Wide scope must be accorded the Attorney General in the facilities for adequate investigation."). That is why, in prior matters against Georgia and Texas, the United States obtained SVRLs containing driver's license numbers and the last four

digits of Social Security numbers to evaluate compliance with the NVRA's list-maintenance requirements.[4]

That the NVRA and HAVA supply their own enforcement mechanisms changes nothing. *Cf.* JA14 (arguing that the NVRA and HAVA do not authorize "the line-by-line audit of each state's computerized SVRL"). Indeed, the court's observation—that HAVA contains no disclosure provision while the NVRA and the CRA do (JA15)—cuts the other way. Congress legislates "against the backdrop of existing law." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation omitted). When Congress made the Attorney General responsible for enforcing HAVA's list requirements in 2002, 52 U.S.C. 21111, Title III's inspection power had been on the books for more than 40 years. Congress had no reason to duplicate it.

---

[4] *See* Compl., *United States v. Georgia*, No. 1:06-cv-2442 (N.D. Ga. Oct. 12, 2006). The district court entered a consent decree in the Georgia case requiring production of the SVRL. *See* Consent Decree, *Georgia*, *supra* (Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding. *See* U.S. Dep't of Just., Memorandum of Understanding between the United States and Texas (May 13, 2008), https://www.justice.gov/media/1173461/dl?inline (last visited Oct. 22, 2026).

The NVRA, on the other hand, opens records to public inspection by anyone. 52 U.S.C. 20507(i)(1). Courts have permitted redaction of sensitive information in this context. *Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (*Project Vote*) (allowing redactions in the NVRA context to prevent the "intolerable burden" on voting that would result due to "a statute that conditions voting on public release of a voter's Social Security number" (citation omitted)). Section 303, by contrast, gives the inspection power to the Attorney General alone, and Section 304 forbids him to disclose what he receives. 52 U.S.C. 20703-20704. The rationale for inferring that redactions are permissible under the NVRA therefore does not carry over, and Section 304's confidentiality provision would be unnecessary if Title III reached only information already public. *See Project Vote*, 682 F.3d at 339.

#### 4. Arguments regarding pretext provide no basis to affirm.

The Secretary implies that the United States is using Title III as an "immigration enforcement mechanism," and that its reliance on the CRA is "a pretextual investigative purpose." JA118 (citation omitted).

Those arguments provide no basis to affirm—and the district court itself recognized that the question was "not before" it. JA15 n.9.

First, as stated above, Section 303 leaves no room for a court to probe the sincerity of the Attorney General's stated purpose. *Lynd II*, 306 F.2d at 226. That is the whole point of a summary proceeding.

Second, even under the administrative-subpoena precedents the district court discussed, the burden of showing an improper motive rests on the party resisting the demand. "The burden of demonstrating an abuse of process is on the party challenging the investigation." *American Target*, 257 F.3d at 354. And discovery into an agency's motives is unavailable absent "extraordinary circumstances." *Id.* at 355 (citation omitted). To obtain such discovery, the target must "distinguish himself from the class of the ordinary respondent, by citing special circumstances that raise doubts about the agency's good faith"—which takes specific allegations and affidavits, not speculation. *Ibid.* (citation omitted); *Alphin*, 809 F.2d at 238. Nor does West Virginia's disagreement with the DOJ's priorities and policy choices show the type of "improper purpose," such as harassment or pressure to settle a collateral dispute, *Powell*, 379

U.S. at 58, that could warrant overriding the Executive's investigative authority.

Third, the procedural posture forecloses the inquiry. The Secretary moved to dismiss under Rule 12(b)(6). A pretext theory "goes to the truth of the DOJ's allegations and cannot be addressed on a motion to dismiss." *Benson I*, 819 F. Supp. 3d at 767. The Complaint alleges that the September 8 letter stated the basis and the purpose of the demand. JA33. On a motion to dismiss, that allegation is taken as true.[5] *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

West Virginia's assertions of pretext fall well short of this standard. JA135; JA140. They cannot overcome the heavy burden of disproving the demand's good-faith basis and showing that it issued out of malice, an intent to harass, or a desire to pressure the Secretary to settle a collateral

[5] The Secretary cites *Department of Commerce v. New York*, 588 U.S. 752, 785 (2019), to suggest courts can reject "contrived" agency rationale (JA117-118), but that case involved an inapposite Administrative Procedure Act challenge and "[a] rare" extensive administrative record that presented "unusual circumstances[.]" *Department of Com.*, 588 U.S. at 785. In any event, it supports the United States' position: a "strong showing of bad faith or improper behavior" is required to venture beyond the record, and "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Id.* at 780-781 (citation omitted).

dispute. West Virginia relies on (1) a letter it sent the DOJ which expressed West Virginia's understanding that the DOJ intends to run the SVRL through the Systematic Alien Verification for Entitlements (SAVE) database administered by the Department of Homeland Security (JA103; JA117); (2) 90 Fed. Reg. 14,005 (Mar. 25, 2025) (Executive Order No. 14,248) (JA117; JA268); (3) alleged statements of unnamed former DOJ officials (JA117 (citing *United States v. Weber*, 816 F. Supp. 3d 1168, 1185 (C.D. Cal. 2026) (cited therein as *United States v. Weber*, No. 25-cv-9149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026))), *appeal pending*, No. 26-1232 (9th Cir. oral argument held May 19, 2026)); and (4) other courts' "concerns . . . about the true purpose of [DOJ's] voter data requests" (JA118 (quoting *United States v. Oregon*, 828 F. Supp. 3d 1092, 1106 (D. Or. 2026) (cited therein as *United States v. Oregon*, No. 25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026))), *appeal pending*, No. 26-1231 (9th Cir. oral argument held May 19, 2026)).

West Virginia did not elaborate below on how the first two asserted bases for pretext are inconsistent with the DOJ's stated purpose of ensuring compliance with NVRA and HAVA. *See Department of Homeland Sec. v. League of Women Voters*, No. 26A308, 2026 WL

2879700 (S. Ct. Sept. 25, 2026) (per curiam) (staying a judgment that had vacated the modified SAVE program, which allows States to verify the citizenship status of registered voters). The same is true for the statement of the former DOJ attorney cited in *Weber*. Setting aside the fact that it is hearsay, that source merely asserted that the United States sought the last four digits of voters' Social Security numbers—a fact both consistent with the United States' stated purpose and its authority to enforce federal election law. *Weber*, 816 F. Supp. 3d at 1185. And concerns raised to and by other courts are, as the district court correctly held, not properly before it. *See* JA15.

But the mere existence of a secondary motive related to identifying ineligible voters does not constitute bad faith or improper motive. *Department of Com. v. New York*, 588 U.S. 752, 780-781 (2019). And because "[m]ere allegations of bad faith will not suffice[,]" West Virginia's speculation based on its interpretation of public statements falls well short of the "specific facts in its responsive pleadings, supported by affidavits, from which the court can infer a possibility of some wrongful conduct" that *Alphin* requires. 809 F.2d at 238 (citation omitted). Given that failure, "second-guess[ing]" the DOJ's stated purpose would

improperly intrude upon its investigative functions. *American Target*, 257 F.3d at 354.

## II. West Virginia's SVRL is a record subject to Sections 301 and 303.

The Secretary argued below that West Virginia's SVRL is not a record subject to Sections 301 and 303. JA119-120. The district court did not decide the issue; it assumed that an electronic SVRL is covered. JA5 n.2. The Secretary is wrong.

### A. The SVRL is a "record" or "paper" "relating to" registration.

Section 301 covers "all records and papers . . . relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. The SVRL is such a record.

The phrase "'relating to' sweeps broadly[,]" and "means 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1060 (2026) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting *Black's Law Dictionary* 1158 (5th ed. 1979))). Section 301 thus reaches beyond applications, registrations, and poll-tax receipts to any record relating to one of those

acts—or to the catchall "other act requisite to voting." 52 U.S.C. 20701. The SVRL fits comfortably within that scope.

### B. The SVRL "come[s] into" the Secretary's possession.

When a statute leaves a term undefined, courts ask what its "ordinary, contemporary, common meaning was" at enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation omitted). Consistent with dictionary definitions contemporaneous with the CRA's passage, an officer "come[s] into . . . possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own"). None of these definitions limit the author, source, or origin of the thing acquired or possessed.

In fact, the definition of "acquire" conveys the opposite: "to come into possession of often by some *uncertain or unspecified means*." *Webster's Seventh New Collegiate Dictionary* 8 (1967 ed.) (emphasis added); *see also Webster's Third New International Dictionary* 18 (1966

ed. unabridg. Vol. I) ("to come into possession, control, or power of disposal of often by some uncertain or unspecified means"); *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (alteration in original; emphasis added) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (quoting 1 *New Shorter Oxford English Dictionary* 20 (4th ed. 1993))). As the contemporaneous Black's Law Dictionary described, to acquire was to "receive or gain *in whatever manner*[,]" broadly "being the act of getting or obtaining something which may be already in existence, *or may be brought into existence* through means employed to acquire it." *Acquire*, *Black's Law Dictionary* 41 (4th ed. 1968) (emphases added) (citing *Ronnow v. City of Las Vegas*, 65 P.2d 133, 139 (Nev. 1937) (explaining that "[a] bridge may be acquired *by construction* as well as by purchase")).

The defining feature of the phrase "come into possession," then, is the resulting possession—not the means by which it is secured. The Secretary's reading, which limits the phrase to externally created records, does exactly the opposite of what the text commands.

Congress used the phrase "*come* into his possession" rather than "*in* his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. 52 U.S.C. 20701; *see Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance"); *Benson III*, 187 F.4th at 470-471 (Griffin, J., dissenting) ("By 1960, 'come into' possession or custody was a familiar legal expression. . . . [I]t did not distinguish property according to its source."). And the "come into . . . possession" language emphasizes the fact that Section 301 imposes its duty on "[e]very officer of election," and that Section 302 attaches criminal penalties to individuals. 52 U.S.C. 20701-20702. The "come into . . . possession" language thus "cabins an election official's liability to documents she received during her tenure." *Benson II*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting) (ellipsis in original).

The language ensures that the moment that a document comes into an election officer's possession is when the Section 301 obligations vest. Had Section 301 said "in his possession" rather than "which come into his

possession," one might argue that an officer must retain only the records he held on election day—the only date Section 301 mentions, and the date from which the 22-month period runs. The chosen phrase forecloses that reading. A record that reaches the officer a month after the election has still come into his possession, and he must keep it for the balance of the 22 months. The distinction between a record that "come[s] into" an officer's possession and one that is "in" his possession is, as Judge Nalbandian put it, "a temporal and custodial limitation"—"not a broader limitation on the source of origin of a record." *Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting). Five judges of the Sixth Circuit endorsed this reading. *See Benson III*, 187 F.4th at 477 (Thapar, J., dissenting). And although that court denied rehearing, four more joined a concurrence indicating they "likely would have agreed with much of Judge Nalbandian's dissent if [they] had sat on the panel" and concluded there was "room for doubt over the panel opinion's interpretation of" that phrase, *id.* at 463-464 (Murphy, J., concurring).

Moreover, treating Section 301 as covering internally generated records is consistent with the context of Title III. If internally generated records were excluded, the Attorney General would have no authority to

demand records created by a county clerk tracking voters by race. *Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting). At the time of the CRA's passage, such internally generated and inculpatory documents would have been among the most pertinent records the Attorney General could have sought to investigate rampant discriminatory practices.

Congress likely chose "comes into his possession" because it is broad enough to cover both voter-generated and state-generated documents.[6] *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 8-9), https://www.justice.gov/olc/media/1440346/dl (discussing that the phrase "come into possession" "does not carry a requirement that the thing is received from a third party" and that "it is not unusual to say that one comes into possession of a thing that one created oneself"); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney Gen. of the*

[6] This would not be the only time Congress has used the phrase in a manner meant to encompass both self-generation and receipt from an outside source. *See* Civil Rights Cold Case Records Collection Act of 2018, Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) ("was created or made available for use by, obtained by, or otherwise came into the possession of" an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

*U.S.*, 285 F.2d 430 (5th Cir. 1961) (referring to "all records and papers which are in the possession of an election official . . . if those records and papers relate to the acts requisite to voting"). Indeed, courts have recognized that Section 301 encompasses "records of voting registration[,]" *United States v. Mississippi*, 380 U.S. 128, 134 (1965), including voter registration lists, *see, e.g.*, *United States v. Maine*, No. CIV. 06-86-B-W, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985).

The Supreme Court understands the term the same way. Under the Freedom of Information Act, two requirements make a document an agency record: "an agency must either create or obtain the requested materials," and "the materials [must] have come into the agency's possession in the legitimate conduct of its official duties." *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-146 (1989) (emphasis added; citation and internal quotation marks omitted). An agency record that the agency created itself thus "come[s] into the agency's possession"—the phrase marks when and how possession began. *See ibid.*

Even if Section 301 did contain a hidden outside-source requirement, the Secretary would satisfy it. He did not build West

Virginia's list himself. He acquired the document when he took office and gained access to it, and he receives updated versions of it from his staff and clerks throughout the State. *See Benson II*, 179 F.4th at 486-487 (Nalbandian, J., dissenting); *Benson III*, 187 F.4th at 465 (Murphy, J., concurring) ("At the least, the Secretary of State 'came into possession' of the voter-registration list when she assumed office."), 473 (Griffin, J., dissenting) ("[W]hen the [SVRL] comes under [the Secretary's] official custody and control through the actions of those subordinates, it comes into her possession."), 479 (Thapar, J., dissenting). "As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting) (second ellipsis in original) (quoting 52 U.S.C. 20701).

### C. Treating the SVRL as a record creates no conflict with Section 302, the NVRA, or HAVA.

The Secretary contends that treating the SVRL as a Section 301 record would criminalize the list maintenance that HAVA requires. JA120. It would not.

Section 302 reaches those who "willfully . . . steal[], destroy[], conceal[], mutilate[], or alter[]" a covered record. 52 U.S.C. 20702. The surrounding verbs illuminate "alter." *Fischer v. United States*, 603 U.S.

480, 486-487 (2024). Each describes conduct that "impair[s] the integrity or availability of records." *Id.* at 490; *Benson III*, 187 F.4th at 473-474 (Griffin, J., dissenting) ("Read in that company, then, 'alters' likewise refers to any minor tampering with or corruption of the document's integrity—not routine updates necessary to maintain an accurate voter list."). Routine list maintenance does the opposite: it keeps the official list accurate. Updating a list that federal law requires to be kept current is "retain[ing] and preserv[ing]" it, not altering it. 52 U.S.C. 20701; *see Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 338-339 (4th Cir. 2012) (*Project Vote*) (explaining how States "maintain" voter lists (citation omitted)); *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1084-1085 (10th Cir. 2025) (explaining how States can "maintain" documents under the NVRA even when those documents are "dynamic" and "constantly changing"). The fact that the SVRL is a dynamic record in need of maintenance does not exclude it from Section 301's scope. *See Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (recognizing a "strong presumption" that two statutes touching on the same topic can "coexist harmoniously" (citation omitted)).

An accurate SVRL must be updated, but at any given moment it contains a discrete set of information. If a snapshot of the SVRL as of September 8, 2025, exists, an election officer might violate Section 302 by altering that archival snapshot. But that is a far cry from treating standard list maintenance as an unlawful alteration. Applying statutorily required updates does not alter any such snapshot, and so does not impair the integrity of the records Section 302 protects.

The mens rea requirement removes any remaining doubt. Section 302 reaches only willful conduct, meaning an act "undertaken with a 'bad purpose.'" *Bryan v. United States*, 524 U.S. 184, 191 (1998) (citation omitted). An official who updates a list because HAVA tells him to acts with no such purpose. And if the statutes really did conflict, the specific list-maintenance commands of the NVRA and HAVA would create an exception to Section 302's general prohibition, not the reverse. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("To eliminate the contradiction, the specific provision is construed as an exception to the general one.").

The United States is not alone in taking this position. A majority of judges on the Sixth Circuit have concluded that Title III of the CRA can

be harmonized with the list-maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another. *See Benson III*, 187 F.4th at 466-468 (Murphy, J., concurring), 473-474 (Griffin, J., dissenting), 479 n.7 (Thapar, J., dissenting); *Benson II*, 179 F.4th at 485-486 (Nalbandian, J., dissenting) (explaining that these provisions can easily be harmonized without resorting to an "implied repeal" of Section 301 as applied to SVRLs).

## III. No privacy law bars production.

The district court also did not reach the Secretary's arguments regarding federal privacy laws (JA6 n.3), but these arguments are likewise meritless. West Virginia's duty to comply with Title III is independent of any duty the United States has to comply with the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896, or the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899. Even if the United States' compliance were lacking—and it is not—West Virginia's obligations under Title III are separate from, and not dependent on, the United States' obligations under other federal laws. *See United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement

of an IRS summons”). Regardless, though, the United States is complying with federal privacy laws.

### A. The United States’ demand does not create a constitutional concern.

West Virginia invoked the constitutional avoidance canon below to support its interpretation that Title III does not cover the United States’ request for the SVRL. “If the Government’s present demands were deemed permissible under Title III,” West Virginia argued, “then serious constitutional concerns would arise” because the “‘fundamental right to vote is substantially burdened’ by laws that require disclosure of private information such as Social Security numbers.” JA121 (quoting *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993)). West Virginia’s reliance on *Greidinger* was misplaced, however. In *Greidinger*, Virginia included voters’ Social Security numbers in voter registration records that were open to public inspection, and therefore effectively conditioned a voter’s right to vote on the *public* disclosure of his *full* Social Security number. 988 F.2d at 1355. This Court deemed that “an intolerable burden on [the right to vote] as protected by the First and Fourteenth Amendments.” *Ibid.*

The Attorney General's request for the last four digits of voters' Social Security numbers for internal government use is not analogous. Indeed, this Court made clear in *Greidinger* that if Virginia's scheme "provided for only the receipt and internal use of the SSN by Virginia, no substantial burden would exist." 988 F.2d at 1354 n.10. That is the situation at hand here as the CRA, by its own terms, generally precludes the Attorney General and his employees or representatives from "disclos[ing]" the SVRL. 52 U.S.C. 20704.

**B. The United States is complying with the Privacy Act.**

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896). The Secretary invokes the provision barring an agency from maintaining records "describing how any individual exercises rights guaranteed by the First Amendment." 5 U.S.C. 552a(e)(7); *see* JA122-123. That provision does not apply when the record is "pertinent to and within the scope of an authorized law enforcement

activity."[7] 5 U.S.C. 552a(e)(7). Enforcing Section 302's criminal prohibition on willfully destroying or altering covered records, 52 U.S.C. 20702, and the NVRA's and HAVA's list-maintenance requirements, 52 U.S.C. 20510(a), 21111, is such an activity. However, the United States agrees that certain information, like an individual's party affiliation and how that individual votes (including for which party), both "describ[es] how an[] individual exercises" his First Amendment rights and is not "pertinent to" the DOJ's investigation. 5 U.S.C. 552a(e)(7). Accordingly, the United States will not object to a redaction of that information in the State's SVRL. Any argument that additional information cannot be provided due to the Privacy Act is an appropriate avenue for inquiry on remand in tailoring the order of production.

---

[7] The *Common Cause* court read the law-enforcement exception narrowly, faulting the DOJ for seeking "to investigate every single registered voter without any specific reason to believe that they committed voter fraud or that their state violated the NVRA or HAVA." *Common Cause v. United States Dep't of Just.*, No. 1:26-cv-1352 (SLS), 2026 WL 3033772, at *34 (D.D.C. Oct. 9, 2026). But the United States is investigating States' list-maintenance compliance, not "registered voter[s]," and Title III requires no "specific reason to believe" a violation has occurred. *Ibid.*; *see* pp. 25-26, *supra*; *cf. United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950).

To the extent the Secretary contends that the United States failed to provide a System of Records Notice (SORN), he is wrong. *See* JA123. The United States has published a full list of routine uses for its collection of voter information, which can be found in the SORN titled JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept . . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers the NVRA, HAVA, and the CRA as statutes for routine use.[8]

---

[8] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited Oct. 22, 2026).

No more persuasive is the Secretary's argument that this SORN's identification of "the categories of individuals on whom records are maintained in the system," 5 U.S.C. 552a(e)(4)(B), cannot be read to include all registered West Virginia voters. *See* JA273-274. The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted), which includes anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Just. Manual § 9-11.151 (2020). Persons who appear in an SVRL are "[s]ubjects of investigations," 68 Fed. Reg. at 47,611, as their voter registrations are within the scope of the Division's investigation into West Virginia's list-maintenance practices.[9] Moreover, because votes cast by eligible voters may be diluted by those cast by ineligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594

[9] The *Common Cause* court disagreed because the *Justice Manual* uses the term "subject" in the context of grand-jury proceedings. 2026 WL 3033772, at *29. But the *Justice Manual* provides merely one example of the term's broad ordinary meaning. *See Black's Law Dictionary* 1465 (8th ed. 2004) ("[t]he matter of concern").

U.S. 647, 672 (2021), eligible voters are potential "victims" of NVRA and HAVA non-compliance, 68 Fed. Reg. at 47,611. The *Common Cause* court dismissed that dilution harm as "pure speculation." *Common Cause v. United States Dep't of Just.*, No. 1:26-cv-1352 (SLS), 2026 WL 3033772, at *29 (D.D.C. Oct. 9, 2026). But *Brnovich* recognizes the dilutive harm that unlawful votes work on lawful ones. 594 U.S. at 672. The Privacy Act therefore provides no alternative basis to affirm the district court.

### C. The United States is complying with the E-Government Act.

The Secretary also argued below that the DOJ was barred from inspecting West Virginia's SVRL because it failed to comply with the E-Government Act. JA274. Section 208 requires a privacy impact assessment before an agency initiates a "new collection of information." E-Government Act of 2002, Pub. L. No. 107-347, § 208, 116 Stat. 2921-2922 (44 U.S.C. 3501 note) (hereinafter cited without reference to the Statutes at Large or the U.S. Code note). A "collection of information" means obtaining "answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, ten or more persons." 44 U.S.C. 3502(3)(A)(i). The privacy impact assessment requirement does not apply here for several reasons.

First, the Attorney General has not asked identical questions of nor imposed any reporting requirements on any persons in connection with his demand for West Virginia's SVRL. E-Government Act § 208(b)(1)(B)(i). A demand for a copy of a pre-existing document does not impose a "reporting requirement." Authority to Obtain & Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 31-32), https://www.justice.gov/olc/media/1440346/dl; *cf.* 31 U.S.C. 5314(a) (calling for a reporting requirement for individuals "to keep records, file reports, or keep records and file reports" whenever individuals engage in transactions or maintain relationships with "any person with a foreign financial agency").

Second, a "collection of information" does not include information collected during an investigation like the one the DOJ is carrying out here. "The term 'collection of information' . . . shall not include a collection of information described under [44 U.S.C. 3518(c)(1)]." 44 U.S.C. 3502(3)(B); *see* E-Government Act § 201. And Section 3518(c)(1)(B), in turn, excludes any collection of information "during the conduct of . . . an . . . investigation involving an agency against specific individuals or entities." 44 U.S.C. 3518(c)(1)(B). The DOJ's investigation

into West Virginia's compliance with HAVA falls squarely within this carve-out. *See* 50 Op. O.L.C., *supra* (slip op. at 33).[10]

Third, the Attorney General has not "initiat[ed] a new collection of information." E-Government Act § 208(b)(1)(A)(ii) and (B)(i). The Act defines neither "initiating" nor "new," so both carry their ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). To "initiate" is "[t]o begin, commence, enter upon." *Electronic Priv. Info. Ctr. v. United States Dep't of Com.*, 356 F. Supp. 3d 85, 89 (D.D.C.) (brackets in original; citation omitted), *vacated and remanded on other grounds*, 928 F.3d 95 (D.C. Cir. 2019). Something is "new" if it has "come into being only a short time ago" or was "[n]ever used . . . before now." *The American Heritage College Dictionary* 936 (4th ed. 2002).

---

[10] The *Common Cause* court believed the DOJ to be carrying out a "general investigation" under Section 3518(c)(2) as opposed to an investigation "against specific individuals or entities" under Section 3518(c)(1)(B) because the Attorney General demanded SVRLs from numerous States. 2026 WL 3033772, at *34-35 (citation and internal quotation marks omitted). But the word "specific" serves to distinguish between investigations targeting generic issues (such as a generic investigation into how to improve federal election laws) and investigations targeting identifiable individuals or entities who may have violated federal law (such as the investigation here). An investigation that targets "specific individuals or entities" does not become any less specific simply because, as here, its targets are numerous.

The demand in this case did not begin any new collection of information. The Attorney General demanded the Secretary provide the State's SVRL, which the State was required to "define[], maintain[], and administer[] at the State level." 52 U.S.C. 21083(a)(1)(A). Ever since the passage of HAVA, an SVRL must "contain[] the name and registration information of every legally registered voter in the State and assign[] a unique identifier to each legally registered voter in the State." *Ibid.*; *see generally* 52 U.S.C. 21083(a). Seeking information already maintained by the State due to *pre-existing* "reporting or recordkeeping requirements," 44 U.S.C. 3502(3)(A)(i) (defining "collection of information"), is not the "*initiat*[*ion* of] a *new* collection of information," E-Government Act § 208(b)(1)(A)(ii) (emphasis added).

### D. The Driver's Privacy Protection Act does not prevent the DOJ from obtaining data supporting its claims.

The Secretary also invoked the Driver's Privacy Protection Act (DPPA), 18 U.S.C. 2721 *et seq.*, but it does not limit the United States' ability to obtain the requested SVRL. JA123; JA274-275. Although the DPPA generally prohibits the disclosure of "personal information" obtained by a state department of motor vehicles in connection with a motor-vehicle record, *see* 18 U.S.C. 2721(a) and (c), 2725(1) and (3)-(4),

disclosure is allowed "[f]or use by any government agency . . . in carrying out its functions," including law enforcement or other regulatory enforcement purposes. 18 U.S.C. 2721(b)(1); *see also Reno v. Condon*, 528 U.S. 141, 145 & n.1 (2000) ("The DPPA *permits* DMVs to disclose personal information from motor vehicle records for a number of purposes," including "for use 'by any government agency . . . in carrying out its functions.'" (quoting 18 U.S.C. 2721(b)(1))).

The United States' demand for an electronic, unredacted copy of West Virginia's SVRL falls squarely within this exception. The DOJ is a "government agency . . . carrying out [one of] its functions," 18 U.S.C. 2721(b)(1), namely assessing and ensuring compliance with federal election statutes. *See* 52 U.S.C. 20510(a) (authority to enforce the NVRA); 52 U.S.C. 21111 (authority to enforce HAVA). In particular, the DOJ is verifying voter registration records and associated list-maintenance activities by state and local entities. Under the governmental-function exception in Section 2721(b)(1), the United States' use of and access to the SVRL is authorized even though some of the information originates from a motor-vehicle record.

### E. Federal law preempts West Virginia's redaction statute.

West Virginia law permits public examination of voter registration records but bars disclosure of a registrant's Social Security number and driver's license number. W. Va. Code § 3-2-30(a) (2026).

The Elections Clause, on which the Secretary relies (JA106-107), does not help him. A State's authority over federal elections "has always existed subject to the express qualification that it 'terminates according to federal law.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) (citation omitted). To the extent West Virginia law would bar production of records within the scope of Sections 301 and 303, it must yield, because "federal law preempts state law when the two conflict." *Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023); *see* U.S. Const. Art. VI, Cl. 2; *Foster v. Love*, 522 U.S. 67, 69 (1997). But in any event, there is no conflict because West Virginia's statute governs public inspection. Section 304 forbids public disclosure of anything the Attorney General obtains. 52 U.S.C. 20704; *see* pp. 35-36, 51-52, *supra* (distinguishing public inspection under the NVRA from Title III inspection by the Attorney General). Thus, the Attorney

General's inspection does not run afoul of West Virginia's redaction statute.

The Northern District of Georgia reached a contrary conclusion in *United States v. Raffensperger*, No. 1:26-cv-485-VMC, 2026 WL 3002013, at *9 (N.D. Ga. Sept. 30, 2026), but that decision is wrong. *Raffensperger* construed a Georgia statute exempting certain identifiers from public inspection, Ga. Code Ann. § 21-2-225(b) (West 2026), and read into Title III an unwritten exception permitting redaction whenever state law shields a record from public view. *Raffensperger*, 2026 WL 3002013, at *3, *8-9. Title III contains no such exception, and the Georgia statute—like West Virginia's—says nothing about a demand by the Attorney General, who may not disclose what he obtains except as Section 304 allows. 52 U.S.C. 20704. Under *Raffensperger*'s reading, the States that moved in the 1950s to destroy their registration records could have placed those records beyond Sections 301 and 303 simply by declaring them confidential.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order granting the Secretary's Motion to Dismiss and denying the

United States' Motion to Compel Production, and remand with instructions to order the Secretary immediately to produce the requested unredacted SVRL.

Further, because the district court's application of an erroneous framework has deprived the DOJ of the "prompt and expeditious inspection" that is required under Title III, the "mandate of this Court sh[ould] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b).

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that it is in all parties' interest to obtain a decision from this Court quickly. Accordingly, the United States is willing to waive oral argument, despite the great importance of the issues here, to allow faster resolution of this case. Of course, the United States will participate in oral argument, if the Court believes that the benefit of oral argument would outweigh the other concerns.

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

s/ Michael T. Hayes
ANDREW G. BRANIFF
DAVID N. GOLDMAN
MICHAEL T. HAYES
BENJAMIN E. SACHRISON
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 805-7671

Date: October 26, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because the brief contains 12,869 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Michael T. Hayes
MICHAEL T. HAYES
Attorney

Date: October 26, 2026