No. 26-2262

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellant

v.

KRIS WARNER, in his Official Capacity as West Virginia Secretary of State,
Defendant-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

# JOINT APPENDIX
(VOLUME 1 OF 1)

MICHAEL R. WILLIAMS
Solicitor General

CALEB A. SECKMAN
Assistant Solicitor General
West Virginia Attorney General's Office
State Capitol Building
1900 Kanawha Boulevard East
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
(304) 558-2021

*Counsel for Kris Warner*

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
MICHAEL T. HAYES
BENJAMIN E. SACHRISON
Attorneys Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
Michael.Hayes6@usdoj.gov
(202) 805-7671

*Counsel for the United States of America*

# TABLE OF CONTENTS

**PAGE**

Memorandum Opinion and Order, filed July 13, 2026 (Doc. 56) ............ 1

Order Granting Motion for Entry of Judgment,
filed September 28, 2026 (Doc. 64) ............ 17

District Court Docket ............ 18

Complaint, filed February 26, 2026 (Doc. 1) ............ 27

United States' Motion to Compel Federal Election Records
Under the Civil Rights Act of 1960, filed April 3, 2026
(Doc. 14) ............ 35

Declaration of Eric Neff in Support of Motion to Compel,
filed April 3, 2026 (Doc. 14-1) ............ 38

Letter from the DOJ to Secretary Warner,
dated September 8, 2025 (Doc. 14-2) ............ 42

Letter from Secretary Warner to the DOJ,
dated September 22, 2025 (Doc. 14-3) ............ 45

Consent Judgment and Order (*U.S. v. North Carolina State Board of Elections, et al.*), filed April 3, 2026 (Doc. 14-4) ............ 52

Complaint (*U.S. v. State of Georgia and Cathy Cox*),
filed April 3, 2026 (Doc. 14-5) ............ 65

Consent Judgment and Decree (*U.S. v. State of Georgia and Cathy Cox*), filed April 3, 2026 (Doc. 14-6) ............ 70

Memorandum of Understanding (Texas), filed April 3, 2026
(Doc. 14-7) ............ 77

**TABLE OF CONTENTS (continued): PAGE**


United States' Memorandum Supporting its Motion to Compel Federal Election Records, filed April 3, 2026 (Doc. 15)................79

Defendant Kris Warner's Motion to Dismiss, filed April 29, 2026 (Doc. 24)....................................................100

Exhibit A (Letter from Secretary Warner to the DOJ), dated February 11, 2026 (Doc. 24-1)..........................................101

Defendant Kris Warner's Memorandum of Law in Support of Motion to Dismiss, filed April 29, 2026 (Doc. 25).......................105

Defendant Kris Warner's Response to Plaintiff's Motion to Compel, filed April 29, 2026 (Doc. 26) ........................................127

United States' Memorandum in Response to Defendant's Motion to Dismiss and in Reply to Defendant's Opposition to Motion to Compel, filed May 13, 2026 (Doc. 39)..........................145

Second Declaration of Eric Neff, filed May 13, 2026 (Doc. 39-1) .........180

Defendant's Second Status Report (*U.S. v. North Carolina State Board of Elections, et al.*), filed May 13, 2026 (Doc. 39-2)......................................................................185

Order (*U.S. v. North Carolina State Board of Elections, et al.*), filed May 13, 2026 (Doc. 39-3)..................................................187

Supplemental Consent Decree, Judgment, and Order (*U.S. v. State of Maine and Matthew Dunlap*), filed May 13, 2026 (Doc. 39-4)......................................................................196

Stipulation and Order (*U.S. v. State of New Jersey and Stuart Rabner*), filed May 13, 2026 (Doc. 39-5) .....................................209

**TABLE OF CONTENTS (continued): PAGE**

Consent Decree and Order (*U.S. v. State of Indiana, Kristi Robterson, and Bradley King*), filed May 13, 2026 (Doc. 39-6) ........ 220

United States' Motion to Amend Consent Decree, filed May 13, 2026 (Doc. 39-7) ........ 228

Order (*U.S. v. State of Indiana, Kristi Robertson, and Bradley King*), filed May 13, 2026 (Doc. 39-8) ........ 233

Complaint (U.S. v. State of Alabama and Beth Chapman), filed May 13, 2026 (Doc. 39-9) ........ 235

Complaint (*U.S. v. State of Vermont and Deborah Markowitz*), filed May 13, 2026 (Doc. 39-10) ........ 239

Letter from the DOJ to Karen Pachuta, dated October 26, 2021 (Doc. 39-11) ........ 243

To Assure Pride and Confidence in the Electoral Process, filed May 13, 2026 (Doc. 39-12) ........ 245

Letter from the DOJ to Sheriff Curry, dated April 2, 2009 (Doc. 39-13) ........ 254

Defendant Kris Warner's Reply Memorandum in Support of Motion to Dismiss, filed May 20, 2026 (Doc. 49) ........ 256

Motion for Entry of Judgment, filed August 6, 2026 (Doc. 59) ........ 277

Notice of Appeal, filed September 9, 2026 (Doc. 61) ........ 279

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

THE UNITED STATES OF AMERICA,

Plaintiff,

v. CIVIL ACTION NO. 2:26-cv-00156

KRIS WARNER,
*in his Official Capacity as*
*West Virginia Secretary of State,*

Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is a Motion to Compel Federal Election Records filed by the United States ("Plaintiff"). (ECF No. 15.) Also pending before the Court is a Motion to Dismiss filed by Defendant Kris Warner ("Defendant"). (ECF No. 24.) For the following reasons, the Court **DENIES** Plaintiff's Motion to Compel Production, (ECF No. 15), and **GRANTS** Defendant's Motion to Dismiss, (ECF No. 24).

## *I. BACKGROUND*

This action is one of the many lawsuits brought by the federal government against numerous states throughout our nation.[1] It stems from repeated requests by the Attorney General

[1] Thus far, eleven federal district courts and one court of appeals have now dismissed Plaintiff's lawsuits on motions similar to the ones pending before this Court. No court has ruled in favor of the United States to date. *See United States v. Benson*, No. 26-1225, 2026 WL 1815425 (6th Cir. June 24, 2026); *United States v. Schmidt*, No. 2:25-cv-01481-CB, 2026 WL 1850016 (W.D. Pa. June 27, 2026); *United States v. Scanlan*, No.25-cv-371-JL, 2026 WL 1864054 (D.N.H. June 29, 2026); *United States v. Demarinis*, No. CV SAG-25-3934, 2026 WL 1780586 (D. Md. June 18, 2026); *United States v. Wis. Elections Comm'n*, ––– F. Supp. 3d ––––, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, ––– F. Supp. 3d ––––, 2026 WL 1430481 (D. Me. May 21, 2026); *United States*

of the United States for the West Virginia Secretary of State to turn over an unredacted copy of West Virginia's statewide voter registration list ("SVRL"). Like many other states, Defendant has steadfastly denied these requests.

It started on September 8, 2025, when Plaintiff sent a letter to Defendant seeking a copy of West Virginia's SVRL. (ECF No. 1 at 5, ¶ 20.) The information requested therein includes individuals' full name, date of birth, address, and driver's license or the last four digits of their social security number "as required under [the Help America Vote Act] to register individuals for federal elections." (*Id.* at ¶ 22 (citing 52 U.S.C. § 21083(a)(5)(A)(i)).) Plaintiff claims the letter indicated that the basis of the demand was the Civil Rights Act of 1960 ("CRA"), whereas the purpose of the request was to assess West Virginia's compliance with the maintenance provisions of the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). (ECF No. 39 at 8.) On September 22, 2025, Defendant categorically denied this request. (ECF No. 1 at 6.)

In response, on December 10, 2025, December 19, 2025, and January 13, 2026, the Attorney General sent follow-up emails renewing the request for a copy of West Virginia's SVRL. (*Id.*) Again, on February 11, 2026, Defendant sent a letter maintaining the position that he would not be adhering to the request in any degree. (*See id.*)

Consequently, on February 26, 2026, Plaintiff initiated this lawsuit. (*See id.* at 1.) The Complaint asserts that, by withholding the requested information, Defendant is violating the CRA.

---

*v. Fontes*, ––– F. Supp. 3d ––––, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, ––– F. Supp. 3d ––––, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, ––– F. Supp. 3d –––-, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *United States v. Oregon*, ––– F. Supp. 3d ––––, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026).

(*Id*. at 6–8.) Plaintiff asks the Court to (1) declare that Defendant's alleged wrongful concealment of information violates the CRA; and (2) subsequently order Defendant to relinquish West Virginia's SVRL and other federal election records demanded by the Attorney General to ascertain Defendant's compliance with HAVA and the NVRA. (*Id.*)

Plaintiff then filed the pending Motion to Compel Federal Election Records on April 3, 2026. (ECF No. 14.) Defendant filed a response, (ECF No. 26), and Plaintiff replied, (ECF No. 49). Defendant subsequently filed the pending Motion to Dismiss on April 29, 2026. (ECF No. 24.) Plaintiff filed a response, (ECF No. 39), and Defendant replied, (ECF No. 49).

As such, these motions are fully briefed and ripe for adjudication.

## *II. LEGAL STANDARD*

As an initial matter, the parties dispute the appropriate standard for this case. According to Plaintiff, it is entitled under Title III of the CRA to a "special statutory proceeding" on its Motion to Compel Production, under which the Court plays a "limited" role. (ECF No. 15 at 5.) Defendant argues that the Federal Rules of Civil Procedure ("FRCP") govern this case, and that Plaintiff is not entitled to any sort of alternative proceeding. (ECF No. 26 at 9.) The Court agrees with Defendant.

The Federal Rules of Civil Procedure "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute, *except as otherwise provided by statute*, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5) (emphasis added). Nothing in the text of Title III of the CRA establishes a special statutory proceeding. *See* 52 U.S.C. § 20701 et seq.; *accord Weber*, 816 F. Supp. 3d at 1182; *Oregon*, 2026 WL 318402, at *8 (confirming "[t]here is no current or

binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III"). Rather, the CRA simply provides that a district court "shall have jurisdiction by *appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added).

The statute does not define what an "appropriate process" might entail. Plaintiff nevertheless relies primarily on *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962) to support its position that the "appropriate process" contemplated by statute requires a proceeding in which the Court's autonomy is "severely limited." (ECF No. 15 at 4.) That reliance is misplaced. Two years after *Lynd*, the Supreme Court interpreted identical language in a similar statute and held that because that statute "contains no provision specifying the procedure to follow in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). The Fourth Circuit has applied *Powell* to other demands for records in the context of federal agencies. *See, e.g., United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 165–66 (4th Cir. 1988); *E.E.O.C. v. Md. Cup Corp.*, 785 F.2d 471, 475–76 (4th Cir. 1986).

As such, the Court will evaluate Plaintiff's Motion to Compel under the same standard applicable to Defendant's Motion to Dismiss brought pursuant to Rule 12(b)(6). A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint. Fed. R. Civ. P. 12(b)(6). A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007). A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint

does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In applying this standard, a court must utilize a two-pronged approach. First, it must separate the legal conclusions in the complaint from the factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged." *Id.*

Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.

## *III. DISCUSSION*

Plaintiff justifies its demand to acquire West Virginia's SVRL by invoking the alleged pressing necessity to investigate the State's compliance with list maintenance provisions of the NVRA and HAVA. (*See* ECF No. 1 at 5.) Plaintiff asserts its authority to obtain these records for investigation under Title III of the CRA. (*Id.*) Conversely, Defendant argues, *inter alia*, that Plaintiff has failed to show its entitlement to West Virginia's SVRL under Title III of the CRA[2]

[2] The Court assumes without deciding, for purposes of its analysis, that an electronic SVRL is a record subject to the retention and demand provisions of Title III. 52 U.S.C. §§ 20701, 20703; *but see Demarinis,* 2026 WL 1780586, at *5 (concluding that "an SVRL is not a record or paper that a state must produce to the United States under the CRA.")

because (1) it failed to provide a factual basis for its demand, and (2) the stated purpose of the demand falls outside of Title III's scope.[3] As discussed below, the Court agrees with Defendant.

### *A. Basis and Purpose*

This case presents the question of whether the Attorney General of the United States is permitted, by law, to obtain West Virginia's SVRL. To answer this, the Court's analysis must remain tethered to the text of Title III of the CRA. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 184 (2004) (explaining that statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous" (citations omitted)). If a statute does not define a term, the Court gives the term its ordinary meaning. *EPA v. Calumet Shreveport Refin., L.L.C.*, 605 U.S. 627, 638 (2025). Under this first "cardinal canon" of construction, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54 (1992).

To that extent, Title III of the CRA sets out certain requirements regarding federal election records, and penalizes the theft, destruction, or alteration of those records. *See* 52 U.S.C. §§ 20701, 20702. Of relevance, the CRA mandates that "[a]ny record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative . . . be made available for inspection, reproduction, and copying." *Id*. § 20703 (emphasis added.) The statute commands that the written demand "*shall* contain a statement of the *basis and the purpose therefor*." *Id.* (emphasis added).

[3] Defendant also argues that (1) the demand seeks information not covered by Title III; (2) if Plaintiff's requests were honored, three federal privacy laws would be violated in the process; and (3) West Virginia law prohibits the unredacted disclosure sought. (ECF No. 25 at 6.) Because the Court concludes that Plaintiff's Complaint failed to contain a statement of the basis and purpose for the demand as required by law, the Court does not need to reach Defendant's remaining arguments.

The central question then becomes how to construe the statute's distinct requirements of providing a description of the "basis" and "purpose" of the demand.

**1. Plaintiff's Demand Lacks a Sufficient Statement of its Basis**

Plaintiff's demand fails to include a factual basis, as required by Title III.[4] The letter begins with an overview of the Attorney General's authority to request and obtain West Virginia's SVRL under the NVRA, HAVA, and Title III of the CRA. (ECF No. 14-2 at 1–3.)[5] The letter then specifically references the CRA by stating: "Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of West Virginia's complete and current VRL. The purpose of this request is to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." (ECF No. 14-2 at 1–3.)

Clearly, this demand is devoid of any factual basis. The demand includes no indication that West Virginia is suspected to be noncompliant with the list maintenance requirements of HAVA or the NVRA, nor does it point to any anomalies in West Virginia's voter registration data. Indeed, the letter contains the term "purpose" but does not use the word "basis," or provide any equivalent explanation supporting the necessity of the records request. *See Galvin*, 2026 WL 972129, at *4 (taking into consideration the fact that neither the word "basis" nor any equivalent

[4] To determine whether the written demand provided a statutorily acceptable "basis," the Court is directed to the contents of the written demand. *See Galvin*, 2026 WL 972129, at *9 (finding that the statute directs the Court to the Attorney General's written demand—rather than Plaintiff's subsequent court filings—to determine whether that demand contained a statement of the basis for the demand).

[5] In considering a motion to dismiss, the Court "should properly take judicial notice of its own records[.]" *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir.1990); *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 Fed. App'x. 200 (4th Cir. 2016) (finding that courts can "'take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment.'"). The Complaint incorporates by reference the September 8, 2025, letter, (*see* ECF No. 1, ¶ 8), which was submitted as an exhibit to Plaintiff's Motion to Compel, (ECF No. 14-2 at 1–3).

term was included in the demand letter). Plaintiff nevertheless offers several theories on how this demand did provide a factual basis, which all fail.

To start, Plaintiff claims the legally justifiable basis of its demand is the CRA itself. (ECF No. 1, ¶ 21.) Plaintiff insinuates that the term "basis" in Title III refers to the legal basis for the investigation, rather than a factual basis supporting its pursuit. (*See* ECF No. 15 at 10.) Consequently, a permissible statement of the basis for the demand could just be a recitation of the statute itself.

The Court disagrees. This circular interpretation contravenes practical principles of statutory analysis by disregarding the ordinary meaning of the language employed by Congress. *See Engine Mfrs. Assn. v. South Coast Air Quality Management Dist*., 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks omitted)). Title III does not define the term "basis," so it must be given its ordinary meaning. *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995) (citation omitted). A basis is "an underlying *fact* or condition." *Basis*, BLACK'S LAW DICTIONARY (12th ed. 2024) (emphasis added); *see also Basis*, Merriam-Webster (2026), https://www.merriam-webster.com/dictionary/basis (last visited June 20, 2026) (providing that "basis" refers to "something on which *something else* is established or based") (emphasis added)). Thus, at bottom, the statute requires a statement providing some factual support as to why the Attorney General demands production of the requested records. *See Weber*, 816 F. Supp. 3d at 1184 (noting that the basis-and-purpose requirement precludes Plaintiff

from "embark[ing] on a fishing expedition of voter records in any state . . . without identifying a single issue with the state's policies beforehand").

Moreover, if Congress sought to direct the Attorney General to simply reference the statute itself in order to invoke its authority, "requiring the letter to contain a 'statement of the basis … therefor' would not be the obvious way to do so." *See Galvin*, 2026 WL 972129, at *5. In other statutes Congress provides express instructions for agencies to identify the legal authority underlying their actions. *See, e.g.*, 5 U.S.C. § 553(b)(2) (requiring notice of proposed rulemaking to include "reference to the *legal authority* under which the rule is proposed") (emphasis added)); 8 U.S.C. § 1229(a)(1)(B) (requiring notice to appear for removal proceedings to "specify[] . . . [t]he *legal authority* under which the proceedings are conducted") (emphasis added)). Thus, *if* Congress had intended to impose the requirement of a mere citation to statutory authority, it "knew exactly how to do so." *See SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 138 S. Ct. 1348, 200 L. Ed. 2d 695 (2018) (declining to confer a particular authority that Congress did not expressly provide because Congress "knew exactly how to do so" in other statutes).

Instead, the Court adopts the reasoning within the many decisions that have rejected Plaintiff's position and found that the "basis" contemplated by Title III is a factual, not legal basis. *See Weber*, 816 F. Supp. 3d at 1184; *Oregon*, 2026 WL 318402, at *8–9; *Galvin*, 2026 WL 972129, at *4. This interpretation also aligns with the Attorney General's contemporaneous practice following Title III's enactment to include an express statement of facts to support the grounds of the demand. *Lynd*, 306 F.2d at 229 n.6 (observing compliance with the requirements of Title III when a written demand stated the records request was "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been

made with respect to registration and voting within your jurisdiction[.]"); *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (same); *In re Coleman*, 208 F. Supp. at 199–200 (same). To that extent, the letter did not contain a *factual* basis, as discussed above.

Alternatively, Plaintiff contends that the letter did provide a factual basis for the demand. (ECF No. 15 at 10.) Specifically, Plaintiff claims that West Virginia's SVRL was needed "to provide the means" to assess compliance with the SVRL maintenance provisions of the NVRA and HAVA. (*Id.*) This alleged basis is likewise insufficient under Title III given that Plaintiff also maintains that the purpose of the request was to "ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." (*Id.*) In other words, Plaintiff contends both the written demand's basis and purpose are completely identical. The statutory text clearly forecloses this interpretation by conveying that "the basis" and "the purpose" are conceptually distinct. *Galvin*, 2026 WL 972129, at *4.

The statute commands that the written demand "*shall* contain a statement of the *basis and the purpose therefor*." § 20703 (emphasis added.) "Shall" and "and" are important words in § 20703. *See Benson*, 2026 WL 1815425, at *8. "The use of the word 'shall' creates an obligation impervious to judicial discretion." *Smith v. Spizzirri*, 601 U.S. 472, 476, 144 S.Ct. 1173, 218 L.Ed.2d 494 (2024) (citation omitted). "And, in grammatical terms, is of course a conjunction … whose function is to connect specified terms." *Pulsifer v. United States*, 601 U.S. 124, 133, 144 S.Ct. 718, 218 L.Ed.2d 77 (2024). Thus, "[o]n its plain terms, this construction signals that 'basis' and 'purpose' are separate, non-overlapping requirements, each of which must independently be satisfied." *Scanlan*, 2026 WL 1864054, at *6. Accepting Plaintiff's interpretation would compound "the basis" requirement into "the purpose" and essentially read the

word "basis" out of the statute. *Cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007) (cautioning "against reading a text in a way that makes part of it redundant"). Further, as discussed more fully below, Plaintiff's explanation—whether labeled as a basis or a purpose—fails.

Rather, only *after* this litigation began did Plaintiff attempt to provide factual justifications for its requests by citing how recent out of state enforcement efforts demonstrate the need for broader federal scrutiny. (*See* ECF No. 39-1 at 3.) Plaintiff points to instances in which North Carolina election officials admitted that the state was not maintaining records in compliance with HAVA. (ECF No. 39 at 8.) However, those assertions do not cure the factual deficiencies within the initial demand, nor does it identify any comparable concerns regarding West Virginia's list registration requirements.[6]

Accordingly, applying this textual framework to Plaintiff's letter, the Court finds that the demand fails to satisfy § 20703's basis requirement.

**2. Plaintiff's Demand Lacks a Valid Purpose**

Plaintiff's September 8 letter did contain an explicit statement of the purpose for its Title III demand: "to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." (ECF No. 14-2 at 2.) Yet, Defendant argues that Plaintiff's stated purpose is insufficient because it is unrelated to the purpose of Title III, which is to protect against the infringement or denial of voting rights. (ECF No. 25 at 12.) Plaintiff responds that (1) Title III authorizes demands to investigate violations of any federal statute and does not require a nexus

[6] Plaintiff also provides consent decrees for instances in which it sought records in other states to assess compliance with HAVA and the Voting Rights Act. (*See* ECF No. 39-1 at 3–5.) However, these were voluntary agreements that did not test the legality of the requests generally.

between the demand and the purpose of the CRA, and (2) enforcing list maintenance compliance with HAVA and the NVRA is compatible with securing an individual's right to vote. (*See* ECF No. 39 at 13–14.)

Whether Plaintiff's stated "purpose" can be as all-encompassing as it protests is ultimately a question of statutory interpretation.[7] Congress required that a records request under Title III "shall" include a statement of "the" purpose underlying that demand. *See* 52 U.S.C. § 20703. "The use of the word 'shall' creates an obligation impervious to judicial discretion." *Smith v. Spizzirri*, 601 U.S. 472, 476, 144 S.Ct. 1173, 218 L.Ed.2d 494 (2024) (citation omitted). Thus, "[i]f any purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function." *Oregon*, 2026 WL 318402, at *8. The Court declines to read Title III so broadly as to render an express statutory obligation void of any authoritative meaning. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (citation modified)).

Because the "purpose" requirement cannot be satisfied by a blanket statement to a potential violation of any federal law, the Court must determine what Congress intended "purpose" in Title III to entail. In doing so, the Court looks to Title III's text together with the legislative backdrop against which Congress enacted the statute. *Cf. Turner v. Littleton-Lake Gaston Sch. Dist.*, 442 F.2d 584, 587 (4th Cir. 1971) ("In determining the purpose of legislation, it is appropriate to consider not only the effect of the legislation itself, but also the history and setting out of which the legislation arose."); *United States v. Hernandez*, 173 F.4th 94, 98 (4th Cir. 2026) ("Interpreting

[7] The ordinary understanding of "purpose" means "[a]n objective, goal, or end[.]" *See Purpose*, BLACK'S LAW DICTIONARY (12th ed. 2024).

the plain language of a statute requires looking to both the 'specific context in which the language is used, and the broader context of the statute as a whole.'") (citation omitted)).

Title III of the CRA of 1960 was passed in the midst of the Jim Crow era, "to help end voting discrimination." *See Benson*, 2026 WL 1815425, at *7; *see also* H. Rep. 86-956, at 7 (1959) ("The purpose of title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race.") Congress enacted Title III of the CRA to strengthen enforcement of the Civil Rights Act of 1957 by requiring the maintenance and preservation of specific records to facilitate the investigation of allegations of discrimination in voter registration. *See* Pub. L. No. 85-315, 71 Stat. 634 (1957). Following its passage, Courts observed that Title III was "designed to secure a more effective protection of the right to vote." *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom*, *Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *Lynd*, 306 F.2d at 228 ("[O]ne of the clearest purposes of the Title III proceeding is to enable the Attorney General to assemble all of the voter record information . . . relating to all persons as to whom there is a question concerning infringement or denial of their constitutional voting rights.")

Reading Title III in light of that historical context, the Court finds that "the 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10. While Plaintiff argues that assessing compliance with HAVA and the NVRA does align with this purpose, Plaintiff's only apparent motivation to assess list maintenance compliance involves generalized nationwide concerns that voter registration records may contain too many names. (*See* ECF No. 39 at 8.) ("As a result of the Attorney General's enforcement action, North Carolina has reduced the number

of voter records missing an identification number under HAVA from 103,329 to 70,709.") The potential failure on behalf of an unrelated state to purge voter records does not automatically fall within the bounds of Title III. *See Bruce*, 298 F.2d at 863, n.2 (observing that evidence concerning a state's failure to remove voters who died or relocated was "a matter which does not bear any particular importance to the present [Title III] inquiry"). Rather, Plaintiff must state a "purpose" that relates to an investigation into potential violations of an individual's right to vote. It has not done so.

Nonetheless, even if investigating compliance with the NVRA or HAVA were valid purposes for seeking voter registration lists, Plaintiff does not provide any reasonable explanation for why obtaining highly sensitive voter data serves those purposes. The NVRA and HAVA establish a comprehensive scheme governing the creation, maintenance, and enforcement of states' computerized SVRLs. *See* 52 U.S.C. § 20501, § 21083(a)(1)(A). The information Plaintiff is seeking pursuant to these statutes includes individuals' full name, date of birth, address, and driver's license or the last four digits of their social security number. (ECF No. 1 at ¶ 22.) Although the NVRA and HAVA authorize the Attorney General to "bring a civil action" against a state that has violated those provisions, *see* 52 U.S.C. §§ 20510(a), 21111, neither statute contemplates "the line-by-line audit of each state's computerized SVRL by the federal government to assess compliance with those provisions."[8] *Bellows*, 2026 WL 1430481, at *8.

---

[8] Despite basing the necessity of its investigation on ensuring compliance with the NVRA and HAVA, Plaintiff only brings this suit under Title III of the CRA. If Plaintiff wanted to enforce HAVA or the NVRA, there are avenues for it to do so pursuant to those specific statutes. *Bellows*, 2026 WL 1430481, at *8 ("If the Department of Justice wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in those statutes— which do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list.")

To the contrary, Courts have recognized that states are entitled to redact sensitive voter information, like social security numbers and birthdates, under the NVRA and that this information is not relevant to the removal of ineligible voters from voting rolls. *See Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711–12 (E.D. Va. 2010) ("[Social security numbers ("SSN")] are uniquely sensitive and vulnerable to abuse . . . . For that reason, a SSN disclosure requirement potentially undermines the voter registration goals of the NVRA."); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 733 (S.D. Miss. 2014). Thus, while the NVRA authorizes investigations into states' policies regarding reasonable voter list maintenance, it does not green light the form of "intrusive digging DOJ is proposing" here. *Weber*, 816 F. Supp. 3d at 1188.

Likewise, states are not required under HAVA to disclose SVRLs. *Id.* at 1190 ("HAVA simply contains no such [disclosure] provision. This ends the inquiry. And the fact that the NVRA and CRA do include such provisions signals that the omission in HAVA was intentional." (citing to *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 392 (2015)); *Oregon*, 2026 WL 318402, at *6 ("Congress knows how to include disclosure provisions, as it did so in both the NVRA and Title III. It did not do so here, and the Court will not play the role of Congress by adding one where it does not exist." (citing *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988))).

Thus, even if Plaintiff's stated purpose of assessing compliance with the NVRA and HAVA were sufficient, those statutes do not automatically entitle Plaintiff to the disclosure of the requested records. Regardless, because the demand letter did not include an adequate statement of its basis or purpose, as statutorily required, Plaintiff has failed to state a claim.[9] Therefore,

[9] Given the lack of an adequate basis or purpose, one is left to wonder what the real purpose was for the Justice Department to go to the trouble of filing civil actions like this one all around the nation. Troubling though this question is, it is not before the Court at this time.

Defendant's Motion to Dismiss under Rule 12(b)(6) is granted. For the same reasons, Plaintiff's Motion to Compel is denied.

## *IV. CONCLUSION*

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion to Compel Production (ECF No. 15) and **GRANTS** Defendants' Motions to Dismiss (ECF No. 24.)

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: July 13, 2026

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

THE UNITED STATES OF AMERICA,

Plaintiff,

v. CIVIL ACTION NO. 2:26-cv-00156

KRIS WARNER,
*in his Official Capacity as*
*West Virginia Secretary of State,*

Defendant.

**ORDER**

Pending before the Court is the United States of America's Motion for Entry of Judgment, (ECF No. 59.) The Court **GRANTS** the motion. Accordingly, the following motions, (ECF Nos. 21, 23, 30, 35, 38, 40, 41, 43, 44, 48, 52, and 54), are hereby **DENIED** as **MOOT**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: 9/28/2026

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

# 2:26cv156, The United States Of America V. Warner

US District Court Docket

United States District Court, West Virginia Southern

(Charleston)

**This case was retrieved on 10/18/2026**

## Header

**Case Number:** 2:26cv156
**Date Filed:** 02/26/2026
**Assigned To:** Judge Thomas E. Johnston
**Referred To:** Magistrate Judge Dwane L. Tinsley
**Nature of Suit:** Voting (441)
**Cause:** Federal Question: Other Civil Rights
**Lead Docket:** None
**Other Docket:** None
**Jurisdiction:** U.S. Government Plaintiff

**Class Code:** Closed
**Closed:** 09/28/2026
**Statute:** 28:1331
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Voting

## Participants

### Litigants

The United States of America
**Plaintiff**

### Attorneys

Brittany E. Bennett
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
UNITED STATES DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, Nw
Washington Dc, DC 20579
USA
202-704-5430 Email:Brittany.Bennett@usdoj.Gov

Christopher J. Gardner
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
UNITED STATES DEPARTMENT OF JUSTICE
150 M Street Ne
Washington, DC 20002
USA
202-812-2631 Email:Christopher.Gardner@usdoj.Gov

Eric Neff
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
UNITED STATES DEPARTMENT OF JUSTICE
Civil Rights Division Suite 8-142 150 M Street Ne
Washington, DC 20002
USA
202-532-3628 Email:Eric.Neff@usdoj.Gov

Harmeet K. Dhillon
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
UNITED STATES DEPARTMENT OF JUSTICE
4 Constitution Square, Room 8.141 150 M Street Ne
Washington, DC 20002
USA

| Litigants | Attorneys |
|---|---|
| | 202-704-5430<br><br>James T. Catania<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>UNITED STATES DEPARTMENT OF JUSTICE<br>8th Floor 150 M Street, Nw<br>Washington, DC 20001<br>USA<br>202-322-0312 Email:James.Catania@usdoj.Gov<br><br>James Thomas Tucker<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>UNITED STATES DEPARTMENT OF JUSTICE<br>4con 8th Floor 950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-307-2767 Email:James.T.Tucker@usdoj.Gov<br><br>Raymond Yang<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>UNITED STATES DEPARTMENT OF JUSTICE<br>8th Floor 150 M Street Ne<br>Washington, DC 20002<br>USA<br>202-316-3962 Email:Raymond.Yang@usdoj.Gov<br><br>Robert J. Keenan<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>UNITED STATES DEPARTMENT OF JUSTICE<br>4 Constitution Square, Room 8.141 150 M Street Ne<br>Washington, DC 20002<br>USA<br>202-704-5430<br><br>Joseph W. Voiland<br>ATTORNEY TO BE NOTICED<br>UNITED STATES DEPARTMENT OF JUSTICE<br>Civil Rights Division 4 Constitution Square 150 M Street Ne<br>Washington, DC 20002<br>USA<br>202-353-5318 Email:Joseph.Voiland@usdoj.Gov |
| Kris Warner<br>in his Official Capacity as West Virginia Secretary of State \|<br>**Defendant** | Caleb Allen Seckman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL<br>State Capitol Complex Building 6, Room 432 1900 Kanawha Boulevard East<br>Charleston, WV 25305<br>USA<br>304-558-2021 Email:Caleb.A.Seckman@wvago.Gov<br><br>Michael Ray Williams<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>WV ATTORNEY GENERAL'S OFFICE<br>Building 1, Room 26e 1900 Kanawha Boulevard, East<br>Charleston, WV 25305<br>USA<br>304-558-2021 Fax: 304-558-0140<br>Email:Michael.R.Williams@wvago.Gov |

| Litigants | Attorneys |
|---|---|
| West Virginia Alliance for Retired Americans<br>[Terminated: 07/15/2026]<br>**Movant** | Christina L. Smith<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>POWELL & MAJESTRO<br>Suite P-1200 405 Capitol Street<br>Charleston, WV 25301<br>USA<br>304-346-2889 Fax: 304-346-2895<br>Email:Csmith@powellmajestro.Com<br><br>Elisabeth C. Frost<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ELIAS LAW GROUP<br>Suite 400 250 Massachusetts Avenue Nw<br>Washington, DC 20001<br>USA<br>202-968-4513 Email:Efrost@elias.Law<br><br>Graham B. Platz<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>POWELL & MAJESTRO<br>Suite 807 405 Capitol Street<br>Charleston, WV 25301<br>USA<br>304-881-5885 Email:Gplatz@powellmajestro.Com<br><br>Julianna D. Astarita<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ELIAS LAW GROUP<br>Suite 400 250 Massachusetts Avenue Nw<br>Washington, DC 20001<br>USA<br>202-968-4509 Email:Jastarita@elias.Law<br><br>Lucas D. Lallinger<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>ELIAS LAW GROUP<br>Suite 400 250 Massachusetts Avenue Nw<br>Washington, DC 20001<br>USA<br>202-968-4508 Email:Llallinger@elias.Law |
| West Virginia Citizen Action Group<br>[Terminated: 07/15/2026]<br>**Movant** | Adriel I. Cepeda Derieux<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>915 15th Street Nw<br>Washington, DC 20005<br>USA<br>202-457-0800<br><br>Aubrey Sparks<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ACLU OF WEST VIRGINIA<br>P. O. Box 3952<br>Charleston, WV 25339<br>USA<br>304-202-3616 Email:Asparks@acluwv.Org |

| Litigants | Attorneys |
|---|---|
| | Daniel S. Lenz<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CAMPAIGN LEGAL CENTER<br>Suite 400 1101 14th Street Nw<br>Washington, DC 20005<br>USA<br>202-736-2200 Email:Dlenz@campaignlegalcenter.Org |
| | Justin Lam<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW<br>Suite 1100 777 6th Street Nw<br>Washington, DC 20001<br>USA<br>202-753-5911 Email:Lamju@brennan.Law.Nyu.Edu |
| | Maura Eileen O'Connor<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW<br>Suite 1100 777 6th Street Nw<br>Washington, DC 20001<br>USA<br>202-679-5893 Email:Oconnore@brennan.Law.Nyu.Edu |
| | Renata M. O'Donnell<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>CAMPAIGN LEGAL CENTER<br>Suite 400 1101 14th Street Nw<br>Washington, DC 20005<br>USA<br>202-736-2200 Email:Rodonnell@campaignlegalcenter.Org |
| | Robb Livingood<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>ACLU OF WEST VIRGINIA<br>606 Virginia Street East<br>Charleston, WV 25301<br>USA<br>304-777-8879 Fax: 304-404-2033<br>Email:Rlivingood@acluwv.Org |
| Democratic National Committee<br>**Movant** | Daniel J. Freeman<br>LEAD ATTORNEY;PRO HAC VICE;ATTORNEY TO BE NOTICED<br>DEMOCRATIC NATIONAL COMMITTEE<br>Suite #3 430 South Capitol Street Se<br>Washington, DC 20003<br>USA<br>202-923-6429 Email:Freemand@dnc.Org |
| | Robert M. Bastress , III<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DIPIERO SIMMONS MCGINLEY & BASTRESS |

## Litigants

## Attorneys

604 Virginia Street, East
Charleston, WV 25301
USA
304-342-0133 Email:Rob.Bastress@dbdlawfirm.Com

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 02/26/2026 | COMPLAINT without Jury Demand. (Attachments: # 1 Attachment 1, # 2 Proposed Summons as to Kris Warner, # 3 Civil Cover Sheet) (mfo) | |
| 2 | 02/26/2026 | ELECTRONIC SUMMONS ISSUED as to Kris Warner, re: 1 Complaint. Summons returnable 21 days. Instructions to Counsel: This is your electronic summons. Please print as many copies of the Summons and Complaint as are necessary to effectuate service under Fed. R. Civ. P. 4. See Proof of Service page of this Summons form for filing a return of service if required by Fed. R. Civ. P. 4(l). (mfo) | |
| | 02/26/2026 | CASE assigned to Judge Thomas E. Johnston. (klc) | |
| 3 | 02/26/2026 | STANDING ORDER IN RE: ASSIGNMENT AND REFERRAL OF CIVIL ACTIONS AND MATTERS TO MAGISTRATE JUDGES ENTERED SEPTEMBER 1, 2024. Discovery referred to Magistrate Judge Dwane L. Tinsley. (cc: counsel of record; any pro se party) (klc) | |
| 4 | 03/06/2026 | MOTION by West Virginia Alliance for Retired Americans to Intervene as Defendant (Attachments: # 1 Exhibit A - Proposed Answer, # 2 Exhibit B - Case Declaration, # 3 Exhibit C - US v Scanlan Order, # 4 Proposed Order)(Smith, Christina) | |
| 5 | 03/06/2026 | MEMORANDUM OF LAW by West Virginia Alliance for Retired Americans in support of 4 MOTION by West Virginia Alliance for Retired Americans to Intervene as Defendant (Smith, Christina) | |
| 6 | 03/06/2026 | DISCLOSURE STATEMENT PURSUANT TO RULE 7.1, Federal Rules of Civil Procedure, by Interested Party West Virginia Alliance for Retired Americans (Smith, Christina) | |
| 7 | 03/06/2026 | STATEMENT OF VISITING ATTORNEY from Elisabeth Frost on behalf of West Virginia Alliance for Retired Americans. Local counsel: Christina L. Smith. Fee $50.00. Receipt # AWVSDC-9061881. (Attachment: # 1 WVSB receipt)(Smith, Christina) | |
| 8 | 03/06/2026 | STATEMENT OF VISITING ATTORNEY from Lucas Lallinger on behalf of West Virginia Alliance for Retired Americans. Local counsel: Christina L. Smith. Fee $50.00. Receipt # AWVSDC-9061887. (Attachment: # 1 WVSB receipt)(Smith, Christina) | |
| 9 | 03/06/2026 | STATEMENT OF VISITING ATTORNEY from Julianna Astarita on behalf of West Virginia Alliance for Retired Americans. Local counsel: Christina L. Smith. Fee $50.00. Receipt # AWVSDC-9061898. (Attachment: # 1 WVSB receipt)(Smith, Christina) | |
| 10 | 03/12/2026 | NOTICE OF APPEARANCE by Christopher J. Gardner on behalf of The United States of America. (Gardner, Christopher) | |
| 11 | 04/02/2026 | MOTION by West Virginia Citizen Action Group to Intervene as a Defendant. (Attachments: # 2 Index, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F)(Sparks, Aubrey) (Modified on 4/2/2026 to remove memorandum in support (attachment #1) and file at entry #13) (kew). | |
| 12 | 04/02/2026 | DISCLOSURE STATEMENT PURSUANT TO RULE 7.1, Federal Rules of Civil Procedure, by Movant West Virginia Citizen Action Group (Sparks, Aubrey) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 13 | 04/02/2026 | MEMORANDUM OF LAW by West Virginia Citizen Action Group in support of 11 MOTION by West Virginia Citizen Action Group to Intervene as a Defendant. (kew) | |
| | 04/02/2026 | NOTICE OF DOCKET CORRECTION re: 11 MOTION by West Virginia Citizen Action Group to Intervene as a Defendant. ERROR: Memorandum in support attached to motion. CORRECTION: Memorandum removed and filed at entry #13. (kew) | |
| 14 | 04/03/2026 | MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960 (Attachments: # 1 Declaration of E. Neff, # 2 Letter to WV, # 3 Refusal Letter, # 4 NC Consent Decree, # 5 Georgia Complaint, # 6 Georgia Consent Decree, # 7 Texas MOU)(Gardner, Christopher) | |
| 15 | 04/03/2026 | MEMORANDUM by United States of America supporting 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960 (Gardner, Christopher) | |
| 16 | 04/07/2026 | NOTICE OF APPEARANCE by Raymond Yang on behalf of United States of America. (Yang, Raymond) | |
| 17 | 04/15/2026 | STATEMENT OF VISITING ATTORNEY from Daniel S Lenz on behalf of West Virginia Citizen Action Group. Local counsel: Aubrey Sparks. Fee $50.00. Receipt # AWVSDC-9086223. (Sparks, Aubrey) | |
| 18 | 04/15/2026 | STATEMENT OF VISITING ATTORNEY from Renata O'Donnell on behalf of West Virginia Citizen Action Group. Local counsel: Aubrey Sparks. Fee $50.00. Receipt # AWVSDC-9086225. (Sparks, Aubrey) | |
| 19 | 04/16/2026 | STATEMENT OF VISITING ATTORNEY from Maura Eileen O'Connor on behalf of West Virginia Citizen Action Group. Local counsel: Aubrey Sparks. Fee $50.00. Receipt # AWVSDC-9087167. (Sparks, Aubrey) | |
| 20 | 04/16/2026 | STATEMENT OF VISITING ATTORNEY from Justin Lam on behalf of West Virginia Citizen Action Group. Local counsel: Aubrey Sparks. Fee $50.00. Receipt # AWVSDC-9087172. (Sparks, Aubrey) | |
| 21 | 04/17/2026 | MOTION by West Virginia Citizen Action Group for Leave to File Memorandum in Opposition to the 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960 (Attachment: # 1 Exhibit A)(Sparks, Aubrey) | |
| 22 | 04/17/2026 | MEMORANDUM by West Virginia Citizen Action Group in opposition to 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960 (Sparks, Aubrey) | |
| 23 | 04/17/2026 | MOTION by West Virginia Alliance for Retired Americans for Leave to File Response to 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960. (Attachment: # 1 Exhibit 1)(Smith, Christina) (Modified on 4/20/2026 to add link to #14 motion) (kew). | |
| 24 | 04/29/2026 | MOTION by Kris Warner to Dismiss 1 Complaint. (Attachment: # 1 Exhibit A)(Williams, Michael) (Modified on 4/30/2026 to add link to #1 complaint) (kew). | |
| 25 | 04/29/2026 | MEMORANDUM OF LAW by Kris Warner in support of 24 MOTION by Kris Warner to Dismiss 1 Complaint. (Williams, Michael) | |
| 26 | 04/29/2026 | RESPONSE by Kris Warner in opposition to 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960. (Attachment: # 1 Exhibit A)(Williams, Michael) | |
| 27 | 04/30/2026 | NOTICE OF APPEARANCE by Caleb Allen Seckman on behalf of | |

2:26cv156, The United States Of America V. Warner

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Kris Warner. (Seckman, Caleb) | |
| 28 | 05/04/2026 | SUMMONS RETURNED EXECUTED by U. S. Marshal for service upon Kris Warner, Kris Warner served on 4/23/2026, answer due 5/14/2026. (Yang, Raymond) | |
| 29 | 05/05/2026 | STATEMENT OF VISITING ATTORNEY from Adriel I. Cepeda Derieux on behalf of West Virginia Citizen Action Group. Local counsel: Aubrey Sparks. Fee $50.00. Receipt # AWVSDC-9101171. (Sparks, Aubrey) | |
| 30 | 05/06/2026 | MOTION by Democratic National Committee for Leave to File a Brief as Amicus Curiae (Attachment: # 1 Proposed Order)(Bastress, Robert) | |
| 31 | 05/06/2026 | MEMORANDUM by Democratic National Committee in support of 30 MOTION by Democratic National Committee for Leave to File a Brief as Amicus Curiae (Bastress, Robert) | |
| 32 | 05/06/2026 | AMICUS BRIEF by Democratic National Committee in opposition to 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960 (Bastress, Robert) | |
| 33 | 05/06/2026 | STATEMENT OF VISITING ATTORNEY from Daniel J. Freeman on behalf of Democratic National Committee. Local counsel: Robert M. Bastress III. Fee $50.00. Receipt # AWVSDC-9101362. (Bastress, Robert) | |
| 34 | 05/06/2026 | DISCLOSURE STATEMENT PURSUANT TO RULE 7.1, Federal Rules of Civil Procedure, by Interested Party Democratic National Committee (Bastress, Robert) | |
| 35 | 05/08/2026 | MOTION by United States of America for Leave to File Response in Opposition to 4 and 11 Motions to Intervene. (Gardner, Christopher) (Modified on 5/11/2026 to add links to #4 and #11 motions) (kew). | |
| 36 | 05/08/2026 | RESPONSE by United States of America in opposition to 4 MOTION by West Virginia Alliance for Retired Americans to Intervene and 11 MOTION by West Virginia Citizen Action Group to Intervene. (Gardner, Christopher) | |
| 37 | 05/13/2026 | NOTICE OF APPEARANCE by James Thomas Catania on behalf of United States of America. (Catania, James) | |
| 38 | 05/13/2026 | MOTION by United States of America to Exceed Page Limits for Memorandum in Response. (Gardner, Christopher) | |
| 39 | 05/13/2026 | MEMORANDUM by United States of America in response to 24 MOTION by Kris Warner to Dismiss 1 Complaint and REPLY to 26 Response In Opposition. (Attachments: # 1 Second Declaration of Eric Neff, # 2 Exhibit 7, # 3 Exhibit 8, # 4 Exhibit 9, # 5 Exhibit 10, # 6 Exhibit 11, # 7 Exhibit 12, # 8 Exhibit 13, # 9 Exhibit 14, # 10 Exhibit 15, # 11 Exhibit 16, # 12 Exhibit 17, # 13 Exhibit 18)(Gardner, Christopher) | |
| 40 | 05/14/2026 | MOTION by West Virginia Citizen Action Group for Leave to File Motion to Dismiss. (Sparks, Aubrey) | |
| 41 | 05/14/2026 | MOTION by West Virginia Citizen Action Group to Dismiss 1 Complaint. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Sparks, Aubrey) | |
| 42 | 05/14/2026 | MEMORANDUM OF LAW by West Virginia Citizen Action Group in support of 41 MOTION by West Virginia Citizen Action Group to Dismiss 1 Complaint. (Sparks, Aubrey) | |
| 43 | 05/14/2026 | MOTION by West Virginia Alliance for Retired Americans for Leave to File Motion to Dismiss the Complaint. (Platz, Graham) | |
| 44 | 05/14/2026 | MOTION by West Virginia Alliance for Retired Americans to Dismiss 1 Complaint. (Platz, Graham) (Modified on 5/15/2026 to add link to #1 complaint) (kew). | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 45 | 05/14/2026 | MEMORANDUM OF LAW by West Virginia Alliance for Retired Americans in support of 44 MOTION by West Virginia Alliance for Retired Americans to Dismiss 1 Complaint. (Platz, Graham) | |
| 46 | 05/15/2026 | RESPONSE by West Virginia Citizen Action Group in opposition to 35 MOTION by United States of America for Leave to File Response in Opposition to 4 and 11 Motions to Intervene and REPLY to 36 Response In Opposition. (Sparks, Aubrey) (Modified on 5/18/2026 to add link to #35 motion) (kew). | |
| 47 | 05/15/2026 | COMBINED RESPONSE by West Virginia Alliance for Retired Americans in opposition to 35 MOTION by United States of America for Leave to File Response in Opposition to 4 and 11 Motions to Intervene and REPLY to 36 Response In Opposition. (Attachment: # 1 USA v. Evans et al)(Smith, Christina) (Modified on 5/18/2026 to add link to #35 motion) (kew). | |
| 48 | 05/19/2026 | MOTION by West Virginia Alliance for Retired Americans for Leave to File Notice of Supplemental Authority in Support of Motion to Intervene (Attachments: # 1 Exhibit 1, # 2 Exhibit A)(Smith, Christina) | |
| 49 | 05/20/2026 | REPLY MEMORANDUM by Kris Warner to 39 Memorandum In Opposition. (Williams, Michael) | |
| 50 | 05/22/2026 | NOTICE of Supplemental Authority by Kris Warner re: 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960 and 24 MOTION by Kris Warner to Dismiss 1 Complaint. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Williams, Michael) | |
| 51 | 06/02/2026 | RESPONSE by United States of America re: 50 Notice of Supplemental Authority. (Catania, James) | |
| 52 | 06/23/2026 | MOTION by West Virginia Alliance for Retired Americans for Leave to File Second Notice of Supplemental Authority (Attachment: # 1 Exhibit 1 - Notice of Supplemental Authority)(Smith, Christina) | |
| 53 | 06/25/2026 | NOTICE of Supplemental Authority by Kris Warner re: 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960 and 24 MOTION by Kris Warner to Dismiss 1 Complaint. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Williams, Michael) | |
| 54 | 06/30/2026 | MOTION by West Virginia Alliance for Retired Americans for Leave to File Third Notice of Supplemental Authority (Attachment: # 1 Exhibit 1)(Platz, Graham) | |
| 55 | 07/01/2026 | RESPONSE by United States of America to 53 Notice of Supplemental Authority. (Catania, James) (Modified on 7/2/2026 to add link to #53 notice) (kew). | |
| 56 | 07/13/2026 | MEMORANDUM OPINION AND ORDER The 24 MOTION by Kris Warner to Dismiss 1 Complaint is GRANTED; the 14 MOTION by United States of America to Compel Federal Election Records Under the Civil Rights Act of 1960 is DENIED, as set forth more fully herein. Signed by Judge Thomas E. Johnston on 7/13/2026. (cc: counsel of record; any unrepresented party) (kew) | |
| 57 | 07/15/2026 | ORDER denying as moot 4 MOTION by West Virginia Alliance for Retired Americans to Intervene as Defendant and 11 MOTION by West Virginia Citizen Action Group to Intervene as a Defendant. Signed by Judge Thomas E. Johnston on 7/15/2026. (cc: counsel of record; any unrepresented party) (cmb) | |
| 58 | 07/23/2026 | APPEARANCE OF COUNSEL by James Thomas Tucker on behalf of United States of America. (Tucker, James) | |
| 59 | 08/06/2026 | MOTION by United States of America for Entry of Judgment. Responses due by 8/20/2026. (Gardner, Christopher) | |
| 60 | 08/17/2026 | APPEARANCE OF COUNSEL by Joseph W. Voiland on behalf of | |

2:26cv156, The United States Of America V. Warner

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | United States of America. (Voiland, Joseph) | |
| 61 | 09/09/2026 | NOTICE OF APPEAL WITH NO FEE REQUIRED by United States of America as to 56 Memorandum Opinion and Order. (Tucker, James) | |
| 62 | 09/10/2026 | TRANSMITTAL OF NOTICE OF APPEAL TO 4CCA via APPEAL TRANSMITTAL SHEET re: 61 Notice of Appeal to the 4CCA. (cmb) | |
| 63 | 09/15/2026 | NOTICE OF APPELLATE CASE OPENING BY 4CCA re: 61 Notice of Appeal to the 4CCA in 4CCA Case No. 26-2262. Case Manager: A. Walker. (cmb) | |
| 64 | 09/29/2026 | ORDER granting United States of America's 59 MOTION for Entry of Judgment; denying as moot the 21 , 23 , 30 , 35 , 38 , 40 , 41 , 43 , 44 , 48 , 52 , and 54 Motions. Signed by Judge Thomas E. Johnston on 9/28/2026. (cc: counsel of record; any unrepresented party) (jsa) (Modified on 9/29/2026 to update signature and filing dates) (ts). | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division

*Attorneys for the United States*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KRIS WARNER, in his Official Capacity as WEST VIRGINIA SECRETARY OF STATE,<br><br>Defendant. | **CIVIL ACTION NO. 2:26-cv-000156**<br><br>**COMPLAINT** |

## COMPLAINT

1. Title III of the Civil Rights Act of 1960 ("CRA") imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to "retain and preserve… *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C.

§ 20701 (emphasis added).

2. Title III likewise grants the Attorney General the sweeping power to obtain these records: "Any record or paper required by [section 301] to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

3. If the custodian to whom the written demand is made refuses to comply, the CRA requires "a special statutory proceeding in which the courts play a limited, albeit vital, role" in assisting the Attorney General's investigative powers. *Lynd*, 306 F.2d at 225. The Attorney General or her representative may request a federal court to issue an order directing the officer of election to produce the demanded records, akin to "a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Id.*

4. In this "summary" proceeding, *In re Gordon*, 218 F. Supp. 826, 826 (S.D. Miss. 1963), the Attorney General need only show that she made a "written demand" for records covered by Section 301 of the CRA and that "the person against whom an order for production is sought … has failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703). The court does not adjudicate "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand" or "the scope of the order to produce…." *Id.*

## I. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and

2201(a).

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred in this District, and this District is where the Attorney General made her demand for federal election records under Section 303 of the CRA and is where the federal election records are located, as provided by 52 U.S.C. § 20705.

## II. PARTIES

7. Plaintiff is the United States. The Attorney General has authority to enforce various federal election statutes, including the CRA, *see* 52 U.S.C. § 20703; the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20510(a); and Title III of the Help America Vote Act ("HAVA"), 52 U.S.C. § 21111.

8. Defendant is responsible for the administration of elections in accordance with West Virginia Code ("WVC") § 3-2-3.

9. Defendant is sued in his official capacity as the chief election official (Secretary of State Warner) responsible for coordinating and maintaining West Virginia compliance under the NVRA and CRA. *See* 52 U.S.C. § 20509.

## III. BACKGROUND

10. This proceeding arises from the Attorney General's investigation into West Virginia's compliance with federal election law, particularly the CRA, NVRA, and HAVA.

11. Section 301 of Title III of the CRA, the NVRA, and HAVA require States and other election officers to maintain and preserve certain records and papers relating to registration to voting or other acts requisite to voting in federal elections.

**The National Voter Registration Act**

12. The NVRA requires each state to "designate a Secretary of State or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509. The NVRA includes as a definition that the term "'State' means a State of the United States and the District of Columbia." 52 U.S.C. § 20502(4).

13. The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the death of the registrant, or "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. § 20507(a)(4).

14. The NVRA also requires States to maintain, with exceptions not relevant here, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1).

**The Help America Vote Act**

15. HAVA requires all States to maintain and administer "a single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State…." 52 U.S.C. § 21083(a)(1)(A).

16. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), and prohibits States from processing voter-registration applications without obtaining and verifying certain identifying information from the applicants, namely, a Driver's License number for those who possess a valid one, the last four digits of a social security number for those who do not possess a valid Drivers' License, and for those who have neither, a unique identifier. *See* 52 U.S.C. § 21083(a)(5)(A).

**The Civil Rights Act of 1960**

17. Congress empowered the Attorney General to request records pursuant to Title III of the Civil Rights Act ("CRA"), codified at 52 U.S.C. § 20701, *et seq.*

18. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting in a federal election for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

19. Section 303 of the CRA provides, in pertinent part, "[a]ny record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." 52 U.S.C. § 20703. The written demand is required to "contain a statement of the basis and the purpose thereof." *Id.*

**IV. FACTUAL ALLEGATIONS**

20. On September 8, 2025, the Attorney General contacted Defendant seeking a copy of the statewide voter registration list ("SVRL) with all fields to assess West Virginia's compliance with federal election law. *See* Letter from Attorney General to Defendant Warner ("September 8 Letter").

21. The September 8 Letter said the basis of the demand was the CRA.

22. The September 8 Letter stated that the purpose of the request is to ascertain compliance with the list maintenance requirements of the NVRA and HAVA. The September 8

Letter also requested that West Virginia's response contain "all fields," including full name, date of birth, address, and driver's license or last four digits of social security number, "as required under HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i)." *Id.*

23. The August 14 Letter stated that the SVRL and all other federal election records that were produced would be maintained according to all applicable federal laws, including Section 304 of the CRA and the Privacy Act. The September 8 Letter explained to Defendants that "HAVA specifies that the 'last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974.'" 5 U.S.C. § 552a note; 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's Privacy Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Department is now doing.

24. On September 22, 2025, the Attorney General received a response Letter from Defendant, refusing to provide the requested SVRL for all fields. ("September 22 Letter").

25. On December 10, 2025, December 19, 2025, and January 13, 2026, the Attorney General sent follow-up emails renewing the request for a copy of West Virginia's SVRL with all fields.

26. On February 11, 2026, Defendant sent the Attorney General a letter explaining that it would not provide West Virginia's SVRL with all fields. ("February 11 letter").

## COUNT ONE
## VIOLATION OF THE CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20703

27. The United States restates and incorporates herein the foregoing allegations in this Complaint.

28. Defendant is an "officer of election," as that term is defined in Section 306 of the

CRA, 52 U.S.C. § 20706.

29. On September 8, 2025, the Attorney General sent a written demand to Defendant for the production of specific election records pursuant to 52 U.S.C. § 20703.

30. The written demand "contain[ed] a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

31. In the September 22 and February 11 letters, Defendant refused to provide the records requested.

Wherefore, the United States respectfully requests this Court:

A. Declare that Defendant's refusal to provide the election records upon a demand by the Attorney General violates Title III of the Civil Rights Act as required by 52 U.S.C. § 20703;

B. Order Defendant to provide to the Attorney General the current electronic copy of West Virginia's computerized voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their Driver's License number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083 within five days of a Court order.

C. Order Defendant to produce such other federal election records demanded by the Attorney General to ascertain Defendant's compliance with HAVA and the NVRA;

D. Order such other relief as the interests of justice may require.

DATED: February 26, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ Brittany E. Bennett
BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
brittany.bennett@usdoj.gov
Tel. (202) 704-5430

Attorneys for the United States

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KRIS WARNER, in his official capacity as West Virginia Secretary of State,<br><br>Defendant. | Civil Case No.: 2:26-CV-00156-TEJ |

**UNITED STATES' MOTION TO COMPEL FEDERAL ELECTION RECORDS UNDER THE CIVIL RIGHTS ACT OF 1960**

Plaintiff, UNITED STATES OF AMERICA, by and through the Attorney General, pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701, *et seq.*, hereby moves this Honorable Court for an Order compelling Defendant to produce the documents requested by Plaintiff. The Attorney General offers the attached Memorandum of Law, Declaration of Eric Neff, and Exhibits, in Support of its Motion to Compel Production.

**Introduction**

The Attorney General has been tasked by Congress with enforcement authority for both the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA"). *See* 52 U.S.C. § 20510(a) and 52 U.S.C. § 21111. Both statutes require Defendants to conduct specified maintenance of the West Virginia's statewide voter registration list ("SVRL"). These requirements are an integral measure to ensure that West Virginia's voter registration lists are accurate. Ensuring the accuracy of the list of eligible voters preserves the integrity of West Virginia's federal election procedures. Pursuant to Section 301 of the CRA, "every officer of election shall retain and

preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any *application, registration*, payment of poll tax, or other act requisite to voting in such election[.]" 52 U.S.C. § 20701 (emphasis added).

Further, Section 303 of the CRA provides, "Any record or paper required by [section 301] of this title to be retained and preserved shall, *upon demand in writing by the Attorney General* or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703 (emphasis added).

The United States has properly demanded records from the Defendant pursuant to these federal statutes and the Defendant has failed to comply as detailed in the Memorandum of Law in Support of this Motion, and exhibits filed contemporaneously herein. The United States brings this action and files this Motion to compel Defendants to produce the requested records forthwith.

Section 305 of the CRA provides that "[t]he United States District Court for the district in which a demand is made pursuant to [Section 303] of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. § 20705.

**Prayer for Relief**

For the foregoing reasons, Plaintiff requests that this Court enter an Order directing the Defendant to produce the demanded records. Plaintiff further requests this Court:

A. Order the Defendant to produce an electronic copy of the West Virginia's statewide Voter Registration List, to include each registrant's name, date of birth, address, and as required by HAVA, the last four digits of the registrant's social security number, driver's license/state identification number or the unique HAVA identifier; and

B. Order the Defendant to submit the demanded records electronically to the Attorney General within 5 (five) days of this order.

DATED: April 3, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ANDREW BRANIFF
Acting Chief, Appellate Section
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ Christopher J. Gardner
Christopher J. Gardner
Jonathon Hauenschild
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Christopher.Gardner@usdoj.gov
Jonathon.Hauenschild@usdoj.gov
202-812-2631

Attorneys for the United States

UNITED STATES DISTRICT COURT
DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>KRIS WARNER, in his official capacity as West Virginia Secretary of State<br><br>Defendant(s). | Case Number: 2:26-CV-00156-TEJ |

**DECLARATION OF ERIC NEFF IN SUPPORT OF MOTION COMPEL RECORDS DEMANDED PURSUANT TO THE CIVIL RIGHTS ACT OF 1960**

I, Eric Neff, declare, pursuant to 28 U.S.C. § 1746, that:

1. I am currently Acting Chief to the Voting Section within the Civil Rights Division of the United States Department of Justice. I am fully and personally familiar with the facts stated herein. I make this declaration in support of the United States' Motion to Compel the production of election records pursuant to the Civil Rights Act ("CRA") codified at 52 U.S.C. §§ 20701, *et seq*.

2. The National Voter Registration Act, 52 U.S.C. § 20501 ("NVRA"), et seq., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, et seq., require each state to perform voter-list maintenance to ensure that only eligible voters remain on the statewide voter registration list. Under Section 11 of the NVRA and Section 401 of HAVA, the Attorney General is charged with the responsibility for enforcement of the list maintenance requirements of both statutes. 52 U.S.C. § 20510(a) and 52 U.S.C. § 21111. This enforcement responsibility has been delegated to the Civil Rights Division by Congress.

3. Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1).

4. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections.

5. To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the electronic statewide voter registration list ("SVRL"), as assurance that the applications are being properly processed and that reasonable and nondiscriminatory list maintenance efforts have been practiced.

6. When the Civil Rights Division performs this individualized assessment, West Virginia's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records.

7. On September 8, 2025, the United States sent correspondence to Secretary Warner requesting cooperation by providing federal election records necessary to its assessment.

8. The letter informed the Secretary that the basis for the demand was the CRA and purpose of the demand was to assess compliance with the NVRA and HAVA.

9. A true and correct copy of the September 8 Letter is attached as Exhibit 1.

10. The Secretary of State refused to produce the requested records.

11. A true a correct copy of the refusal letter is attached as Exhibit 2.

12. Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny, as Congress contemplated in authorizing the Attorney General to bring enforcement actions under HAVA and the NVRA.

13. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025). Specifically, the State's HAVA List included over one hundred thousand active voter records that were missing one of the identification numbers required by HAVA: the registrant's driver's license number, the last four numbers of the registrant's social security number, or a unique identifying number if the registrant had neither a driver's license nor a social security number. A true and accurate copy of the North Carolina Consent Judgment and Order is attached as Exhibit 3.

14. The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA.

15. For example, in two of those CRA matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and last four digits of the registrant's social security number, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.

16. A true and accurate copy of the Complaint filed in United States v. Georgia, Case No. 1:06-cv-02442-CC (N.D. Ga. filed Oct. 12, 2006), is attached as Exhibit 4.

17. On October 27, 2006, the Court entered a Consent Decree in Georgia requiring the state to produce its SVRL to the United States. A true and accurate copy of the Georgia Consent Decree is attached as Exhibit 5.

18. The Texas matter was resolved by a Memorandum of Understanding ("MOU") dated May 13, 2008, which required Texas to produce its SVRL to the United States. A true and accurate copy of the Texas MOU is attached as Exhibit 6.

19. The United States has offered states an MOU memorializing these requirements. As of April 3, 2026, seventeen states have provided their SVRL, including: fourteen states that have provided their SVRLs without any MOU, two states that have agreed to provide their SVRL under the terms of the MOU, and one state that entered a Settlement Agreement after the filing of a Complaint.

I declare under the penalty of perjury that the above statements are true and correct.

Dated: April 3, 2025 at Washington, DC.

_*/s/ Eric Neff*_____
Eric Neff

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General* *Washington, D.C. 20530*

September 8, 2025

Via Mail and Email

The Honorable Kris Warner
Secretary of State
1900 Kanawha Blvd.
Bldg. 1, Suite 157-K
Charleston, WV 25305
wvsos@wvsos.com

Re: **Request for Complete West Virginia's Voter Registration List with All Fields**

Dear Secretary Warner:

We write to you as the chief election official for the State of West Virginia concerning your State's compliance with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*. Please provide a copy of West Virginia's statewide voter registration list ("VRL") within fourteen days of the date of this letter.

The electronic copy of the statewide VRL should contain *all fields*, which means, your state's VRL must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under HAVA[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We request West Virginia's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the NVRA. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding no private right of action to enforce HAVA requirements).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" *See* 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is requesting an electronic copy of West Virginia's complete and current VRL. The purpose of this request is to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA.

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 522a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act explained at Civil Rights Division - Department of Justice - Privacy Policy[2].

[2] Available at: https://civilrights.justice.gov/privacy-policy#:~:text=Our%20Statutes-,Privacy%20Act%20Statement,the%20scope%20of%20our%20jurisdiction.

Please provide the requested electronic VRL[3] to the Justice Department fourteen days from the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). If West Virginia would be interested in a data sharing agreement with the Civil Rights Division, please reply to voting.section@usdoj.gov prior to the expiration of the fourteen-day response window. Upon receipt, we will send you an agreement template.

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc: Brittany Westfall
Elections Director
1900 Kanawha Blvd.
Bldg. 1, Suite 157-K
Charleston, WV 25305
bwestfall@wvsos.gov

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

Kris Warner
Secretary of State
State of West Virginia

1900 Kanawha Blvd. E.
Building 1, Suite 157K
Charleston, West Virginia 25305

Telephone: (304) 558-6000
Toll Free: 1-866-SOS-VOTE
Fax: (304) 558-0900
www.wvsos.gov

September 22, 2025

**Via U.S. Mail & E-mail**

Harmeet K. Dhillon
Assistant Attorney General
U.S. Department of Justice
Civil Rights Division, Voting Section
950 Pennsylvania Avenue NW, 4CON
Washington, D.C. 20530

Dear Ms. Dhillon:

The Office of the West Virginia Secretary of State acknowledges receipt of your September 8, 2025, correspondence wherein the U.S. Department of Justice requests an unredacted electronic copy of West Virginia's statewide voter registration list. Your letter states that the list "should contain *all fields*," including a registrants' driver's license numbers and Social Security numbers.

As West Virginia's chief election official, the Secretary of State prioritizes the integrity of elections in this state and consistently strives to exceed both state and federal requirements for conducting uniform and nondiscriminatory list maintenance. Our Office ensures that county clerks – the local officials responsible for list maintenance – have the necessary data, tools, and guidance to complete their duties.

The Secretary of State obtains data from various sources, including the U.S. Department of Justice ("DOJ"), and provides it to county clerks through the Statewide Voter Registration System ("SVRS") for review and action on each identified record. The SVRS tracks, with county clerk action, records of voters who (1) have moved out of state, (2) have moved to a new address in the state, (3) are deceased in another state, (4) have been convicted of a felony and remain under conviction, or (5) are otherwise ineligible (*e.g.* noncitizens). These records are identified through interstate maintenance programs, federal data sources (*e.g.* Social Security Administration), federally recognized data sources (*e.g.* National Chage of Address Service), and others.

West Virginia's voter registration list maintenance statutes can be found in W. Va. Code §3-2-1, *et seq*. We commend the DOJ's efforts to ensure state compliance with federal voter registration list maintenance requirements. However, your letter neither identifies how West Virginia's procedures fail to comply, nor does it provide a factual basis supporting such a claim.

West Virginia law protects the sensitive personally identifiable information of its citizens, and the Secretary of State takes seriously his responsibility to safeguard such information from unauthorized disclosure. You cite several legal authorities in support of the DOJ's request for unrestricted access to West Virginia's statewide voter registration list, including provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. §20501 et seq.; the Help America Vote Act ("HAVA"), 52 U.S.C. §20901 et seq.; and Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. §20701 et seq., to support the DOJ's demand.

However, our thorough review of these provisions reveals no authority compelling compliance with such a broad request, and your request cites no specific legal basis supporting disclosure of a registrants' sensitive personal information.

Even assuming the DOJ were authorized under federal law to conduct an "independent review of each state's list," your letter does not explain why disclosure of registrants' driver's license numbers and Social Security numbers is necessary to that review. While Congress has authorized the Attorney General to bring civil actions in district court for declaratory and injunctive relief under the NVRA and HAVA, neither Act requires states to disclose the sensitive personally identifiable information of their citizens.

Further, although the CRA imposes certain record-retention and preservation requirements, your letter does not establish how the DOJ's proposed "review" of West Virginia's voter registration list maintenance procedures falls within the statutory purpose set forth in 52 U.S.C. §20703.

West Virginia law provides that any person may examine the active, inactive, rejected and canceled voter registration records of West Virginia residents. W. Va. Code §3-2-30(a) requires that these files be maintained in electronic format and makes them available for examination and copying. However, the statute expressly prohibits disclosure of a registrant's telephone number, email address, Social Security number, driver's license number, or nonoperator's identification number issued by the West Virginia Division of Motor Vehicles.

In accordance with West Virginia law, the Secretary of State's Office makes voter registration lists available subject to these statutory limitations. The statewide voter list automatically includes name, residence address, party affiliation, status (active or inactive), and registration date. Additional information available upon request includes birthdate, mailing address, precinct number, congressional district, state senate district, state delegate district, and state magisterial district.

The attached "Voter Registration Data Services Request Form" must be used when requesting voter data. The fee for the statewide voter registration list $500. Please advise if you would like to purchase a copy of the list, specifying the desired delivery method and data format.

The Secretary of State respects your position in this matter and remains willing to work with your office towards an expeditious and amicable resolution within the limits of state and federal law. To assist your inquiry, we are willing to provide a detailed narrative of our voter roll list maintenance procedures if requested.

Please do not hesitate to contact me with any questions or concerns.

Sincerely,

David P. Cook
General Counsel
Office of the West Virginia Secretary of State
Main: (304) 558-6000
Email: DCook@wvsos.gov

cc: Via email: maureen.riordan2@usdoj.gov

Office of the West Virginia Secretary of State

## Request for Voter Registration Data Instructions

In accordance with West Virginia Code §3-2-30, voter registration data will be made available through the West Virginia Secretary of State's office. The West Virginia Secretary of State's office relies on information recorded by County voter registration offices in the statewide voter registration system (ElectioNet). Although every effort is made to ensure the accuracy of the information we distribute, we cannot assume liability for inaccurate or incomplete data. The user assumes all liability associated with the use of such data.

### How to Order Voter Registration Data

The attached "Voter Registration Data Services Request Form" must be used when requesting voter data. The request may be mailed, faxed, or e-mailed using the contact information below. The total cost due is payable before delivery of voter data. Requests are filled on a first-come, first-served basis.

**NOTE: West Virginia Code §3-2-30(f) states that "*No voter registration lists or data files containing voter names, addresses or other information derived from voter data files may be used for commercial or charitable solicitations or advertising, sold or reproduced for resale.*"**

| **Fees for Statewide Voter Lists** | | **Fees for Partial Voter Lists/List Updates**** | |
|---|---|---|---|
| **(1)** Election Cycle Subscription Service* | $1,000 | **(7)** Partial Voter Registration List | $25/hour |
| **(2)** Statewide Voter Registration List | $500 | **(8)** Voter History List | $25/hour |
| **(3)** Master Voter History List Export | $500 | **(9)** Complex Research Query | $25/hour |
| **(4)** Statewide Early Voters List | $200 | **(10)** Update to (2), (4), (5), or (6) during the election year in which the list was requested | $25/hour |
| **(5)** Statewide Absentee Requests List | $200 | | |
| **(6)** Statewide Absentee Received List | $200 | **(11)** Update to (3) between the day following the request date and the completion of voter history | $25/hour |

* The subscription service includes (1) Statewide Voter Registration List updated monthly throughout the year and updated daily starting thirty days prior to election day through election day; (2) Master Voter History List Export following certification of the primary, general and odd-year elections; (3) Statewide Mail-in Absentee Requests List and Statewide Mail-in Absentee Received List for the primary, general and odd-year elections, updated daily starting thirty days prior to election day through ten days following election day; and (4) Statewide Early Voters List for the primary, general and odd-year elections, updated daily starting on the first day of early voting through election day.

**The price of partial voter registration lists and list updates are based on the current hourly rate as determined by the Secretary of State. The staff generating your request will contact you with an estimate of the number of hours needed to fulfill your request.

**Payment Options:** Cash . Check (made payable to the WV Secretary of State) . Prepaid Account
Credit Card (MasterCard, Visa, Discover, or American Express)

*** **Please return your completed form by mail or e-mail to:** ***
West Virginia Secretary of State's Office
**Attn: Elections Division**
1900 Kanawha Blvd East
Building 1, Suite 157-K
Charleston WV 25305
E-mail: svrs@wvsos.com

Rev. 8/9/2024

Office of the West Virginia Secretary of State

## Request for Voter Registration Data Services

**Election Year** ___________

| **Delivery Style** (subject to file size) | **Data Format** |
|---|---|
| ☐ Cloud storage/transfer (FTP, Dropbox, *etc.*)<br>☐ E-mail | ☐ MS Excel Spreadsheet (*not available for large files that exceed limits in Excel*)<br>☐ Delimited Text File (.csv or .txt)<br>☐ PDF File |

### Voter Information

Your voter list will automatically include the following voter information:

- ✓ **Name**
- ✓ **Residence Address (+ County)**
- ✓ **Party Affiliation**
- ✓ **Status (Active or Inactive)**
- ✓ **Registration Date**

Select any additional voter information you want to include in your voter list.

| | |
|---|---|
| ☐ Birthdate | ☐ State Senate District |
| ☐ Mailing Address | ☐ State Delegate District |
| ☐ Precinct number | ☐ State Magisterial District |
| ☐ Congressional District | ☐ Other ____________ |

### Sort Order (if Paper List)

Enter up to three of the above categories in the order you want to sort your printable voter list.

1. ______________________________
2. ______________________________
3. ______________________________

### ☐ Statewide Voter Lists

Select from the options below to receive a statewide voter registration list or subscription. Subscription files are in delimited text file format.

| | | | |
|---|---|---|---|
| ☐ **Election Cycle Subscription Service** | $1000 | ☐ **Statewide Early Voters List**<br>☐....................update ($25/hour) | $200 |
| ☐ **Statewide Voter Registration List**<br>☐....................update ($25/hour) | $500 | ☐ **Statewide Absentee Requests List**<br>☐....................update ($25/hour) | $200 |
| ☐ **Master Voter History List Export**<br>☐....................update ($25/hour) | $500 | ☐ **Statewide Absentee Received List**<br>☐....................update ($25/hour) | $200 |

Office of the West Virginia Secretary of State

## ☐ Partial Voter List $25/hour

The price of a partial voter registration list is based on the current hourly rate as determined by the Secretary of State. The staff generating your request will contact you with an estimate of the number of hours needed to fulfill your request. Follow the steps below to complete your partial voter registration list request.

**1. Select ONE of the categories below and enter the jurisdiction OR district of your choice.**

- ☐ **Partial Statewide Voter Registration List***
- ☐ **Countywide Voter Registration List** for ______________________ Co.
- ☐ **District Voter Registration List**
  - WV House of Delegates District ______________
  - WV Senate District ______________
  - US Congressional District ______________
- ☐ **Municipal Voter Registration List** for ____________________, ____________________ Co.
- ☐ **Precinct Voter Registration List** for Pct.____________________, ____________________ Co.

*If you select the **Partial Statewide Voter Registration List**, you must filter your list below. Go to the section for **Statewide Voter Lists** if you want a full list of registered voters in the state.

**2. Do you want all registered voters in the jurisdiction or district selected above?**

- ☐ Yes (proceed to number 4)
- ☐ No, filter my list

**3. If you choose to filter your list, please select the voters you want to include.**

**Political Party**

- ☐ Democrat
- ☐ Libertarian
- ☐ Mountain
- ☐ Republican
- ☐ Other
- ☐ All of the above

**Voter Registration Status**

- ☐ Active voters
- ☐ Inactive voters
- ☐ Both Active and Inactive voters

## Voter History (optional)

**4. If want to include voter history in your voter registration list, please enter the elections you want to include.**

Election: ______________________________ Year: __________
Election: ______________________________ Year: __________
Election: ______________________________ Year: __________

**5. OR if you want your list to only include the voters you selected above who voted in a specific election, early voted, or participated in mail-in absentee voting, select from the options below.**

- ☐ **Voter History List** Election: ______________________________ Year: __________
- ☐ **Early Voters List** Election: ______________________________ Year: __________
- ☐ **Absentee Requests List** Election: ______________________________ Year: __________
- ☐ **Absentee Received List** Election: ______________________________ Year: __________

Office of the West Virginia Secretary of State

**☐ Complex Research Query**

If you have a more complex data request, please describe your request in detail below. Attach additional pages if needed.

_______________

_______________

_______________

_______________

_______________

**Purchaser Contact Information**

Name: _______________ Phone: _______________

Address: _______________ E-mail: _______________

_______________

**Method of Delivery**

☐ I will pick up my order at the WV Secretary of State's Office

Ship my order to:

☐ Same as contact information

☐ Address: _______________

_______________

E-mail my order to:

☐ Same as contact information

☐ E-mail: _______________

**The statement below must be completed before purchasing a voter list from the West Virginia Secretary of State's office:**

**I,** _______________ **for** _______________

(name of purchaser) (organization, if any)

understand that West Virginia law prohibits the sale and use of the list of registered voters for commercial or charitable solicitations or advertising, and that I or my organization may not sell the list or reproduce it for resale. I hereby certify that the purposes for which the names and addresses of voters will be used are not in violation of this prohibition.

_______________ Date: _______________

Signature

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil No. 5:25-cv-00283-M-RJ

UNITED STATES OF AMERICA,

Plaintiff, v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections; FRANCIS X. DE LUCA, JEFF CARMON, STACY EGGERS IV, SIOBHAN O'DUFFY MILLEN, and ROBERT RUCHO, in their official capacities as Members of the North Carolina State Board of Elections; and STATE OF NORTH CAROLINA,

Defendants.

**CONSENT JUDGMENT AND ORDER**

Plaintiff United States of America initiated this action on May 27, 2025, against the North Carolina State Board of Elections (the "NCSBE"); Sam Hayes, in his official capacity as Executive Director of the NCSBE; Francis X. De Luca, Jeff Carmon, Stacy Eggers IV, Siobhan O'Duffy Millen, and Robert Rucho, in their official capacities as Members of the NCSBE (the "State Board Defendants"); and the State of North Carolina, acting through the North Carolina's chief State elections official as defined in 52 U.S.C. § 21083, to enforce the requirements of Section 303(a) of the Help America Vote Act of 2002 ("HAVA"), 52 U.S.C. § 21083(a).

Section 303(a) requires, among other things, that a voter registration application for an election for Federal office may not be accepted or processed by a State unless it includes a driver's

license number from the applicant, or if the applicant does not have a driver's license, the last four digits of the applicant's social security number ("SSN4"). If an applicant has not been issued a current and valid driver's license or social security number, the State must assign a special identifying number for voter registration. *See* 52 U.S.C. § 21083(a)(5)(A)(ii). The information for each record must be timely entered into the State's computerized voter registration list after it is received.

Compliance with the computerized statewide voter registration list requirements in Section 303 of HAVA facilitates voter list maintenance procedures to ensure the accuracy of voter records used for Federal elections.

The United States' Complaint alleges, among other things, that Defendants did not comply with the requirements of Section 303(a) of HAVA. Compl. ¶¶ 5, 15-19, Doc. 1. Specifically, the Complaint alleges that Defendants used state voter registration forms and instructions that did not explicitly require a voter to provide a driver's license or the last four digits of a social security number and then the county boards of elections registered a significant number of North Carolina voters who did not provide one of those two identification numbers. *Id.* ¶¶ 35-37, 39(b)-(d), 45(a)-(c). The Complaint further alleges that in some cases in which a driver's license or the last four digits of a social security number were later obtained by the county boards of elections from some voters, that information was not timely added to update voter records in the State's computerized statewide voter registration list. *Id.* ¶¶ 33(d)-(e), 38, 39(d)-(e).

The United States and State Board Defendants, through counsel, have conferred in good faith and agree that this action should be settled without protracted and costly litigation. The United States and State Board Defendants therefore propose to resolve this lawsuit through the terms of this Consent Judgment and Order ("Order"). Accordingly, the United States and State Board Defendants hereby consent to the entry of this Order, as indicated by the signatures of counsel at the end of

this Order. The United States and State Board Defendants waive a hearing and the entry of findings of fact and conclusions of law on all issues specific to State Board Defendants in this matter, and all claims are dismissed without prejudice in consideration for the entry of this Order.

North Carolina law makes the State Board Defendants responsible for carrying out the State's duties under HAVA. Therefore, the remedies in this Order apply only to the State Board Defendants and their agents, employees, contractors, successors, and all other persons representing the interest of State Board Defendants.

As part of their commitment to full compliance with Section 303 of HAVA, State Board Defendants agree to each provision of this Order to resolve the issues in this case. Accordingly, the United States and State Board Defendants stipulate and agree that:

1. This action is brought by the Attorney General on behalf of the United States pursuant to Section 303 of HAVA, 52 U.S.C. § 21083.

2. The Attorney General is authorized to bring a civil action against any state or jurisdiction to enforce the requirements of HAVA, 52 U.S.C. § 21111, and this Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201(a) and 52 U.S.C. § 21111.

3. State Board Defendants are proper parties in this action.

4. Section 303 of HAVA sets certain minimum standards for a statewide voter registration list used for Federal elections ("HAVA List"). The HAVA List functions as the single system for storing and managing the official list of registered voters throughout the State. 52 U.S.C. § 21083(a)(1)(A)(i). The HAVA List must contain the name and registration information of, and must assign a unique identifier to, each legally registered voter in the State who votes in Federal elections. 52 U.S.C. §§ 21083(a)(1)(A)(ii)-(iii).

5. The HAVA List must be coordinated with other agency databases within the State. 52 U.S.C. § 21083(a)(1)(A)(iv). Any election official in the State, including any local election

official, must be able to obtain immediate electronic access to the information contained in the list, and all voter registration information obtained by any local election official must be electronically entered into the computerized list on an expedited basis at the time the information is provided to the local election official. 52 U.S.C. §§ 21083(a)(1)(A)(v)-(vi). The State must provide the necessary support so that local election officials are able to enter voter registration information on an expedited basis. 52 U.S.C. § 21083(a)(1)(A)(vii).

6. The HAVA List serves as the official voter registration list for the conduct of all elections for Federal offices in the State. 52 U.S.C. § 21083(a)(1)(A)(viii). No application for voter registration to be included in the HAVA List can be accepted or processed unless it includes a driver's license number, for those who have a driver's license number, or SSN4 for those who do not have a driver's license number; except, for those who do not have one of these numbers, the application may be accepted and processed and the State must assign a unique identifier. 52 U.S.C. § 21083(a)(5)(A).

7. State Board Defendants have maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5).

Signatures on the following page:

**STIPULATED AND AGREED TO:**

For the United States of America:

HARMEET K. DHILLON

Assistant Attorney General
Civil Rights Division

MICHAEL E. GATES

Deputy Assistant
Attorney General

/s/ James Thomas Tucker
MAUREEN RIORDAN
Acting Chief, Voting Section
TIMOTHY F. MELLETT
JAMES THOMAS TUCKER
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Telephone: (202) 307-2767
E-mail: james.t.tucker@usdoj.gov

For State Board Defendants and the State acting through the Chief State Elections Official:

Sam Hayes
Executive Director of the State Board
Chief State Election Official

NORTH CAROLINA
DEPARTMENT OF JUSTICE

/s/Terence Steed
Terence Steed
Special Deputy Attorney General
N.C. State Bar No. 52809
Email: tsteed@ncdoj.gov

/s/Mary L. Lucasse
Mary L. Lucasse
Special Deputy Attorney General
N.C. Bar No.: 39153
Email: mlucasse@ncdoj.gov

/s/Ryan C. Grover
Ryan C. Grover
Special Deputy Attorney General
N.C. Bar No.: 53703
Email: rgrover@ncdoj.gov

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6567
Facsimile: (919) 716-6763

Space left blank intentionally.

The Joint Motion for Entry of Consent Judgment and Order [DE 70] is GRANTED. It is ORDERED, ADJUDGED, and DECREED that:

1. State Board Defendants are subject to the requirements of Section 303(a) of HAVA. 52 U.S.C. §§ 21083(a), 21141.

2. The terms of this Order apply to all elections for Federal office held in North Carolina.

3. State Board Defendants, their agents, employees, contractors, successors, and all other persons representing the interest of State Board Defendants are required to ensure that North Carolina's voter registration forms and instructions and the State's HAVA List used for elections for Federal office fully complies with Section 303(a)(5) of HAVA, 52 U.S.C. § 21083(a)(5).

4. State Board Defendants are further enjoined from engaging in any act or practice that fails to comply with the requirements of Section 303(a) of HAVA, 52 U.S.C. § 21083(a), including:

a. For elections for Federal offices, the use of any voter registration forms or instructions that do not comply with the requirements of Section 303(a)(5) of HAVA, including any such materials provided in languages other than English;

b. For elections for Federal offices, the use of any training materials provided to elections officials that include information or instructions that do not comply with the requirements of Section 303(a)(5) of HAVA, 52 U.S.C. § 21083(a)(5);

c. For elections for Federal offices, acceptance or processing any application for voter registration to be entered into the State's HAVA List unless it includes a driver's license number, for persons who have an current and valid driver's license number; or the last four digits of the social security number, for

persons who do not have a driver's license number and have a social security number, as required by 52 U.S.C. § 21083(a)(5)(A); or for registration applicants that have neither a driver's license number or a social security number, failing to assign a unique identifier as required by 52 U.S.C. § 21083(a)(5)(A);

d. For elections for Federal offices, failing to enter "all voter registration information obtained by any local election official," including any update to the Section 303(a)(5) identification number provided by a registrant into the State's HAVA List "on an expedited basis at the time the information is provided to the local official" as required by 52 U.S.C. §§ 21083(a)(1)(A)(v)-(vi). Consistent with the requirements of the National Voter Registration Act of 1993 ("NVRA") for the timely transmission of voter registration applications to State election officials, 52 U.S.C. §§ 20504(e), 20506(d), the State Board Defendants agree to define "expedited basis" in this Order as "not later than 10 days after the date of acceptance" except that if voter registration information obtained by any local election official "is accepted within 5 days before the last day for registration to vote in an election," then it shall mean "not later than 5 days after the date of acceptance"; and, if voter registration information is submitted to any local election official between the day after the last day that voter registration applications may be accepted prior to an election under state law and the county canvass, then it shall mean no later than 10 days after the county canvass, unless otherwise provided by state law; and

e. For elections for Federal offices, when any update to the Section 303(a)(5) identification number is entered into the State's HAVA List by the State or county elections board, that update will include comparing the updated record

with existing records to identify and remove any duplicates.

5. State Board Defendants have proposed and are implementing a remedial plan to update records included in the State's HAVA List so that all records comply with the requirements of Section 303(a) of HAVA. That plan, as modified by agreement of the Plaintiff and State Board Defendants, includes the terms in this Order ("Remedial Plan").

6. Voters who registered without supplying the information required by HAVA. State Board Defendants have identified records of voters who appear to have registered to vote after HAVA's effective date without providing a driver's license number, for those who had a driver's license number, or SSN4, for those who did not have a driver's license number and had a social security number, in violation of 52 U.S.C. § 21083(a)(5)(A).

a. First mailing. On or before August 31, 2025, State Board Defendants will mail a form to voters in this group requesting the voter provide their driver's license number if the voter has a current and valid driver's license, or SSN4 if the voter does not have a current and valid driver's license. If the voter does not have a current and valid driver's license number or a social security number, the voter may indicate that on the form. The mailing will include a self-addressed, postage- prepaid return envelope to return the form to the voter's county board of elections. The mailing will include instructions to the voter regarding how they can update their record securely online through the North Carolina Division of Motor Vehicles registration portal.

b. Second mailing. On or before December 15, 2025, State Board Defendants will send a follow-up mailing with the same material and information in Paragraph 6(a) to voters who did not respond to the first mailing.

c. Election Day procedure. Voters identified in Paragraph 6 who have not updated their registration record to include the information required by Section 303(a)(5) of HAVA by the next Federal election will vote by provisional ballot using a form requesting their driver's license number if the voter has a current and valid driver's license, or SSN4 if the voter does not have a current and valid driver's license. If the voter does not have a current and valid driver's license number or a social security number, the voter may indicate that on the provisional ballot.

d. Provisional ballot to be counted for Federal elections. State Board Defendants will instruct the county boards of elections that for all provisional ballots issued pursuant to Paragraph 6(c), the vote cast for each Federal office on the provisional ballot will be counted, notwithstanding the presence of or validation of identification information supplied by the voter on the provisional ballot form, so long as the voter is otherwise eligible to vote under state law.

e. Provisional voting will not result in removal from voter rolls. The provisional voting process outlined in this Section shall not, by itself, result in any voter being removed from the official list of registered voters in state or Federal elections in North Carolina.

7. County Boards of Election updates to voter records.

a. State Board Defendants will direct county boards of elections that on or before August 31, 2025, each board will review and update records in the HAVA List for active or inactive status voters who provided a current and valid driver's license number or SSN4, but that information was not entered into their record, or who confirmed that they did not have a current and valid driver's license

number or a social security number, but that information was not entered into their record.

b. State Board Defendants will further direct county boards of elections that on or before August 31, 2025, each board will review and correct records in the HAVA List for voters who registered before HAVA's effective date of January 1, 2004 but whose current records indicate an incorrect registration date.

8. List-maintenance procedures unaffected by the Remedial Plan. Pursuant to 52 U.S.C. § 21083(a)(2)(A)(i), nothing in the Order or the Remedial Plan alters the requirement that for any "individual… to be removed from the computerized list, such individual shall be removed in accordance with the provisions of the National Voter Registration Act of 1993," 52 U.S.C. §§ 20501 *et seq.*, "including subsections (a)(4), (c)(2), (d), and (e) of section 8" of the NVRA, 52 U.S.C. § 20507.

9. Training, instructions, and oversight. State Board Defendants will ensure that county boards of elections and all appropriate election officers and officials receive appropriate training and instructions on voter registration procedures that comply with Section 303(a)(5) of HAVA, including use of HAVA-compliant registration forms and instructions and timely entry into the HAVA List of any updates or changes to a voter record within the time provided for in Paragraph 4(d). State Board Defendants will monitor compliance with Section 303(a)(5) requirements, as set forth in Paragraphs 9 and 10, and take any other steps necessary, as provided by law, to ensure the State's HAVA List is maintained consistent with the requirements of Federal law.

10. Reporting requirements.

a. On or before August 31, 2025, State Board Defendants will file with the court and provide to the United States a copy of all materials mailed to voters

pursuant to Paragraph 6(a) of the Order.

b. On or before December 1, 2025, State Board Defendants will file with the court and provide to the United States a written report indicating the number of voters sent the first mailings identified in Paragraph 6(a) of the Order, the date the mailings went out, and the number of and date of all records subject to the mailings that were updated.

c. On or before February 1, 2026, State Board Defendants will file with the court and provide to the United States a written report indicating the number of voters sent the second mailings identified in Paragraph 6(b) of the Order, the date the mailings went out, and the number of and date of all records subject to the mailings that were updated.

d. On or before October 15, 2025, State Board Defendants will file with the court and provide to the United States a written report of the updates to the HAVA List made by the county boards of elections pursuant to Paragraph 7 of the Order.

e. Annual report. Beginning in 2026, on or before April 30th, State Board Defendants will file with the court and provide to the United States a written report of all steps taken to comply with the Order and with Section 303(a)(5) of HAVA since the previous report that State Board Defendants filed under this Order.

11. State Board Defendants will make available to the United States upon request any non-privileged documents created or maintained by State Board Defendants regarding compliance with this Order or compliance with Section 303(a)(5) of HAVA, including voter records in the State's HAVA List and any relevant documents that the State Board Defendants may be required to produce or retain under North Carolina State law. As used herein, "voter records" means an

electronic copy of the State's HAVA list including each registrant's full name, date of birth, residential address, his or her driver's license number or state identification number or the last four digits of the registrant's social security number, which is the information required under HAVA to register individuals for Federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i). All records and data received by the United States from the State Board Defendants will be kept securely and treated consistently with the Privacy Act, 5 U.S.C. § 552a, et seq. To the extent confidential records or data is requested, the State Board Defendants reserve the right to seek a protective order from the court.

12. Upon entry of this Order, Plaintiff's claims shall be dismissed without prejudice. Plaintiff and Defendants shall bear their own costs and fees for this litigation.

13. This Order is final and binding between the United States and State Board Defendants and their successors in office regarding the claims raised in this action.

14. The Order shall take effect immediately upon being approved by the court and entered upon the docket ("the effective date").

15. This Order shall remain in effect from its effective date until June 30, 2027, unless a party obtains an extension pursuant to Paragraph 16.

16. This court shall retain jurisdiction of this case to enter further relief or such other orders as may be necessary for the effectuation of the terms of this Order and to ensure compliance with Section 303(a)(5) of HAVA. For good cause shown, any party may move to extend the Order or to reopen the case.

17. As set forth herein, the court finds that all interests are adequately represented by the parties in this enforcement action, and the matters raised in the action are fully and finally settled. Therefore, the motions to intervene [DE 7, 34, and 39] are DENIED AS MOOT.

18. The Clerk of the Court shall administratively close this case.

SO ORDERED this 8th day of September, 2025.

Richard E. Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 12 2006

JAMES N. HATTEN, Clerk
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| The UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>The STATE of GEORGIA; and<br>CATHY COX, Secretary of State,<br>in her official capacity,<br><br>Defendants. | ) | Civil Action No.<br><br>1 06 CV 2442<br><br>CC |

## COMPLAINT

The plaintiffs UNITED STATES OF AMERICA herein, alleges:

1. The United States hereby files this action on behalf of the United States of America to enforce the requirements of the Civil Rights Act of 1960, 42 U.S.C. § 1974 *et seq*. ("CRA"), with respect to the production of voter registration data for federal office in the State of Georgia. 42 U.S.C. §§1974 and 1974b.

## JURISDICTION AND VENUE

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. § 1974d.

3. Venue for this action is proper in the United States District Court for the Northern District of Georgia, pursuant to 28 U.S.C. §§ 90 and 1391(b).

## PARTIES

4. Plaintiff the UNITED STATES OF AMERICA seeks to compel production of records pursuant to 42 U.S.C. §§ 1974b and 1974d, which authorize the Attorney General of the United States to bring suit when a jurisdiction fails to maintain and/or make available all records and papers relating to voter registration for federal elections.

5. Defendant STATE of GEORGIA is a State of the United States of America and is subject to the requirements of 42 U.S.C. § 1974.

6. Defendant CATHY COX is the Secretary of State and the chief State elections official for the defendant STATE of GEORGIA and is responsible for custody and maintenance of voter registration records for all persons eligible to vote under State law. O.C.G.A. § 21-2-210; 42 U.S.C. § 1974e.

## CLAIM FOR RELIEF

7. Under Section 1974, every officer of election shall retain and

preserve, for a period of twenty-two (22) months from the date of any federal election, all records and papers relating to voter registration. 42 U.S.C. § 1974.

8. Any record or paper required to be retained and preserved under 42 U.S.C. § 1974, upon written demand by the Attorney General or his representatives, must be made available to the Attorney General or his representatives for inspection, reproduction and copying. 42 U.S.C. § 1974b.

9. On July 11, 2006, attorneys for the Department of Justice ("Department"), representatives of the Attorney General, sent a letter ("demand letter"), pursuant to 42 U.S.C. § 1974b, to the Deputy Attorney General of Georgia, Counsel for the Secretary of State, formally demanding, among other things, the current Georgia voter registration list including the voters' social security numbers, and providing a basis for that demand, specifically to assess compliance by the State with the procedures for voter registration at motor vehicle licensing and other State agencies, as well as the list maintenance provisions of the National Voter Registration Act, 42 U.S.C. § 1973gg *et seq.* ("NVRA").

10. The July 11, 2006, demand letter requested the voter registration list including the full social security number for each voter regularly maintained by

the State as part of voter registration.

11. The State has declined to provide the records absent an Order from a Court of the United States in light of a State statute limiting access to such records. O.C.G.A. § 21-2-225. This statute is superseded, however, by the relevant federal statute. See 42 U.S.C. § 1974b; U.S. CONST. art VI, cl.2.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff the UNITED STATES OF AMERICA prays for an order:

1. Declaring that Defendants are in violation of 42 U.S.C. § 1974b with respect to the production of voter registration data, which they are required to provide upon demand in writing to the Attorney General;

2. Compelling Defendants to immediately make available for inspection, reproduction and copying, the requested voter registration records, in electronic format pursuant to 42 U.S.C. § 1974b.

3. Plaintiff further prays that this Court order such relief as the interest of justice may require, together with the costs and disbursements of this action.

Dated: October 10, 2006.

Respectfully submitted,

By:

DAVID E. NAHMIAS
United States Attorney

SHARON D. STOKES
GA Bar No. 227475
Assistant U.S. Attorney

ALBERTO R. GONZALES
Attorney General

WAN J. KIM
Assistant Attorney General
Civil Rights Division

JOHN TANNER
DC Bar No. 318873
Chief, Voting Section

ROBERT D. POPPER
NY Bar No. 2357275
Special Litigation Counsel
CHRISTY A. McCORMICK
VA Bar No. 44328
NICOLE S. MARRONE
PA Bar No. 89863
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-305-0526
Facsimile: 202-307-3961

RECEIVED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 12 2006

JAMES N. HATTEN, Clerk
By: [signature] Deputy Clerk

ORIGINAL
FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 27 2006

JAMES N. HATTEN, Clerk
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

The UNITED STATES OF AMERICA )
)
Plaintiff, ) Civil Action No.
)
v. ) 1 06 CV 2442
)
The STATE of GEORGIA; and )
CATHY COX, Secretary of State, )
in her official capacity, )
)
Defendants. )

CC

## CONSENT JUDGMENT AND DECREE

The United Stated filed the Complaint in this action on this date pursuant to 42 U.S.C. §§ 1974b and 1974d, which authorize the Attorney General of the United States to bring suit when a jurisdiction fails to maintain and/or make available all records and papers relating to voter registration for federal elections. The Attorney General alleges that the defendants violated 42 U.S.C. § 1974b by failing to make available upon written demand the Georgia voter registration list with any social security numbers collected by the state for voter registration purposes, for inspection,

reproduction and copying. The defendants seek a declaration authorizing such inspection, reproduction and copying from a Court of the United States.

The parties are desirous of resolving this matter without the need for litigation. Accordingly, they have engaged in good faith negotiations and have agreed to the terms of this Consent Judgment and Decree as an appropriate resolution of all claims alleged in this litigation.

This Court has jurisdiction over the parties and the subject matter of this litigation. This agreement is final and binding between the parties, their successors in office, and their agents regarding the claims raised in this action.

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that:

1. Defendants are enjoined to take the actions specified below to comply with 42 U.S.C. § 1974b and to make available to the United States all records and papers relating to voter registration for federal elections, specifically the State's voter registration list, including Social Security numbers that the State has collected for voter registration purposes.

## PROVISION OF INFORMATION BY THE STATE

2. Defendants shall immediately make available to the United States the full statewide voter registration list including each registered voters' full name, address, birth date and all additional voter identification information, including social security numbers or drivers license numbers as collected by the State for voter application and registration purposes. The State shall produce such data in electronic format on a CD-ROM or DVD formatted in consultation and full agreement with the United States.

## SCOPE OF USE OF INFORMATION

3. The United States shall use the voter registration list information to assess the state's compliance with the federal voting laws, including, but not limited to, the National Voter Registration Act, 42 U.S.C. §1973gg *et seq.* ("NVRA") and the Help America Vote Act of 2002, 42 U.S.C. § 15301 *et seq.* ( "HAVA").

4. Pursuant to 42 U.S.C. § 1974c, unless otherwise ordered by a court of the United States, neither the Attorney General, nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to 42 U.S.C. § 1974, or

any reproduction or copy, except to Congress and any committee thereof, or in the presentation of any case or proceeding before any court or grand jury.

5. The United States shall retain any and all records concerning the subject matter of this Decree during the term of its use of the information, and shall then destroy the information and any copies pursuant to appropriate and approved Department of Justice procedures for destruction of sensitive data.

6. In the event that the United States identifies information indicating an issue as to compliance with federal law, the United States agrees to provide the State with such information as is necessary and appropriate to offer an opportunity to address and correct such issue. Provision of such information will not be deemed to waive any attorney-client or attorney work product privileges. Plaintiff retains the right to take legal redress at any time, if necessary, to compel the State and/or the Secretary of State to comply with federal law.

7. Any notices sent by the respective parties pursuant to provisions of this Decree shall be sent to:

For the United States:

John K. Tanner
Chief, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W., Room 7254-NWB
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
Email: robert.popper@usdoj.gov
Email: christy.mccormick@usdoj.gov
Email: nicole.marrone@usdoj.gov

For the Defendants:

Dennis R. Dunn, Esq.
Deputy Attorney General
Department of Law
State of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
Phone: (404) 656-5614
Fax: (404) 657-9932
Dennis.Dunn@LAW.State.GA.US

The provisions of this Decree shall expire on December 31, 2009. The Court retains jurisdiction of this action to enforce the terms of this Decree during the effective period of this Decree.

Entered this 27th day of October, 2006.

Clarence Cooper
JUDGE

Approved as to form and content:

**For the Plaintiff, United States of America:**

ALBERTO R. GONZALES
Attorney General

DAVID E. NAHMIAS
United States Attorney

WAN J. KIM
Assistant Attorney General
Civil Rights Division

SHARON D. STOKES
GA Bar No. 227475
Assistant U.S. Attorney

JOHN TANNER
DC Bar No. 318873
Chief, Voting Section

ROBERT D. POPPER
NY Bar No. 2357275
Special Litigation Counsel
CHRISTY A. McCORMICK
VA Bar No. 44328
NICOLE S. MARRONE
PA Bar No. 89863
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-305-0526
Facsimile: 202-307-3961

**For the Defendants, the State of Georgia and Cathy Cox, Secretary of State, in her official capacity::**

Thurbert E. Baker
Attorney General
State of Georgia

Dennis R. Dunn
Deputy Attorney General
State of Georgia
Department of Law
40 Capitol Square SW
Atlanta, GA 30334
Telephone: 404-656-5614
Facsimile: 404-657-9932

**MEMORANDUM OF UNDERSTANDING**

The following memorandum of understanding ("MOU") is entered into by and between the United States Department of Justice ("DOJ") and Secretary of State Phil Wilson, acting in his official capacity as the Secretary of State ("SOS") of the State of Texas.

WHEREAS, in the absence of this MOU, DOJ would, pursuant to 42 U.S.C. §§ 1974b and 1974d, seek to compel the production of the current Texas voter registration list, including, *inter alia*, voters' driver license numbers, social security numbers, and other personal information, from the SOS in order to assess compliance by the State of Texas with the procedures for voter registration at motor vehicle licensing and other state agencies, as well as the list maintenance provisions of the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg *et seq.*; and

WHEREAS, Texas law, specifically TEX. ELEC. CODE §§ 13.004(c); 18.066(b), provides that information, including social security numbers and driver license numbers, furnished on a voter registration application is confidential and is not subject to public disclosure under the Texas Public Information Act, TEX. GOVT. CODE chapter 552; and

WHEREAS, the SOS has an interest, duty and desire to ensure compliance with these and other statutory provisions that are intended to protect the privacy of Texas residents; and

WHEREAS, DOJ and SOS acknowledge that DOJ is entitled to receive and that SOS is required to provide the requested information under the relevant statutes and pursuant to the Supremacy Clause of the United States Constitution; and

WHEREAS, neither DOJ nor the SOS consider DOJ's request under 42 U.S.C. § 1974b to be a request for public information for purposes of the Texas Public Information Act; and

WHEREAS, neither DOJ nor the SOS consider SOS's compliance with this request to be a release of public information to a member of the public for purposes of Tex. Elec. Code § 13.004(c), Tex. Elec. Code § 18.066(b) or the Texas Public Information Act; and

WHEREAS DOJ and SOS are desirous of resolving this matter without the need for litigation which, in the absence of this MOU, both DOJ and the SOS believe would be imminent;

ACCORDINGLY, DOJ and SOS have engaged in good faith negotiations and have agreed to the terms of this Memorandum of Understanding, as follows:

1. SOS shall immediately make available to DOJ the full statewide voter registration list including, where available, the following information: each registered voters' full name, address, full date of birth, social security number, driver license number, race, voter status (*i.e.*, active or inactive), and voting history. SOS shall produce such data in electronic format on a CD-ROM or DVD formatted in consultation and full agreement with DOJ.

2. DOJ shall use the voter registration list information to assess the State's compliance with the federal voting laws, including, but not limited to, the NVRA.

3. Pursuant to 42 U.S.C. § 1974c, unless otherwise ordered by a court of the United States, neither the Attorney General, nor any employee of DOJ, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to 42 U.S.C. § 1974, or any reproduction or copy, except to Congress and any committee thereof, or in the presentation of any case or proceeding before any court or grand jury; provided, however, that in the event that DOJ receives a request to provide or disclose this information to anyone outside of DOJ, then DOJ will make reasonable efforts to inform the SOS of this request, and provide SOS with the opportunity to take whatever action SOS considers necessary to ensure that this information remains confidential and is not disclosed to the public.

4. The DOJ shall retain exclusive possession and control over any and all voter registration records and information during the term of its use of the information, and shall then destroy the records and information pursuant to appropriate and approved DOJ procedures for destruction of sensitive data.

IN WITNESS WHEREOF, the parties have executed this MOU as of the date set forth below. Each party represents that its respective signatory is duly authorized to execute this MOU on its behalf.

FOR THE OFFICE OF THE TEXAS SECRETARY OF STATE

Phil Wilson Date: 5/7/08

By: The Honorable Phil Wilson
Title: Texas' Secretary of State

FOR THE DEPARTMENT OF JUSTICE:

Christopher Coates Date: 5/13/08

CHRISTOPHER COATES
Acting Chief
ROBERT POPPER
Acting Deputy Chief
AMANDA E. GREGORY
STEVEN WRIGHT
Trial Attorneys
Voting Section; Civil Rights Division
U.S. Department of Justice
Room 7254NWB
950 Pennsylvania Avenue
Washington, D.C. 20530
(202) 616-4227 (phone)
(202) 307-3961 (facsimile)
Attorneys for United States of America

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KRIS WARNER, in his official capacity as West Virginia Secretary of State,<br><br>Defendant. | Civil Case No.: 2:26-CV-00156-TEJ |

**UNITED STATES' MEMORANDUM SUPPORTING ITS MOTION TO COMPEL FEDERAL ELECTION RECORDS UNDER THE CIVIL RIGHTS ACT OF 1960**

This is a straightforward case. It is an action under Title III of the Civil Rights Act of 1960 ("CRA") for federal election records. The CRA empowers the United States to immediately obtain those records, including West Virginia's statewide Voter Registration List ("SVRL"). It broadly authorizes the Attorney General to compel production of "all records and papers" that "come into … possession" of officers of election relating to registration or other acts requisite to voting in federal elections. 52 U.S.C. § 20701. Title III of the CRA provides a unique investigative tool to the Attorney General to determine whether a federal lawsuit "should be instituted" and through a summary proceeding "to obtain evidence for use in such cases if and when filed." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); *see also In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") ("Congress has said that such records shall be made available to the Attorney General upon his demand therefor. He is the chief law enforcement officer of the nation. He desires to ascertain himself whether or not any violation of Federal law has occurred...").[1] In crafting the CRA's mandate in this way, Congress respected the federal structure. It recognized that state governments are responsible for conducting elections for federal office, balanced against the Attorney General's need to confirm that they are doing so in compliance with federal law. Its approach is one of "trust but verify," and ensures that federal elections are conducted transparently.

The United States made a written demand for federal election records to an officer of election for West Virginia, identifying the basis for the demand – Title III of the CRA – and the purpose for the demand – to assess West Virginia's compliance with the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). *See* Compl. ¶¶ 20-25. That

---

[1] The Fifth and Eleventh Circuits are the only federal circuits in which there is controlling authority addressing the CRA. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1210 (11th Cir. 1981) (en banc) (decisions by the Fifth Circuit issued before September 30, 1981, are binding in the Eleventh).

demand was denied. *See* Compl. ¶ 26. Therefore, pursuant to the CRA, the United States has filed this action requesting through a summary proceeding that the Court issue an order compelling production of the requested federal election records, including the SVRL. *See Lynd*, 306 F.2d at 225-26; 52 U.S.C. §§ 20703, 20705.

## I. BACKGROUND

The Attorney General of the United States brought this case as part of his investigation of West Virginia's compliance with provisions of federal election law. On September 8, 2025, the United States sent correspondence to West Virginia Secretary of State Kris Warner ("Secretary Warner"), requesting cooperation by providing federal election records necessary to its assessment ("September 8 Letter"). Neff Decl. ¶ 7 & Ex. 1. In that correspondence, the United States cited the CRA as the basis for the request and stated that the purpose was to assess West Virginia's compliance with HAVA and the NVRA. Those efforts were met by Secretary Warner's refusal to produce the requested records as mandated by Title III of the CRA. *Id.* at ¶ 9 & Ex. 2. This action followed. *See* Compl., Dkt. 1.

## II. LEGAL STANDARD

The CRA restricts the Court to a "severely limited" inquiry: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the officer(s) of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that he satisfied the first three elements. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. As discussed below in detail, the record before the Court demonstrates that the United States has satisfied each of these

requirements.

## III. ARGUMENT

The CRA requires that the Court review the Attorney General's Motion to Compel federal election records on an expedited basis using a summary proceeding without discovery. Through its Motion, the United States has established that it provided Secretary Warner with notice of this action and a written statement of basis and purpose, which he rejected. As a result, Secretary Warner cannot establish that there remains any "matter[] open for determination" under the Court's "severely limited" inquiry. *Lynd*, 306 F.2d at 226. To the extent that state laws purport to limit production of the federal election records to the Attorney General, they are preempted by the CRA. Therefore, the United States respectfully submits that its Motion to Compel should be granted and an order compelling production of West Virginia's SVRL and other responsive federal election records entered.

### A. The Attorney General's Motion to Compel is a demand to be reviewed in a summary proceeding without discovery.

The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*." *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative." *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen.*, 285 F.2d 430 (5th Cir. 1961). It does not require known violations of federal law, but is a tool to evaluate "possible violations…" *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). In other words, "Congress has specifically committed the investigative responsibility to the Attorney General and has equipped him with machinery thought suitable for the effective fulfillment of that obligation" through Title III of the CRA. *Lynd*, 306 F.2d at 230. That approach makes sense. The United States cannot be

expected to effectively enforce federal election laws such as HAVA or the NVRA if the Attorney General is required to allege facts from federal election records that state officers of election have denied to him. *See id.* at 227 (the Attorney General's "right to records does not require that he show he could win without them").

The Attorney General's filing of an application for an order under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Id.* at 225. It is "a special statutory proceeding in which the courts play a limited, albeit vital, role."[2] *Id.* It functions much like an administrative summons. Therefore, "it does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing CRA applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations").[3] "There is no place for any other procedural device or maneuver" in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also id.* at 225 (explaining that a contrary construction reflects "a basic misconception … concerning a Title III proceeding.").

Since a CRA summary action functions like an administrative summons, "the matters open for determination … are, of course, severely limited." *Lynd*, 306 F.2d at 226. The only issues to be

---

[2] The Supreme Court has recognized that statutes that vest investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). "It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt,* 338 U.S. at 643.

[3] The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *See Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added).

assessed if there "is a genuine dispute" are "whether the written demand has been made … or whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Id.* That expedited and limited procedure was not altered by the passing reference in a footnote in *United States v. Powell* that the Federal Rules of Civil Procedure apply where a statute "contains no provision specifying the procedure…" 379 U.S. 48, 58 n.18 (1964). Rather, as the Supreme Court subsequently clarified, "the post-*Powell* cases, too, are clearly and consistently to the effect that the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 529 (1971), *superseded by statute on other grounds* as stated in *Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023).

In *United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789, (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 25, 2026), the court followed that approach and construed "a request for records under the CRA as a form of administrative subpoena." *Id.* at *7 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, the court explained, "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…'" *Benson*, 2026 WL 362789, at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). The court further noted "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Benson*, 2026 WL 362789, at *7 (quoting *Markwood*, 48 F.3d at 976). Consistent with the Supreme Court's clarification of footnote 18 in *Powell*, the *Benson* court recognized the propriety of "'a summary enforcement proceeding'" under Title III of the CRA. 2026 WL 362789, at *7 (quoting *Donaldson*, 400 U.S. at 529).

On the other hand, two District Courts in the Ninth Circuit recently misconstrued the nature of the CRA's summary proceeding. In *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026), *appeal docketed* No. 26-1232 (9th Cir. Feb. 25, 2026), the court misread the Supreme Court's decision in *Powell* to reject the Fifth Circuit authority that the Federal Rules of Civil Procedure do not apply to the CRA's special statutory proceeding. *See Weber*, 2026 WL 118807, at *8 & n.15. However, *Powell* merely observed that the Rules could be applied where no process was specified. *See* 379 U.S. at 58 n.18. As discussed above, it did not "impair a summary enforcement proceeding," *Donaldson*, 400 U.S. at 529, such as the one used by the CRA.

A separate decision in *United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Feb. 25, 2026), also applied a much broader construction of *Powell* than the Supreme Court intended. *Oregon* found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. 2026 WL 318402, at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). Although the quoted language from *Powell* is correct, *see id.*, the *Oregon* court omitted any explanation that the quoted language referred to a process expressly provided in the IRC that does not exist in the CRA. The Supreme Court explained that judicial inquiry was appropriate when asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." Powell, 379 U.S. at 58. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a

taxpayer "to unnecessary examination or investigations." *Id.* at 52 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for officers of election to object to Title III proceedings being initiated against them. *See id.*

Moreover, even with language in the IRC limiting records to "necessary" investigations, the Supreme Court noted in *Powell* that strong deference is given to the Government to investigate, and "'does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, *or even because it wants assurance that it is not*.'" 379 U.S. at 57 (quoting *Morton Salt*, 338 U.S. at 642-43) (emphasis added). *Powell* is completely consistent with *Lynd*. It does not support *Oregon*'s restrictions on records demands under the CRA to the statutory limitations that Congress included in the IRC.[4]

The *Weber* court also cited *Becker v. United States*, 451 U.S. 1306 (1981) to say that "the federal government's demands for documents are governed by the Federal Rules of Civil Procedure." *See Weber*, 2026 WL 118807, at *8.[5] *Becker* involved an administrative summons under the Internal Revenue Code ("IRC"). In that case, then-Justice Rehnquist recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under

---

[4] The *Oregon* decision similarly misread *Lynd* by reasoning "the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation" instead of applying "directly to the court for the records." *Oregon*, 2026 WL 318402, at *8 n.1. *Lynd* does not say filing a pleading waives the expedited process under the CRA. Instead, as discussed above, the Fifth Circuit explained only that any pleadings that are filed do not need to "satisfy usual notions under the Federal Rules of Civil Procedure." 306 F.2d at 225-26.

[5] *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority.

the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (quoting *Donaldson*, 400 U.S. at 528-29). Justice Rehnquist distinguished between agency efforts "to take what is potentially income-producing property" from efforts to "merely require [the respondent] to produce evidence." *Id.* at 1308. Although "the need for summary enforcement of IRS summonses is clear and justifies dispensing with Federal Rules" in the latter context (gathering evidence), "the need to proceed summarily is less clear, as is the justification for dispensing with otherwise applicable provisions of the Federal Rules" in the former context (seizing income-producing property). *Id.*; *see also id.* at 1310-11. When it comes to requests for evidence, "[o]bviously the taxpayer cannot simply write his own ticket as to the manner in which relevant nonprivileged evidence shall be made available to the IRS." *Id.* at 1311. In other words, far from supporting *Weber's* conclusion that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it. Therefore, summary proceedings apply to this Title III action.

**B. The Motion to Compel should be granted because the United States provided notice of this action and a written demand stating its basis and purpose.**

The CRA establishes a well-defined means by which the Attorney General may expeditiously obtain federal election records. It imposes a "sweeping" obligation requiring officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 of the Act provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 of the Act authorizes the Attorney General of the United States to compel

any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or his representative." 52 U.S.C. § 20703. After that written demand has been made, and the officer of election has rejected it, the Attorney General may seek an order from the federal court "to compel the production of such record or paper." 52 U.S.C. § 20705. Each of those requirements is met here.

On September 8, 2025, the Department of Justice sent the Secretary Warner a written demand for a copy of West Virginia's SVRL. *See* Neff Decl. ¶ 7 & Ex. 1. As stated in that correspondence, the basis for the demand was Title III of the CRA and the purpose was "to ascertain compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* Although it was unnecessary to state a factual basis for the demand, *see Lynd*, 306 F.2d at 226, the Department of Justice nevertheless provided one. As it explained in its written demand, West Virginia's SVRL was needed to provide the means "to assess [West Virginia's] compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*." Neff Decl., Ex. 1. On February 11, 2026, Secretary Warner rejected the Attorney General's written demand. *Id.* at ¶ 9 & Ex. 2.

Section 303's requirement that the written demand "contain a statement of the basis and the purpose therefor," 52 U.S.C. § 20703, "means only that the Attorney General identify in a general way the reasons for his demand." *Coleman II*, 313 F.2d at 868 (citation omitted). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible violations* of a Federal statute." *Id.* (emphasis added); *see also Coleman I*, 208 F. Supp. at 200 (the written demand need only indicate the records were needed "to see if any federal laws were violated"); *cf. Morton Salt*, 338 U.S. at 642-43 (same construction of administrative subpoena by the FTC). It does not require any factual basis *proving* a violation of

federal law, which would undermine the "purely investigative" nature of Section 303. *Gallion*, 187 F. Supp. at 854; *see also Benson*, 2026 WL 362789 at *8 ("The CRA aids the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights. Thus, the DOJ may use the CRA to investigate possible violations of the NVRA.") (citations omitted). As a result, the United States satisfied the "basis and purpose" requirement by stating that the basis was the CRA and the purpose of the request was "to ascertain West Virginia's compliance with the list maintenance requirements of the NVRA and HAVA." as required by federal law. Neff Decl., Ex. 1.

The United States then proceeded to file this action in "the district in which [the] demand was made pursuant to [Section 303], or in which a record or paper so demanded is located…" 52 U.S.C. § 20705. In its Complaint (Dkt. 1), the United States provided "a simple statement by the Attorney General that after a … written demand for inspection of records … covered in [Section 301], the person against whom an order for production is sought … has failed or refused to make" the SVRL "'available for inspection, reproduction, and copying.'" *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703). The United States provided notice to Secretary Warner through service of the Complaint (Dkt.1). As a result, the United States has established the CRA's requirements for compelling production of the SVRL and other responsive federal election records.

"[T]he prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 855 (emphasis added). And when the language is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting the CRA in a manner that better suits non-compliant officers of election. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is

limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). That does not change merely because the CRA has long been in effect. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…").

Officers of election and other parties likewise are prohibited from using any "procedural device or maneuver" to challenge or "ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Lynd*, 306 F.2d at 226. No discovery or other tools ordinarily available under the Federal Rules of Civil Procedure may be used to question or examine "the reasons why the Attorney General considers the records essential…" *Id.* "Questions of relevancy or good cause or other like considerations" that may be assessed under other statutes to which the Federal Rules of Civil Procedure are applicable "are completely foreign to the summary proceeding" under Section 304 of the CRA. *Id.* at 228. Congress vested the Attorney General with broad authority to obtain federal election records under Title III of the CRA. *Coleman I*, 208 F. Supp. at 200-01. In sum, "the factual foundation for, or the sufficiency of, the Attorney General's" written demand under Section 303

"is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226; *cf. Powell*, 379 U.S. at 56 (explaining that there is no judicial oversight "to oversee the [IRS] Commissioner's determinations to investigate").

The *Benson* court acknowledged the "severely limited" inquiry that was to be applied to CRA motions to compel. *Lynd*, 306 F.2d at 226. It rebuffed the state's efforts to dispute the accuracy of the Attorney General's allegations of the state's list maintenance practices. *Benson*, 2026 WL 362789, at *8. The court reasoned, "the CRA does not allow courts to evaluate the substance of the DOJ's purported basis and purpose." *Id.* (citing *Lynd*, 306 F.2d at 226).

*Benson* found that the United States had adequately explained why its records request was "reasonably related to [the state's] compliance with the NVRA." 2026 WL 362789, at *9. That explanation was the same one provided by the United States in this case:

> The DOJ asserts that it intends to use [the state's] voter registration list to determine whether the State is properly removing ineligible voters and duplicate registrations from the rolls. It further contends that the entries [the state] seeks to omit from the [voter] list [that was requested under Section 303 of the CRA] – such as SSNs and driver's license numbers – are "necessary to identify duplicate registration records, registrants who have moved, and registrants who have died or otherwise are no longer eligible to vote in federal elections."

*Id.* (citation omitted). The *Benson* court therefore applied the deference the Supreme Court has instructed is afforded to the Government in its exercise of investigatory powers. *See*, *e.g.*, *Powell*, 379 U.S. at 57. It concluded, "[g]iven the Court's limited role in reviewing the purpose behind an administrative subpoena, the DOJ's representations sufficiently establish that [the state's] voter registration list is relevant to investigating the State's compliance with the NVRA." *Benson*, 2026 WL 362789, at *9.

### C. West Virginia's SVRL is a record subject to production under Title III of the CRA.

While the *Benson* decision largely comports with the United States' position, it made a significant legal error in its construction of the federal election records covered by the CRA. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added). This language is unequivocal in its breadth. "Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved … if they relate to acts requisite to voting in such election." *Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701). "[T]he papers and records" covered by Section 301 "have been specifically identified by Congress." *Lynd*, 306 F.2d at 226. As *Lynd* succinctly explained, "All means all." 306 F.2d at 230.

The *Benson* court read Section 301 much more narrowly and denied production of a SVRL to the Attorney General because the court determined that the CRA applies "only to documents that people *submit* to the State as part of the voter registration process, not a document like the voter registration list that is *created* by state officials." 2026 WL 362789, at *9 (emphasis added). The United States respectfully disagrees; no other federal court has adopted such a limitation. Moreover, today many voter registration applications are only in a compiled electronic form in a SVRL.[6] Such a reading would effectively carve out vast numbers of federal election records,

---

[6] According to data reported to the U.S. Election Assistance Commission for the State, it is doubtful that millions of federal voter registration records exist in any medium other than electronic form. A large percentage of voter registration transactions are accomplished online or

including voter rolls, which was plainly not the intention of Congress in passing such "sweeping" legislation. *Lynd*, 306 F.2d at 226. Indeed, courts specifically have recognized that Section 301 reaches "records of voting registration," *United States v. Mississippi*, 380 U.S. 128, 134 (1965), including voter registration lists, *see, e.g.*, *United States v. Maine*, Civ. A. No. 06-0086, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985). Even the *Benson* court expressed some discomfort at its conclusion, acknowledging that it was possible that "the distinction between voter registration applications and voter registration lists is overly pedantic…" 2026 WL 362789, at *10. Nevertheless, *Benson* attributed any failing in that respect to "a pedantic distinction *made by Congress*…" *Id.* (emphasis in original).

Federal courts have rejected similar attempts to limit the scope of voting records under other statutes. In *Judicial Watch, Inc. v. Lamone*, the defendants argued that a "voter list is not a 'record' under Section 8(i)" of the NVRA, and even if it was, Maryland law allowed election officials to "limit the production of voting-related records more strictly than the NVRA." 399 F. Supp. 3d 425, 434 (D. Md. 2019). The court disagreed. It explained that Maryland misunderstood the NVRA's requirements and the plaintiff was entitled to the registered voter list because "a voter list is simply a partial compilation of voter registrations" encompassed by the Act. *Id.* at 442. The court also was persuaded that the "focus on the information sought" was significant "rather than the particular language used to characterize that information." *Id.* at 440 (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)); *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d

---

through other means not completed by a paper document. U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2024 Comprehensive Report (June 2025) at 163, *available at* https://www.eac.gov/research-and-data/studies-and-reports (last visited March 26, 2026).

331, 337 (4th Cir. 2012) (finding "all records" under Section 8(i)(1) included voter registration records).

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 2026 WL 362789, at *10. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 20701, 20703. According to the *Benson* court, "'*come* into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789, at *9 (first emphasis added). That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). Secretary Warner acquired the relevant records in the course of carrying out his duties as an officer of elections responsible for administering elections in West Virginia.

The *Benson* court's focus on the word "come" cannot create a carve-out for self-generated documents. Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. *See Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) ("to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or trigger duties to act based

on acquiring information or property *at a particular time*.[7] Following this focus on the *when* and *how* an individual gains possession of a record or paper, 52 U.S.C. § 20701 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision – and then only "for a period of twenty-two months from the date" of that same election.

Contrary to the *Benson* court's construction, then, "distinction[s] between possessing something and having something come into one's possession," 2026 WL 362789, at *9, are temporal distinctions – not distinctions between obtaining records from an outside source and through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

In any event, even if the *Benson* court's distinction between self-generated records and papers and those acquired from another source had merit, it would be irrelevant in all but the most

---

[7] *See, e.g.*, 44 U.S.C. § 3572(f) ("comes into possession of such information by reason of his or her being an officer"); 13 U.S.C. § 214 (similar); 30 U.S.C. § 1732(b) ("as soon as practicable after it comes into the possession of the Secretary"; "30 days after such information comes into the possession of the Secretary"); 10 U.S.C. § 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received").

marginal cases. Sections 20701 and 20703 focus on individual "officer[s] of election" and "person[s] having custody, possession, or control of such record[s] or paper[s]." So even if someone in the Secretary of State's office generated the requested record and, under the *Benson* court's view, therefore did not "come into … possession" thereof himself or herself, any *other* "officer of election" within the same agency that acquires the record has indeed "come into … possession" of the record under that court's view and was obligated to "retain and preserve" it. 52 U.S.C. § 20701. Secretary Warner, now "having custody, possession, or control of such record or paper" must "ma[k]e [it] available for inspection, reproduction, and copying." *Id.* § 20703.

Finally, this construction would create absurd results. Title III was enacted to, *inter alia*, counteract discriminatory practices in allowing citizens to vote. *Lynd*, 306 F.2d at 228. (This is not to say that this is Title III's sole function. It is not.) The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the CRA. For example, in two of those matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and SSN4s, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.[8] To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic SVRL, so as to assure himself that the

---

[8] *See* Compl., *United States v. Georgia*, No. 1:06-cv-02442 (N.D. Ga. Oct. 12, 2006), Dkt. 1. The Court entered a consent decree in the Georgia case requiring production of the SVRL. *See Georgia*, *supra*, at Dkt. 4 (filed Oct. 27, 2006). The Texas matter was resolved by a Memorandum of Understanding (MOU). *See* U.S. Dep't of Just., MOU between the United States and Texas (May 13, 2008), *available at* https://www.justice.gov/media/1173461/dl?inline (last visited March 26, 2026); *See also United States v. North Carolina* 5:25-cv-00283 (E.D. N.C. Sept. 8, 2025). The four documents are provided herein as Neff Decl., Exs. 3-6.

applications are being properly processed and that reasonable list maintenance efforts have been practiced. *See* Neff Decl. ¶ 5. Limiting the Attorney General's ability to anything other than *all records* would make it nearly impossible for him to carry out the duties assigned to him by Congress.

**D. To the extent that state law conflicts with the requirements of the CRA, it is preempted.**

Secretary Warner cannot deny the Attorney General access to West Virginia's SVRL or other federal elections records because of conflicting state law. While the United States Constitution invests states with broad powers over the conduct of federal elections, it also explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.*; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the two statutes at issue in this litigation. Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*,

306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA).

The United States believes that state law can be read in harmony with federal law. If it cannot be, and there is a direct conflict between state and federal laws, then state law must yield. *See* U.S. Const. art. VI, cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15 ("States' role in regulating congressional elections – while weighty and worthy of respect – has always existed subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001)). In any event, the United States has complied and will continue to comply fully with all federal privacy laws applicable to the SVRL and other federal election records that are produced.

## IV. CONCLUSION

The Attorney General made a written demand for federal election records stating the basis and purpose for the demand to Secretary Warner, who is an "officer[] of election" subject to the CRA, and that demand was rejected. The United States has provided "a simple statement" to the Court establishing these facts. *Lynd*, 306 F.2d at 225-26; *see also* 52 U.S.C. § 20703. That is all that the CRA requires the Attorney General to establish to obtain the federal elections records he

seeks here. Accordingly, for the foregoing reasons, the United States respectfully submits that its Motion to Compel production of federal election records under Section 305 of the CRA should be granted.

DATED: April 3, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ Christopher J. Gardner
Christopher J. Gardner
Raymond Yang
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Christopher.Gardner@usdoj.gov
Raymond.Yang @usdoj.gov
202-812-2631

Attorneys for the United States

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**THE UNITED STATES OF AMERICA,**

***Plaintiff,***

**v.**

**KRIS WARNER, in his Official Capacity as WEST VIRGINIA SECRETARY OF STATE,**

***Defendant.***

**Civil Action No. 2:26-cv-00156**
**Hon. Thomas E. Johnston**

**DEFENDANT KRIS WARNER'S MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Kris Warner respectfully moves the Court to dismiss Plaintiff's complaint, ECF No. 1. This Motion is made on the grounds detailed in the accompanying Memorandum of Law.

Respectfully submitted,

/s/ *Michael R. Williams*
Michael R. Williams (WV Bar # 14148)
*Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
*Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

DATE: April 29, 2026

# EXHIBIT A

STATE OF WEST VIRGINIA
MONTANI SEMPER LIBERI

**Kris Warner**
Secretary of State
State of West Virginia

1900 Kanawha Blvd. E.
Building 1, Suite 157K
Charleston, West Virginia 25305

Telephone: (304) 558-6000
Toll Free: 1-866-SOS-VOTE
Fax: (304) 558-0900
www.wvsos.gov

February 11, 2026

**Via U.S. Mail & E-mail**

Eric Neff
Acting Chief
Civil Rights Division, Voting Section
Department of Justice
150 M St. NE, Ste. 8-1807
Washington, DC 20002
Eric.Neff@usdoj.gov

Dear Mr. Neff:

The Office of the West Virginia Secretary of State ("WVSOS") acknowledges receipt of your February 4, 2026, correspondence, wherein the U.S. Department of Justice ("DOJ") requests confirmation that the position expressed in our September 22, 2025, letter remains our position on this matter.

For context, on September 8, 2025, the DOJ demanded that the WVSOS provide an electronic, unredacted copy of West Virginia's statewide voter registration list. The DOJ's request states that the list must include, among other data fields, the voter registrant's full name, date of birth, residential address, and either the individual's state driver's license number or the last four digits of the registrant's Social Security number, as required under the Help America Vote Act ("HAVA") for individuals registering to vote in federal elections. *See* 52 U.S.C. § 20901, *et seq*.

The DOJ cited various legal authorities supporting this request, including provisions of HAVA; the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §20501, *et seq*.; Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701, *et seq*.; and The Privacy Act of 1974, 5 U.S.C. § 552a.

Prior to responding to the DOJ's original request, our Office performed a thorough review of the cited statutes, none of which require compliance with such a broad request.

As set forth in the DOJ's September 8, 2025, letter, the stated purpose of the request is to "assess your state's compliance with the statewide [voter registration list maintenance] provisions of the NVRA." However, the demand included only a vague explanation of the basis and specific purpose of the request.

Based on recent verbal communications with your office, the alleged purpose of the DOJ's request is to run West Virginia's entire voter list through the Systematic Alien Verification for Entitlements ("SAVE") database, which is administered by the U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Verification Division.

However, as we discussed, the WVSOS is a registered and recently approved user of the SAVE database. Despite this fact, and despite our offer to work collaboratively with the DOJ to utilize the SAVE database within the confines of federal and state law, the DOJ has restated its position that, under the CRA, it is entitled to the unredacted voter information of West Virginia citizens.

As set forth in our September 22, 2025, correspondence, West Virginia law protects the sensitive personally identifiable information of its voters, and the Secretary of State takes seriously his responsibility to safeguard such information from unauthorized disclosure. Nothing in the interim has altered our position.

The CRA, NVRA, and HAVA were enacted by Congress to protect voting rights. Congress places responsibility on the states to administer voter registration and elections in accordance with these statutes. To that end, West Virginia has enacted a series of statutes governing voter list maintenance. *See* W. Va. Code § 3-2-1, *et seq*. A summary of West Virginia's voter registration list maintenance procedures and data sources was included in our original letter.

At present, West Virginia has 1,195,305 registered voters. Since 2017, 408,397 voter registration records have been lawfully cancelled, 62,756 of which were cancelled under Secretary of State Kris Warner's administration. Nevertheless, to further assist your inquiry, we remain willing to provide a detailed narrative of our voter list maintenance procedures upon request.

W. Va. Code § 3-2-30(a) provides that any person may examine the voter registration records of West Virginia residents. However, the statute expressly prohibits the disclosure of a registrant's Social Security number or driver's license number. Further, the Privacy Act of 1974 provides that executive agencies may not collect personal or sensitive information from a West Virginia citizen exercising his or her constitutionally protected right to vote absent applicable statutory authority. No such exception exists under the CRA, NVRA, HAVA, or the Privacy Act of 1974.

The Secretary of State respects your position in this matter and remains willing to work with the DOJ to reach an amicable resolution within the limits of state and federal law. As set forth in our prior correspondence, the WVSOS makes voter registration lists available subject to the statutory limitations set forth above.

Please do not hesitate to contact me with any questions or concerns.

Sincerely,

David P. Cook
General Counsel
Office of the West Virginia Secretary of State
Main: (304) 558-6000
Email: DCook@wvsos.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**THE UNITED STATES OF AMERICA,**

***Plaintiff,***

**v.**

**Civil Action No. 2:26-cv-00156**
**Hon. Thomas E. Johnston**

**KRIS WARNER, in his Official Capacity as WEST VIRGINIA SECRETARY OF STATE,**

***Defendant.***

**DEFENDANT KRIS WARNER'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO DISMISS**

Michael R. Williams (WV Bar # 14148)
*Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
*Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

## INTRODUCTION

The United States seeks unredacted access to West Virginia's voter registration list. Secretary Warner cooperated as much as West Virginia law would allow him to, but he has explained that state law does not allow him to release the list without redactions. The Secretary thus asked the Government to accept a redacted list. Instead, the Government sued.

This same story is playing out in dozens of States across the country. The United States asks a State to turn over unredacted voter lists; the State refuses; the Government sues. But the Government's suits have not been successful. At least five federal courts have dismissed complaints nearly identical to this one.

These decisions come as no surprise. The Government's demand exceeds the agency's statutory authority in multiple ways. For one, it has provided no basis in fact for its request, instead pointing only to Title III generally. The demand also lacks a proper purpose under Title III—and the purpose given here warrants close scrutiny given the circumstances surrounding the demand. Finally, the documents the Government seeks fall outside the statute's scope.

Beyond its lack of statutory authority, the Government's demand comes with other problems. For one, it violates at least three federal privacy laws. For another, it interprets Title III in a way that would make the statute itself constitutionally suspect. And at bottom, the Government's authority is largely a moot point, as West Virginia's redaction law isn't preempted.

Because the Government demands more than what federal or state law allows, the Court should dismiss the Complaint.

## STATEMENT

### I. Federal law puts States in charge of elections.

The Constitution gives States primary responsibility over elections. The Elections Clause directs States to prescribe the time, place, and manner of congressional elections. U.S. CONST. art.

I, § 4, cl. 1. This constitutional prescription creates a "default" rule that States carry out all election "mechanics." *Foster v. Love*, 522 U.S. 67, 69 (1997). Congress must speak with clarity to change this default. *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

Congress has largely left the election arena to the States. Only a few relevant federal statutes speak to the issue.

First, Title III of the Civil Rights Act of 1960 directs States to retain certain voting records. 52 U.S.C. § 20701. As with the other provisions of the Civil Rights Act, Title III sought to eliminate racial discrimination in voting. *See United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). Under Title III, state election officials must "retain and preserve" "all records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" for a "period of twenty-two months" after any federal election. 52 U.S.C. § 20701. The Act imposes criminal penalties for altering documents subject to the "retention and preservation" requirement. *Id.* §§ 20701-02. The Attorney General may inspect, reproduce, or copy these records if he first provides an adequate "basis and purpose" for the request. *Id.* § 20703. Federal courts retain "jurisdiction by appropriate process to compel" production of those records if the request was properly made. *Id.* § 20705.

Second, the National Voter Registration Act (NVRA) of 1993 mandates States maintain accurate voter rolls. *See* 52 U.S.C. § 20507.

Third, the Help America Vote Act (HAVA) of 2002 requires States to keep a centralized voter registration database. *See* 52 U.S.C. § 21083(a)(1)(A).

**II. State law empowers West Virginia to administer elections.**

West Virginia law dictates most everything else about federal elections. As relevant here, it requires the State establish a permanent voter registration system, W. VA. CODE §§ 3-2-1–44. State law also allows people to examine voter registration records. *See id.* § 3-2-30(a). But that

latter provision prohibits disclosure of sensitive voter information, like Social Security or driver's license numbers. *See id.*

### III. The federal government seeks comprehensive, unredacted voter information.

In March 2025, President Trump issued an executive order instructing the federal government to obtain and review States' voter information. *Preserving and Protecting the Integrity of American Elections*, Exec. Order 14,248, 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025). The order directed the Department of Homeland Security to cross-check States' "publicly available voter registration list" and NVRA records of voter list maintenance activities against federal immigration databases and other state records. *Id.* (emphasis added).

Six months later, the Department of Justice began demanding comprehensive voter information nationwide. *See* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES (Sept. 9, 2025), https://tinyurl.com/mpd97sc3. On September 8, 2025, DOJ sent one such demand to Secretary Warner. The agency "demanded … [he] provide an electronic, unredacted copy of [the State's] statewide voter registration list," including a registrant's full name, date of birth, residential address, and driver's license number or the last four digits of their Social Security number. February 11, 2026 Letter, at 1[*]. DOJ cited Title III of the Civil Rights Act, the NVRA, and HAVA as the statutory bases for its request.

### IV. Secretary Warner responds.

The Secretary quickly replied to DOJ's demand, denying it for two reasons. First, the request was inadequate under federal law. September 22, 2025 Letter, ECF No. 14-3, at 2. The

---

[*] In considering a motion to dismiss, courts can consider "documents that are explicitly incorporated into the complaint by reference." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). The Complaint incorporates by reference the February 11, 2026 Letter. *See* Compl. ¶¶ 26, 31. So the Court can consider the letter, which is attached as Exhibit A.

demand letter did not establish how the "proposed review of West Virginia's voter registration list maintenance procedures [fell] within" Title III's statutory purpose. *Id.* (cleaned up). Second, state law also barred disclosure of that information. *Id.* (citing W. VA. CODE § 3-2-30(a)).

DOJ reached out a second time, but the Secretary maintained the same view. February 11, 2026 Letter, at 1-2. He reiterated that DOJ's demand "included only a vague explanation of the basis and specific purpose of the request," which was insufficient under Title III. *Id.* at 1. And recent "verbal communications" with DOJ made this general explanation more dubious, as they revealed that the "alleged purpose of the request [was] to run [the State's] entire voter list" through DHS's alien verification database. *Id.* at 2.

**V. The United States brings lawsuits nationwide; courts dismiss them.**

Nearly every State that has denied DOJ's request has been met with swift legal action. *See Tracker: DOJ Lawsuits Seeking States' Sensitive Voter Data*, STATE DEMOCRACY RSCH. INITIATIVE, https://tinyurl.com/34eyy98d (last updated Apr. 20, 2026) (twenty-nine pending lawsuits). West Virginia was no exception. The Government filed this action demanding voter information on February 26, 2026. *See* Compl. The Government continues to assert that Title III authorizes its request. *See generally id.* Alongside its complaint, the United States filed a motion to compel production of the voter list. ECF No. 14. The accompanying memorandum makes the same general arguments set forth in the complaint. *See* ECF No. 15.

Every court to have ruled so far has dismissed the Government's complaints. *United States v. Weber*, No. 25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) (dismissing because the Government lacked a proper basis and purpose), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026) (dismissing because the Government lacked a proper basis and purpose, and because no federal statute entitled it to unredacted voter information), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3,

2026); *United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (dismissing because voter registration lists were not "records" under Title III), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026) (dismissing because the Government lacked a proper "basis"); *United States v. Amore*, No. 25-CV-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026) (dismissing because the Government lacked a proper basis or purpose); *United States v. Fontes*, No. CV-26-00066-PHX-SMB, slip op. (D. Ariz. Apr. 28, 2026) (dismissing because a voter list is not "a § 20701 document").

## SUMMARY OF THE ARGUMENT

**A.** The Government's demand is not valid under Title III. It has not provided an adequate statement of the demand's basis and purpose. It lacks a factual basis because the demand only superficially references the statute itself, and it lacks a proper purpose because the purpose alleged falls outside Title III's scope. The statute's text is enough to decide the issue, but the circumstances surrounding the demand warrant even closer scrutiny of the Government's explanations. The demand also seeks information not covered by Title III. The voter registration list is not a "paper" or "record" that the Secretary "comes into possession of." It is an internally created database. Thus, Title III cannot compel its production.

**B.** The demand also violates at least three federal privacy laws. The United States failed to comply with the requirements of the Privacy Act, the E-Government Act, and the Driver's Privacy Protection Act. So even if the demand were valid under Title III, the Government would still need to make its request in compliance with federal laws.

**C.** West Virginia law also prohibits the unredacted disclosure sought here. The Constitution positions States as the default entities responsible for election regulations. Here, state law permits only the redacted voter registration list to be released. And no federal law—including

Title III, the NVRA, and HAVA—preempts this redaction requirement. So even if the demand was otherwise proper, the Government would still only be entitled to a redacted list.

The Court should dismiss the complaint.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the "legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 189 (4th Cir. 2009). Under this standard, the Court must "accept as true all well-pleaded facts … and construe them in the light most favorable to the plaintiff." *Matherly v. Andrews*, 859 F.3d 264, 274 (4th Cir. 2017). But the Court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, this "plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis*, 588 F.3d at 193 (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

### I. The Civil Rights Act does not authorize the Government's demand.

The Government premises its request on the authority of the Department of Justice. As with all agencies, DOJ is a "creature[] of Congress." *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013) (Roberts, C.J., dissenting). It "literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). So DOJ's demand may only be enforced if it "is within the authority of the agency" under Title III. *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

"The interpretation of the meaning of statutes … is exclusively a judicial function." *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 544 (1940). And "[i]n ascertaining the plain meaning" of a statute, the Court "must look to the particular statutory language at issue." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Laws also can't be interpreted "in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (cleaned up).

Title III lays out a simple framework. A valid Title III demand must include a "statement of the basis *and* the purpose." 52 U.S.C. § 20703 (emphasis added). The two "requirements are connected by the conjunctive 'and,' meaning [the Government] must meet" both. *United States v. Palomar-Santiago*, 593 U.S. 321, 326 (2021). This language "imposes a mandatory command." *Bufkin v. Collins*, 604 U.S. 369, 379 (2025). "Basis" refers to the factual reason the Government requests the records; "purpose" requires the Government to show its request is connected to investigating violations of voting rights. Title III allows the Attorney General to request "records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. As with all administrative production requests, the Government's ability to demand information under Title III "is not without limits." *EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997).

The demand here lacks a valid basis and a proper purpose. What's more, the voter lists the Government seeks aren't "records and papers which come into the Secretary's possession" within the meaning of the statute. The Government's demand lacks statutory authority three times over.

### A. The demand lacks a valid basis.

The Government failed to provide a proper basis for its request. Instead, the agency claims that the exclusive "basis of [its] demand [is] the CRA" itself. *See* Compl. ¶ 21. No court has ever interpreted the term "basis" to simply mean a circular reference back to the statute. This Court

shouldn't break new ground: without a factual basis, the demand fails to meet Title III's requirements.

A basis is "an underlying fact or condition." *Basis*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Galvin*, 2026 WL 972129, at *3. Title III's text thus requires the Attorney General to show "specific, articulable facts pointing to the violation of federal law," or at least some "evidence behind its investigation." *Weber*, 2026 WL 118807, at *9; *see also Oregon*, 2026 WL 318402, at *9. It might suffice to simply "point[] to … purported anomalies" in voting data. *Benson*, 2026 WL 362789, at *8. But "the statement must be 'the' factual basis, not just a conceivable or possible basis." *Galvin*, 2026 WL 972129, at *3. After all, administrative demands must "reflect[] on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964). Without a statement of the factual basis, the Court "cannot accurately determine whether the inquiry is within the authority of [the Attorney General] and whether the information sought is reasonably relevant." *CFPB v. Accrediting Council for Indep. Colls. & Secondary Schs.*, 854 F.3d 683, 691 (D.C. Cir. 2017). "Put simply, [Title III] requires a statement of *why* [the Attorney General] demands production of the requested records." *Galvin*, 2026 WL 972129, at *3.

This understanding of the statute has long prevailed. Indeed, the Department of Justice itself has always treated "basis" to mean the facts underlying a demand. For instance, in *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962), the Government's "demand [was] based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." DOJ relied on the same factual basis in other cases as well. *See, e.g.*, *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199 (S.D. Miss. 1962). And courts

permitted past requests because the DOJ provided "reasonable grounds for belief that certain voters [were] being discriminatorily denied their voting rights." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962).

The Government's now-contrary reading of "basis" would erase that requirement and "collapse[] its meaning with that of 'purpose.'" *Oregon*, 2026 WL 318402, at *9. Yet "it is generally presumed that statutes do not contain surplusage." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 299 n.1 (2006). And the statute permits a demand only if it's accompanied by a statement of "the basis *and* the purpose." 52 U.S.C. § 20703 (emphasis added). Title III's statutory text thus "clearly conveys that 'the basis' and 'the purpose' are conceptually distinct." *Galvin*, 2026 WL 972129, at *4. But "[t]o read 'basis' as meaning a legal basis would conflate that requirement with the required statement of the demand's "purpose." *Amore*, 2026 WL 1040637, at *5. "Congress could not have intended Title III to be interpreted in this redundant and circular manner." *Id.* So "the requirement that the Attorney General state 'the basis' for [the] request is mandatory, not a mere formality with which the federal government or this Court is free to dispense." *Galvin*, 2026 WL 972129, at *3.

And the "basis" requirement isn't satisfied by a reference to the statute itself, as the Complaint suggests. *See* Compl. ¶ 21. "This argument confuses the legal authority under which the Attorney General made the demand—the CRA—and the statute's requirement to state 'the basis'—the foundation in fact or evidence for the demand." *Galvin*, 2026 WL 972129, at *5. This reading, too, would render "basis" effectively meaningless. The Court should thus adhere to the plain text of Title III differentiating between the two terms, thereby "giv[ing] effect to every clause and word of [the] statute." *Marx v. Gen. Rev. Corp.*, 568 U.S. 371, 385 (2013) (cleaned up).

Reading "basis" the way the Government suggests would also give the agency "virtually limitless access to records required to be maintained under" the statute. *Oregon*, 2026 WL 318402, at *8. The Government might want more than the statute provides, but its "interpretation is not better just because it would go further than" the plain text. *Pulsifer v. United States*, 601 U.S. 124, 152 (2024). And this claim of previously "unheralded power" warrants "a measure of skepticism." *Util. Air. Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

The Court should "enforce [Title III] according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (cleaned up). The Attorney General must provide "a factual basis for investigating a violation of a federal statute," not just "identify[] any federal statute." *Oregon*, 2026 WL 318402, at *8-9. "Here, [the Government] offered no basis—none—and the demand [is] therefore facially inadequate." *Galvin*, 2026 WL 972129, at *4.

### B. The demand lacks a proper purpose.

The Government's alleged purpose also falls short. It says that the demand's purpose "is to ascertain compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 22. But that purpose is divorced from Title III's original purpose. Under Title III, the Attorney General is only "entitle[d] to inspect and copy all of the voter papers and records as defined" if doing so is "in fulfillment of the duties imposed upon [it] by the Civil Rights Act of 1957 and 1960." *Lynd*, 306 F.2d at 228. Title III doesn't allow records demands "based on a statement of *any* purpose." *Amore*, 2026 WL 1040637, at *6. The purpose must come from the statute.

Title III doesn't expressly define what qualifies as a valid purpose under the statute, but the term is "clarified by the remainder of the statutory scheme." *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). "The purpose of Title III is to detect voting-related racial discrimination." *Weber*, 2026 WL 118807, at *8; *see State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 852 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y*

*Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). Specifically, the law was meant to supplement the existing voting-rights enforcement scheme which, at the time, "lack[ed] a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit." H.R. REP. NO. 86-956, at 1944 (1959).

"[W]ithin its larger statutory and historical context," "the 'purpose' required" by "Title III's text … must relate to a purpose of investigating violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10. So Title III "enable[s] the Attorney General to determine whether [Civil Rights Act suits] or similar actions should be instituted." *Lynd*, 306 F.2d at 228; *see also United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) ("The chief purpose of the provisions of Title III, dealing with the preservation and production of records, is to facilitate the investigation of the records before suit is filed."); *Gallion*, 187 F. Supp. at 852. Ultimately, reading Title III's purpose as limited to the Act's purpose is the only reading that "produces a substantive effect that is compatible with the rest of the law." *King v. Burwell*, 576 U.S. 473, 492 (2015) (cleaned up).

As the Fifth Circuit long ago explained, voter roll issues like the issues the Government alludes to here are "matter[s] which do[] not bear any particular importance to [an] inquiry" under the Civil Rights Act. *Bruce*, 298 F.2d at 863 n.2. "Uniform, centralized statewide voter registration lists—like the one [the Government] is seeking from [West Virginia], were not even required" until decades after the Civil Rights Act of 1960's passage. *Weber*, 2026 WL 118807, at *9. Nor was Title III conceived to provide access to "confidential, private papers and effects" like the unredacted information Government now demands. *Lynd*, 306 F.2d at 231.

As with the basis arguments, the Government's interpretation of purpose would also "render … [the word] meaningless." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128

(2018). Title III granted "the Attorney General an opportunity to inspect the records as to those who may have been illegally denied the right to qualify" to vote. *Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963). It didn't create "an unlimited discovery device which may be employed and used without restraint." *In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963). The Government's demand thus falls beyond its Title III authority.

The Government's "purpose" argument presents another problem: circumstances surrounding the request cast doubt that the purpose described in the Complaint is the true purpose for the request. And judicial review is not "an empty ritual." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). So the Court isn't obligated to accept the Government's offered rationale if the Court believes it to be "contrived." *Id.* at 756.

Though DOJ initially claimed the list-maintenance-review purpose, it seems the Government now wants to use the voter list for immigration enforcement reasons. February 11, 2026 Letter, at 2. That purpose matches the purpose outlined in a recent executive order. *See* 90 Fed. Reg. 14005. Demanding unredacted voter lists for this use would be outside the Civil Rights Act's purview.

The scope of the Government's efforts further undermines their supposed purpose. Instead of making targeted requests connected to Title III's purpose, the United States has "requested the same statewide voter registration lists in states across the country." *Oregon*, 2026 WL 318402, at *11. The Government has not pointed to any potential voting irregularities. And former DOJ officials even stated that "the goal was for all fifty states to receive similar requests for voter rolls so that the government could get the last four digits of every voter's Social Security number." *Weber*, 2026 WL 118807, at *10.

Other courts have pointed out that "significant concerns [exist] about the true purpose of [the Government's] voter data requests." *Oregon*, 2026 WL 318402, at *11. These concerns were substantial enough that the "presumption of regularity that" the Government "could be taken at its word … no longer [held]." *Id.* This Court, too, should "not take lightly [the Government's] obfuscation of its true motives." *Weber*, 2026 WL 118807, at *12. Rather than investigate voting rights violations, the Government appears to be "laying the groundwork to amass the personal information of millions of Americans in a centralized database," *id.* at 11, "for the purposes of immigration enforcement," *Oregon*, 2026 WL 318402, at *11.

Given "the disconnect between the decision made and the explanation given," the Court should decline to "exhibit a naiveté from which ordinary citizens are free" and instead ensure that the United States has provided a "genuine justification." *New York*, 588 U.S. at 756, 785 (cleaned up). Title III "protect[s] voting rights." *Weber*, 2026 WL 118807, at *12. It's not an immigration enforcement mechanism, and the Government can't use it as one "under the guise of a pretextual investigative purpose." *Id.* If it has done so here, the Court must dismiss the complaint.

### C. Unredacted voter lists are not discoverable under the Civil Rights Act.

The registration list demanded is also not a "record" or "paper" under Title III. The statute permits the Attorney General to request only "records and papers which come into [the election official's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Voter registration lists fall outside that definition, so they are not subject to Title III's production requirements.

The Act applies to "records and papers which come into [the Secretary's] possession." 52 U.S.C. § 20701. That phrase refers to "a process by which someone *acquires* an item from an external source." *Benson*, 2026 WL 362789, at *9 (citing *Honeycutt v. United States*, 581 U.S. 443, 449 (2017)). This choice of wording isn't unusual, either. "Congress frequently uses the

phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." *Id.* (collecting examples). So the Court shouldn't presume that "the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883).

The voter registration list doesn't "come into [the Secretary's] possession" because his office creates it. 52 U.S.C. § 20701. He does not "acquire" it in any way. *Huddleston v. United States*, 415 U.S. 814, 820 (1974) (defining "acquire" as "to come into possession, control, or power of disposal of"). What's more, the voter registration list isn't even "assembled purely from information in voter registration applications." *Benson*, 2026 WL 362789, at *10. Instead, the list consists of information compiled from a variety of sources, including individual voters, motor vehicle officers, and other state agencies. *See* 52 U.S.C. §§ 20504, 20506 (NVRA provisions requiring States to accept information from these sources).

Expanding that qualification to include documents the Secretary creates would "nullify Congress's purposeful choice of language." *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 773 (2025). That's especially true here where Congress "did not adopt obvious alternative language." *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (cleaned up). For instance, Congress could easily have chosen to require production of "all papers and records in the possession" of an election official. *See, e.g.*, 30 U.S.C. § 1732(b); 6 U.S.C. § 1502(a). Congress could've also "referred simply to … 'records' without any qualifier" as it did in the NVRA. *Benson*, 2026 WL 362789, at *9 (citing 52 U.S.C. § 20507(i)(1)). It didn't. Thus, "the natural implication" is "that [Congress] did not intend the alternative." *Stapleton*, 581 U.S. at 477 (cleaned up).

"The statutory context of [Title III's text] further confirms its ordinary meaning." *BedRoc Ltd. v. United States*, 541 U.S. 176, 185 (2004). When referring to what must be preserved, the

text lists "records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. "Each of these terms refers to something that the voter submits or does as part of the registration process." *Benson*, 2026 WL 362789, at *9; *see also Fontes*, slip op. at 12 (explaining that there are "salient differences between" the documents listed in Title III and voter registration lists). Thus, "the provision requires officials to preserve voters' submissions to the State so that the federal government can determine whether the State is improperly rejecting voter registration applications." *Id.* This interpretation likewise aligns with the Civil Rights Act's purpose of "protect[ing] the voting rights of Black citizens" which "had been frustrated by state officials' destruction of voter registration applications." *Id.*

Finally, the Government's reading of Title III would create conflict between the Civil Rights Act and HAVA. HAVA requires election officials to update voter lists regularly. 52 U.S.C. § 21083(a)(1)-(2). But the Civil Rights Act prohibits—indeed, imposes criminal sanctions for—altering documents subject to its "retention and preservation" requirement. 52 U.S.C. §§ 20701-02. So if Title III covered internally created voter lists, then HAVA would *mandate* that the Secretary frequently update those lists, while Title III would *impose criminal penalties* on him for doing so. *See Fontes*, slip op. at 7. The Court should interpret Title III in a way that avoids that unnecessary conflict.

Voter registration databases created by the Secretary are not "records or papers" that he "comes into possession" of. The demand lacks statutory support for that reason, too.

**D. The Court should reject the Government's reading of Title III to avoid any constitutional concern.**

Should this Court find some ambiguity in Title III's provisions, it should still be reluctant to embrace the Government's broad reading of the statute. "Courts should indeed construe statutes to avoid not only the conclusion that they are unconstitutional, but also grave doubts upon that

score." *Palomar-Santiago*, 593 U.S. at 328-29 (cleaned up). "Even where there are two reasonable constructions of a statute's language, [courts] are to avoid adopting the unconstitutional reading." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 958 (4th Cir. 2020).

If the Government's present demands were deemed permissible under Title III, then serious constitutional concerns would arise. "[T]he accumulation of vast amounts of personal information in computerized data banks or other massive government files" comes with an inherent "threat to privacy." *Whalen v. Roe*, 429 U.S. 589, 605 (1977). Thus, the Fourth Circuit has held that the "fundamental right to vote is substantially burdened" by laws that require disclosure of private information such as Social Security numbers. *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993); *see also Benson*, 2026 WL 362789, at *4. Mandating the release of unredacted voter information like Social Security numbers "sweeps broader than necessary to advance electoral order." *Norman v. Reed*, 502 U.S. 279, 290 (1992). The Government's "interest in preventing voter fraud and [promoting] voter participation could easily be met without the disclosure of the [Social Security number] and the attendant possibility of a serious invasion of privacy that would result from that disclosure." *Greidinger*, 988 F.2d at 1354.

Thus, Title III—as understood by the United States—could "create[] an intolerable burden on that right as protected by the First and Fourteenth Amendments." *Greidinger*, 988 F.2d at 1355; *see also Benson*, 2026 WL 362789, at *4 (Requiring "public disclosure of all private information submitted for voter registration purposes would potentially cause [Title III] to impose an unconstitutional burden on the right to vote guaranteed by the First Amendment.") This Court should "avoid rendering [Title III] unconstitutional," *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019), and instead hold that redacted information would satisfy a demand under the statute.

## II. The demand violates federal privacy laws.

The Government's demand violates other federal laws, too. In particular, the demand ignores the requirements of the Privacy Act of 1974, 5 U.S.C. § 552a et seq., the E-Government Act, Pub. L. No. 107-347, 116 Stat. 2899 (2002), and the Driver's Privacy Protection Act, 18 U.S.C. § 2721 et seq. Unless their text says otherwise, these later-enacted laws impose additional standards on all government actions falling within their ambit, including Title III requests seeking protected information. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) ("It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law." (cleaned up)). Thus, "all federal officials … are bound by" them. *Big Ridge, Inc. v. Fed. Mine Safety and Health Rev. Comm'n*, 715 F.3d 631, 650 (7th Cir. 2013); *see also EPIC v. Presidential Advisory Comm'n on Election Integrity*, 266 F.Supp.3d 297, 310-11 (D.D.C. 2017); *Reno v. Condon*, 528 U.S. 141, 143-44 (2000). Because the request here runs afoul of those statutes, the Court should dismiss the Complaint.

*First*, the Privacy Act's safeguards prevent the unredacted disclosure demanded here. The "Privacy Act exists to protect individuals from disclosure of government-collected information." *Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025); *see also Weber*, 2026 WL 118807, at *17 ("The Act was passed in 1974 amidst concerns over the Executive accumulating and centralizing Americans' personal information."). It creates safeguards requiring agencies "to follow specific procedures prior to maintaining, collecting, using or disseminating records." *Weber*, 2026 WL 118807, at *17 (citing 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f)). And it defines a "system of records" as a "group of any records under the control of any agency, from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). The information in West Virginia's voter registration list falls under this definition because it includes and can be sorted by, among

other things, the "name … of the registrant." W. VA. CODE § 3-2-30(b)(1). Thus, before "establish[ing]" or "revis[ing]" its own "system of records" using the information, DOJ first needed to publish a notice in the federal register about its "existence and character." 5 U.S.C. § 552a(e)(4). DOJ failed to give such notice here, thus invalidating the demand. *See Weber*, 2026 WL 118807, at *18.

*Second*, the demand fails to satisfy the E-Government Act's strictures. That law requires agencies to perform a "privacy impact assessment" before "initiating a new collection of information" covering "10 or more persons" that "includes any information in an identifiable form permitting the physical or online contacting a specific individual." Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921-22 (2002). This assessment must be done "*before* the agency initiates a new collection of information." *EPIC*, 266 F.Supp.3d at 311. DOJ shirked this assessment and declined to perform any privacy impact assessment at all. So the request violates its responsibilities under the E-Government Act. *See Weber*, 2026 WL 118807, at *19.

*Third*, the Driver's Privacy Protection Act erects yet another privacy-law roadblock to the demand. That statute "regulates the disclosure of personal information contained in the records of state motor vehicle departments." *Reno*, 528 U.S. at 143. It achieves this regulation by preventing disclosure of "personal information" obtained by the West Virginia Department of Motor Vehicles in connection with a "motor vehicle record." 18 U.S.C. §§ 2721(a), 2725(1), (3), (4). West Virginia's voter registration list receives information from the State's DMV. *See* W. VA. CODE § 3-2-11; *see also* 52 U.S.C. § 20504. The Government's demand thus includes that information. The Driver's Privacy Protection Act shields this data, blocking the demand. *See Weber*, 2026 WL 118807, at *19.

**III. West Virginia law prohibits the Secretary from releasing the State's voter list.**

State law poses a last barrier to fulfilling the Government's demand. West Virginia law bars disclosure of sensitive voter information. West Virginia Code § 3-2-30(a) permits "[a]ny person" to "examine the active, inactive, rejected and canceled voter registration records." But the disclosure "may not include the registrant's telephone number, email address, Social Security number or driver's license number or nonoperator's identification number issued by the Division of Motor Vehicles." *Id.*

For the Secretary to ignore this state-law mandate, some federal law would need to preempt West Virginia's redaction requirement. The Government only makes a halfhearted pass at a preemption argument. *See* Mem. Supporting Mot. to Compel at 18-19. In fact, its frontline position is that the state and federal laws are *harmonious*. *Id.* at 19. But, if they conflict, then "the state law must yield." *Id.* True, but that's not the preemption analysis. Instead, the Government would have to argue that a federal law either "occup[ies] [the federal election] field exclusively" or is "in actual conflict" with West Virginia's law. *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995). It can't do either.

Start with first principles. As the Government acknowledges, the Constitution's Election Clause "is a default provision" that "invests the States with responsibility for the mechanics" of federal elections. *Foster*, 522 U.S. at 69 (citing U.S. CONST. art. I., § 4, cl. 1). "Unless Congress" chooses to do so, States are in charge. *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972). And by and large, Congress has long "le[ft] the conduct of the [federal elections] to state laws, administered by state officers." *Gradwell*, 243 U.S. at 485. When Congress displaces state election laws, it does so by "positive and clear statutes." *Id.*

As the United States itself recognizes, federal law operates harmoniously with West Virginia law.

Title III of the Civil Rights Act of 1960 doesn't address voter lists at all, so no preemption issues arise there. Also, Title III concerns only "public records which ought ordinarily to be open," not "confidential, private papers and effects" like are protected under West Virginia law. *Lynd*, 306 F.2d at 231.

Nor do the NVRA and HAVA preempt West Virginia law. To the contrary, the state law helps accomplish the same goals as those federal laws. The NVRA bars the release of "uniquely sensitive information" like Social Security numbers. *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012). It provides access only "with the voters' [Social Security numbers] redacted." *Id.* (cleaned up). West Virginia's law strikes precisely the same balance. *Cf. Weber*, 2026 WL 118807, at *14. And HAVA sets only a broad directive to create a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1). It leaves the States to "define[], maintain[], and administer" the list "at the State level." *Id.* § 21083(a)(1)(A). HAVA thus assumes the States are best positioned to determine how best "to improve voting systems and voter access" in their State. *RNC v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). And HAVA doesn't even include a disclosure provision in the first place, so no preemption issues exist there either. *See, e.g.*, *Weber*, 2026 WL 118807, at *15.

Federally enacted election laws operate only "so far as [Congress's power] is exercised, and no farther." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). Here, none of the federal statutes displace States from the field of election law, nor do they conflict with West Virginia's redaction requirements. So West Virginia's law remains, and the Secretary can also refuse to disclose unredacted lists on that basis.

**CONCLUSION**

For these reasons, the Court should dismiss the Complaint.

Respectfully submitted,

/s/ *Michael R. Williams*
Michael R. Williams (WV Bar # 14148)
*Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
*Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

DATE: April 29, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**THE UNITED STATES OF AMERICA,**

***Plaintiff,***

**v.**

**Civil Action No. 2:26-cv-00156**
**Hon. Thomas E. Johnston**

**KRIS WARNER, in his Official Capacity as WEST VIRGINIA SECRETARY OF STATE,**

***Defendant.***

**DEFENDANT KRIS WARNER'S RESPONSE TO PLAINTIFF'S MOTION TO COMPEL**

Michael R. Williams (WV Bar # 14148)
*Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
*Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

## INTRODUCTION

The United States's motion to compel takes some surprising positions. For instance, our judiciary employs an adversarial system where procedure protects due process rights. But the Government believes that Title III bars the Secretary from "using *any* procedural device" to challenge its demand. Mem. Supporting Mot. to Compel at 11 (cleaned up) (emphasis added). Likewise, Title III allows the federal government to obtain certain records only if the request contains a proper "statement of the basis and the purpose" of the request. 52 U.S.C. § 20703. But the Government believes that even a facially deficient request may not be "challenge[d]." Mem. Supporting Mot. to Compel at 11. Title III also limits the Government to obtain "all records and papers which come into [the Secretary's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. But the Government believes that "all" means anything and everything relating to voting. *See* Mem. Supporting Mot. to Compel at 13 (arguing "[a]ll means all," but not engaging with the defined categories).

The United States is mistaken. Title III does not greenlight fishing expeditions. Nor does it reduce the Secretary to a spectator instead of a defendant. And the Court is not a clerk checking whether the correct paperwork was filed.

Courts across the country have already recognized these basic precepts. Those courts started with the text of Title III. The text reveals that the Department of Justice's requests lack a proper factual basis. They also lack a legal purpose. And finally, the voter lists are not records the Secretary "comes into possession of"; they're documents he creates.

In reaching these conclusions, reviewing courts have deployed a careful statutory analysis, embodying the foundational principle that judicial review is more than a rubber stamp. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Title III presents no exception. It grants this Court jurisdiction to employ "appropriate process" to determine if a record request should be

granted. 52 U.S.C. § 20705. The Federal Rules of Civil Procedure provide the default process in federal court. Nothing in Title III displaces that default.

Taking on the required analysis, DOJ's request fails on Title III's own terms. Finally, even if the Government made a viable argument that the Secretary should produce unredacted voter rolls, due process requires the Secretary have a chance to fully present his objections. Appropriate process also entitles the Secretary to discovery on open factual questions. For instance, what is the purpose for the request? And how will the Government obtain voter information in compliance with federal privacy law?

All these considerations counsel against granting a premature motion to compel. That proves particularly true here, where doing so would require accepting an untenable statutory interpretation to grant the Government the relief it seeks under that statute. The motion should be denied.

## STATEMENT

### I. Federal law puts States in charge of elections.

The Constitution gives States primary responsibility over elections. The Elections Clause directs States to prescribe the time, place, and manner of congressional elections. U.S. CONST. art. I, § 4, cl. 1. This constitutional prescription creates a "default" rule that States carry out all election "mechanics." *Foster v. Love*, 522 U.S. 67, 69 (1997). Congress must speak with clarity to change this default. *United States v. Gradwell*, 243 U.S. 476, 485 (1917).

Congress has largely left the election arena to the States. So the federal government has only a narrow role to play. A few federal statutes are relevant. These laws require only that States administer voting practices that comply with the Fourteenth Amendment, maintain accurate voter rolls, and compile voter registration into a state database.

First, Title III of the Civil Rights Act of 1960 directs States to retain certain voting records. 52 U.S.C. § 20701. As with the other provisions of the Civil Rights Act, Title III sought to eliminate racial discrimination in voting. *See United States v. Mayton*, 335 F.2d 153, 159 (5th Cir. 1964). Under Title III, state election officials must "retain and preserve" "all records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" for a "period of twenty-two months" after any federal election. 52 U.S.C. § 20701. The Act imposes criminal penalties for altering documents subject to the "retention and preservation" requirement. *Id.* §§ 20701-02. The Attorney General may inspect, reproduce, or copy these records if he first provides an adequate "basis and purpose" for the request. *Id.* § 20703. Federal courts retain "jurisdiction by appropriate process to compel" production of those records if the request was properly made. *Id.* § 20705.

Second, the National Voter Registration Act (NVRA) of 1993 mandates States maintain accurate voter rolls. The NVRA requires States to ensure all "eligible applicant[s] [are] registered to vote" and establish procedures that make a "reasonable effort to remove the names of ineligible voters from" voter rolls. 52 U.S.C. § 20507(a)(1), (4). It also contains a few disclosure provisions. For example, each State must keep for at least two years "all records concerning the implementation of programs" conducted to ensure accurate and current voter eligibility. *Id.* § 20507(i).

Third, the Help America Vote Act (HAVA) of 2002 requires States to keep a centralized voter registration database. 52 U.S.C. § 21083(a)(1)(A). The database must contain the names of all registered voters and their relevant personal information. *Id.* Like the NVRA, HAVA directs States to make "reasonable effort[s] to remove registrants who are ineligible to vote from the official list." *Id.* § 21083(a)(4)(A). States must also create "[s]afeguards to ensure that eligible

voters are not [wrongly] removed." *Id.* § 21083(a)(4)(B). The Attorney General may "bring a civil action against any State" for "declaratory and injunctive relief … necessary" to carry out these requirements in a uniform and nondiscriminatory way. *Id.* § 21111.

Federal law thus imposes only minimal voting requirements on States.

## II. State law empowers West Virginia to properly administer elections.

West Virginia law dictates everything else about federal elections. State law establishes who can vote, W. VA. CODE § 3-1-3; when elections happen, *id.* §§ 3-1-14–15; how precincts are drawn, *id.* §§ 3-1-5–7; how ballots are printed and distributed, *id.* §§ 3-1-19–26; and how voters cast ballots, *id.* §§ 3-1-34–36. Other provisions govern electronic voting systems, *id.* §§ 3-4A-1–33, outline procedures for early voting, *id.* §§ 3-3-1–8; and establish a permanent voter registration system, *id.* §§ 3-2-1–44. State law allows people to examine voter registration records. *See id.* § 3-2-30(a). But that last provision prohibits disclosure of sensitive voter information, like Social Security or driver's license numbers. *See id.*

## III. The federal government seeks comprehensive, unredacted voter information.

In March 2025, President Trump issued an executive order instructing the federal government to obtain and review States' voter information. *Preserving and Protecting the Integrity of American Elections*, Exec. Order 14,248, 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025). The order directed the Department of Homeland Security to cross-check States' "publicly available voter registration list" and NVRA records of voter list maintenance activities against federal immigration databases and other state records. *Id.* (emphasis added).

Six months later, DOJ began demanding comprehensive voter information nationwide. *See* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES (Sept. 9, 2025), https://tinyurl.com/mpd97sc3. Many States share concerns about the agency's sweeping requests for voter information and have thus refused. *See Tracker: DOJ*

*Lawsuits Seeking States' Sensitive Voter Data*, STATE DEMOCRACY RSCH. INITIATIVE, https://tinyurl.com/34eyy98d (last updated Apr. 20, 2026).

On September 8, 2025, DOJ sent one such demand to Secretary Warner. The agency "demanded … [he] provide an electronic, unredacted copy of [the State's] statewide voter registration list," including registrants' full name, date of birth, residential address, and driver's license number or the last four digits of their Social Security number. February 11, 2026 Letter, at 1*. DOJ cited Title III of the Civil Rights Act, NVRA, and HAVA as the statutory bases for its request.

**IV. Secretary Warner responds.**

The Secretary quickly replied to DOJ's demand. His September 22 letter addressed the agency's concerns about "compliance with federal voter registration list" requirements by outlining the state process used to maintain accurate voter records. September 22, 2025 Letter, ECF No. 14-3, at 1. The letter likewise expressed the Secretary's willingness to provide a more "detailed narrative" of "voter roll list maintenance procedures." *Id.* at 2.

But the Secretary denied the request for two reasons. First, the request was inadequate under federal law. September 22, 2025 Letter, at 2. The demand letter did not establish how the "proposed review of West Virginia's voter registration list maintenance procedures [fell] within" Title III's statutory purpose. *Id.* (cleaned up). DOJ's demand also failed to explain how the NVRA or HAVA could be used to request private voter information given that "neither Act requires [S]tates to disclose [voters'] sensitive personally identifiable information." *Id.* Second, state law also barred disclosure of that information. *Id.* (citing W. VA. CODE § 3-2-30(a)). To facilitate the

* The February 11, 2026 Letter is attached as Exhibit A. The Complaint references and incorporates the Letter. *See* Compl. ¶¶ 26, 31.

agency's acquisition of voter information that could be *lawfully* disclosed, however, the Secretary provided DOJ with the necessary form and procedure to obtain it. *Id.*

On February 4, 2026, DOJ sought confirmation that the Secretary's earlier position remained unchanged. February 11, 2026 Letter, at 1. The Secretary confirmed as much. *Id.* at 1-2. He reiterated that DOJ's demand "included only a vague explanation of the basis and specific purpose of the request" which was insufficient under Title III. *Id.* at 1. And recent "verbal communications" with DOJ made this general explanation more dubious: the "alleged purpose of the DOJ's request [was] to run [the State's] entire voter list" through DHS's alien verification database. *Id.* at 2. Plus, the Secretary remained committed to following state and federal law barring disclosure of sensitive voter information. *Id.*

The Secretary also dispelled concerns about the State's commitment to maintaining accurate voter rolls. He again outlined the relevant state law procedures. February 11, 2026 Letter, at 2. He shared that, over the last decade, the State has lawfully cancelled 408,397 invalid voter registration records. *Id.*

**V. The United States brings lawsuits nationwide; courts dismiss them.**

Nearly every State that has denied DOJ's request has been met with swift legal action. *See Tracker: DOJ Lawsuits*, *supra* (twenty-nine pending lawsuits). West Virginia was no exception. The United States filed this action demanding voter information on February 26, 2026. *See* Compl. The agency continues to assert that its request is authorized by Title III. *See id.* Alongside its complaint, the Government filed a motion to compel production of the voter list. ECF No. 14. The accompanying memorandum makes the same general arguments set forth in the complaint. *See* ECF No. 15.

Every court to have ruled so far has dismissed the Government's complaints. *United States v. Weber*, No. 25-cv-09149, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) (dismissing because the

Government lacked a proper basis and purpose), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026) (dismissing because the Government lacked a proper basis and purpose, and because no federal statute entitled it to unredacted voter information), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (dismissing because voter registration lists were not "records" under Title III), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026) (dismissing because the Government lacked a proper "basis"); *United States v. Amore*, No. 25-CV-00639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026) (dismissing because the Government lacked a proper basis or purpose); *United States v. Fontes*, No. CV-26-00066-PHX-SMB, slip op. (D. Ariz. Apr. 28, 2026) (dismissing because a voter list is not "a § 20701 document").

## SUMMARY OF THE ARGUMENT

**A.** The Federal Rules of Civil Procedure govern this action. The Federal Rules apply in all civil suits, unless the Rules or another statute clearly dictate otherwise. And Congress knows how to create special proceedings when it wants to. A statute that requires adequate process invokes the normal Federal Rules.

Nothing in Title III or the Federal Rules exempts the statute from the Rules' reach. Title III calls for "appropriate process." That language reinforces, not displaces, the Federal Rules—particularly because the statute lacks any detailed procedures to replace the default. The Government's authority suggesting otherwise is a seven-decade-old, out-of-circuit case that has been superseded by Supreme Court precedent and from which the issuing circuit has retreated. Because the Federal Rules apply, no expedited proceeding is available.

**B.** Even if Title III authorized some kind of abbreviated proceeding, the Government has not met the statutory preconditions necessary to permit it. Title III requires DOJ to provide an adequate basis and purpose, and the agency can only seek certain types of records.

DOJ's request fails on all fronts. It provided no factual basis, its alleged legal purpose is off target (and perhaps pretextual), and it seeks records outside the scope of Title III. Because DOJ's demand is facially deficient, the motion to compel should be denied.

**C.** And even if the Government stated a colorable Title III claim, the motion to compel cannot be granted without raising serious constitutional concerns. The government's desire for efficiency cannot come at the cost of due process. That process includes time to make objections and discover evidence.

The Government may want to move quickly, but the Constitution guarantees the Secretary due process. He should be able to pursue discovery to answer important factual questions about, for example, the true purpose for the request and how the Government will obtain the information it seeks in compliance with federal law. Granting the motion to compel without any discovery would be fundamentally unfair.

The Court should deny the motion.

## ARGUMENT

### I. The Federal Rules apply.

The normal Federal Rules of Civil Procedure govern this case. The United States claims Title III creates a "summary proceeding" to which the Federal Rules are "completely foreign." Mem. Supporting Mot. to Compel at 11. Not so. The Rules apply unless they or a statute clearly say otherwise. Title III comes nowhere close. So no expedited proceeding is available.

The Federal Rules almost always apply. The Rules govern "all civil actions." FED. R. CIV. P. 1. And any action commenced "by filing a complaint with the court" is a civil action. *Id.* at 2,

3. The Federal Rules help guarantee the constitutional due process requirements are met. *See id.* at 1.

Few exceptions exist. Rule 81 enumerates only a handful of cases to which the Federal Rules don't apply. FED. R. CIV. P. 81(a)(1)-(6). That Rule, for example, addresses proceedings involving a subpoena; in those cases, the Federal Rules apply unless a conflict exists. *Id.* at 81(a)(5).

These standard procedures remain unless Congress demonstrates a clear intent to displace them. And Congress knows how to do so. *See* 15 U.S.C. § 78aa(a) ("Rule 45(c)(3)(A)(ii) of the Federal Rules of Civil Procedure shall not apply to a subpoena issued under" this sentence.); *see also* 42 U.S.C. § 2000a-5 (Title II creating a detailed alternative procedure). "In the absence of express statutory authorization," courts must be "extremely reluctant to allow proceedings more summary than the full court trial at common law." *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407 (1960). Congress rarely shows "clear expression" necessary to exempt statutes from Federal Rules. *Marek v. Chesny*, 473 U.S. 1, 11-12 (1985).

The Federal Rules of Civil Procedure govern here. The Government instituted this "civil action" by "filing a [standard] complaint." FED. R. CIV. P. 2, 3; *see* Compl. No provision of Rule 81 exempts Title III from the Rules' reach. The most analogous provision involving government subpoenas undercuts the Government's contention: it directs the Federal Rules to apply wherever possible. FED. R. CIV. P. 81(a)(5). Thus, "the Federal Rules apply to proceedings to compel … production of documents." *Becker v. United States*, 451 U.S. 1306, 1307-08 (1981) (Rehnquist, J., in chambers) (cleaned up); *see also Weber*, 2026 WL 118807, at *8.

Title III similarly lacks the express authorization needed to create a special proceeding. Title III instructs courts to employ "appropriate process" to compel production of records. 52

U.S.C. § 20705. Although it doesn't define "what that 'appropriate process' is," *Oregon*, 2026 WL 318402, at *8, "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures," *Weber*, 2026 WL 118807, at *8. Nor does it say that a particular Federal Rule does not apply. *Compare* 52 U.S.C. § 20705 *with* 15 U.S.C. § 78aa(a) (the Securities Exchange Act citing a specific Rule that the Act displaces). Without clear congressional authorization, this Court should be "extremely reluctant to allow proceedings more summary than" what the Rules require. *Scanlon*, 362 U.S. at 407.

Supreme Court precedent reinforces that conclusion. In *United States v. Powell*, 379 U.S. 48 (1964), the Court held the same phrase, "appropriate process," did not create any special proceeding. The statute "contain[ed] no provision specifying the procedure to be followed," so "the Federal Rules of Civil Procedure appl[ied]." *Id.* at 58 n.18; *see Weber*, 2026 WL 118807, at *8; *Oregon*, 2026 WL 318402, at *8. And "when Congress uses the same language in two statutes, … it is appropriate to presume that Congress intended that text to have the same meaning." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). *Powell* thus "squarely rejects [the Government's] contention and reliance on *Lynd*." *Oregon*, 2026 WL 318402, at *8. "Title III cannot transform an election records request by the federal government from an ordinary civil action into" a summary proceeding. *Weber*, 2026 WL 118807, at *8. And the Government agrees that Title III does not create "any process for officers of election to object to Title III proceedings being initiated against them." Mem. Supporting Mot. to Compel at 7. Without any displacing process, the Federal Rules apply.

The Government wrongly argues that cases post-*Powell* undermine this clear statement rule. *See* Mem. Supporting Mot. to Compel at 5. That's wrong. The cases they cite only reiterate that when Congress clearly creates summary enforcement proceedings, they are permissible

because they still adequately protect a defendant's rights. In *Donaldson v. United States*, 400 U.S. 517, 529 (1971), for example, the Supreme Court endorsed the IRS's summary proceedings only because procedural protections remained. *See id.* ("The post-*Powell* cases, … [show that] a summary enforcement proceeding [is permissible] so long as the rights of the party summoned are protected and an adversary hearing … is made available. We agree with that conclusion." (cleaned up)). And *Becker*, 451 U.S. 1306, fares even worse. Justice Rehnquist granted a stay for the taxpayers to retain their seized property during litigation because the IRS's summary enforcement proceedings went too far. *Id.* at 1308-09 ("The language of Rule 62(d) seems clear, and the enumerated exceptions do not include tax summons enforcement proceedings."). So *Powell*'s and *Scanlon*'s clear statement rule maintains, and summary enforcement proceedings—when clearly created—still must protect parties' rights.

The Government's primary support for shirking the Federal Rules comes from a stale, out-of-circuit authority. *See* Mem. Supporting Mot. to Compel at 1-5, 7-14, 17-19 (citing *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962)). That case falls short for several reasons. First, *Lynd* has been abrogated. *See, e.g.*, *Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018) ("Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent." (cleaned up)). A few years after *Lynd* came *Powell*, which held that Congress must speak with clarity to displace standard federal procedure. *Powell*, 379 U.S. at 58. Second, because of that intervening authority, the Fifth Circuit has retreated from *Lynd*. *See Weems v. McCloud*, 619 F.2d 1081, 1095 n.34 (5th Cir. 1980) (citing *Scanlon*, 362 U.S. at 406 (permitting an alternate process only because the statute contained "express … authorization.")). So *Lynd* isn't even good law within that circuit. *See Gahagan*, 911 F.3d at 302; *see also Oregon*, 2026 WL 318402, at *8 (noting no cases "within the last sixty years" have applied *Lynd*). That

one recent district court has wrongly relied on *Lynd* does not change that it carries no persuasive weight. *Contra* Mem. Supporting Mot. to Compel at 5 (citing *Benson*, 2026 WL 362789). Third, even *Lynd* acknowledged that courts must "exercise[] judicial judgment." 306 F.2d at 225. That judgment would require, for example, a court to resolve any "genuine dispute" about whether a "particular paper or record comes within" Title III's scope. *Id.* at 226. Finally, were all that not enough, *Lynd* is factually distinct. The government there was seeking "public records which ought ordinarily to be open to legitimate reasonable inspection," 306 F.2d at 231—not voter rolls chock full of confidential information.

The presumption that the Federal Rules apply can be overcome only by a clear statement. No such statement exists here, so expedited proceedings are off the table. The Federal Rules govern.

**II. The Government's request is facially deficient.**

The motion to compel should also be denied because DOJ's request fails under Title III's own terms. *See* Memorandum Supporting Mot. to Dismiss. A valid Title III request must outline a factual "basis" and legal "purpose" for the request. *See* 52 U.S.C. § 20703. And under Title III, DOJ can request only certain "records and papers" that "come into [the election official's] possession." *See id.* § 20701.

DOJ's request fails on all three fronts.

First, the agency did not identify "specific, articulable facts" suggesting West Virginia is violating federal law. *Weber*, 2026 WL 118807, at *9; *see also Amore*, 2026 WL 1040637, at *5. True, the agency need not "prov[e]" a violation before investigating, Mem. Supporting Mot. to Compel at 9. But it must have some factual basis for believing a State is violating Title III. *See, e.g.*, *Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962) (DOJ demanding records because it had information suggesting "that distinctions on the basis of race or color have been made" in voting

and registration). The Government declares that the statutory language controls. *See* Mem. Supporting Mot. to Compel at 10-11 (primarily citing *Lynd* for its interpretation of Title III). The Secretary agrees. But even now, the Government conflates "basis" with "purpose." *See id.* at 9 (stating that the "factual basis for the demand" was to ensure "compliance with the … [NVRA]").

Second, DOJ didn't identify any legitimate purpose for the request—such as suggesting that it was making the request to "investigat[e] violations of individuals' voting rights." *Oregon*, 2026 WL 318402, at *10. And circumstances surrounding the request suggest that DOJ's true purpose relates to immigration enforcement, not voting integrity. *See* February 11, 2026 Letter, at 2. Title III authorizes DOJ to obtain voting records only if they meet the statutory preconditions. *See* 52 U.S.C. § 20703; *see also Amore*, 2026 WL 1040637, at *6. And courts are bound to interpret the law as it is, not as the Executive Branch wants it to be. *See Loper Bright*, 603 U.S. at 412; *contra* Mem. Supporting Mot. to Compel at 11-12 (citing *Benson*, 2026 WL 362789, at *8-9).

Third, the voter registration rolls are not "records or paper" that "c[a]me into [the Secretary's] possession." 52 U.S.C. § 20701; *see Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of"). What records count under the NVRA is irrelevant to the Title III question. *Contra* Mem. Supporting Mot. to Compel at 9. The voter lists are something the Secretary *created* not *acquired*—and Title III cares only about the latter. *Benson*, 2026 WL 362789, at *9. Records of voting registration, by contrast, are within Title III's scope. The statute specifically targets voting "registration" documents, which are records that "come[s] into [the State's] possession." 52 U.S.C. § 20701; *see* Mem. Supporting Mot. to Compel at 14 (citing *United States v. Mississippi*, 380 U.S. 128, 134 (1965)).

The United States mistakenly argues that the "come into his possession" language only matters because it starts the clock on how long the Secretary must keep records. *See* Mem. Supporting Mot. to Compel at 15-16. But that temporal requirement does not change that an internally created voter registration list does not "come into his possession" at all. Plus, the timing component revolves around election cycles—further bolstering the conclusion that Title III targets only records the Secretary receives for a given election, not an ongoing list that he maintains.

Finally, the United States contends that, even if the Secretary's interpretation is right, someone in the Secretary's office probably created the list, so the list still came into the *Secretary's* possession. *See* Mem. Supporting Mot. to Compel at 17. This argument is "pedantic," *id.* at 15, and disregards the reality that Secretary Warner is the one responsible for creating the State's voter registration list, whether he receives help from members of his office or not. In any event, it doesn't change that voter lists are not the type of record the statute contemplates. *See* 52 U.S.C. § 20701 (enumerated examples are records of "registration, payment of poll tax, or other act requisite to voting in such election").

At bottom, the best evidence that Congress did not intend to sweep in voter rolls is that the text does not allow it. *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *contra* Mem. Supporting Mot. to Compel at 13-14.

* * *

DOJ's demand for voter lists was atextual and extrastatutory. That, too, shows that the motion to compel must be denied.

**III. Due process demands the Secretary can pursue discovery before relief issues.**

Even if DOJ's demand was not facially deficient, an abbreviated process would still be fundamentally unfair. The motion to compel can also be denied for that independent reason.

"[T]he Constitution recognizes higher values than speed." *Stanley v. Illinois*, 405 U.S. 645, 656 (1972). Indeed, "the Due Process Clause in particular … [was] designed to protect [citizens] … from the overbearing [government] concern for efficiency." *Id.* Courts must exercise particular care to ensure expedited proceedings meet this constitutional floor. *See Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 195 (1946) (finding summary enforcement of a subpoena appropriate because the respondent had an "adequate opportunity to present objections" and did not do so).

The Government may want this proceeding to be brief, but the Court must guarantee the Secretary has adequate process. That process must include an opportunity for the Secretary to substantiate his objections. *Walling*, 327 U.S. at 195. The Government has also presented no reason why this proceeding would need to be expedited. It seems the agency may want to hit the gas because it does not want its arguments to be "challenge[d]." Mem. Supporting Mot. to Compel at 11. That only heightens concerns that granting expedited relief would deprive the Secretary of constitutional due process.

Due process also demands parties have adequate discovery. A final decision is likely "premature" if it would deprive a party of "the opportunity to discover evidence necessary" to develop their claims. *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 481 (4th Cir. 2014); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). Discovery helps "clarify" the issues presented and "ascertain[]" the key facts. *Hickman v. Taylor*, 329 U.S. 495, 501 (1947).

Granting the government's motion to compel would be a final decision on the merits because it would give the government all the relief it seeks. It would be premature to grant the government's motion now while key factual questions remain.

The Secretary, for example, would want to seek discovery on the Department's purpose in requesting voter rolls—and whether the agency has plans to disseminate that information. The Government now maintains that it seeks to ensure compliance with federal voting law. Compl. ¶ 22. But circumstances suggest otherwise. *See* February 11, 2026 Letter, at 2 (the Secretary's "verbal communications" with the Department suggested the purpose of the request was to "run [the State's] entire voter list" through DHS's alien verification database.); *see also* Exec. Order 14,248, 90 Fed. Reg. 14005 (ordering DHS to do just that). Ultimately, DOJ's purpose may be more legitimate than what that circumstantial evidence indicates. That's why summary proceedings are inappropriate.

Discovery is also needed to show how the Government plans to obtain voter information in compliance with federal law. The agency's request for sensitive voter information poses serious questions under federal privacy laws. *See* Mot. to Dismiss at 14-16. Those statutes require federal entities to follow certain procedures when collecting information. *See, e.g.*, 5 U.S.C. § 552a(e)(4), (11) (requiring agencies to publish a public notice 30 days before creating a new "system of records"). Discovery would be necessary to ensure that the demand complies with federal law.

* * *

The Secretary is entitled to due process. Constitutional standards extend to States and their officials not just for the protection of "abstract political entities," but for "the protection of individuals." *New York v. United States*, 505 U.S. 144, 181 (1992). So even if Title III created special proceedings *and* the Government made a colorable argument that its demand was proper, granting the motion to compel would still be inappropriate. The Constitution guarantees the Secretary—and mandates courts offer—adequate process and meaningful judicial review.

**CONCLUSION**

For these reasons, the Court should deny the motion to compel.

Respectfully submitted,

/s/ *Michael R. Williams*
Michael R. Williams (WV Bar # 14148)
*Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
*Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

DATE: April 29, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KRIS WARNER, in his official capacity as West Virginia Secretary of State<br><br>Defendant. | Case No. 2:26-cv-00156-TEJ |

**UNITED STATES' MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS DKT. 24 AND IN REPLY TO DEFENDANT'S OPPOSITION TO MOTION TO COMPEL FEDERAL ELECTION RECORDS UNDER THE CIVIL RIGHTS ACT OF 1960 DKT. 26**

Plaintiff United States of America respectfully submits this Consolidated Response in Opposition to the Motion to Dismiss by the Defendant Secretary of State Warner ("Defendant") and in reply to his Opposition to the Motion to Compel Production Federal Election Records.

## I. INTRODUCTION

Title III of the Civil Rights Act of 1960 ("CRA") empowers the United States to obtain federal election records upon written demand. *See* 52 U.S.C. §§ 20701, 20703. When a State refuses to comply with the demand, Title III provides that the United States may seek "appropriate process to compel the production" of those federal election records. 52 U.S.C. § 20705. The United States made a written demand to Secretary of State Warner for West Virginia's statewide voter registration list ("SVRL")— i.e., federal election records. Secretary Warner refused to comply with that demand, necessitating this action. Compl., Dkt. 1.

Title III is a unique provision of federal law because it is purely an investigative tool. The "chief purpose" of Title III "is to facilitate the investigation of the records *before suit is filed*."

*United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added). "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960) *affirmed sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961), to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). Title III authorizes the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Kenndey v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962).

The Court's inquiry here is a limited one: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to one or more "officer[s] of election" responsible for performing any act requisite to voting in federal elections including voter registration; (3) did the "officer[s] of election" fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that he satisfied the first three elements. *Lynd*, at 225-26.

Defendant seeks to complicate that narrow inquiry by arguing that the United States' demand exceeds its statutory authority in several unfounded respects and violates federal and state privacy laws. First, Defendant argues that the United States lacks a valid basis and purpose and instead has ulterior nefarious motives. *See* Dkt. 25 at 12-13. Second, Defendant argues that certain voting records do not constitute "papers" under the CRA that came into Defendant's possession.

Finally, Defendant also prematurely asserts affirmative defenses including the Privacy Act, E-Government Act, and Driver's Privacy Protection Act. None of Defendant's assertions have merit.[1]

## II. BACKGROUND

On September 8, 2025 the Attorney General sent a letter to Secretary Warner requesting the State's SVRL. The letter cited Section 303 of the Civil Rights Act of 1960 as the basis of the request and the stated purpose was to ascertain West Virginia's compliance with the list maintenance requirements of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501, *et seq.* and the Help America Vote Act of 2002 ("HAVA") 52 U.S.C. § 20901, *et seq.* On September 22, 2025, Secretary Warner sent an email attaching a letter refusing to provide the list citing state law. On December 10, 2026, the Attorney General contacted Secretary Warner again requesting the State's SVRL. Secretary Warner again refused this second request. The United States then commenced this summary proceeding. Compl., Dkt. 1.

## III. ARGUMENT

### A. The Civil Rights Act calls for a summary proceeding to compel federal election records.

The Attorney General's filing of an application for an order under Title III of the CRA "is not the commencement of an ordinary, traditional civil action with all of its trappings." *Lynd*, 306 F.2d at 225. Rather, a CRA Title III proceeding is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Id.* In structuring the statute in this way, Congress indicated that the Federal Rules of Civil Procedure are inapplicable. "Since it is a special statutory proceeding, it does not require pleadings which satisfy usual notions under the Federal Rules of

---

[1] The Attorney General advises the Court of an opinion from the Department of Justice Office of Legal Counsel published on May 12, 2026. That opinion concludes that the CRA authorizes the Attorney General to compel States to produce unredacted SVRLs. https://www.justice.gov/olc/media/1440346/dl. *Authority to Obtain and Share Voter Roll Data* Op. O.L.C. (2026).

Civil Procedure." *Id.* at 225-26; *see also Gallion*, 187 F. Supp. at 854 (comparing applications to compel to actions by the Securities and Exchange Commission in which procedural rules "are made specifically inapplicable to investigations"). The CRA differs from ordinary civil actions because its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. In stark contrast, "[t]he chief purpose of Rule 34 … is to give a party litigant the right to have records produced *after* suit has been filed." *Id.* (emphasis added). To summarize, "[t]here is no place for any other procedural device or maneuver," including Defendant's motion to dismiss, in response to a CRA claim. *Lynd*, 306 F.2d at 226; *see also* Fed. R. Civ. P. 81 (summarizing other federal claims to which the Federal Rules of Civil Procedure do not apply).

In other words, Title III invests the Attorney General with a power akin to a grand jury which "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). The Supreme Court has recognized that statutes that vested investigative powers in Executive Branch agencies provide such agencies with grand jury-like powers and latitude. *See, e.g.*, *United States v. Powell*, 379 U.S. 48, 57 (1964) (recognizing that the IRS Commissioner has grand jury-like powers); *Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (same with respect to the Federal Trade Commission). The investigative powers that the Attorney General derives from Title III fall comfortably within this paradigm.

West Virginia asserts that the Federal Rules of Civil Procedure must govern these proceedings, because FRCP 81(a)(5) specifically makes the rules applicable to subpoenas. Dkt. 26 at 9. A recent decision issued by a district court in the Sixth Circuit agreed with *Lynd* and rejected the arguments raised by Defendants. *See United States v. Benson*, No. 1:25-cv-01148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27,

2026). Consistent with the Supreme Court's treatment of similar statutes, *Benson* construed "a request for records under the CRA as a form of administrative subpoena." *Benson at* *7 (citing *Lynd*, 306 F.2d at 225 and *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963)). Therefore, "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable…'" *Benson* at *7 (quoting *United States v. Markwood*, 48 F.3d 969, 982 (6th Cir. 1995)). Consequently, *Benson* acknowledged that "'a district court's role in the enforcement of an administrative subpoena is a limited one.'" *Id.* (quoting *Markwood*, 48 F.3d at 976). This is because the United States has not issued a subpoena, it has made a "*demand"* under the CRA. 52 U.S.C. §20703. While a demand is similar and akin to a subpoena, it is a term of art with a specific meaning differing from a subpoena.

Defendant relies heavily on two district court decisions out of the Ninth Circuit to reach a contrary conclusion. In those decisions, the district courts misread the Supreme Court's decision in *United States v. Powell*, 379 U.S. 48 (1964), to reject the Fifth Circuit's determination in *Lynd* that Title III of the CRA is a special statutory proceeding. *See United States v. Oregon*, No. 6:25-cv-01666-MTK, 2026 WL 318402 at **7-8 (D. Or. Feb. 5, 2026), *appeal docketed*, No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS, 2026 WL 118807 at *8 & n.15 (C.D. Cal. Jan. 15, 2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026). However, *Powell* applied certain Federal Rules of Civil Procedure to an IRS administrative summons against a citizen. The Supreme Court explained that because section 7604(b) of the Internal Revenue Code ("IRC") "contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply…[.]" 379 U.S. at 58 n.18. However, the *Oregon* court applied a much broader construction of *Powell* than the Supreme Court intended.

The *Oregon* court found that *Powell* involved interpretation of "a similar statute" to Title III of the CRA, and the decision's admonition that "the court may 'inquire into the underlying reasons for the examination [of records]'" therefore applied to the CRA. *Oregon*, 2026 WL 318402 at *8 (quoting *Powell*, 379 U.S. at 58 & n.18). The *Oregon* court omitted any explanation that the quoted language from *Powell* referred to a process expressly provided in the IRC that is missing from the CRA. The Supreme Court explained that judicial inquiry was appropriate where asked to enforce an administrative summons under the IRC to determine "if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. That inquiry was permitted because it was specifically authorized by section 7605(b) of the IRC, which prohibited the Government from subjecting a taxpayer "to unnecessary examination or investigations." *Powell* at 52-53 (quoting 26 U.S.C. § 7605(b)). However, no similar language limits the Attorney General's authority to compel records under the CRA and the CRA is not directed at a private citizen but rather state election officers acting in their official capacity. *See* 52 U.S.C. §§ 20701-20706. Nor does the CRA provide any process for election officers to object to CRA proceedings being initiated against them. *See id.*

The *Weber* court, in addition to *Powell*, referred to what it indicated was a decision of the United States Supreme Court also supporting this argument. *See Weber*, 2026 WL 118807 at *8 (citing "*Becker v. United States*, 451 U.S. 1306 (1981)"). That is incorrect. *Becker* was an order issued by the Circuit Justice on an application for a temporary stay. *See* 451 U.S. 1306 (1981) (Rehnquist, J., in chambers) (continuing temporary stay pending review by the Court). The subsequent history indicates that the stay was continued, 452 U.S. 912 (1981), and later vacated and denied, 452 U.S. 935 (1981), leaving it without any precedential authority. Moreover, because

*Becker* involved an administrative summons under the IRC, then-Justice Rehnquist specifically recognized that *Powell*'s reference to the Federal Rules of Civil Procedure applying to records demanded under the IRC was "'not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available.'" *Becker*, 451 U.S. at 1308 (Rehnquist, J., in chambers) (citation omitted). Far from supporting Defendant's argument that the summary proceeding does not apply to production of federal records under the CRA, Justice Rehnquist's opinion in *Becker* undercuts it. As the Supreme Court later clarified, "post-*Powell* cases, too, are clearly and consistently to the effect that the footnote in *Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 529 (1971).

That is exactly what has happened here. Defendant was notified of and is responding to the Motion to Compel. Even if this court decides to apply the Federal Rules of Civil Procedure, the rules must be applied on a limited basis – that is, no discovery is permitted – consistent with the investigative, pre-suit, summary nature of a CRA proceeding.

Moreover, with respect to Defendant's motion to dismiss, this court must draw all reasonable inferences in favor of the United States, *Hall v. DirectTV,* 846 F.3d 757,765 (4th Cir 2017), within the constraints imposed by the CRA. *Lynd*, 306 F.2d at 225-30. Taking as true the allegations in the United States' Complaint, the United States has satisfied each of the four elements of its CRA action. Therefore, the motion to dismiss must be denied.

**B. The Attorney General has a basis and purpose to investigate West Virginia's compliance with federal election laws.**

The CRA establishes a straightforward requirement for the Attorney General to make a written demand to officers of election for federal election records that articulates "the basis and

purpose therefor." 52 U.S.C. § 20703. The United States has done that. On September 8, 2025, the United States sent Defendant a written demand for a copy of West Virginia's SVRL. Dkt. 14, attachment 1, Eric Neff Declaration ("First Neff Decl.") at ¶¶ 7, 9 and Ex. 1. As stated in that demand, the basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose was to "assess West Virginia's compliance with the SVRL maintenance provisions of the National Voter Registration Act ("NVRA")." *Id.* at 2. ****

Nevertheless, Defendant argues that the United States failed to provide a sufficient statement of basis and purpose for its demand for federal election records or, in the alternative, that it has not provided the true reason for the demand. Dkt. 25 at 4, 7-13.

To begin, recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. First Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached as First Neff Decl. ¶ 13, Ex. 3). One of the problems was that even though some of the registration applications had HAVA identifiers, counties failed to input those identifiers into the SVRL. As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached as Eric Neff's second declaration submitted with this response and reply ("Second Neff Decl.") at ¶9, Ex. 7).

Defendant further argues the Attorney General's concern with Defendant's list maintenance is not the true purpose of the Attorney General's request. Dkt. 25 at 13. Rather, Defendant argues, based entirely on unreliable hearsay, that the Department of Justice is amassing a nationwide voter

database. Defendant's argument is absurd and false – as the United States District Court for the Eastern District of North Carolina recently found in rejecting such arguments as "speculative and premature." *United States v. North Carolina Board of Elections*, Case No. 5:25-cv-00283 (E.D.N.C. Sept. 8, 2025), Dkt. 87, Order Denying Motion for Reconsideration of Motions to Intervene at 7. (attached to the Second Neff Decl. at ¶10, Ex. 8).

Obtaining an SVRL to assess and enforce HAVA and the NVRA is not new. As mentioned in its Motion to Compel, the United States used the CRA to obtain statewide voter lists to assess compliance with list maintenance requirements in Georgia and Texas. Dkt. 15 at 17-18. Similarly, in 2007, the United States entered a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. *See United States v. Maine*, No. 1:06-cv-00086, 2007 WL 1059565 (D. Me. Apr. 4, 2007). (attached to the Second Neff Decl. at ¶11, Ex. 9). Paragraph 9(e) of the consent decree required Maine to "provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR (computerized statewide voter registration system) that includes the voter's full name, *unique identifier*, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election." *Id.* at *5(emphasis added).[2] The United States entered into similar agreements with the States of New Jersey and Indiana to enforce voter registration list maintenance compliance.[3] Likewise, Indiana was required by consent decree to "retain voter registration and list maintenance records related to the terms of this agreement for the time periods

---

[2] Paragraph 11 of the consent decree explicitly invokes the CRA, referring to 42 U.S.C. § 1974, which was later transferred to 52 U.S.C. § 20701. 2007 WL 1059565, *5.

[3] *See United States v. New Jersey*, No. 2:06-cv-04889 (D. NJ. Oct. 12, 2006). In New Jersey, paragraph 5 of the stipulated order required the HAVA identifiers to be provided and paragraph 14 required Defendant to retain voter registration and list maintenance records. Dkt. 2 in 2:06-cv-04889. (attached as 2d Neff Decl. as Ex. 10).

provided by… [Section 20701].” Dkt. 5 at 6 in *United States v. Indiana*, 1:06-cv-01000 (S.D. Ind. July 5, 2006). (attached to the Second Neff Decl. at ¶12, Ex. 11).

In *Indiana,* the United States later moved to amend the consent decree to obtain the full, unredacted SVRL, including driver license numbers and social security numbers. Dkt. 16 in *Indiana*, 1:06-cv-01000. (attached to the Second 2d Neff Decl. at ¶12, Ex. 12). As discussed in the Motion, the United States was entitled to the unredacted SVRL pursuant to Title III, notwithstanding any conflicting state laws. *Id*. at 2. The consent decree acknowledged that the State is “required to provide the requested information under the relevant statutes and pursuant to the Supremacy Clause of the Constitution.” *Id*. at 4. The parties further recognized that “compliance with this request [was] a release of public information to a member of the public.” *Id*. Importantly, the United States agreed to “use the voter registration list information to assess the State’s compliance with federal voting laws, including, but not limited to, the NVRA.” *Id*. The Order granting the Motion to Amend the Consent Decree required Indiana, within 21 days of the order, to immediately make available to the United States the full statewide voter registration list including, where available, the following information: each registered voter’s full name, address, full date of birth, voter identification number as defined in IC 3-5-2-50.1, driver license number, race, voter status and voting history. Moreover, the amended order required Indiana to produce such data in electronic format on a CD ROM or DVD. Dkt. 18 in *Indiana*, 1:06-cv-01000. (attached to the Second Neff Decl. at ¶13, Ex. 13).

The United States’ use of Title III of the CRA is not limited to investigating compliance with HAVA and the NVRA. It also has used the law in the enforcement of the Uniformed and Overseas Citizen Absentee Voting Act (“UOCAVA”), 52 U.S.C. §§ 20301, *et seq*. The United

States sued Alabama for the State's noncompliance with 42 U.S.C. § 1973ff-1(c),[4] which required Alabama to report to the Election Assistance Commission, not later than ninety days after a regularly scheduled general election for Federal office, certain data regarding ballots from absent uniformed services voters and overseas voters. *See* Dkt. 1, *United States of America v. Alabama*, Case No. 2:08-cv-00920 (M.D. Ala. March 28, 2009). (attached to the Second Neff Decl. at ¶14, Ex. 14). The United States sought data in 21 Alabama counties under the CRA, and the Court issued an Order approving that request, and indicated that it would send demand letters to each of those counties for those election records. *Id.* at Dkt. 24. A copy of a letter sent to Shelby County in 2009 requesting election records pursuant to Title III is attached to (attached to the Second Neff Decl. at ¶14, Ex. 18). The United States filed a similar lawsuit in Vermont to obtain records for enforcement of the UOCAVA reporting requirement and the parties agreed that election officials are required to retain election records under the CRA. *See, e.g.*, Dkt. 1, *United States of America v. Vermont*, Case No. 2:08-cv-00217 (D. Vt. Feb. 26, 2009). (attached to the Second Neff Decl. at ¶15, Ex. 15).

The United States has also used the CRA in enforcement of the Voting Rights Act. The United States sought election records from counties gathering evidence for a lawsuit brought under Section 2 of the Voting Rights Act in *United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021), Dkt. 1. The Civil Rights Division sought election information from 159 counties in Georgia, and demand letters under Title III were sent to some of those counties. A copy of a letter sent to Newton County, Georgia is attached to the Second Neff Decl. at ¶16, Ex. 16. The Federal Prosecution of Election Offenses explains under the heading "Retention of Federal Records: 52 U.S.C. § 20701" that "[t]he detection, investigation, and proof of election crimes – in many

---

[4] UOCAVA was transferred to 52 U.S.C. §§ 20301, *et seq*.

instances Voting Rights Act violations – often depend[s] on documentation generated during the voter registration, voting, tabulation, and election certification processes." U.S. Dep't of Just., *Federal Prosecution of Election Offenses* 75 (8th ed. 2017). That document further provides that "under Section 20701, all documents and records that may be relevant to the detection or prosecution of federal civil rights or election crimes must be maintained if the documents or records were generated in connection with an election that included one or more federal candidates."[5] *Id*. at 78. Accordingly, the United States has provided a sufficient statement of basis and purpose for its demand for federal election records.

**C. Title III of the CRA does not require allegations that the federal election records demanded are needed to investigate race-based denial of voting rights.**

Title III of the Civil Rights Act of 1960 is entitled "Federal Election Records." CRA § 301, Pub. L. No. 86-449, 74 Stat. 86 (1960). This "sweeping" obligation requires officers of election to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. Section 301 provides, in pertinent part, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of [a federal election] all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election…." 52 U.S.C. § 20701. Section 303 authorizes the Attorney General of the United States to compel any person "having custody, possession, or control of such record or paper" to make "available for inspection, reproduction, and copying … by the Attorney General or [his] representative" such records. 52 U.S.C. § 20703.

---

[5] In April 2024, the Department of Justice also issued guidance that explains Title III of the CRA requires election officials to retain election records. "The Act protects the right to vote by ensuring that federal elections records remain available in a form that allows the Department to investigate and prosecute both civil and criminal election matters under federal law." U.S. Dep't of Justice, *Federal Law Constraints on Post-Election 'Audits'* 2 (April 2024), https://www.justice.gov/crt/media/1348586/dl?inline (accessed April 10, 2026)

Notwithstanding the CRA's plain language, Defendant suggests that the only permissible basis for a Title III request is to investigate racial discrimination in voting and not to assess a state's compliance with HAVA and the NVRA. Dkt.25 at 10-12. Defendant is mistaken. Congress made clear in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). That is consistent with express limitations Congress made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race, color…" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language minority status in the Voting Rights Act of 1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limiting Title III of the CRA to voting rights violations based upon racial discrimination appears anywhere in the statutory text. *See* 52 U.S.C. §§ 20701-20706.

Moreover, in *Gallion,* the court concluded "that the prescribed standard of Section 301 is *clear and unambiguous*." *Gallion*, 187 F. Supp. at 848 (emphasis added). Specifically, Title III functions as "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. The only language that is required in the Attorney General's demand is that it "was made for the purpose of investigating possible violations of a Federal statute." *Coleman II*, 313 F.2d at 868 (quoting "Senator Keating, one of the principal spokesmen for the bill in the Senate," at 106 Cong. Rec. 7767); *see also Coleman v. Campbell*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) ("*Coleman I*") (a sufficient purpose to examine federal election records is "to see if any Federal laws were violated").

Defendant also suggests that enforcing list maintenance by examining compliance with HAVA's identification requirements is incompatible with securing an individual's right to vote. *See* Dkt. 25 at 11-12. Actually, the opposite is true – examining compliance with HAVA is essential to securing an individual's right to vote. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four digits of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2021). (excerpts attached to the Second Neff Decl. at ¶17, Ex. 17). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *Id.* at 30, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id.* The Commission explained, "[u]sed cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id.* at 33. Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when Congress enacted HAVA in 2002. Congress explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote: to

"reduce the incidence of voters appearing at a polling place only to discover that no record of their registration can be found."[6] H.R. Rep. 107-329, pt. 1, at 36 (2001).

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate as well as undermine the Attorney General's enforcement of requirements in HAVA and the NVRA that help protect voting rights. Where, like here, the language of an enactment is unambiguous, "the words employed are to be taken as the final expression of the meaning intended." *United States v. Mo. Pac. R.R. Co.*, 278 U.S. 269, 278 (1929). Well-established principles of statutory construction foreclose federal courts from rewriting a statute in a manner that better suits a litigant. As the Supreme Court explained, "[t]he judicial function to be exercised in construing a statute is limited to ascertaining the intention of the Legislature therein expressed. A *casus omissus* does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554-55 (1925). "[W]here the language of an enactment is clear, and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed." *Mo. Pac.*, 278 U.S. at 278 (citations omitted). In that manner, the "judicial function [is] to apply statutes on the basis of what Congress has written, not what Congress might have written." *United States v. Great N. Ry. Co.,* 343 U.S. 562, 575 (1952). "After

[6] Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny. First Neff Decl. ¶¶ 12-14. In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025) (attached to the First Neff Decl. at ¶13,, Ex. 3). As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026) (attached to the Second Neff Decl. at ¶9,, Ex. 7).

all, only the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process…." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654-55 (2020).

The *Benson* court rejected arguments that parallel those of Defendant in this case, concluding that the CRA cannot be rewritten to restrict the statute's scope. *Benson* first rejected *Weber*'s imposition of a temporal limitation on the CRA to only those statutes in effect when the Act became law. *Benson* explained, "[t]here is no rule of statutory interpretation that prevents a statute from interacting with, or being used in conjunction with, subsequently enacted statutes," *Benson*, 2026 WL 362789 at *8, such as the NVRA and HAVA. Turning to the argument that Title III of the CRA only could be used to investigate racial discrimination, *Benson* observed that "the CRA's text includes no such limitation…" *Id.* Investigating list maintenance efforts under the NVRA fits neatly within the scope of Title III: "The CRA aides the Attorney General in assessing states' compliance with federal election law and protecting voting rights; the NVRA is a federal election law that protects voting rights." *Id.*

As a result, the United States respectfully submits that the Court must decline Defendant's invitation to rewrite the CRA to add a requirement of racial discrimination that simply does not exist in Title III. *See id.*

**D. West Virginia's SVRL falls within Section 301's broad definition of "all records and papers" relating to registration to vote in a federal election.**

Congress broadly established the scope of federal election records covered by Title III. Section 301 of the Act provides that the retention and production requirements apply to "*all records and papers*" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period

of twenty-two months" from the date of any federal election. 52 U.S.C. § 20701 (emphasis added); *see also Lynd*, 306 F.2d at 226.

Contrary to what Defendant argues, the *Benson* decision does not substantially change the application of "all records" to the SVRL, as required by the plain language of Section 301 of the CRA, 52 U.S.C. § 20701. Dkt. 25 at 13-15. Regardless of who created the SVRL, Secretary Warner has "custody, possession, or control of such record or paper" and must make it "available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

West Virginia's SVRL is merely a composite of individual records relating to voter registration for federal elections. When a term goes undefined in a statute, the Court must "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd*., 566 U.S. 560, 566 (2012). The ordinary meaning of the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 566 n.1 (2011) (the term "related" is "expansive"). As required by Section 303 of HAVA, 52 U.S.C. §21803, the SVRL is the method by which West Virginia accumulates the records of who has registered to vote, and one cannot seriously dispute that such a list "has 'a connection with, or reference to,' the topics the statute enumerates," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384) – namely, voter "registrations." 52 U.S.C. § 20701; *cf.* Ky. Rev. Stat. § 116.025(1) (requiring a voter to appear on the registration list to vote); Ky. Rev. Stat. § 116.013 (defining a voter as "any name contained in any registration list").

Indeed, federal courts that have applied 52 U.S.C. § 20701 have concluded that Congress

meant what it said in the statute. It does not exclude any voting record that Defendant maintains, despite his argument that the SVRL is excluded because his office "created" it. *See* Dkt. 25 at 15. One court explained in detail why a similar effort to impede the Attorney General's enforcement of federal election laws failed:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election.'

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).

The United States substantially briefed the Court on *Benson* in its Motion to Compel. *See* Dkt. 26 at 16-19. Notwithstanding Defendants' arguments, *Benson* does not preclude the United States from obtaining the West Virginia's SVRL. *See* Dkt. 25 at 13-15. *Benson* agreed with the United States regarding the summary nature of a Title III proceeding, but in doing so it reached a few atextual conclusions. In particular, *Benson* read Section 301 of the CRA more narrowly than Congress intended in the statute's reference to "all records." *See* 2026 WL 362789 at *9-10. The United States respectfully disagrees. Such a reading carves out vast numbers of federal election records, which was plainly not Congress's intent when passing Title III. *Lynd*, 306 F.2d at 226.

Nothing in Section 301 restricts "all records and papers" to only those records and papers submitted by voters. Even assuming that the examples of documents cited in the statute "refers to something that the voter submits or does," *Benson*, 2026 WL 362789 at *9, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records, poll

lists, applications for absentee ballots, ballot envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves.").

Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves – including statewide voter registration lists – would subvert that purpose by frustrating the United States's ability to acquire evidence that could shed light on whether a violation of the law has occurred. And courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers." *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson*, 400 U.S. at 533); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Moreover, there is no reason to attribute such a "pedantic distinction" to Congress. *Benson*, 2026 WL 362789 at *10. The Attorney General is entitled, after an appropriate written demand, to "all records and papers which come into [the] possession" of an "officer of election" and which "relat[e] to any application, registration, payment of poll tax, or other act requisite to voting in [certain specified] election[s]" for a period of 22 months from the date of election. 52 U.S.C. §§ 230701, 20703. According to *Benson*, "'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source" as opposed to the phrase "records in the possession of," which would include documents or records that were self-generated. 2026 WL 362789 at *9. That, however, is not what the plain terms of the statute dictate: an officer "come[s] into … possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291, (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"). Secretary Warner acquired

the relevant records carrying out his duties as his responsibility for administering federal elections in West Virginia.

Contrary to *Benson*, "distinction[s] between possessing something and having something come into one's possession," 2026 WL 362789, at *9, are temporal distinctions – not distinctions between obtaining records from an outside source and those through self-generation – as shown by the very example that court cites. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who … may come into possession of it" at a later time must likewise surrender the document. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make little sense because no applicant or private person can create a certificate of naturalization nor can any "other person" create a declaration of intention for a separate declarant. *See* 8 U.S.C. §§ 1445(f), 1449.

Federal courts addressing similar provisions of federal election law interpret election records expansively. The District of Maryland, for example, when asked by a private, nongovernment party, found that the "focus on the information sought" was significant "rather than the particular language used to characterize that information" when interpreting the NVRA. *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019) (citing *Project Vote v. Kemp*, 208 F.Supp.3d 1320, 1329 (N.D. Ga. 2016) (court rejected defendant's argument that plaintiff could not obtain voter list)). Focusing on the information sought rather than how it was acquired or generated, the state's voter registration list qualified as election records. *Id.* at 441-43; *see also* *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012) (holding that "all

records" under Section 8(i)(1) for request by private, third party included voter registration records). As a result, the SVRL is encompassed by Section 301 of the CRA and must be produced to the United States.

**E. The United States is entitled to unredacted "reproduction" and "copying" of West Virginia's SVRL.**

Section 303's language provides that "[a]ny record or paper required by [Section 301] to be retained and preserved shall" upon written demand by the Attorney General or his representative stating the basis and purpose, "be made available for inspection, reproduction, and copying…." 52 U.S.C. § 20703. "The incorporated standard of [Section 301] is sweeping." *Lynd*, 306 F.2d at 226. The question is only "open for determination" by the Court if "a genuine dispute… arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers … relating to any … act requisite to voting'…." *Id.*

Nevertheless, Defendant asks the Court to legislate limitations conspicuously absent from Title III by limiting the United States to only the redacted, publicly available SVRL. Dkt. 25 at 13-15, 20. The statutory text of Title III itself makes clear that the records that must be produced under the CRA are not limited to only those that are public. Furthermore, Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704.

Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Despite this, Defendant ignores the plain language of Section 304 and asks the Court to do the same by rewriting the CRA to exclude all non-public records and

information. Congress rejected the position Defendant advances by the statute's broad reference to "all records and papers…" 52 U.S.C. § 20701. In sharp contrast, where Congress intended to require a smaller class of records to be produced in a statute, it has said so. *See* 52 U.S.C. § 20507(i) (providing in the NVRA that voter records to be produced to the public for assessment of list maintenance "shall include lists of the names and addresses" of voters sent confirmation notices and any responses). To put it succinctly: Section 301 means what it says in requiring production of "all records and papers" relating to registration to vote in a federal election, including West Virginia's SVRL. 52 U.S.C. § 20701. As *Lynd* made clear, "All means all." 306 F.2d at 230. Defendant's argument that non-public records are excluded fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order.[7] *Lynd*, 306 F.2d at 230.

Finally, this court's adoption of Defendant's position would eviscerate Title III. Because Defendant's voting list will contain numerous individuals with the same name, the Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter in West Virginia, that requires their social security number or other HAVA identifier. *See* 52 U.S.C. § 21083 (a)(5)(D). As explained above, that information is necessary to identify

---

[7] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states a memorandum of understanding, or MOU, memorializing these requirements. *See* Second Neff Decl. ¶ 18. As of May 11, 2026, fourteen states have provided their SVRLs without any MOU. *Id.* Three states have agreed to provide their SVRL under the terms of the MOU. *Id.* One other state agreed to provide its SVRL to settle a CRA lawsuit. *Id.*

duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[8] The only way for the United States to determine whether West Virginia has an identifier for each person registered to vote for federal elections is by reviewing its complete SVRL. There is no question that enforcement of the list maintenance requirements of HAVA and the NVRA and to ensure that West Virginia is in compliance with HAVA's identification requirements are for "the purpose of investigating possible violations of a Federal statute." *See Coleman II*, 313 F.2d at 868; *cf. Morton Salt*, 338 U.S. at 642-43 (confirming compliance with federal law is a legitimate purpose).

The data the United States has requested under the CRA is the same data twenty-six states and the District of Columbia routinely share with a third party, the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list-maintenance requirements.[9] Similarly, states have released to private parties even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights. *See Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025) (ACLU compelled production of "[a] copy of the New Hampshire statewide voter database and all documents concerning the use of the statewide voter database, including instruction manuals or other guides concerning the data fields contained in the database and their correct interpretation."), *appeal dismissed*, No. 25-1585 (1st Cir. July 2, 2025).

---

[8] *See generally* 52 U.S.C. § 20507 (a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083 (a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

[9] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited May 11, 2026).

Accordingly, the United States is entitled to reproduction and copying of West Virginia's unredacted electronic SVRL under the unambiguous language of Section 303 of the CRA. *See* 52 U.S.C. § 20703; *see also Gallion*, 187 F. Supp. at 855-56 (granting the Attorney General "an order to require the production of records for inspection, reproduction and copying…"); *Lynd*, 306 F.2d at 226 (same).

**F. The CRA respects federalism by trusting states to comply with federal election law and empowering the Attorney General to verify that States do so.**

Defendant argues that the United States is foreclosed from using the CRA to obtain West Virginia's SVRL by principles of federalism. Defendant suggests that the Attorney General plays no role in the conduct of federal elections and that the federal laws at issue must yield to West Virginia's state privacy laws. Dkt. 25 at 15-16. Defendant is mistaken on both counts.

The Attorney General's use of the CRA to investigate compliance with HAVA and the NVRA and, if appropriate, to bring an enforcement action, fully respects the federal structure. Without question, the United States Constitution invests states with the primary responsibility for the conduct of federal elections. But at the same time, the Constitution explicitly authorizes Congress to override those state choices. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices …. Thus, it is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are

paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Id.*; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7-9 & n.1 (2013) (discussing the breadth of the Elections Clause).

Congress enacted broad regulations over the conduct of federal elections in the CRA, HAVA, and the NVRA, adopting a "trust, but verify" approach. State election officials including Defendant are given the primary responsibility for administering federal elections. Specifically, Title III of the CRA imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Lynd*, 306 F.2d at 226. HAVA requires states to implement a computerized SVRL and establish "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

Each of these provisions regulate the conduct of federal elections and make state officials responsible for implementing them. But contrary to what Defendant argues, that does not mean that the Attorney General, as the Nation's chief law enforcement officer, plays no role at all. Far from it. At the same time state election officials were trusted to conduct federal elections, Congress empowered the Attorney General to verify that Defendant is doing so in compliance with federal law. Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that

all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510 (b), 20507 (a)(4). Adopting this approach of trust but verify thereby respects the federal structure and the primacy of state officials in conducting federal elections.

Title III of the CRA further promotes the transparency of the state's conduct of federal elections by giving the Attorney General pre-suit investigative tools to evaluate a state's records pertaining to those elections, including its SVRL. As *Lynd* explained, "the right of the Attorney General to inspect and copy such records is not dependent upon an existing demonstrable right" to maintain a lawsuit. 306 F.2d at 227. "His right to records does not require that he show he could win without them." *Id.* In other words, the CRA's purpose "is to enable the Attorney General to determine" if an enforcement action "should be instituted. And it is to enable him to obtain evidence for use in such cases if and when filed." *Id.* at 228. To afford the Attorney General the ability to verify compliance with federal law, the CRA "has equipped him with the machinery thought suitable for the effective fulfillment of that obligation." *Id.* at 230. "Wide scope must be accorded the Attorney General" in his ability to review federal election records like the SVRL and "extends as far as the sovereign State itself." *Id.* at 228. If the Attorney General's review reveals that state election officials are not in compliance with federal law, then the United States can bring an appropriate enforcement action. In other words, trust, but verify.

The United States believes that state law can be read in harmony with federal law. However, if there is a direct conflict between state and federal laws, then state law must yield under the Supremacy Clause. *See* U.S. Const. art. VI, cl. 2; *see also Inter Tribal Council*, 570 U.S. at 15 ("States' role in regulating congressional elections – while weighty and worthy of respect – has always existed subject to the express qualification that it 'terminates according to federal law.'")

(quoting *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347 (2001)). In any event, the United States has complied and will continue to comply fully with all federal privacy laws applicable to the SVRL and other federal election records that are produced. Through its Motion to Compel, the United States asks the Court to respect the federal structure, acknowledging that while Defendant is trusted to conduct federal elections, the Attorney General has been empowered by the CRA to verify that Defendant is doing so in compliance with HAVA and the NVRA.

**G. The United States is complying with Federal privacy laws and State privacy laws do not prevent disclosure of the requested data.**

Defendant next makes a variety of arguments that various privacy laws – the Privacy Act, E-Government Act, Driver's Privacy Protection Act, and state privacy law – require dismissal of the United States' efforts to compel production of West Virginia's federal election records. *See* Dkt. 25 at 16-20. Defendant's arguments are misguided at best. First, these arguments are affirmative defenses and therefore cannot form the basis for dismissing the Complaint. Federal law does not require the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. The Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use.[10] Defendant's remaining privacy arguments lack merit. The Complaint, incorporating the demand, is in full compliance.

***1. The United States is complying with the Privacy Act.***

Bottom line, the Privacy Act does not bar the disclosure of West Virginia's SVRL to the United States, as Defendant asserts. Dkt. 25 at 17. The Privacy Act regulates federal agencies'

[10] As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act.

collection, maintenance, and disclosure of information with federal agencies. The statute's plain language confirms that it applies only to federal "agencies" as defined in 5 U.S.C. §§ 552a(a)(1), meaning "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government." State and local entities fall outside that definition. The Privacy Act "erects certain safeguards for an individual against an invasion of personal privacy," Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974), only within the scope of the federal agency record systems. There is no basis for Defendant to fail or refuse to disclose information to a federal agency for law enforcement purposes, particularly here, where the United States in complying with the provisions of the Privacy Act.

To that extent, the voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which it has published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's systems of records notices ("SORN"), most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. The list of routine uses for this collection of information includes JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001 in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division Web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 CFR 47611. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the Division in maintaining names of Division employees and their case

> investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id*. The statutes cited for routine use in the Department of Justice SORNs include enforcement of HAVA, the NVRA, and the Civil Rights Act of 1960, as described in note 16 of the Department of Justice's Privacy Policy.[11] The United States made its requests and filed the above captioned matter pursuant to those statutes. *See* Dkt., 1, ¶¶ 10-19. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

To the extent that Defendant is concerned about the transport of such data to the United States, the Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs. Regardless, there is simply no requirement in federal law which requires the United States to plead its compliance with the Privacy Act in a complaint it brings that involves obtaining records that contain personally identifiable information. Rather, the Privacy Act in conjunction with Section 204 of the CRA simply requires that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use. As outlined above, the United States will do that.

---

[11] States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021) (last visited May 11, 2026).

### 2. *The E-Government Act does not prevent the United States from obtaining data supporting its HAVA and NVRA claims.*

Defendant next argues that the demand for production of West Virginia's SVRL and other federal election records violates the E-Government Act. According to Defendant, the United States is required to conduct a "privacy impact assessment," or "PIA," before initiating investigations of each state's compliance with HAVA and the NVRA. *See* Dkt. 25 at 18. Again, neither the E-Government Act nor case law supports this assertion.

The E-Government Act neither authorizes dismissal of this case nor limits the United States' ability to bring suit. The E-Government Act is not applicable to the United States' enforcement of HAVA and the NVRA. The United States is not initiating a new process whereby it is contacting individuals for information as contemplated by Pub. L. No. 107-347, § 208(b)(l)(A)(ii)(II), which "includes any information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." The Attorney General requested Defendant to provide a voter registration list already maintained pursuant to federal law to analyze West Virginia's federally required list maintenance. The SVRL would be kept on a system for which a Privacy Impact Assessment has been done. Only when a new system is established – not when each new data request is made – is a Privacy Impact Assessment required.[12]

[12] When the Civil Rights Division began using ServiceNow (SNOW), a FedRAMP High-compliant Software as a Service (SaaS) cloud-hosting provider offering a suite of natively integrated applications designed to support Information Technology Service Management (ITSM), resource management, and shared support services, it prepared a Privacy Act Assessment ("PIA") as required by the E-Government Act. *See* Office of Privacy & Civ. Liberties, DOJ Privacy Impact Assessments, *available at* https://www.justice.gov/opcl/doj-privacy-impact-assessments (last visited May 11, 2026)."

Even if the Court found the E-Government Act applied here – and it should not – Defendant has misplaced his reliance on *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity,* 266 F. Supp. 3d 297 (D.D.C. 2017) ("*EPIC I*"). *See* Dkt. 25 at 18. *EPIC I* does not support dismissal of a complaint based on an alleged failure to conduct a PIA. In *EPIC I,* the plaintiff sought to enjoin a federal commission's collection of state voter information, claiming the commission had failed to prepare a PIA under § 208 of the E-Government Act. The D.C. Circuit affirmed dismissal of the claim on standing grounds. *See Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Elec. Integrity,* 878 F.3d 371 (D.C. Cir. 2017) ("*EPIC II*"). In doing so, *EPIC II* explained that the Act "is intended to protect individuals – in the present context, voter – by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind. *Id.* at 378 (emphasis in original).

***3. The Driver's Privacy Protection Act does not allow Defendant to deny the United States list maintenance data.***

Finally, Defendant incorrectly maintains that dismissal is warranted because he claims that the United States' demand violates the Driver's Privacy Protection Act ("DPPA"). Dkt. 25 at 18. The DPPA generally prohibits the disclosure of "personal information" obtained by a state Department of Motor Vehicles in connection with a motor vehicle record. *See* 18 U.S.C. §§ 272l(a), 2725(1), (3), (4). Nonetheless, the statute explicitly contains exceptions that permit certain governmental uses. Under 18 U.S.C. § 2721(b)(l), disclosure is allowed "for use by any government agency ... in carrying out its functions," including law enforcement or other regulatory enforcement purposes. This statutory language demonstrates that the DPPA was not intended to block all government access to DMV records – particularly when requested for purposes of law enforcement or regulatory enforcement.

The DPPA's prohibition is clearly not implicated in the present case. The Department of Justice is a government agency performing a statutorily mandated function-verifying voter registration records and associated list maintenance activities by state and local entities. Under the governmental-function exemption in § 2721(b)(l), the United States' use of DMV-provided information is permissible, even though the information originates from a motor vehicle record. Transfers of DMV data to government agencies for official functions, including voter registration administration, are therefore consistent with the DPPA and fall squarely within the statute's exceptions.

**H. The First Amendment does not prohibit the United States' access to data maintained under HAVA or the NVRA.**

Defendant also contends that voter registration data the United States seeks is a form of political expression protected by the First Amendment – the disclosure of which risks imposing "an unconstitutional burden on the right to vote." *See* Dkt. 25 at 16. This argument misses the mark. Without question, voting and registration implicate speech and actions protected under the First Amendment. But that does not foreclose the United States from enforcing federal election laws such as HAVA and the NVRA. Enforcing HAVA and the NVRA are within the scope of an authorized law enforcement activity—necessarily implying that the United States can obtain the materials consistent with the Privacy Act. 5 U.S.C. § 552a(e)(7). Moreover, Defendant's argument would effectively prevent the Voting Section of the Civil Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

**I. West Virginia's Public Inspection Laws do not prevent the United States from obtaining data maintained under HAVA or the NVRA.**

Finally, Defendant asks the Court to legislate limitations conspicuously absent from Title III. Defendant cites to West Virginia Public Inspection laws to support the argument that only a

redacted version of the West Virginian's SVRL is required. *See* Dkt. 25 at 19-20. On its face, though, West Virginia law does not prohibit the disclosure of the state's SVRL as the Defendant claims. In fact, the statute "may not be interpreted to prevent the Secretary of State from sharing data … across state lines with any state or local official for the purpose of voter registration and election administration in accordance with … applicable federal law." W. Va. Code § 3-2-30(g).

Furthermore, when viewed alongside W. Va. Code § 5A-8-22(a)-(b) which governs the release of Social Security numbers maintained by West Virginia executive branch agencies – a statute conveniently ignored by Defendant here – there can be no doubt the United States can obtain the information sought from Defendant. By its express terms, W. Va. Code § 5A-8-22(b) permits Social Security numbers otherwise "exempted from public disclosure as an unreasonable invasion of privacy" to be released to the United States "for such purposes as are authorized by federal law or regulation …." Title III which defines election records at 52 U.S.C. § 20701 and requires the West Virginia to produce them upon demand, 52 U.S.C. § 20703, is that law.

Put another way, West Virginia law makes certain information confidential from *public* disclosure. W. Va. Code § 3-2-30(a) (requiring redaction of a social security number before it is furnished to a member of the public to examine); W. Va. Code § 5A-8-22(a)(1) (exempting Social Security numbers from disclosure to "non-governmental entities"). But the United States is not asking for *public* disclosure of West Virginia's SVRL. It is requesting an intergovernmental transfer of the data authorized by federal laws and regulations – which West Virginia's statute already accounts for – to assess the West Virginia's compliance with federal election law. Pursuant to the CRA's privacy provisions and the Privacy Act, none of the information obtained will be publicly disclosed.

Section 304 of the CRA makes clear that the records that must be produced are not limited

to only those that redact personal identifying information (PII). Section 304 of the CRA explicitly requires the nondisclosure of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. Section 304's privacy protection only has meaning if the records covered by the CRA include non-public information. Defendant ignores the plain language of Section 304 and asks the Court to rewrite the CRA to exclude all non-public records and information.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. The unredacted VRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order. *Lynd*, 306 F.2d at 230.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Motion to Dismiss (Dkts. 24-25) be denied and that the United States' Motion to Compel Production of federal election records under Section 305 of the CRA (Dkt. 15) be granted.

Dated this 13th day of May, 2026,

Respectfully submitted

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/*Christopher Gardner*___
Christopher Gardner
James Catania
Trial Attorneys
Voting Section, Civil Rights Division
4 Constitution Square
150 M. Street NE, 8th Floor
Washington, D.C. 20002
Christopher.Gardner@usdoj.gov
James.Catania@usdoj.gov
202-812-2631

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KRIS WARNER, in his official capacity as West Virginia Secretary of State,<br><br>Defendant. | Case No. 2:26-cv-00156-TEJ |

**SECOND DECLARATION OF ERIC NEFF**

I, Eric Neff, declare, pursuant to 28 U.S.C. § 1746, that:

1. I am currently Acting Chief to the Voting Section within the Civil Rights Division of the United States Department of Justice. I am fully and personally familiar with the facts stated herein. I make this declaration in support of the United States' Motion to Compel the production of election records pursuant to the Civil Rights Act ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.

2. The National Voter Registration Act, 52 U.S.C. § 20501, *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901, *et seq*., require each state to perform voter-list maintenance to ensure that only eligible voters remain on the statewide voter registration list. Under Section 11 of the NVRA and Section 401 of HAVA, the Attorney General is charged with the responsibility for enforcement of the list maintenance requirements of both statutes. *See* 52 U.S.C. §§ 20510(a), 21111. This enforcement responsibility has been delegated to the Civil Rights Division by Congress.

3. Section 8(i) of the NVRA requires states to make available "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1).

4. HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number, or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections.

5. To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote and the final voting rolls, including the unredacted electronic statewide voter registration list ("SVRL"), so as to assure herself that the applications are being properly processed and that reasonable and nondiscriminatory list maintenance efforts have been practiced.

6. When the Civil Rights Division performs this individualized assessment, the Commonwealth's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records. An Initial Privacy Assessment (IPA) Determination was issued on October 12, 2012, showing that no Privacy Impact Assessment is required for the Justice Consolidated Office Network (JCON) system where personal identifying information associated with the United States' CRA demand is stored.

7. The Department of Justice uses a secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). That system implements strict access controls to ensure that each user can only access their own files and is also covered by SORNs.

8. Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny, as Congress contemplated in authorizing the Attorney General to bring enforcement actions under HAVA and the NVRA.

9. As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026). A true and accurate copy of the Second Status Report from the *North Carolina* litigation is attached as Exhibit 7.

10. The United States District Court for the Eastern District of North Carolina also recently rejected arguments that the Department of Justice is amassing a nationwide voter database as "speculative and premature." *United States v. North Carolina Board of Elections*, Case No. 5:25-cv-00283 (E.D.N.C. Sept. 8, 2025). A true and accurate copy is attached as Exhibit 8.

11. In 2007, the United States entered into a Consent Decree with the State of Maine regarding HAVA compliance and list maintenance. A true and correct copy of the Consent Decree in *United States v. Maine*, No. 1:06-cv-00086 (D. Me. Apr. 4, 2007) is attached as Exhibit 9.

12. The United States entered similar agreements with the States of New Jersey and Indiana to enforce voter registration list maintenance. In New Jersey, paragraph five of the stipulated order required the HAVA identifiers to be provided and paragraph 14 required Defendants to retain voter registration and list maintenance records. In Indiana, paragraph 8 of that Consent Decree required the State of Indiana to "retain voter registration and list maintenance

records related to the terms of this agreement for the time periods provided by… [Section 20701].” True and correct copies of these documents from *United States v. New Jersey*, No. 06-cv-4889 (D. NJ. Oct. 12, 2006) and *United States v. Indiana*, 1:06-cv-01000 (S.D. Ind. July 5, 2006) are provided as Exhibits 10 and 11.

13. After the Indiana consent decree was entered, the United States moved to amend it to obtain the full, unredacted SVRL, including driver's license numbers and social security numbers. Dkt. 16 in *Indiana*, 1:06-cv-01000 (D. Ind. June 27, 2006), attached as Exhibit 12. The Court in *Indiana* issued an Order granting the United States' Motion to Amend Consent Decree. A true and accurate copy of this Order is attached herein as Exhibit 13.

14. The United States sued Alabama for the State's noncompliance with 42 U.S.C. § 1973ff-1(c), which required the State to report to the Election Assistance Commission, not later than ninety days after a regularly scheduled general election for Federal office, certain data regarding ballots from absent uniformed services voters and overseas voters. *See* Dkt. 1, *United States of America v. Alabama*, Case No. 2:08-cv-00920 (M.D. Ala. March 28, 2009), attached as Exhibit 18. A true and accurate copy of a letter sent to Shelby County in 2009 requesting election records pursuant to Title III is attached as Exhibit 14.

15. The United States filed a similar lawsuit in Vermont to obtain records for enforcement of the UOCAVA reporting requirement and the parties agreed that election officials are required to retain election records under the CRA. *See, e.g.*, Dkt. 1, *United States of America v. Vermont, Case No. 2:08-cv-00217* (D. Vt. Feb. 26, 2009). A true and accurate copy is attached as Exhibit 15.

16. The United States has also used the CRA in enforcement of the Voting Rights Act. The United States sought election records from counties gathering evidence for a lawsuit brought

under Section 2 of the Voting Rights Act in *United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021), Dkt. 1. The Civil Rights Division sought election information from 159 counties in Georgia, and demand letters under Title III were sent to some of those counties. A true and accurate copy of a letter sent to Newton County, Georgia is attached as Exhibit 16.

17. In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four digits of the Social Security numbers for federal elections protected individual voters. A true and accurate copy of the excerpts of Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 32-33 (Aug. 2021) is attached herein as Exhibit 17.

18. The United States has offered states an MOU memorializing these requirements. As of May 13, 2026, eighteen states have provided their SVRL including: fourteen states that have provided their SVRLs three any MOU, two states that have agreed to provide their SVRL under the terms of the MOU, and one state pursuant to a settlement agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Washington, D.C. on May 13, 2026.

/s/ Eric Neff
Eric Neff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**NO. 5:25-CV-00283-M**

UNITED STATES OF AMERICA,

Plaintiff,

v.

NORTH CAROLINA STATE BOARD OF ELECTIONS; SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections; FRANCIS X. DE LUCA, JEFF CARMON, STACY EGGERS IV, SIOBHAN O'DUFFY MILLEN, and ROBERT RUCHO, in their official capacities as Members of the North Carolina State Board of Elections; and STATE OF NORTH CAROLINA,

Defendants.

**DEFENDANTS' SECOND STATUS REPORT [D.E. 72, ¶ 10 (c)]**

NOW COMES Defendants North Carolina State Board of Elections, its Executive Director and its Members (collectively "State Board Defendants" or "Defendants"), and provides the Court with a Second Status Report as contemplated by paragraph 10 of the Court's September 8, 2025 Consent Judgment and Order ("Order")]. [D.E. 72, ¶ 10 at (c)] The information required by the Order is set forth below:

Pursuant to Paragraph 10(c) of the Order, the State Board provides the following information.

- 74,333 voters were sent the second mailing identified in Paragraph 6(b) of the Order.
- The second mailing went out on November 24, 2025.[1]

---

1 This corrects the date the second mailing was sent out which was referred to in the first Status Report. [D.E. 84]

- From December 1, 2025 to January 30, 2026, 2,355 records subject to the first and second mailings were updated to include the missing identification information.[2]
- Since the beginning of the Registration Repair Project on July 17, 2025 to the date of this filing, the total number of voters missing this information has decreased from 103,329 to 70,709. *See* State Board webpage, "Registration Repair Search Tool," https://dl.ncsbe.gov/RegistrationRepair/index.html, last visited January 30, 2026.

The State Board Defendants remain willing to provide additional information on these issues if requested by the Court.

Respectfully submitted this the 30th day of January, 2026.

NORTH CAROLINA
DEPARTMENT OF JUSTICE

/s/ Mary L. Lucasse
Mary L. Lucasse
Special Deputy Attorney General
N.C. Bar No.: 39153
Email: mlucasse@ncdoj.gov

North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6567
Facsimile: (919) 716-6763

*Counsel for State Board Defendants*

[2] The State Board reports that during this time period an additional 554 voters' records were removed from the voter registration list due to their own cancellation or other regular list maintenance processes. None of these voters were removed due to being in the Registration Repair Project.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil No. 5:25-cv-00283-M-RJ

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS;<br>SAM HAYES, in his official capacity as Executive Director of the North Carolina State Board of Elections;<br>FRANCIS X. DE LUCA,<br>JEFF CARMON,<br>STACY EGGERS IV,<br>SIOBHAN O'DUFFY MILLEN, and<br>ROBERT RUCHO, in their official capacities as Members of the North Carolina State Board of Elections; and<br>STATE OF NORTH CAROLINA,<br><br>Defendants. | ORDER |

These matters come before the court on the North Carolina Alliance for Retired Americans' Motion for Reconsideration of its Motion to Intervene as Defendant [DE 73] and the Democratic National Committee's Renewed Motion to Intervene [as a Defendant] [DE 75]. Plaintiff and Defendants oppose both motions. For the reasons that follow, the motions are denied.

On September 8, 2025, this court issued a Consent Judgment and Order ("Order") at the request of the parties, following their settlement of the issue raised in this enforcement action—i.e., whether Defendants had violated "the requirements of Section 303(a) of the Help America Vote Act of 2002 ('HAVA') with respect to the conduct of elections for Federal office in the State of North Carolina." Compl. ¶ 1. The court ordered that the State Board Defendants "ensure that North

Carolina's voter registration forms and instructions and the State's HAVA List used for *elections for Federal office* fully compl[y] with Section 303(a)(5) of HAVA, 52 U.S.C. § 21083(a)(5)." Order ¶ 3, DE 72 (emphasis added). The court further ordered that State Board Defendants refrain "from engaging in any act or practice" for "*elections for Federal offices*" that "fails to comply with the requirements of Section 303(a) of HAVA." *Id.* at ¶ 4 (emphasis added). In fact, the court specified that "[t]he terms of this Order apply to all elections for Federal office held in North Carolina." *Id.* at ¶ 2.

Prior to entry of the Order, the North Carolina Alliance for Retired Americans ("Alliance"), the Democratic National Committee ("DNC"), and others filed motions to intervene as defendants in the action. DE 7, 34, 39. The court reviewed the motions and determined that "all interests are adequately represented by the parties in this enforcement action, and the matters raised in the action are fully and finally settled"; thus, the court denied the proposed intervenors' motions as moot. DE 72 at 12. The present motions by the Alliance and the DNC followed,[1] and the court is now fully apprised.

<u>Alliance's Motion to Reconsider</u>

The Federal Rules of Civil Procedure do not expressly contemplate motions to "reconsider." Rather, a party in a civil case may move to alter or amend a judgment pursuant to Rule 59(e) or move for relief from a judgment or order pursuant to Rule 60(b). Here, the Alliance seeks relief pursuant to Rule 59(e). DE 74 at 2, 6, 13. "This rule was promulgated to make clear that the district court, with broad discretion, could 'rectify its own mistakes in the period immediately following the entry of judgment.'" *Daulatzai v. Maryland*, 97 F.4th 166, 177–78 (4th Cir. 2024) (quoting

---

[1] During the briefing period, the federal government experienced a lapse in appropriations and, at the parties' request, the court stayed the proceedings until the stay was lifted on December 4, 2025. DE 78, 79. The motions were submitted to the undersigned on December 9, 2025.

*White v. N.H. Dep't of Emp. Sec.*, 455 U.S. 445, 450 (1982)). "Rule 59(e) is generally invoked 'only to support reconsideration of matters properly encompassed in a decision on the merits.'" *Id.* (quoting *White*, 455 U.S. at 451). While a court is authorized to reconsider its ruling on virtually any basis that it determines might have been an error in its judgment, "courts will not address new arguments or evidence that the moving party could have raised before the decision issued." *Id.* (quoting *Banister v. Davis*, 590 U.S. 504, 508 (2020)).

The Alliance contends that it is "entitled to intervention as of right" and argues that the court erred in several ways when it entered the Order by: (1) failing to recognize that the State Board Defendants do not adequately represent the Alliance's interests; (2) failing to consider the impact of the Order on voters in state and local elections (DE 74 at 1, 4, 5, 11); (3) permitting "the [Department of Justice] full access to North Carolina's voter records" in apparent violation of N.C. Gen. Stat. §§ 132-1.10(b) and 163-82.10(a1); and (4) failing to permit submissions by *amicus curiae* before the Order was entered, as suggested by the parties.

Under Rule 24(a)(2) of the Federal Rules of Civil Procedure, a district court "must permit intervention as a matter of right if the movant can demonstrate '(1) an interest in the subject matter of the action; (2) that the protection of this interest would be impaired because of the action; and (3) that the applicant's interest is not adequately represented by existing parties to the litigation.'" *Stuart v. Huff*, 706 F.3d 345, 349 (4th Cir. 2013) (quoting *Teague v. Bakker*, 931 F.2d 259, 260–61 (4th Cir. 1991)). "If intervention of right is not warranted, a court may still allow an applicant to intervene permissively under Rule 24(b), although in that case the court must consider 'whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.'" *Id.* (citing Fed. R. Civ. P. 24(b)(3)).

Because it underlies some of the Alliance's other objections, the court will start by examining the Alliance's concern that the court failed to consider any impact its Order may have

on state and local elections. This concern is easily allayed; the Order provides, and this enforcement action seeks, relief specifically for statutory (HAVA) violations concerning "elections for Federal office." Thus, the action and Order are limited in nature and scope. Nothing in the Order (nor in this action for that matter) challenges, addresses, or references the State Board's policies and/or procedures regarding state and local elections. The Alliance has taken no action (nor even suggested attempting) to amend the nature or broaden the scope of this case to include purported violations of voters' statutory and/or constitutional rights concerning state and local elections. To the extent that the Alliance disagrees with the State Board's actions, if any, taken outside the scope of the Order,[2] it may pursue relief through appropriate channels. In this respect, the Alliance fails to demonstrate that disposition of this action "may as a practical matter impair or impede" the Alliance's "ability to protect" an "interest *relating to* the property or transaction that is *the subject of the action*." Fed. R. Civ. P. 24(a)(2) (emphasis added).

Second, regarding adequate representation, the Alliance does not dispute that it has an interest in ensuring the State Board complies with all statutory requirements concerning voter registration. Rather, the Alliance contends that, unlike the State Board, it has an "organizational interest in preserving its own resources" and the "consent judgment would require the Alliance to undertake significant operations to help its members comply with the Board's plan." DE 74 at 8. To the extent that the Alliance references the State Board's "plan" as set forth in the Order, the court

---

[2] The Alliance characterizes "issues relating to state and local elections" as "a byproduct of the Board's choice to craft a [remedial] program implementing its agreement with DOJ that would disenfranchise voters in state and local elections." DE 83 at 1-2; *see also id.* at 7 (asserting that "the Board's remedial program [was] adopted to implement the consent judgment") (citing "ECF No. 73-1"). However, nothing in the September 8, 2025 revised memorandum, to which the Alliance refers as describing the "remedial program" (DE 73-1), indicates that any procedure concerning state and local elections arose from an agreement between the State Board and the United States, nor from the Order or any order issued in this action. In fact, in describing the content of the Order, the DNC recognizes that "[w]hether [voter] ballots will be counted in contests for state and local office is a matter of state law and outside the scope of the [Consent] Decree." DE 76 at 2.

finds the Alliance fails to explain or identify how it or its members are unduly burdened by the State Board's compliance with HAVA procedural requirements in North Carolina's federal elections. To the extent that the Alliance's reference is to a "plan" outside the parameters of the Order, it is not relevant to this action.

The Alliance also argues that the State Board cannot adequately represent its interests since the State Board and the United States have been "on the same team" since the initiation of the action, and the State Board has failed to "fight[] to protect the interests of voters in its state." Even if this were true, the Alliance again fails to recognize the limited scope of this enforcement action, and it has done nothing to modify or broaden it.

Finally, the Alliance asserts that the State Board failed to adequately represent its interest in objecting to the Order's "Election Day procedure" (*see* DE 72 at 9). Under the procedure, voters appearing on Election Day who present HAVA-required information, but who did not previously update their registration records with the required information, will vote by provisional ballot. *Id.* Here, the Alliance objects that "HAVA does not require relegating these voters to provisional status" and characterizes the procedure as "disfavored treatment." DE 74 at 12. However, the procedure specifies that the provisional ballots will be counted for federal elections, and provisional voting will not result in the voters' removal from voter rolls. DE 72 at 9. The Alliance fails to explain how the procedure "disfavors" its members.

Notably, the Alliance also argues that the Order "grant[s] DOJ broad access to the Alliance member[s'] voting records, despite state law providing privacy protection for much of that information." DE 74 at 8; *see also id.* at 12 ("The consent judgment would grant DOJ unfettered access to voters' driver's license numbers, dates of birth, and partial social security numbers, all of which are meant to be kept 'confidential' under state law."). Because this issue was raised by both the Alliance and the DNC, the court will address it below.

In sum, the Alliance fails to show it has a right to intervene, in that it has failed to demonstrate an interest, which is properly related to this limited enforcement action, that was not adequately represented by the parties in this action. *See* Fed. R. Civ. P. 24(a)(2). Moreover, even if the Alliance had demonstrated it "has a claim or defense that shares with the main action a common question of law or fact," its nonessential intervention in this completed action would unduly delay and prejudice the adjudication of the government's right to enforce—and the State Board's right to implement—federal voting laws. *See Stuart*, 706 F.3d at 350 ("It is incontrovertible that motions to intervene can have profound implications for district courts' trial management functions. Additional parties can complicate routine scheduling orders, prolong and increase the burdens of discovery and motion practice, thwart settlement, and delay trial."). Thus, the court will not permit the Alliance to intervene. *See* Fed. R. Civ. P. 24(b).

<u>DNC's Renewed Motion to Intervene</u>

The DNC renews its motion to intervene arguing that the Order presents a "live" issue in permitting the State Board to provide the United States with certain voter records, which may contain private information, and to seek a protective order governing the use and release of any confidential data. *See* Order ¶ 11 ("Disclosure Clause"). The DNC contends that the possible disclosure of private voter information (including driver's license numbers and partial social security numbers) to the government may cause some Democratic voters to remove themselves from the voter rolls. DE 76 at 4-5. To ensure that any such disclosure of private information remains confidential, the DNC proposes certain terms to be included in a protective order governing the disclosure. *Id.* at 6. In addition, the Alliance asserts generally that the Disclosure Clause "runs afoul of state privacy laws" (DE 74 at 12) and that the "DOJ has no entitlement to the sensitive voter data it seeks" (DE 83 at 7).

The parties oppose intervention on this basis, arguing first that the United States has made no request for information or documents pursuant to the Disclosure Clause and, thus, any request for relief is premature. The parties also contend that the Order does not grant the United States "unfettered access" to private information as suggested by the Alliance; rather, to "ensure that no unlawful use or disclosure of confidential information arises during the compliance period," the Order specifically reserves the State Board's right "to seek a protective order from the Court." DE 82 at 9. Finally, the parties assert that they will treat any confidential data in accordance with state and federal laws, including the Privacy Act, 5 U.S.C. § 552a, et seq., as set forth in paragraph 11 (or, the Disclosure Clause) of the Order. *See* DE 80 at 10-11 (the United States (more particularly, the Civil Rights Division of the Department of Justice) "has longstanding protocols in place consistent with Privacy Act protections").

The DNC is not persuaded. Citing recent news articles, the DNC contends that the Department of Justice not only is "develop[ing] a national voter file" but also has improperly "shared voter information" with the Department of Homeland Security, and argues that the United States may do the same with any information shared in accordance with the Order. The DNC asserts that intervention is necessary to protect its members' privacy interests, particularly in light of the United States' "conce[ssion] that it will grab sensitive voter data wherever it can and use that data however it wants, including sharing the data with anyone it chooses." DE 81 at 5. The Alliance echoes the DNC's concerns. *See* DE 83 at 8.

The court finds the proposed intervenors' arguments in this case speculative and premature. The DNC and Alliance's claimed interest under Rule 24(a)(2)—protecting the privacy of their members' identifying information—is, on its face, adequately represented in this action by the requirements set forth in the Order. The Disclosure Clause provides:

11. State Board Defendants will make available to the United States upon request

> any non-privileged documents created or maintained by State Board Defendants regarding compliance with this Order or compliance with Section 303(a)(5) of HAVA, including voter records in the State's HAVA List and any relevant documents that the State Board Defendants may be required to produce or retain under North Carolina State law. As used herein, "voter records" means an electronic copy of the State's HAVA list including each registrant's full name, date of birth, residential address, his or her driver's license number or state identification number or the last four digits of the registrant's social security number, which is the information required under HAVA to register individuals for Federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i). All records and data received by the United States from the State Board Defendants will be kept securely and treated consistently with the Privacy Act, 5 U.S.C. § 552a, et seq. To the extent confidential records or data is requested, the State Board Defendants reserve the right to seek a protective order from the court.

Order, DE 72. No party disputes that the United States has made no request for the information described in the Disclosure Clause. If it does so in the future, the State Board has expressed its "inten[t] to seek a protective order similar to protective orders entered in other actions in which similar records were disclosed as part of litigation," and "anticipates that any such request would include the same or similar protective provisions to what is contemplated by the DNC in their moving papers." DE 82 at 9. To the extent that they are properly presented, the court will accept and consider briefs filed by *amici curiae* with any motion(s) for protective order filed in this case. Thus, in this regard, the court finds the proposed intervenors have failed to demonstrate that they have a claimed interest in the subject of this enforcement action and are so situated that disposition may impair or impede their ability to protect such interest.

The Alliance has expressed its concern that the Order "provides no guarantee that the Alliance would even be notified of [the United States'] demand, nor given time to intervene before the Board complied." DE 83 at 9. The court is not persuaded; the proposed intervenors have demonstrated their abilities to monitor and participate in this action. In fact, in its response brief, the DNC recounts its own act that purportedly led to the State Board's "change of course" in

ensuring that the Order "recogniz[e] that votes cast by registrants impacted by the Decree must be counted in federal contests." DE 76 at 2.

In conclusion, the DNC and the Alliance have failed to demonstrate they have a right or should be permitted to intervene in this HAVA enforcement action. Their motions [DE 73, 75] are DENIED.

SO ORDERED this 12th day of January, 2026.

Richard E. Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF MAINE, and MATTHEW DUNLAP, Secretary of State, in his official capacity,<br><br>Defendants. | ) | CIVIL NO. 06-86-B-W |

**SUPPLEMENTAL CONSENT DECREE, JUDGMENT, and ORDER**

The United States filed its Complaint in this action on July 28, 2006, pursuant to Section 401 of the Help America Vote Act ("HAVA"), 42 U.S.C. § 15511 and Section 11(a) of the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg-9(a), alleging that Defendants violated HAVA and the NVRA by failing to comply with Sections 301(a) and 303(a)(3) of HAVA, 42 U.S.C. §§ 15481(a), 15483(a)(3), and Section 8 of the NVRA, 42 U.S.C. § 1973gg-6 ("Section 8 "). The United States alleged that Defendants: 1) had violated Section 301(a)(3) of HAVA, 42 U.S.C. § 15481(a)(3) ("Section 301(a)(3)"), by not having in place on January 1, 2006 voting systems for use in federal elections complying with accessible voting system standards; 2) had violated Section 303(a) of HAVA, 42 U.S.C. § 15483(a) ("Section 303(a)"), by not having fully developed and implemented a computerized statewide voter registration list meeting the Section's requirements; and 3) had violated Section 8 by failing to ensure that local registrars eliminated duplication in voter registration records across municipal jurisdictions in federal elections.

The United States and the State of Maine agreed to a Consent Decree on July 28, 2006, which was approved and entered by this Court on August 1, 2006. The parties then approved a modification to the terms of that Consent Decree on October 23, 2006, which was filed by this Court on October 26, 2006. The modifications that the parties requested were incorporated in the document labeled Attachment A-1, which was substituted for the original Attachment A to the Consent Decree.

The State of Maine asserts that it has fully complied with the accessible voting equipment portions of the Consent Decree and Attachments, as it had accessible voting equipment on site and functioning for the federal election on November 7, 2006, in all but one polling place with no telephone service and only thirteen registered voters. The clerk in Kingsbury Plantation, the township that could not use the accessible voting equipment, agreed to drive any voters to the adjoining town of Guilford, approximately fifteen miles away, to vote using accessible equipment if voters wished to do so. The State has indicated that such measures will continue to be available to voters in Kingsbury Plantation so long as the township is unable to use the accessible voting equipment.

Defendants admit that the State still does not have a fully implemented HAVA-compliant computerized statewide voter registration system ("CVR") containing all of its voter registration data in place, and cites technical problems for the delay. Paragraph 6 of Attachment A-1 provides that by January 17, 2007, all municipalities in the State would be "live" on the HAVA-compliant CVR. As of that date, however, only 238 municipalities and a total of 402,112 voter records were live in the CVR, representing just under half of the jurisdictions and approximately forty percent of the total number of voter records in the state. Another 168 municipalities with 378,157 voter records had been entered into the Data Correction Tool and were awaiting data

corrections by local registrars before going live. Data from the remaining 96 municipalities still had to be entered manually, or converted electronically, into the CVR. Thirty-seven of these 96 municipalities, with approximately 21,885 voter records, appeared, as of that date, to have made no significant progress toward entering their voter registration data into the system.

Since January 17, 2007, an additional 125 municipalities and an additional 322,787 voter records have been added to the CVR. At present, over 70% of the jurisdictions and over 70% of the voter records are live in the CVR.

With respect to the list maintenance requirements of Section 8 of the NVRA, Defendants acknowledge that because of delays in the implementation of the CVR, the State still does not have an adequate means of identifying voter records of ineligible voters among the lists that have not been entered into the CVR.

Defendants already have received one extension of deadlines under the original Consent Decree signed on July 28, 2006. Because Defendants have not fully complied with the timeline set forth in Paragraph 6 of Attachment A-1, and because Defendants cannot assure the United States that they will meet the deadline set forth in Paragraph 7 (a) of the original Consent Decree, the parties have agreed to enter into a new consent decree specifically addressing the problems with the CVR implementation.

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that:

1. Defendants are enjoined to take the actions specified below to comply fully with Sections 301(a) and 303(a)(3) of the Help America Vote Act, 42 U.S.C. §§ 15481, 15483(a), and Section 8 of the National Voter Registration Act, 42 U.S.C. § 1973gg-6.

2. Defendants are enjoined to take the actions specified below to comply fully with Section 303(a) of the Help America Vote Act, 42 U.S.C. § 15483(a), and Section 8 of the National Voter Registration Act, 42 U.S.C. § 1973gg-6.

**COMPLIANCE WITH STATEWIDE VOTER REGISTRATION LIST REQUIREMENTS OF SECTION 303(a) OF HAVA**

3. Defendants will send a written communication to each of the municipalities (including here townships and other similar political subdivisions) that have not yet completed the process of entering their voter registration data into the CVR. The written communication must inform these municipalities: (1) that they are out of compliance with HAVA and this order; (2) that it is extremely urgent that they complete the task of data entry within two weeks of receipt of the communication; (3) that the names of any municipalities that do not cooperate in completing this tasks will be forwarded to the Department of Justice within 15 days after that deadline; and (4) that continued failure to cooperate and complete data entry may subject them to possible legal action by the State and/or the federal government. Defendants will make a follow-up contact in writing within 30 days after the first written communication to those municipalities that have not responded to the State's notification and have not entered their voter registration data (unless there are reasons for the delay that the parties agree are beyond their control), stating that the municipalities receiving it have been referred to the Department of Justice. Defendants will send a copy of both letters to the Department of Justice. The State agrees that it will move to implead any non-compliant municipalities as third-party defendants in this action if they have not entered their registration data by April 5, 2007.

4. Defendants have explained that the State's technical staff that is electronically converting voter registration data into the CVR cannot predict what issues may arise with the

data or how long it will take to resolve problems until the staff discovers the details of the municipalities' legacy data systems. The State therefore shall provide written progress reports explaining the nature of any issues that arise. The first report shall be submitted to the United States within seven days after this Consent Decree is approved by the Court. A subsequent report shall be submitted to the United States every two weeks thereafter, until such time as the State has completely converted data from all municipalities and ensured that they are live in the CVR. Each report shall list the names of the remaining municipalities, explain what steps remain for these municipalities, estimate the length of time it will take for remaining municipalities to be fully converted and live in the CVR, and outline future actions the State intends to take to accomplish full implementation of the CVR.

5. A HAVA-compliant CVR including converted data from all of the State's municipalities will be fully implemented by April 15, 2007. Within five business days of full implementation of the CVR, the State will submit to the United States a certificate of full implementation.

6. Defendants shall continue to implement a comprehensive training program for elections staff in each local jurisdiction as each jurisdiction's voter records are entered into the CVR on the proper use of the CVR, including how it shall be used to conduct proper list maintenance under Section 8 of the NVRA. All training shall be concluded by April 30, 2007.

**COMPLIANCE WITH VOTER REGISTRATION LIST MAINTENANCE REQUIREMENTS OF SECTION 8 OF THE NVRA**

7. Defendants shall ensure that the Elections Division has sufficient staff and resources to meet its obligations under the NVRA and this order. The computerized statewide voter registration system that is currently being developed and implemented is, among other things,

designed to identify and remove duplicate and deceased voter records from among the 503 separate local jurisdictions and to automate list maintenance practices under Section 8 of the NVRA. The Elections Division shall take the following steps:

(a) perform procedures to identify and resolve voter records of ineligible voters beginning on March 15, 2007, and concluding as promptly as is reasonably possible. A certificate of completion shall be provided to the United States within five days after the Elections Division has notified local registrars of the records that identify potential ineligible voters. A certificate of completion also shall be provided to the United States within five days after the Elections Division has verified, or received certification from each municipality verifying, that voter records of ineligible voters previously identified pursuant to this Decree have been resolved;

(b) notify local registrars of potential ineligible voters, based on records of deceased individuals from the Bureau of Vital Statistics, and change of address notifications from the State's motor vehicle authority. This shall be done on a monthly basis after completion of subparagraph (a) above, and shall begin no later than April 30, 2007;

(c) by June 30, 2007, perform a match against the U.S. Postal Service National Change of Address ("NCOA") program for all registered voters whose records have not been cancelled as the result of resolving duplications and checking deceased voter records pursuant to subparagraph (b) above; and by the end of June 2009, ensure that a process of confirming voter registration records is performed statewide, using either (i) the two-step mailing process provided by state regulations, or (ii) matching data against the U.S. Postal Service NCOA program, and that the information generated by the NCOA or two-step mail matching program is

forwarded to local registrars for purposes of sending the confirmation mailing and/or updating the voter registration rolls in a manner consistent with Section 8 of the NVRA;

(d) monitor the voter registration list maintenance activities conducted by local election officials according to a monitoring plan to be submitted to the United States by April 30, 2007, and require corrective action whenever compliance issues are detected; and

(e) maintain records of the compliance issues detected by such methods and the corrective actions taken.

The Elections Division will utilize the CVR to carry out the steps described in subparagraphs (a) through (d) above.

8. As noted in paragraph 6 above, local election officials will be trained prior to April 30, 2007 in how to use the CVR to conduct proper list maintenance under Section 8 of the NVRA. In addition, the Elections Division shall continue to provide annual training for local elections officials in proper list maintenance procedures in accordance with Section 8 of the NVRA.

**COMPLIANCE MONITORING AND RECORDKEEPING**

9. Defendants shall take the following actions to advise the United States of the State's progress in carrying out the terms of this Decree:

(a) report to the United States according to the terms and schedule set forth in paragraphs 3 through 8 concerning progress in achieving full compliance with HAVA Section 303(a) under the terms of this Decree, in writing (by e-mail or overnight delivery), or by telephone;

(b) report to the United States on or before June 30, 2007, concerning the monitoring of on-going list maintenance activities under Section 8 of the NVRA as described in subparagraphs 7(d) and (e) above;

(c) report to the United States in July 2007 and again in January 2009, for each of Maine's local election jurisdictions: 1) the number of registered voters (including total, active, inactive, cancelled, or other status); 2) how many registrants have been sent address verification notices, or have been identified as having a possible change of address through the NCOA program pursuant to paragraph 7(c) above; 3) how many registrants have been sent change of address confirmation mailings; 4) how many registrants have been placed on inactive status; and 5) how many registrants have been removed for ineligibility and the basis for that removal;

(d) provide notice to the United States within 24 hours in writing (by e-mail or overnight delivery), as well as by telephone or other personal contact with the Chief of the Voting Section, or the Chief's designee, of any occurrence known to the Elections Division which may give rise to noncompliance with any term of this Decree or with any reporting obligations or deadlines of this Decree, and include a summary of the nature and causes of such noncompliance, and within 72 hours of said notice, provide a summary of the corrective actions Defendants propose to implement; and

(e) provide to the United States in July 2007 and again in January 2009 an electronic copy of voter information from the CVR that includes the voter's full name, unique identifier, date of birth, address, voter jurisdiction, active or inactive status, and (in January 2009 only) whether the voter participated in the 2008 federal election.

10. Defendants shall retain any and all records concerning the subject matter of this Decree during the term of this Decree. The United States shall have access to all such records within a reasonable period of time, but no later than three business days after request. Defendants shall make appropriate State personnel available to the United States at any and all reasonable times in order to answer questions and provide information concerning compliance issues which arise during the term of this Decree.

11. Defendants shall retain, or require municipal officials to retain, voter registration and list maintenance records related to the terms of this decree and as set forth in 42 U.S.C. § 1974. The Elections Division shall also retain the training materials referenced above for a period of 22 months. The State shall make these records and any reports that may be generated from the CVR available to counsel for the United States upon request.

12. If at any time the United States obtains information that Defendants are or are about to be in breach of any of the terms of this Decree, the United States shall advise Defendants in writing by notice sent to the Elections Division by e-mail or overnight delivery, and facsimile. Defendants shall have three business days following transmission of such notice to respond in writing (by e-mail or overnight delivery, and facsimile) to the United States. The parties shall thereafter immediately attempt to resolve any issue of potential noncompliance. If the parties are unable to agree on a resolution of the issue, either party may bring the matter before the Court for appropriate resolution. Nothing in this Agreement shall otherwise prevent the United States

from taking any actions required to enforce any and all provisions of HAVA or the NVRA other than those that are the subject of this action.

13. Any notices sent by the respective parties pursuant to provisions of this Decree shall be sent to:

For the United States:

Chief
Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W. Room 7254-NWB
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
Email: sean.odonnell@usdoj.gov
Email: hillary.maki@usdoj.gov

For the Defendants:

Deputy Secretary of State
Bureau of Corporations, Elections and Commissions
101 State House Station
Augusta, ME 04333-0101
Phone: (207) 624-7650
Fax: (207) 287-5428
Email: julie.flynn@maine.gov
Email: phyllis.gardiner@maine.gov

Agreed to this 22th day of March, 2007.

AGREED AND CONSENTED TO:

For Plaintiff:

ALBERTO GONZALES
Attorney General

WAN KIM
Assistant Attorney General

/s/ Paula Silsby
PAULA SILSBY
United States Attorney

JOHN TANNER
Chief, Voting Section

/s/ Robert Popper
ROBERT POPPER
Special Litigation Counsel
SEAN W. O'DONNELL
HILLARY E. MAKI
Trial Attorneys
United States Department of Justice
Civil Rights Division, Voting Section
950 Pennsylvania Avenue, N.W., Room 7254-NWB
Washington, D.C. 20530
Telephone: (202) 305-4857
Facsimile: (202) 307-3961
sean.odonnell@usdoj.gov
hillary.maki@usdoj.gov

Attorneys for the United States of America

For the Defendants:

MATTHEW DUNLAP
Secretary of State
148 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8400
Facsimile: (207) 287-8598

/s/ Phyllis Gardiner

PHYLLIS GARDINER
Assistant Attorney General
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8800
Facsimile: (207) 287-3145

Counsel for the Defendants

**JUDGMENT AND ORDER**

This Court, having considered the United States' claim under Sections 301 and 303(a) of the Help America Vote Act of 2002, 42 U.S.C. §§ 15481 and 15483(a), and Section 8 of the National Voter Registration Act, 42 U.S.C. § 1973gg-6, and having determined that it has jurisdiction over this claim, has considered the terms of the Consent Decree, and hereby enters the relief set forth above and incorporates those terms herein. The provisions of this Decree shall expire on December 31, 2009. The Court retains jurisdiction of this action to enforce the terms of this Decree during the effective period of this Decree.

ENTERED and ORDERED this 4th day of April, 2007.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-4889 (JLL) |
| | ) | |
| STATE OF NEW JERSEY; and STUART RABNER Attorney General, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**STIPULATION AND ORDER**

The United States filed its Complaint in this action on this date against the State of New Jersey and the New Jersey Attorney General, in his official capacity, alleging violations of Section 303(a) of the Help America Vote Act ("HAVA"), 42 U.S.C. § 15483(a), and Section 8(a) of the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973gg-6(a). In particular, the Complaint alleges that Defendants failed to fully implement a computerized statewide voter registration list under Section 303(a) of HAVA, 42 U.S.C. § 15483(a), and failed to collect driver's license numbers for new registration applications in the State under Section 303(a)(5) of HAVA, 42 U.S.C. § 15483(a)(5). The United States also alleges that Defendants have failed to perform reasonable registration list maintenance under Section 8 of the NVRA, 42 U.S.C. § 1973gg-6. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 42 U.S.C. §§ 1973gg-9(a), 15511.

The parties, having engaged in extensive good-faith negotiations, have agreed to the terms of this Stipulation and Order as an appropriate resolution of all claims alleged in the Complaint. The parties further agree to waive a hearing and thus stipulate that each provision of

this Stipulation and Order is appropriate and necessary.

Accordingly, it is hereby ORDERED and ADJUDGED that:

1. Defendants are enjoined to take the actions specified below to comply with Section 303(a) of the HAVA, 42 U.S.C. § 15483(a), and Section 8 of the NVRA, 42 U.S.C. § 1973gg-6.

2. *Statewide Voter Registration List.* For the November 7, 2006 general election, each election district in the State of New Jersey, with the exception of Hunterdon County, shall have a poll book(s) of valid registered voters for that district generated using the pre-existing county voter registration system. Each eligible voter whose name appears in the poll book shall be able to cast a regular ballot, and each person whose name does not appear in the poll book, and who claims to be registered and eligible to vote, shall have an opportunity to cast a provisional ballot. For the purposes of confirming the eligibility of voters casting provisional ballots, a supplemental list of valid registered voters shall be generated from the statewide voter registration system against which provisional ballots will be checked by the county commissioner of registration. On or before May 30, 2007, the State shall ensure that its statewide voter registration list complies fully with Section 303(a) of HAVA, including, but not limited to, the following requirements:

(a) The list shall serve as the single system for storing and managing the official list of registered voters throughout the State, 42 U.S.C. § 15483(a)(1)(A)(i);

(b) The list must contain the name and registration information of, and must assign a unique identifier to, each legally registered voter in the State, 42 U.S.C. §§ 15483(a)(1)(A)(ii)-(iii);

(c) The list must be coordinated with other agency databases within the State, 42 U.S.C. § 15483(a)(1)(A)(iv); and

(d) The list must serve as the official voter registration list for the conduct of all elections for federal office in the State, 42 U.S.C. § 15483(a)(1)(A)(viii).

The State shall provide a written certification of its compliance with this Paragraph to counsel for the United States on or before June 15, 2007.

3. *Missing Dates of Birth from Registration Records.* With respect to registrants whose date of birth information is currently missing from the statewide voter registration list, the Defendants, on or before October 20, 2006, shall send a letter along with a pre-paid, pre-addressed return envelope to enable such registrants to provide the missing information.

4. *Duplicate Registrations*. On or before May 30, 2007, the State shall take reasonable steps to identify the names of possible duplicate registrations on the computerized list and distribute information about each duplicate registration to the appropriate county officials for investigation and, where the entry is confirmed to be a duplicate, removal. The State shall require each county to take appropriate action, consistent with all notice requirements mandated by law, on each potentially duplicate registration on or before July 25, 2007. The State shall provide a final report to counsel for the United States by August 15, 2007, on a county by county basis, regarding the total number of duplicate registrations identified for each county, the total number of duplicate registrations removed in each county, the total number of voters placed on the inactive list in each county, and the number of duplicate registrations where the county took no action.

Case 2:06-cv-04889-JLL-CCC Document 2 Filed 10/12/06 Page 4 of 11 PageID: 13

5. *Registration Applications without Driver's License Number, Motor Vehicle Commission non-driver's identification number, or Social Security Digits*. On or before October 20, 2006, the State shall ensure that all eligible registrants who filed a registration application without a driver's license number, a Motor Vehicle Commission ("MVC") non-driver's identification number, or social security digits on or after January 1, 2006, and before October 20, 2006, will be processed so that each such registrant will appear on the county-generated poll book for the November 7, 2006 general election. In addition, on or before May 30, 2007, for those registrants identified immediately above, the State shall obtain each such registrant's driver's license or MVC non-driver's identification number if the registrant has such a number or, if the registrant does not have such a number, the last four digits of his or her social security number if the registrant has such a number. If the State is unable to obtain this information from the databases set forth in HAVA § 303(a)(5)(b), it shall make repeated efforts to obtain such information, including sending at least one non-forwardable mailing, one forwardable mailing and making two telephone calls. If a registrant does not have a valid driver's license, MVC non-driver's license or a social security number, the State shall assign that registrant a number which will serve to identify the applicant for voter registration purposes, as required by Section 303(a)(5)(A)(ii) of HAVA. The Defendants shall ensure that the State is in compliance with the verification requirements set forth in Section 303(a)(5) of HAVA, 42 U.S.C. § 15483(a)(5).

6. Defendants shall take immediate steps to ensure that voter registration applications used in elections for federal office in the State of New Jersey conform to the standards set forth in Sections 303(a)(5)(A) and 303(b)(4)(A)(ii), (iii), and (iv) of HAVA.

Case 2:06-cv-04889-JLL-CCC Document 2 Filed 10/12/06 Page 5 of 11 PageID: 14

7. *Disenfranchised Offenders*. On or before May 30, 2007, the State shall require each county commissioner of registration to ensure that each registrant who becomes ineligible pursuant to New Jersey Statute 19:4-1(6)-(8) is removed from the State's computerized registration list upon confirmation by the county of such ineligibility. Any such removal shall be accomplished in uniform and non-discriminatory fashion. The State shall provide written certification regarding its compliance with this Paragraph at the same time and in a manner consistent with the certification in Paragraph 2.

8. *Deceased Registrants*. For all registrations that have been identified by the State prior to this Stipulation as being potentially deceased, the State will ensure by October 20, 2006, that each county reviews and, where applicable, removes any registrant who is confirmed as being deceased. In addition, by no later than May 30, 2007, the State shall require each county commissioner of registration to ensure that any registrant who has been identified by the State's computerized registration system as potentially deceased and has been confirmed by the county to be deceased, shall be removed from the State's computerized registration list. As part of the State's efforts to identify deceased registrants, the State of New Jersey shall compare its registration list against the Social Security Administration's Death Master File provided that such file is either commercially available or made available to the Defendants through the Social Security Administration or other United States government entity in a format suitable for this purpose. The State shall require each county to take appropriate action, consistent with all notice requirements mandated by law, on each potentially deceased registrant on or before July 25, 2007. Any such removal shall be accomplished in uniform and non-discriminatory fashion. The State shall provide a report to counsel for the United States by August 15, 2007, on a county by

county basis, regarding the total number of potentially deceased registrants identified for each county, the total number of confirmed deceased registrants removed in each county, the total number of registrants placed on the inactive list in each county, and the total number of potentially deceased registrants where the county took no action.

9. *Registrants Who Have Moved.* On or before May 30, 2007, the State shall require each county commissioner of registration to take reasonable steps to identify voters who have moved to another county in New Jersey, or who have moved out of State, in the manner set forth in Section 8 of the NVRA, 42 U.S.C. § 1973gg-6. Any such program must "be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," 42 U.S.C. § 1973gg-6(b)(2); must not permit the removal of a registrant solely because he or she failed to vote in an election, 42 U.S.C. § 1973gg-6(b)(1); and must comply with the notice provisions of Section 8(d) of the NVRA, 42 U.S.C. § 1973gg-6(d). Nothing in this paragraph shall preclude updating valid registrations of voters who have moved to another county in New Jersey. The State shall provide a report to counsel for the United States by June 15, 2007 regarding its program and the number of registrants, on a county by county basis, who have been identified and processed under Section 8 of the NVRA.

10. With regard to the State's list maintenance obligations under Paragraphs 4, 7-9, the State shall monitor the voter registration list maintenance activities conducted by local election officials , and require corrective action whenever compliance issues are detected.

11. *Reporting.* Defendants shall report to counsel for the United States every second month from the date of this Stipulation and Order in writing (by e-mail or overnight delivery) concerning progress in implementing the terms of this Stipulation and Order, beginning in

Case 2:06-cv-04889-JLL-CCC Document 2 Filed 10/12/06 Page 7 of 11 PageID: 16

October 2006 and on or about the 15th of every second month thereafter.

12. *Notice of Violation.* It shall be the responsibility of the Defendants to provide advance notice that there is about to be a breach of any of the terms of this Stipulation. Such advance notice shall include the nature and causes of such prospective breach, and the steps the Defendants propose to take to resolve the prospective breach and to ensure that it does not recur.

13. *Modification of the Stipulation.* The parties to this Stipulation and Order remain free to alter the terms herein upon mutual consent, including any change in deadlines set forth in this agreement. Such changes must be in writing and approved by both parties and submitted to the Court.

14. *Retention of Records.* Defendants shall retain all voter registration and list maintenance records and other records related to the terms of this Stipulation, including written survey materials and responses. Defendants shall make these records available to counsel for the United States for inspection and copying upon request.

15. *Contact Information.* Any notices and reports sent by the respective parties pursuant to provisions of this Stipulation shall be sent to:

For the United States:

Chief
Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Room 7254-NWB
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
Email: eric.eversole@usdoj.gov

For the Defendants:

New Jersey Attorney General
Richard J. Hughes Justice Complex
8th Floor
25 West Market Street
Trenton, NJ 08625
Phone: (609) 984.9579
Fax: (609) 633.7550
Email: anne.milgram@lps.state.nj.us

Susan J. Steele
Chief - Civil Division
United States Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, New Jersey 07102
Phone: (973) 645- 2920
Fax: (973) 297-2010
E-mail: susan.steele@usdoj.gov

Rudolph A. Filko
Deputy Chief - Civil Division
United States Attorney's Office
District of New Jersey
970 Broad Street, Suite 700
Newark, New Jersey 07102
Phone: (973) 645-2829
Fax: (973) 297-2010
E-Mail: rudolph.a.filko@usdoj.gov

16. *Costs*. Each party shall bear its own costs with regard to actions taken by the parties up to and including the entry of this Stipulation.

17. *Binding Nature of Stipulation and Order.* This Stipulation and Order is binding on the Defendants, any successors in office, employees, representatives, delegates, agents, assigns, and all persons acting on their behalf.

18. *Expiration*. This Stipulation and Order shall expire on March 15, 2008. The Court retains jurisdiction of this action to enforce the terms of this Stipulation and Order during the effective period of this Stipulation and Order.

19. *Signatures*. This Stipulation may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same agreement. Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this Stipulation.

Case 2:06-cv-04889-JLL-CCC Document 2 Filed 10/12/06 Page 9 of 11 PageID: 18

Entered this 12th day of OCTOBER, 2006.

For the United States:

WAN J. KIM
Assistant Attorney General
Civil Rights Division

CHRISTOPHER CHRISTIE
United States Attorney
District of New Jersey
970 Broad Street, Suite 700
Newark, New Jersey 07102
Phone: 973-645-2890
Fax: 973-297-2008

JOHN TANNER
ROBERT D. POPPER
M. ERIC EVERSOLE
VERONICA SEUNGWON JUNG
JAMES "NICK" BOEVING
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-305-0526
Facsimile: 202-307-3961

For the Defendants:

STUART RABNER
Attorney General of New Jersey
Office of The Attorney General
P.O. Box 080
Trenton, NJ 08625-0080

Case 2:06-cv-04889-JLL-CCC Document 2 Filed 10/12/06 Page 10 of 11 PageID: 19

Entered this 11th day of October, 2006.

For the United States:

WAN J. KIM
Assistant Attorney General
Civil Rights Division

CHRISTOPHER CHRISTIE
United States Attorney
District of New Jersey
970 Broad Street, Suite 700
Newark, New Jersey 07102
Phone: 973-645-2890
Fax: 973-297-2008

JOHN TANNER
ROBERT D. POPPER
M. ERIC EVERSOLE
VERONICA SEUNGWON JUNG
JAMES "NICK" BOEVING
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-305-0526
Facsimile: 202-307-3961

For the Defendants:

STUART RABNER
Attorney General of New Jersey
Office of The Attorney General
P.O. Box 080
Trenton, NJ 08625-0080

Case 2:06-cv-04889-JLL-CCC Document 2 Filed 10/12/06 Page 11 of 11 PageID: 20

SO ORDERED this 12 day of Oct., 2006

United States District Judge

Case 1:06-cv-01000-RLY-TAB Document 4 Filed 06/27/06 Page 1 of 8 PageID #: 10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

2006 JUN 27 PM 3:07
SOUTHERN DISTRICT OF INDIANA
LAURA A. BRIGGS
CLERK

UNITED STATES OF AMERICA,

Plaintiff,

v.

STATE OF INDIANA; and KRISTI ROBERTSON and J. BRADLEY KING, Co-Directors of the Indiana Election Division, in their official capacity,

Defendants.

Civil Action No. 1:06-cv-1000-RLY-TAB

**CONSENT DECREE AND ORDER**

The United States of America filed this action pursuant to Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg-6, to enforce the State of Indiana's obligations concerning voter registration list maintenance in elections for Federal offices. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345 and 42 U.S.C. § 1973gg-9.

The State of Indiana is covered by the requirements of Section 8 of the NVRA with respect to elections for Federal office. *See* 42 U.S.C. §§ 1973gg-1(4), 1973gg-2(b). Section 8(a)(4) of the NVRA requires that "[i]n the administration of voter registration for elections for Federal office, each State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of - (A) the death of the registrant; or (B) a change in the residence of the registrant . . . ." 42 U.S.C. § 1973gg-6(a)(4). Section 8 allows for the immediate removal of a voter from a registration list

when the voter has died, been convicted of a disqualifying crime, or when the voter requests to be removed. *See* 42 U.S.C. § 1973gg-6(c)(2)(B). Section 8 of the NVRA sets forth specific notice procedures and time frames for removing a voter when the State or local county registrar obtains information that a voter no longer lives at his/her registration address of record (*i.e.*, when the State receives undeliverable election mail or returned jury notices). *See* 42 U.S.C. §§ 1973gg-6(b)-(f). The State must comply with these notice provisions and time lines before removing such voters from its registration list.

Notwithstanding these list maintenance obligations, Indiana has failed to conduct an adequate general program of list maintenance that makes a reasonable effort to identify and remove the names of ineligible voters from the voter registration list in elections for Federal office, to remove such ineligible voters, and to engage in oversight actions sufficient to ensure that local election jurisdictions identify and remove such ineligible voters. As a result, the State has violated the registration list maintenance obligations under Section 8 of the NVRA, 42 U.S.C. § 1973gg-6.

The United States and Defendants, through their respective counsel, have conferred and agree that this action should be settled without the delay and expense of litigation. The parties negotiated in good faith and hereby agree to the entry of this Consent Decree ("Decree") as an appropriate resolution of the claims alleged in the United States' complaint. The parties agree to waive a hearing and, thus, stipulate that each provision of this Decree is appropriate and necessary.

Accordingly, it is hereby ORDERED, ADJUDGED, and DECREED that:

1. *Deceased Voters and Duplicate Registrations.* On or before June 30, 2006, the

Indiana Election Division shall distribute notices regarding the more than 29,000 registrants who may be deceased and 290,000 registrations which may be duplicates, which were identified by the State when it implemented the new statewide, computerized database under the Help America Vote Act of 2002 ("HAVA"), 42 U.S.C. § 15483(a), to each county voter registration office for appropriate action. The State shall require each county voter registration office to make a determination, consistent with all notice requirements mandated by law, on these potentially invalid registrations by August 2, 2006, including the removal from the list of eligible voters of any voter registration that has been positively identified as being from a deceased voter or as a duplicate registration. The State shall provide a report to counsel for the United States on or before August 16, 2006, on a county by county basis, regarding the total number of ineligible voters identified as duplicate or deceased in each county, the total number of voters removed in each county, the total number of voters placed on the inactive list in each county, and the number of dead or duplicate registrations where the county took no action.

2. *Statewide Mailing.* On or before June 30, 2006, the Co-Directors shall take reasonable efforts to identify voters who are ineligible to vote by conducting a statewide mailing of election-related materials, via first class non-forwardable mail, to all registered voters. The program must comply with the requirements of Section 8(b) of the NVRA, 42 U.S.C. § 1973gg-6 and Indiana Code § 3-7-38.2-16. To the extent that any mailing is returned as undeliverable with no forwarding address or a forwarding address outside the registrar's jurisdiction, the State shall send a follow-up notice letter by forwardable mail to the voter and a postage prepaid address verification card, as set forth in 42 U.S.C. § 1973gg-6(c)-(d) and Ind. Code § 3-7-38.2-2, whereby the voter can confirm his or her address. Where the mailing is returned as undeliverable

with a forwarding address inside the registrar's jurisdiction, the State shall ensure that voter records are updated in accordance with Section 8(f) of the NVRA. 42 U.S.C. § 1973gg-6(f). The State shall ensure that each county processes returned and undeliverable address verification cards in accordance with State and Federal law. This program must be completed on or before August 10, 2006.

3. *Report on Statewide Mailing.* On or before August 25, 2006, the State shall provide counsel for the United States with a report that identifies, on a county by county basis, the number of voters who were identified as potentially ineligible through use of the measures set forth in Paragraph 2, *supra*, the number of voters actually removed from the registration database and the total number of voters placed on inactive status after confirmation mailings. In addition, the State will provide the total number of active and inactive voters in each county in the State as of August 25, 2006.

4. *Written Plan for Compliance.* During 2007, the Co-Directors shall develop a written plan for identifying and deleting ineligible voters on the State's computerized database, as required in Section 303(a)(2) of HAVA, 42 U.S.C. § 15483(a)(2). In addition, the plan shall set forth the State's procedure for tracking whether each county voter registration office is complying with the list maintenance requirements of Section 8 of the NVRA, including whether the registration office is identifying and removing voters who have died, been convicted of a disqualifying crime, or who have moved. This plan must include a means of tracking whether county voter registration offices are properly: (1) acting on State-provided information obtained from the statewide voter registration database regarding voters who may have become ineligible (such as potential deaths or duplicates); (2) researching and acting on other specific information

Case 1:06-cv-01000-RLY-TAB Document 4 Filed 06/27/06 Page 5 of 8 PageID #: 14

provided in writing by voters that calls into question those voters' continued eligibility to vote at their currently registered addresses, such as jury declinations or county or state tax filings which claim non-resident status; (3) canvassing their registered voter lists to locate voters who have died or moved; (4) using canvass information to update voter registration rolls for voters who have moved within the election jurisdiction consistent with Section 8(f) of the NVRA; (5) sending a forwardable confirmation notice under Section 8(d) of the NVRA to voters who may have moved outside of an election jurisdiction or for whom there is no forwarding information; (6) placing voters who do not respond to the confirmation notice into an inactive status that will indicate the date they were placed in such status; (7) removing inactive voters who do not vote or appear to vote during the two Federal general election cycles following the date the confirmation notice is sent or who indicate in writing that they have moved outside of the jurisdiction; (8) ensuring that eligible voters on inactive status remain on the voter registration list during the period of the two Federal general election cycles following the date the confirmation notice is sent, and that they can cast valid ballots on election day during that period, upon proper assertion of eligibility, if required under state law; and (9) returning eligible inactive voters to active status if they properly reactivate their registration. Where this tracking information indicates that a county voter registration office is not conducting list maintenance activity in accordance with the NVRA and State law, the Co-Directors shall contact the county voter registration office to ensure compliance with the law and, if necessary, take appropriate action against the county, including litigation, if it fails to comply with Federal and State law.

5. *Training*. The Co-Directors, in concert with regularly scheduled training programs conducted by the Indiana Secretary of State, shall develop training manuals and

conduct regular training of local election officials at least once each year on the proper conduct of list maintenance under Section 8 of the NVRA and State law.

6. *Copies of Materials to Counsel for the United States.* The Secretary and/or the Co-Directors shall provide copies of the following to counsel for the United States for review and comment prior to dissemination or implementation: (1) the written plan for tracking county compliance with the NVRA referred to in Paragraph 4, *supra*; and (2) the written training materials discussed in Paragraph 5, *supra*. Both parties agree to confer during development of the materials discussed in this paragraph to ensure potential disagreements are minimized.

7. *Annual Reporting Requirements.* On or about January 31 of each year, the Secretary and/or the Co-Directors shall provide a report to counsel for the United States that sets forth the total number of active and inactive voters in each county in the State, as well as the number of registrants removed by each county in the previous year.

8. *Retention of Records.* The State shall retain voter registration and list maintenance records related to the terms of this agreement for the time periods provided in 42 U.S.C. §§ 1973gg-6(I) and 1974. This shall include training materials and other documents related to the State's and counties' list maintenance obligations under the NVRA and State law. The State shall make these records available to counsel for the United States upon request.

9. *Costs.* Each party shall bear its own costs with regard to actions taken by the parties up to and including the entry of this decree.

10. *Binding Nature of Decree.* This Decree is binding on the Co-Directors, their successors in office, employees, representatives, delegates, agents, assigns, and all persons acting on their behalf.

Case 1:06-cv-01000-RLY-TAB Document 4 Filed 06/27/06 Page 7 of 8 PageID #: 16

11. *Termination Date*. This Agreement shall remain in effect until June 30, 2009.

Agreed to:

For the United States of America:

SUSAN BROOKS
United States Attorney

TIM MORRISON
Ind. Bar No. 9268-53
Assistant United States Attorney
10 West Market Street Suite 2100
Indianapolis, Indiana 46204
Phone: (317) 226-6333
Fax: (317) 226-5002

JOHN TANNER
ROBERT POPPER
M. ERIC EVERSOLE
Ind. Bar No. 21190-49
Trial Attorneys
Civil Rights Division
U.S. Department of Justice
Room 7254-NWB
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: 202-305-0566
Facsimile: 202-307-3961

For the Defendants:

APPROVED as to Form and Legality:
Office of the Attorney General

STEVE CARTER
Attorney General of Indiana
Ind. Bar No. 1958-98
Indiana Government Center South
302 W. Washington Street
Indianapolis, Indiana
Phone: (317) 232-6201
Fax: (317) 232-7979

KRISTI ROBERTSON
Co-Director, Indiana Election Division
302 W. Washington, Room E204
Indianapolis, Indiana 46204
Phone: (317) 232-3939
Fax: (317) 233-6793

J. BRADLEY KING
Co-Director, Indiana Election Division
302 W. Washington, Room E204
Indianapolis, Indiana 46204
Phone: (317) 232-3939
Fax: (317) 233-6793

SO ORDERED this ______ day of ________________, 2006

________________________________
United States District Judge

UNITED STATES DISTRICT COURT FOR THE
SOUTHER DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF INDIANA; and KRISTI ROBERTSON, and J. BRADLEY KING, Co-Directors of the Indiana Election Division, in their official capacity,<br><br>Defendants. | Civil Action No.<br>1:06-cv-1000-RLY-TAB |

**UNITED STATES' MOTION TO AMEND CONSENT DECREE**

The plaintiff UNITED STATES OF AMERICA respectfully moves this Court to amend the Consent Decree approved on July 5, 2006 in the above-captioned matter by adding the following paragraph 12:

12. Within 21 days of entry of the order amending this consent decree, the State shall immediately make available to the United States the full statewide voter registration list including, where available, the following information: each registered voter's full name, address, full date of birth, voter identification number as defined in IC 3-5-2-50.1, driver license number, race, voter status (i.e., active or inactive), and voting history. The State shall produce such data in electronic format on a CD ROM or DVD formatted in consultation and full agreement with counsel for the United States.

In support of this motion, the United States asserts the following:

1. On June 27, 2006, the United States of America and the State of Indiana submitted a consent decree regarding the State's obligation to maintain voter registration lists for Federal office elections pursuant to Section 8 of the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg-6 (hereinafter "the NVRA"). This Consent Decree was approved by the Court on July 5, 2006.

2. The United States, by and through its counsel the U.S. Department of Justice (hereinafter "DOJ") would, pursuant to 42 U.S.C. §§ 1974b and 1974d, seek to compel the production of the current Indiana voter registration list, including, inter alia, voters' driver license numbers, social security numbers, and other personal information, from the State in order to assess compliance by the State of Indiana with the NVRA as set forth in the Consent Decree.

3. Indiana law may provide that some voter registration information is confidential.

4. The DOJ and the State acknowledge that the DOJ is entitled to receive and that the State is required to provide the requested information under the relevant statutes and pursuant to the Supremacy Clause of the United States Constitution.

5. Neither the DOJ nor the State considers the DOJ's request under 42 U.S.C. § 1974b to be a request for public information.

6. Neither the DOJ nor the State considers the State's compliance with this request to be a release of public information to a member of the public.

7. The DOJ shall use the voter registration list information to assess the State's compliance with the federal voting laws, including, but not limited to, the NVRA.

8. Pursuant to 42 U.S.C. § 1974c, unless otherwise ordered by a court of the United States, neither the Attorney General, nor any employee of the DOJ, nor any other representative

of the Attorney General, shall disclose any record or paper produced pursuant to 42 U.S.C. § 1974, or any reproduction or copy, except to Congress and any committee thereof, or in the presentation of any case or proceeding before any court or grand jury; provided, however, that in the event that the DOJ receives a request to provide or disclose this information to anyone outside of the DOJ, then the DOJ will make reasonable efforts to inform the State of this request, and provide the State with the opportunity to take whatever action the State considers necessary to ensure that this information remains confidential and is not disclosed to the public.

9. The DOJ shall retain exclusive possession and control over any and all voter registration records and information during the term of its use of the information, and shall then destroy the records and information pursuant to appropriate and approved DOJ procedures for destruction of sensitive data.

Defendants, State of Indiana, Pamela Potesta (as successor to Kristi Robertson) and J. Bradley King, Co-Directors of the Indiana Election Division, in their official capacity, do not oppose this motion.

WHEREFORE, the United States prays that the Court will grant said unopposed Motion to Amend the Consent Decree.

Respectfully submitted,

TIMOTHY M. MORRISON
United States Attorney

//s// Timothy M. Morrison
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204
Tim.morrison@usdoj.gov
Tel: (317) 226-6333
Fax: (317) 226-5439

LORETTA KING
Acting Assistant Attorney General
for Civil Rights

s/ Mi Yung Park
CHRISTOPHER COATES
ROBERT POPPER
MI YUNG CLAIRE PARK
California Bar No. 202379
United States Department of Justice
Civil Rights Division - Voting Section
950 Pennsylvania Avenue, N.W./NWB
Room 7254
Washington, DC 20530
Tel: (202) 305-0150
Fax: (202) 307-3961
miyung.park@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2009, a copy of the foregoing "United States' Motion to Amend Consent Decree" was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Gary Bippus
Office of the Attorney General
Indiana Government Center South
302 W. Washington Street, 5th Floor
Indianapolis, IN 46204
E-mail: Gary.Bippus@atg.in.gov

s/ Mi Yung Park
Mi Yung Claire Park
miyung.park@usdoj.gov

UNITED STATES DISTRICT COURT FOR THE
SOUTHER DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF INDIANA; and KRISTI ROBERTSON, and J. BRADLEY KING, Co-Directors of the Indiana Election Division, in their official capacity,<br><br>Defendants. | ) | Civil Action No.<br>1:06-cv-1000-RLY-TAB |

**ORDER**

This matter comes before the Court on plaintiff UNITED STATES OF AMERICA's Motion to Amend Consent Decree. The Court having reviewed said motion, and any filed oppositions, and being duly advised in the premises now finds that said motion should be **RANTED**.

It is therefore **ORDERED** that Plaintiff's Motion to Amend Consent Decree be and hereby is **RANTED**.

It is further **ORDERED** that the Consent Decree approved on July 5, 2006 in the above-captioned matter is amended by adding the following paragraph 12:

12. Within 21 days of entry of the order amending this consent decree, the State shall immediately make available to the United States the full statewide voter registration list including, where available, the following information: each registered voter's full name, address, full date of birth, voter identification number as defined in IC 3-5-2-50.1, driver license

number, race, voter status (i.e., active or inactive), and voting history.

The State shall produce such data in electronic format on a CD ROM or DVD formatted in consultation and full agreement with counsel for the United States.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Dated: 03/02/2009

**D r d**

Timothy M. Morrison
United States Attorney
Southern District of Indiana
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204
Phone: (317) 226-6333
Email: Tim.morrison@usdoj.gov

Mi Yung C. Park
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue., NW - NWB
Washington, DC 20530
Phone: (202) 305-0150
Email: miyung.park@usdoj.gov

Gary Bippus
Office of the Attorney General
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
Phone: (317) 234-4923
E-Mail: Gary.Bippus@atg.in.gov

Case 2:08-cv-00920-WKW-CSC Document 1 Filed 11/19/08 Page 1 of 4

RECEIVED
2008 NOV 19 P 1:57
DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>THE STATE OF ALABAMA; BETH CHAPMAN, SECRETARY OF STATE OF ALABAMA, in her official capacity,<br><br>Defendants. | ) | Civil Action No. 2:08cv920-WKW |

**COMPLAINT**

The United States of America alleges:

1. This action is brought by the Attorney General on behalf of the United States pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") 42 U.S.C. § 1973ff-1(c) (2003).

2. 42 U.S.C. § 1973ff-1(c) mandates that States (and local governments through their respective States) report to the Election Assistance Commission the "[n]ot later than 90 days after the date of each regularly scheduled general election for Federal office" the "combined number of absentee ballots that are transmitted to absent uniformed services voters and overseas voters for the election and the combined number of such ballots which were returned by such voters and cast." The States "shall make such a report available to the general public." Id.

3. The Attorney General of the United States is given authority to ensure that states comply with 42 U.S.C. § 1973ff-1(c) and report the number of UOCAVA ballots transmitted,

SCAN
for 11.20.08

Case 2:08-cv-00920-WKW-CSC Document 1 Filed 11/19/08 Page 2 of 4

returned, and cast. Under 42 U.S.C. § 1973ff-4, "[t]he Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as may be necessary to carry out this subchapter [UOCAVA]."

4. This Court has jurisdiction pursuant to 42 U.S.C. § 1973ff-4 and 28 U.S.C. §§ 1345 and 2201(a).

5. The Defendant State of Alabama (the "State") is responsible for complying with UOCAVA, and ensuring required information is transmitted to the Election Assistance Commission within 90 days of a Federal Election.

6. Defendant Beth Chapman is sued in her official capacity as the Secretary of State of the State of Alabama. As the Secretary of State, she is the chief election officer for Alabama. See Ala. Code 1975 § 17-1-3. The principal office of the Secretary of State elections division is in Montgomery, Alabama.

7. Alabama failed to comply with § 1973ff-1(c) in 2006 and did not report any data as required.

8. Alabama has not provided any information demonstrating that there are any new efforts to obtain compliance with § 1973ff-1(c) in 2008.

9. The failure of election officials in Alabama to comply with § 1973ff-1(c) results in an absence of information as to whether or not UOCAVA's guarantees that overseas citizens and those serving in the armed forces are effectively exercising the franchise.

10. An order of this Court is necessary requiring Defendants to take corrective action for the November 4, 2008, election in order to protect the rights granted by UOCAVA.

WHEREFORE, Plaintiff prays that this Court hear this action pursuant to 42 U.S.C. §

Case 2:08-cv-00920-WKW-CSC Document 1 Filed 11/19/08 Page 3 of 4

1973ff-1(c); issue a declaratory judgment under 28 U.S.C. § 2201 that Alabama officials failed to track and report data about the number of UOCAVA ballots requested, transmitted and cast; and issue injunctive relief ordering the Defendants, their agents and successors in office, and all persons acting in concert with them:

(1) to require all election officials to implement procedures to record data about the number of UOCAVA ballots requested, transmitted and cast by UOCAVA voters; and,

(2) to report data required by § 1973ff-1(c) to the Election Assistance Commission to the Election Assistance Commission and general public within 90 days after the November 4, 2008 election and in future federal general elections.

The United States of America further prays that this Court order such other relief as the interests of justice may require, together with the costs and disbursements of this action.

MICHAEL B. MUKASEY
Attorney General

GRACE CHUNG BECKER
Acting Assistant Attorney General

CHRISTOPHER COATES
Chief, Voting Section

REBECCA J. WERTZ
Principal Deputy Chief
TIMOTHY F. MELLETT
Deputy Chief
J. CHRISTIAN ADAMS
CHRISTY A. McCORMICK
Trial Attorneys
United States Department of Justice
Civil Rights Division, Voting Section
950 Pennsylvania Ave., NW
Room NWB-7254
Washington, D.C. 20530
Phone: (202) 305-0609
Fax: (202) 307-3961
christy.mccormick@usdoj.gov

LEURA G. CANARY
United States Attorney

By:
R. RANDOLPH NEELY
Assistant United States Attorney
Middle District of Alabama
One Court Square
Suite 201
Montgomery, Alabama 36104
(334) 223-7280

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2008 OCT 10 PM 3:32

CLERK
BY lw
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA,

Plaintiff,

v.

THE STATE OF VERMONT; DEBORAH L. MARKOWITZ, SECRETARY OF STATE OF VERMONT, in her official capacity,

Defendants.

Civil Action No. 2:08-cv-217

**COMPLAINT**

The United States of America alleges:

1. This action is brought by the Attorney General on behalf of the United States under the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 42 U.S.C. §§ 1973ff-1973ff-6 (2003).

2. 42 U.S.C. § 1973ff-1(c) mandates that States (and local governments through their respective States) report to the Election Assistance Commission "[n]ot later than 90 days after the date of each regularly scheduled general election for Federal office" the "combined number of absentee ballots that are transmitted to absent uniformed services voters and overseas voters for the election and the combined number of such ballots which were returned by such voters and cast in the election." The States "shall make such a report available to the general public." Id.

3. The Attorney General of the United States is given authority to ensure that States

comply with 42 U.S.C. § 1973ff-1(c) and report the number of UOCAVA ballots transmitted, returned, and cast. Under 42 U.S.C. § 1973ff-4, "[t]he Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as may be necessary to carry out this subchapter [UOCAVA]."

4. This Court has jurisdiction under 42 U.S.C. § 1973ff-4 and 28 U.S.C. §§ 1345 and 2201(a).

5. The Defendant State of Vermont (the "State") is responsible for complying with the UOCAVA, and ensuring required information is transmitted to the Election Assistance Commission within 90 days of a Federal Election.

6. Defendant Deborah L. Markowitz is sued in her official capacity as the Secretary of State of the State of Vermont. As the Secretary of State, she is the chief election officer for Vermont. See Vt. Stat. Ann. tit. 17, §2103 (40). The principal office of the Secretary of State elections division is in Montpelier, Vermont.

7. Vermont failed to comply with § 1973ff-1(c) in 2006 and did not report any data as required.

8. Upon information and belief, Vermont will likely fail to comply with § 1973ff-1(c) again in 2008.

9. By failing to comply with § 1973ff-1(c), Vermont has not adhered to the congressional mandate that it capture and report specific election-related data regarding absent uniformed services voters and overseas voters in general elections for Federal office.

10. An order of this Court is necessary requiring Defendants to take corrective action for the November 4, 2008, election in order to protect the rights granted by the UOCAVA.

WHEREFORE, Plaintiff prays that this Court hear this action pursuant to 42 U.S.C. § 1973ff-1(c); issue a declaratory judgment under 28 U.S.C. § 2201(a) that Vermont officials failed to track and report data about the number of UOCAVA ballots requested, transmitted, and cast; and issue injunctive relief ordering the Defendants, their agents and successors in office, and all persons acting in concert with them:

(1) to require all election officials to implement procedures to record data about the number of UOCAVA ballots requested, transmitted and cast by UOCAVA voters; and,

(2) to report data required by § 1973ff-1(c) to the Election Assistance Commission and general public within 90 days after the November 4, 2008, election.

The United States of America further prays that this Court order such other relief as the interests of justice may require, together with the costs and disbursements of this action.

MICHAEL B. MUKASEY
Attorney General

GRACE CHUNG BECKER
Acting Assistant Attorney General

CHRISTOPHER COATES
Chief, Voting Section

REBECCA J. WERTZ
Acting Principal Deputy Chief
TIMOTHY F. MELLETT
Acting Deputy Chief
J. CHRISTIAN ADAMS
CHRISTY A. McCORMICK
Trial Attorneys
United States Department of Justice
Civil Rights Division, Voting Section
950 Pennsylvania Ave., NW
Room NWB-7254
Washington, D.C. 20530
Phone: (202) 616-4227
Fax: (202) 307-3961
j.christian.adams@usdoj.gov

THOMAS D. ANDERSON
United States Attorney

By: ______________________
Michael Drescher
Assistant United States Attorney
District of Vermont
11 Elmwood Avenue, 3rd Floor
Burlington, VT 05402-0570
(802) 951-6725

**U.S. Department of Justice**

Civil Rights Division

*Voting Section – 4CON*
*950 Pennsylvania Ave, NW*
*Washington, DC 20530*

October 26, 2021

***VIA E-MAIL to kpachuta@jarrard-davis.com***

Karen Pachuta, Esq.
Jarrard & Davis, LLP
222 Webb Street
Cumming, Georgia 30040

**RE: DOJ information request to Newton County, GA**

Dear Karen,

Thank you for providing the information from Newton County regarding ballot drop boxes.

I write in response to your request for an explanation of the Department's statutory authority to obtain the information we have requested regarding provisional ballots. The requests in my original email were all made pursuant to the Department of Justice's authority to enforce the Voting Rights Act, 52 U.S.C. § 10308(d). Additionally, the provisional ballot records relating to the 2020 and 2021 elections are covered by the Civil Rights Act, 52 U.S.C. § 20701. We now request those records, as described again below, also pursuant to 52 U.S.C. § 20703, to aid in the Department's enforcement of the civil provisions of federal statutes that protect the right to vote, including Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. Any records provided pursuant to 52 U.S.C. § 20703 are subject to the disclosure limitations in 52 U.S.C. § 20704.

We request the following records related to the November 2020 and January 2021 elections:

- A list of all voters who cast provisional ballots in Newton County in the November 3, 2020 general election and January 5, 2021 federal runoff election. For each voter who cast a provisional ballot, please include (1) the voter's name and voter registration number; (2) the reason the provisional ballot was issued; (3) the precinct in which the provisional ballot was issued; and (4) whether the provisional ballot was counted fully or partially, and the reason. If this information is maintained in an Excel file or a similar useable electronic format (e.g., .dbf, .csv, or a delimited-text file format), please provide it in that format (and specify what delimiter is used, if applicable). If any of these categories of information is not in your records, please indicate that in your response.

Please provide any files as attachment to emails (rather than providing a link for downloading files from a website).

Please call me if you have any questions. I can be reached at 202-598-5262.

Sincerely,

M. Eileen O'Connor

M. Eileen O'Connor
Trial Attorney
Voting Section

# To Assure Pride and Confidence *in the Electoral Process*

August 2001



## *The* National Commission *on* Federal Election Reform

*Organized by*
Miller Center of Public Affairs, University of Virginia
The Century Foundation

*Supported by*
The David and Lucile Packard Foundation
The William and Flora Hewlett Foundation
The John S. and James L. Knight Foundation

## Miller Center of Public Affairs

University of Virginia
P.O. Box 400406
2201 Old Ivy Road
Charlottesville VA 22904-4406

*tel* 804-924-7236
*fax* 804-982-2739
*web* http://millercenter.virginia.edu

## The Century Foundation

41 East 70th Street
New York NY 10021

*tel* 212-535-4441
*fax* 212-879-9190
*web* http://www.tcf.org


www.reformelections.org

## The Commission

**Honorary Co-Chairs**
President Gerald R. Ford
President Jimmy Carter

**Co-Chairs**
Robert H. Michel
Lloyd N. Cutler

**Vice-Chairs**
Slade Gorton
Kathleen M. Sullivan

**Commissioners**
Griffin Bell
Rudy Boschwitz
John C. Danforth
Christopher F. Edley, Jr.
Hanna Holborn Gray
Colleen C. McAndrews
Daniel Patrick Moynihan
Leon Panetta
Deval L. Patrick
Diane Ravitch
Bill Richardson
John Seigenthaler
Michael Steele

**Executive Director**
Philip D. Zelikow

## Public Hearings

**March 26, 2001**
*Citizen Participation*
The Carter Center
Atlanta, Georgia

**April 12, 2001**
*Election Administration*
The Ronald Reagan Presidential Library
Simi Valley, California

**May 24, 2001**
*What Does the Law Require?*
Lyndon B. Johnson Library and Museum
Austin, Texas

**June 5, 2001**
*The American and International Experience*
Gerald R. Ford Library
Ann Arbor, Michigan

# To Assure Pride and Confidence *in the Electoral Process*

August 2001

## *The* National Commission *on* Federal Election Reform

*Organized by*
Miller Center of Public Affairs,
University of Virginia
The Century Foundation

*Supported by*
The David and Lucile Packard Foundation
The William and Flora Hewlett Foundation
The John S. and James L. Knight Foundation

# Letter

## *to the American People*

In 2000 the American electoral system was tested by a political ordeal unlike any in living memory. From November 7 until December 12 the outcome of the presidential election was fought out in bitter political and legal struggles that ranged throughout the state of Florida and ultimately extended to the Supreme Court of the United States. The American political system proved its resilience. But we must think about the future.

The ordinary institutions of election administration in the United States, and specifically Florida, just could not readily cope with an extremely close election. Many aspects of the election process were put under a microscope and viewed by an anxious nation. With dismay and growing anger we saw controversial ballot design; antiquated and error-prone voting machines; subjective and capricious processes for counting votes; voter rolls that let unqualified voters vote in some counties and turned away qualified voters in others; confusion in the treatment of overseas military ballots; and a political process subjected to protracted litigation.

Stepping back from Florida, the picture is no more encouraging. The chief election official of Georgia, Cathy Cox, testified to our Commission that: "As the presidential election drama unfolded in Florida last November, one thought was foremost in my mind: there but for the grace of God go I. Because the truth is, if the presidential margin had been razor thin in Georgia and if our election systems had undergone the same microscopic scrutiny that Florida endured, we would have fared no better. In many respects, we might have fared even worse." Across America, we have heard from official after official who feels the same way.

There is good news, though. In the last few years, and now spurred by the events last year, election reform has returned to the legislative agenda in many states. In much of the country cadres of able and dedicated election administrators are in place who can show what is possible and carry reforms into practice. In a world of problems that often defy any solution, the weaknesses in election administration are, to a very great degree, problems that government actually can solve.

In this report we and our colleagues offer very specific recommendations on what should be done. In other words, Americans can and should expect their electoral system to be a source of national pride and a model to all the world.

Gerald R. Ford

Jimmy Carter

Robert H. Michel

Lloyd N. Cutler

*Co-chairs of the National Commission on Federal Election Reform*

Eleven states and the District of Columbia have already implemented statewide registration systems that cover all their jurisdictions. Seven more states have adopted them and are in the process of implementing them; three more are close to adoption. A statewide registration system was part of the reform program adopted earlier this year in Florida. These 21 states and D.C. include 39.2% of the voting-age population in the United States. In its June 2001 report to Congress, the bipartisan Federal Election Commission, after consulting with state and local election officials, recommended that states "1) develop and implement a statewide computerized voter registration database; 2) insure that all local registration offices are computerized; and 3) link their statewide computerized system, where feasible, with the computerized systems of the collateral public agencies relevant to the NVRA (motor vehicle offices, public assistance offices, etc.)"[19]

With a sense of how voter registration has evolved over the past century, we believe four factors weigh heavily in favor of placing the core responsibilities for voter registration in the hands of state governments.

**The constitutional allocation of responsibilities.** Under the U.S. Constitution, voter qualifications are defined primarily by state governments. So it makes sense to center registration responsibility at this same level of government. Local issues and ballots may vary, but a resident of a given state, voting in a state or presidential election, will find the same voter eligibility rules and the same candidates at the top of the ballot anywhere within the state.

**The nature of the data.** The most important source of applications for new voter registration has become the application for a driver's license. This is already a statewide database, and it is estimated that 92% of all registered voters also have a driver's license. The most effective systems have made DMV (Department of Motor Vehicles) information congruent, and thus interoperable, with the voter information called for by the state's election code. When people move within a state, they are still in the database even if they are slow to get a new license. When they move from one state to another, one of the first—and perhaps the only—civic act they must accomplish is to get a driver's license valid for that state. DMV change-of-address information is thus considered even more comprehensive and reliable than the useful National Change of Address database maintained by the U.S. Postal Service.[20]

**Accuracy can mean access.** People are mobile, but more than three-quarters of all moves are within the same state. An effective statewide database can therefore be quite useful, including its capacity to address such common issues as the registration of in-state college students and people with second homes within a state. But perhaps the most important beneficiaries of statewide registration systems will be members of lower-income groups, who are more likely to move than higher-income groups

and, when they do move, are much more likely to move from one place to another within the same state. They are thus more likely to fall off local voter rolls and bear the burden of re-registration.

**Accountability.** A clear statewide registration system will be more transparent and accountable to outside scrutiny. Some advocates for disadvantaged groups are uneasy about statewide registration proposals, fearing that these will turn into still more powerful tools for "purging." Yet one of the clearest findings from the U.S. Civil Rights Commission's investigation in Florida is that, with purely local administration of list maintenance, local variations on statewide guidelines can be critical yet difficult to track.



Georgia Secretary of State Cathy Cox

Beyond the general recommendation in favor of statewide registration systems, several specific policy issues deserve mention. One is the question of whether to require voters to display some proof of identification at the polls.

All states hope that precinct officials and poll watchers will have at least some familiarity with the residents of their precincts. Seven states, all but one of them rural, do nothing more. In the rest, the most common practice now is to require voters to sign their names in an official registry or on a ballot application. About a third of the states require poll workers to check signatures against those provided at registration. Fourteen states insist that voters produce some form of identification.[21]

Most states that have histories of strong party rivalry or election fraud require signature verification or voter identification at the polls. Signature verification puts an extra burden upon administrators, and especially on often ill-trained poll workers practicing a very subjective, often impossible, task while voter lines lengthen. Also, many polling places lack the means to provide poll workers with accurate copies of the voter's actual signature (the one the voter used in order to register) and a signature may change over time.

One alternative, favored by several Commissioners, is to require those who are registering to vote and those who are casting their ballot to provide some form of official identification, such as a photo ID issued by a government agency (e.g., a driver's license). A photo ID is already required in many other transactions, such as check-cashing and using airline tickets. These Commissioners point out that those who register and vote should expect to identify themselves. If they do not have photo identification then they should be issued such cards from the government or have available alternative forms of official ID. They believe this burden is reasonable, that voters will understand it, and that most democratic nations recognize this act as a valid means of protecting the sanctity of the franchise.

A small percentage of adults, perhaps about 5 to 7%, do not possess a driver's license or other photo identification. They are disproportionately poor and urban (since they may use public transit rather than drive a car). Some Commissioners also object to requiring voters to produce a photo ID or some alternative form to verify their identity because some members of minority groups believe such a process can be used to intimidate voters or turn them away in a racially discriminatory fashion.



Election Day, Gloucester, MA, November 7, 2000

We believe that an assessment of how to strike the right balance between administrative burden and voter responsibility turns too much on the assessment of local conditions to be amenable to any categorical recommendation by this Commission. We do believe, however, that states should be able to verify a voter's identity.

In recommending the adoption of statewide voter registration systems, we looked at the experience of those states that have adopted them. The outstanding models appear to be Michigan and Kentucky. Michigan deserves particular scrutiny because it is the most populous state to have fully implemented such a system and it is also a state with a larger number of separate election jurisdictions, more than 1600, than any other. The Michigan system is new, having been put in place just in the last few years, and it passed the test of the 2000 election with flying colors. The software solution developed in Michigan has been inexpensive and is not exclusive to a particular vendor. Any state can copy it. A more complete description of the Michigan voter registration system is attached in Appendix B to this report.[22]

Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form.

An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier.[23] The Federal Election Commission has made the same recommendation.



Commissioner John Seigenthaler

Some states also seek added identifiers, such as information on the place of birth and prior residential address. We take no position on the value of having this added information, but we do believe that federal law and regulations should be amended over time where state experience provides evidence that a change is needed. Used cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida.

Our policy recommendation need not require any immediate amendment of the NVRA. The NVRA specifies how voters can be registered. In general, those provisions will benefit from and work much more effectively with a statewide registration system. The NVRA also specifies how voter lists should be maintained. We believe those provisions do not take adequate account of the kind of statewide voter registration system we recommend. But we see no need to amend the list of maintenance provisions of the NVRA either to add more safeguards or pare them back until more and wider experience with new systems can give us more evidence about just what is needed.

All states require voters to declare, by their signature, that they are U.S. citizens and meet other criteria for eligibility to vote. Twelve states require applicants at least to check a box specifically affirming they are a citizen, though most of these accept the national mail-in and NVRA forms that do not have such a box. Inability to verify citizenship is a weakness in every state's voter registration system. The problem is not hypothetical. Non-citizens do vote, albeit illegally.[24] We therefore recommend that a specific enforceable affirmation of citizenship be included in all voter registration applications. Combined with enforcement of the relevant state and federal vote fraud laws, this should be sufficient to contain this potential problem.

**U.S. Department of Justice**

Civil Rights Division

*Voting Section - NWB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

April 2, 2009

**VIA FACSIMILE AND FIRST-CLASS MAIL**

Sheriff Chris Curry
Shelby County
P.O. Box 1095
Columbiana, AL 35051

Dear Sheriff Curry:

This letter concerns absentee ballots returned to Shelby County, which are in your legal custody, by uniformed military and overseas citizens for the November 2008 general election. The Attorney General of the United States is entitled under 42 U.S.C. §§ 1974 and 1974b to inspect or reproduce all records and papers requisite to voting. 42 U.S.C. 1974(b) states:

> Any record or paper required by section 301 [42 USCS § 1974] to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

Please consider this letter such a demand.

The Alabama Attorney General's Office has informed us that pursuant to the Alabama Code, the sheriff in each county is the legal custodian of all ballots and voting records, which under federal law must be preserved for a period of twenty-two months from the date of any election. See § 1974. The State has also informed us that neither it, nor the Secretary of State, has any authority under Alabama law to obtain or inspect the ballots from the November 2008 election that are in your custody, except in the case of a recount, which does not apply in this case.

The Attorney General seeks this information for the purpose of obtaining data for the Election Assistance Commission under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 42 U.S.C. § 1973ff-1(c). Accordingly, we ask that you make available to the Attorney General's representative, at your office, all 2008 general election absentee ballot affidavit envelopes in your custody, possession or control for inspection, reproduction and/or copying. In the event that you designate a representative as your bailee, or if the documents are not stored at your office, the Attorney General's representative will work with you to determine the appropriate logistics.

Pursuant to an order of the court in *United States v. Alabama*, Civil Action No. 2:08-CV-00920 (M.D. Ala. Filed November 19, 2008), Winfield J. Sinclair and/or Misty A. Fairbanks of the Alabama Attorney General's office will be present for the inspection. Other State and/or local officials, such as the Circuit Clerk or a representative from the Probate Judge's office, may also be in attendance.

We would like to review the affidavit absentee ballot envelopes during the week of April 14-April 17. Christy McCormick at (202) 305-0609, or Spencer Fisher at (202) 305-0015, trial attorneys in our Voting Section, will contact you next week regarding a specific date and time to review the documents.

If you have any questions, please do not hesitate to contact one of the Voting Section attorneys listed above. Thank you for your assistance in this matter. We appreciate your cooperation and that of your office.

Sincerely,

Christopher Coates
Chief
Voting Section

cc: Honorable Beth Chapman, Alabama Secretary of State
Honorable Troy King, Alabama Attorney General

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**THE UNITED STATES OF AMERICA,**

***Plaintiff,***

**v.**

**Civil Action No. 2:26-cv-00156**
**Hon. Thomas E. Johnston**

**KRIS WARNER, in his Official Capacity as WEST VIRGINIA SECRETARY OF STATE,**

***Defendant.***

**DEFENDANT KRIS WARNER'S REPLY MEMORANDUM**
**<u>IN SUPPORT OF MOTION TO DISMISS</u>**

Michael R. Williams (WV Bar # 14148)
*Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
*Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

## INTRODUCTION

Half a dozen courts stand against the Government.[*] In his motion to dismiss, Secretary Warner explained why those courts are correct. The Government's "Title III demand" (1) seeks documents the statute doesn't cover (2) for a purpose the statute doesn't permit (3) without any factual basis. Each of these reasons is enough to block the demand. Yet the Government hardly acknowledges its demand's shortcomings; nor does it counter the concerns that the Secretary—and multiple federal courts—have raised. Because the Government leaves so many grounds unaddressed, the Court can take its pick to resolve this case.

The Government has more than just Title III problems. Its demand also violates at least three federal privacy statutes—obligations that good intentions and protective orders cannot satisfy. And because Congress has not displaced West Virginia law's redaction requirement, that state law independently bars the disclosure the Government seeks.

Against this backdrop, six courts have considered the Government's demands—and six have found those demands wanting. The Government offers no compelling explanation for why this case should go differently. Instead, it focuses on its view of what Title III *should* do and how much it thinks it needs these documents to carry out the mission it envisions for itself. But Congress granted the Attorney General specific powers for a specific purpose. The demand exceeds both. The Court should thus dismiss this effort to enforce the unjustified demand.

---

[*] *United States v. Weber*, 816 F. Supp. 3d 1168 (2026), *appeal docketed*, No. 26-1232 (9th Cir. Mar. 3, 2026); *United States v. Oregon*, No. 25-cv-1666, 2026 WL 318402 (D. Or. Feb. 5, 2026), *appeal docketed* No. 26-1231 (9th Cir. Mar. 3, 2026); *United States v. Benson*, No. 25-cv-1148, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026), *appeal docketed*, No. 26-1225 (6th Cir. Feb. 27, 2026); *United States v. Galvin*, No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 25-CV-639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, No. 26-66, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026)

## ARGUMENT

### I. Title III does not cover West Virginia's voter registration list.

The demand has a threshold problem: Title III does not cover West Virginia's voter registration list. The list is not a "record[] [or] paper[] which come[s] into [the Secretary's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The Government disagrees, but its reading of Title III ignores the statute's plain text in favor of its view about what the statute should cover. As written, Title III "refers only to documents that people submit to the State as part of the voter registration process, not a document like the voter registration list that is created by state officials." *Benson*, 2026 WL 362789, at *9. This Court should not "superimpose [the Government's] expansive definition where Title III, by its plain text, does not tolerate such a definition." *Fontes*, 2026 WL 1177244, at *6.

**A.** Start with the phrase "all records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The Government argues that because the voter registration list is a "record," Title III must cover it. United States' Memo. in Response to Defendant's Motion to Dismiss and in Reply to Defendant's Opposition to Motion to Compel (Consol. Resp.), ECF No. 39, at 17. This argument ignores that Title III covers *only* those records "relating to" its enumerated "act[s]." 52 U.S.C. § 20701.

The use of the word "act" is critical. An "act" is "[s]omething done or performed." *Act*, BLACK'S LAW DICTIONARY (12th ed. 2024). And the catch-all phrase "other act" should be read to "embrace only objects similar in nature to those objects enumerated by the preceding specific words," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001). Here, the listed "terms refer[] to something that the voter submits or does as part of the registration process." *Benson*, 2026 WL 362789, at *9. Thus, Title III covers its specific examples and "other acts" like them:

things voters do to register to vote. *Id.*; *see also Fontes*, 2026 WL 1177244, at *5-6. The Government's cited cases say the same. *See* Consol. Resp. at 18-19 (citing *United States v. Mississippi*, 380 U.S. 128, 134 (1965) (responding to a state law which made it so "registrars no longer need[ed] to keep any record made *in connection with the application* of anyone to register to vote" that Title III requires retention of "records of voting registration" (emphasis added)); and *McIntyre v. Morgan*, 624 F. Supp. 658, 662-64 (S.D. Ind. 1985) (listing materials related to voter action and observing that Title III covers "election materials," which are things "used in elections for federal offices" that will be "destr[oyed] or dispos[ed] of" following the election in which they are used)).

And while the Government doesn't contest the voter-submitted nature of the specifically enumerated acts, it argues that even if *all* the enumerated items are acts done by voters, that doesn't mean that "every record or paper relating to those examples likewise" must "come[] from a voter." Consol. Resp. at 18 (cleaned up). This reading not only disregards the specific examples, though; it also removes the "other act" qualifier of the statute. The Government's reading would effectively transform Title III's carefully limited phrase—"records and papers … relating to any application, registration, payment of poll tax, or other act requisite to voting"—into an open-ended demand power over any "records and papers relating to elections." But Congress didn't write that statute. The modifier "relating to" might broaden the types of records about those acts, but it doesn't broaden the category of acts themselves. So the Court should decline to "read into [Title III] words that aren't there." *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020).

Lacking textual support, the Government entreats the Court to go beyond Title III's text in fear that a literal reading "would subvert [the statute's] purpose by frustrating the United States's ability" to make demands. Consol. Resp. at 19. But even assuming the Government is right that

its demand serves Title III's purpose (which it doesn't), "what Congress (possibly) expected matters much less than what it (certainly) enacted." *Stanley v. City of Sanford*, 606 U.S. 46, 58 (2025). "[N]o statute yet known pursues its stated purpose at all costs." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (cleaned up). And "[t]here is no canon of statutory construction which requires this Court to construe Title III broadly merely because it pertains to election records." *Fontes*, 2026 WL 1177244, at *6. So the Court should take the statute as it is, not as the Government wishes it to be.

**B.** Next, turn to "come into his possession." 52 U.S.C. § 20701. The Government agrees that this phrase means Title III applies only to records and documents the Secretary "gets or acquires." Consol. Resp. at 19 (cleaned up). Despite this concession, the Government goes on to claim that "Secretary Warner acquired the relevant records" here. *Id.* at 19-20. But the Secretary already explained that he didn't "acquire" the records here, he created them. *See* Memo. in Support of Mot. to Dismiss (Mot. to Dismiss), ECF No. 25, at 14. And the Government doesn't explain why it believes "acquires" actually means "creates."

The only support the Government offers for equating create and acquire is that it believes "distinctions between possessing something and having something come into one's possession are temporal distinctions." Consol. Resp. at 20 (cleaned up). But the statute doesn't say anything of the sort. Ordinary usage runs against this "temporal" idea, too. If a person paints a portrait, they wouldn't say they "came into possession" of a portrait. Nevertheless, the person "possesses" a portrait. Conversely, a person who buys a portrait does "come into possession" and thereby "possess" the portrait. So too here: the Secretary did not receive the voter registration list from some outside source. His office compiled it from individual applications, generating a new document that no one delivered to him.

In short, creation is not acquisition. If the Government thinks this is a "pedantic distinction," Consol. Resp. at 19 (cleaned up), it is a "pedantic distinction made by Congress." *Benson*, 2026 WL 362789, at *10; *see also Fontes*, 2026 WL 1177244, at *6 (noting that it's "disingenuous" to claim *Benson* actually held that the distinction is pedantic). That distinction dooms the Government's demand. *See Benson*, 2026 WL 362789, at *9; *Fontes*, 2026 WL 1177244, at *7.

Faced once more with a lack of textual support, the Government asks the Court to read Title III "expansively" by "[f]ocusing on the information sought rather than how it was acquired or generated." Consol. Resp. at 20. Indeed, based only on references to cases "interpreting the NVRA," the Government says the Court can put aside "the particular language used to characterize that information" in Title III. *Id.* (cleaned up). That form of interpretation, the Government contends, would've allowed the *Benson* court to fully grasp what "Congress intended." *Id.* at 18 (citing *Benson*, 2026 WL 362789, at *9-10). But the *Benson* court instead focused on "the touchstone of statutory interpretation: the text itself." *Benson*, 2026 WL 362789, at *10. This Court should do the same.

**C.** So the Court shouldn't use purpose to stretch Title III's text to reach West Virginia's voter registration list. If it does, the result would not only be atextual: it would also subject the Secretary to a catch-22 between the Government's vision of Title III and HAVA. If the Secretary complies with HAVA by regularly updating the voting lists, *see* 52 U.S.C. § 21083(a)(1)-(2), Title III would levy criminal penalties on him for "willfully … alter[ing]" the now-covered voter registration list, *id.* § 20702. And if he preserves the list as Title III would require, he couldn't fulfill his duties under HAVA. The Government doesn't address the problem at all. Because only

the Government's reading creates this otherwise artificial conflict, this Court should "avoid such an interpretation of Title III." *Fontes*, 2026 WL 1177244, at *7.

**D.** Finally, the Government claims the Secretary "asks the Court to legislate limitations conspicuously absent from Title III by limiting the United States to only the redacted, publicly available [voter registration list]." Consol. Resp. at 21. The Secretary asks no such thing. Indeed, Title III doesn't cover even the *redacted* list for the reasons discussed. Thus, the Secretary only offered a redacted list due to his willingness to work with the federal government to the extent allowed by West Virginia law.

If Title III did cover voter registration lists, demands could hypothetically include non-public information. But Title III doesn't preempt state (or federal) privacy laws regarding voter rolls and the sensitive information they contain. *See* Mot. to Dismiss at 20. Here, West Virginia law prohibits the release of the information. So—like the Secretary said—it's that unpreempted state law, not Title III, that would limit the Government to a redacted list. *See id.* at 5-6 ("[N]o federal law … preempts [West Virginia's] redaction requirement. So even if the demand was otherwise proper, the Government would still only be entitled to a redacted list.").

**II. The Government provides no basis for its demand.**

In his motion to dismiss, the Secretary argued that Title III requires a *factual* basis for a demand. At least four courts have said the same. *See Weber*, 2026 WL 118807, at *9; *Oregon*, 2026 WL 318402, at *8-9; *Galvin*, 2026 WL 972129, at *4; *Amore*, 2026 WL 1040637, at *5-6; *see also Benson*, 2026 WL 362789, at *8 (referring to "several purported anomalies within Michigan's voter registration data" as the "asserted bases" for the Government's demand). The Government doesn't dispute this understanding of basis. Yet instead of any factual support, the Government explains that the "basis" for its request is twofold. First, "recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny." Consol. Resp. at 8. And

second, using voter registration lists "to assess and enforce HAVA and the NVRA is not new." *Id.* at 9. Neither explanation supplies a factual basis for the current demand.

The Government starts by explaining at length how enforcement actions in North Carolina revealed that the State's officials failed to input certain information as required by HAVA. *See* Consol. Resp. at 8. But that action wasn't a Title III case. The Government brought suit based on its HAVA enforcement powers. *See* Complaint, *United States v. N.C. Bd. of Elections*, No. 25-cv-283 (E.D.N.C. May 27, 2025), ECF No. 1. So if anything, this action demonstrates that the Government is fully capable of investigating and enforcing voter list requirements without expanding Title III. What's more, the United States doesn't explain why problems in other States are relevant to whether the Secretary has complied with *his* federal obligations. Nothing in the Complaint or the Response points to anything in that regard.

Next, the Government discusses a handful of past instances in which it has supposedly "used [Title III] to obtain statewide voter lists to assess compliance with list maintenance requirements." Consol. Resp. at 9. But each instance is a voluntary agreement between the State at issue and the federal government. Voluntary compliance under negotiated terms is categorically different from compelled production over a state's legal objection. And where the Government points to court orders, those orders merely interpret and enforce the consent decrees the Government entered into with the States in question. *See id.* at 10-11. Again, these are instances of voluntary production where "the parties agreed" what to do. *Id.* at 11. None of the Government's examples tested the legality of the request generally, let alone in the face of unpreempted state law barring disclosure. And again, the Government fails to clarify why other States' voluntary actions mean that the Secretary is legally obligated to violate state law and produce West Virginia's list.

Ultimately, a single instance of HAVA noncompliance in another State (discovered by means besides Title III) and voluntary agreements with other States do not supply "a factual basis for believing [West Virginia] violated" federal law. *Oregon*, 2026 WL 318402, at *9. Thus, the demand doesn't satisfy Title III.

**III. The Government's purpose must be related to Title III.**

The Secretary previously explained that a Title III demand's "purpose must come from the statute." Mot. to Dismiss at 10. The Government seems to agree, as it doesn't argue that literally any purpose will suffice. But Title III doesn't define "purpose." So the question is, what purposes does Title III permit?

For his part, the Secretary used the "remainder of the statutory scheme" to determine that a valid purpose "must relate to a purpose of investigating violations of individuals' voting rights." Mot. to Dismiss at 10-11 (quoting *Oregon*, 2026 WL 318402, at *10). Three courts looking at the statute have come to the same conclusion. *See Oregon*, 2026 WL 318402, at *10; *Weber*, 816 F. Supp. 3d at 1182 ("alleged civil rights violations"); *Amore*, 2026 WL 1040637, at *6 ("individual voting rights"). That view of purpose also aligns with the contemporary understanding that "one of the clearest purposes of the Title III proceeding is to enable the Attorney General" to investigate "a question concerning infringement or denial of [a person's] constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962); *see also Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963) (describing Title III as providing "an opportunity to inspect the records as to those who may have been illegally denied the right to qualify" to vote). At the time, courts required a "simple assertion … that there are reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights." *United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962).

The Government derides this analysis for supposedly "[e]ngrafting a requirement of racial discrimination" onto Title III. Consol. Resp. at 15. In doing so, the Government doesn't engage with the courts or the statutory context aligned with the Secretary's view. Instead, the Government claims that Title III's "plain language" is all it needs. *Id.* at 13. But unless the Government believes Title III can be used for *any* purpose imaginable, the word must have some statute-specific meaning. Indeed, the Government engrafts its own, saying that purpose means "for the purpose *of investigating possible violations of a Federal statute*." *Id.* (emphasis added) (quoting *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam)). To the Government's credit, the *Benson* court reached the same conclusion. *See Benson*, 2026 WL 362789, at *8. But that court, too, mistakenly observed that Title III "includes no such limitation" (despite what other courts have found), while adding its own view that purpose is somehow limited to "assessing states' compliance with federal election law and protecting voting rights." *Id.*

Title III doesn't go so far as the Government supposes. Violations of federal laws are only relevant to Title III to the extent those violations might warrant a suit to vindicate an individual's "constitutional voting rights." *Kennedy*, 306 F.2d at 228. For instance, a Title III demand couldn't be used to investigate and prosecute an individual whom the Government believed committed voter fraud. *See In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) (Title III isn't "an unlimited discovery device which may be employed and used without restraint."). For the same reasons they don't alter the meaning of "basis," *see* Section II, *supra*, past instances of *voluntary* productions and consent agreements don't change the statute's legal scope with regard to "purpose," either. *Contra* Consol. Resp. at 9-11.

Title III-relevant federal laws include "§ 1971 suits" (now 52 U.S.C. § 10101) and "similar actions." *Kennedy*, 306 F.2d at 228. Title III permits the United States to obtain "evidence for use

in such cases." *Id.* And it's those laws that expressly prohibit denial of the right to vote based on "[r]ace, color, or previous condition." 52 U.S.C. § 10101(a). Congress thus didn't forget to make clear that Title III protects against individual voter discrimination. *Contra* Consol. Resp. at 13. Purpose under Title III relates to these laws; it doesn't extend to a violation of every other federal law, even if the law does concern elections in general. *See Weber*, 816 F. Supp. 3d at 1182-83; *Oregon*, 2026 WL 318402, at *10; *Amore*, 2026 WL 1040637, at *6. The law resulted because the bipartisan Commission on Civil Rights had found it challenging to investigate voter discrimination without some requirement that States preserve relevant records; the Commission thus asked for the legislation that became the voter-registration record preservation and inspection requirements. *See Report of the United States Commission on Civil Rights* 138 (Sept. 9, 1959), https://tinyurl.com/y253324x.

All said, "the entire history of [Title III] reflects that it was and is designed to provide a means of enforcing the basic federally guaranteed rights of citizenship to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 852 (M.D. Ala. 1960) (cleaned up), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430, 430 (5th Cir. 1961) (summarily affirming *Gallion* as a "well reasoned opinion"). The term "purpose" must thus be understood in light of that context. *See United States v. Hernandez*, 173 F.4th 94, 98 (4th Cir. 2026) ("Interpreting the plain language of a statute requires looking to both the specific context in which the language is used, and the broader context of the statute as a whole." (cleaned up)); *cf. Turner v. Littleton-Lake Gaston Sch. Dist.*, 442 F.2d 584, 587 (4th Cir. 1971) ("In determining the purpose of legislation, it is appropriate to consider not only the effect of the legislation itself, but also the history and setting out of which the legislation arose."). And the Government's references to the Uniformed Overseas Citizens Absentee Voting Act and the Voting Rights Act—both statutes that vindicate *individual* voters'

constitutional rights—fit squarely within that understanding of Title III's purpose. *See Doe v. Walker*, 746 F. Supp. 2d 667, 670 (D. Md. 2010) (explaining that UOCAVA is intended "to prevent th[e] disenfranchisement of absent uniformed services and overseas voters"); *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 656 (2021) ("Congress enacted the landmark Voting Rights Act of 1965 … in an effort to achieve at long last what the Fifteenth Amendment had sought to bring about 95 years earlier: an end to the denial of the right to vote based on race.").

None of this is to say that voting list maintenance isn't "essential to securing an individual's right to vote." Consol. Resp. at 14. The Secretary never objected to this general principle, and the Government is wrong to say otherwise. The Secretary said only that "voter roll issues *like the issues the Government alludes to here*" aren't essential to securing an individual's right to vote. Mot. to Dismiss at 11 (emphasis added). And that's true: even now, the Government (without factual basis in West Virginia) suggests only that too many people might be on the voter rolls. *See* Consol. Resp. at 8 ("As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709."); *see also id.* at 15 n.6.

But having too many people on voter rolls doesn't violate or threaten to violate any individual's right to vote. Thus, even apparent "failures to purge voters who have moved away or have died … do[] not bear any particular importance" to whether a Title III demand has a valid purpose. *Kennedy v. Bruce*, 298 F.2d 860, 863 n.2 (5th Cir. 1962) (disregarding as irrelevant "statistics … show[ing] that there are 2634 white citizens of voting age; 112.4% of these, or 2950 white citizens, are registered to vote" and instead focusing on the "disparity in the percentage of voters to eligible citizens as between the races" because "[o]f the 6085 Negro citizens of voting age not a single one is registered to vote"). The Government's reference to the National

Commission on Federal Election Reform tracks this distinction: the Commission wanted to ensure "access" and to "avoid mistaken voter removals," both of which might "disenfranchise individual voters." Consol. Resp. at 14 (quoting Nat'l Comm'n on Fed. Election Reform, *To Assure Pride and Confidence in the Electoral Process* 32-33 (Aug. 2001), *available at* https://tinyurl.com/86jy7ps7). The Commission didn't say that inspection aimed at *removing* records protects an individual's right to vote, and the Government offers no reason why it would. Thus, the Government's reliance on these statements is misplaced.

So the Government's stated purpose falls outside Title III's scope. That's enough to invalidate the demand. Yet if the Court believes the stated purpose suffices, it should still ensure that the purpose isn't "contrived" in the first place to mask an immigration-centered agenda. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

The Government says the Secretary's contrived-purpose argument is "based entirely on unreliable hearsay" and "absurd and false." Consol. Resp. at 8-9. Put aside the implication that the Secretary can't trust his conversations with DOJ. *See* Mot. to Dismiss at 2. The President's executive order is hardly "unreliable hearsay." *See id.* at 12 (citing *Preserving and Protecting the Integrity of American Elections*, Exec. Order 14,248, 90 Fed. Reg. 14005, 14006-07 (Mar. 25, 2025)). And the Government seems to be doubling down on its ulterior motive, informing the Court that DOJ Office of Legal Counsel recently published an opinion on the matter. *See* Consol. Resp. at 3 n.1 (citing Office of Legal Counsel, *Authority to Obtain and Share Statewide Voter Roll Data*, slip op. (May 12, 2026), https://tinyurl.com/vebkdrwp). That opinion—issued well after these demands were sent and lawsuits initiated—says that DOJ can "seek statewide voter lists, and then … share the lists with … DHS." *See* Office of Legal Counsel, *supra*, at 1. In other words, the OLC opinion confirms the very motive the Government called "absurd" when the Secretary

identified it. *See* Mot. to Dismiss at 12; *but see* Office of Legal Counsel, *supra*, at 5 (explaining that although DOJ "has proposed to share these lists with … DHS," it did so to "enable cross-referencing the lists against existing databases in order to identify illegal aliens who are ineligible to vote" and further explaining that "this activity may have incidental immigration consequences by providing DHS updated information regarding the location of illegal aliens").

And though the Government dismisses the Secretary's concerns as "absurd," that dismissal ignores that other courts agree with the Secretary. The *Weber* court "d[id] not take lightly DOJ's obfuscation of its true motives" and called the stated purpose "pretextual." 816 F. Supp. 3d at 1186. And the *Oregon* court said there was "serious doubt as to the true purposes" for the demand such that "[t]he presumption of regularity … no longer holds." 2026 WL 318402, at *11. The Government addresses neither these holdings nor the President's past statements. This Court should take more care in considering the issue.

**IV. Congress has not displaced the States as the primary regulators of elections, so West Virginia law applies here and forbids unredacted disclosure.**

**A.** On preemption, the Government largely ignores the Secretary's position. In its place, the Government tells the Court that the Secretary "suggests that the Attorney General plays no role in the conduct of federal elections and that the federal laws at issue must yield to West Virginia's state privacy laws." Consol. Resp. at 24. The Government misses the mark. The Secretary's real position was that "none of the federal statutes" in this case "displace States from the field of election law, nor do they conflict with West Virginia's redaction requirements." Mot. to Dismiss at 20. The Government has no real answer for *that* argument.

The Government at least agrees "[w]ithout question" that "the United States Constitution invests states with the primary responsibility for the conduct of federal elections." Consol. Resp. at 24. And the Secretary agrees that "the Constitution explicitly authorizes Congress to override

those state choices." *Id.*; *see* Mot. to Dismiss at 19. So all parties agree (in theory) that States are presumptively in charge until Congress says otherwise. Thus, the question is whether any federal law preempts West Virginia's redaction law. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013). None does.

The Secretary argued that none of the relevant statutes here—Title III, HAVA, or the NVRA—conflicted with West Virginia's voter-list-redaction law. *See* Mot. to Dismiss at 20. In response, the Government doesn't point to any "positive and clear" language like Congress would normally deploy when displacing state election law. *United States v. Gradwell*, 243 U.S. 476, 485 (1917). Rather, the United States suggests some form of field preemption wherein the federal government has apparently displaced States entirely and now simply "trust[s]" the States "to conduct federal elections" subject to the Attorney General's oversight. *See* Consol. Resp. at 25. But "statutory text accurately communicates the scope of Congress's pre-emptive intent" in the Elections-Clause context. *Inter Tribal Council of Ariz.*, 570 U.S. at 14. The texts here reveal nothing like the preemption the Government now asserts. And the Government doesn't dispute the Secretary's characterizations and interactions of the three laws with West Virginia's redaction requirement. Thus, the Court should not "strain the intent and meaning of state election laws to find constitutional violations where there are none." *Sharma v. Hirsch*, 121 F.4th 1033, 1039 (4th Cir. 2024).

The Government's formulation of preemption also turns the Elections Clause on its head: the Clause gives Congress the power to "regulate, *in the last resort*, the election of its own members." *Sharma*, 121 F.4th at 1039 (quoting FEDERALIST NO. 59 (Alexander Hamilton) (1788) (C. Rossiter ed. 1961)). "Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *League of United Am. Citizens v. Exec. Off. of the President*,

780 F. Supp. 3d 135, 159 (D.D.C. 2025). So the Clause can't support the Government's sweeping view of preemption for all state laws interacting in any way with federal law. *See Gradwell*, 243 U.S. at 485 (Elections-Clause preemption achieved by "positive and clear" laws). Unless Congress overrode state election rules, the Elections Clause doesn't "restrict the way States enact legislation." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 815 (2015). Without any textual support, the Government's broad appeals to its view of Title III's purpose fall short. *See Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (opinion of Gorsuch, J.) (warning courts away from finding preemption through purpose, as courts may "only wind up displacing perfectly legitimate state laws on the strength of 'purposes' that only we can see, that may seem perfectly logical to us, but that lack the democratic provenance the Constitution demands before a federal law may be declared supreme").

At bottom, West Virginia's redaction law isn't preventing the Attorney General from playing his role in federal elections. The demand fails because the Attorney General is acting outside the role Congress assigned to him. Congress did not displace State redaction laws, so the Attorney General cannot demand otherwise.

**B.** Because West Virginia law applies, the Secretary cannot hand over unredacted lists. The Government's contrary interpretation of West Virginia state law is inappropriate and incorrect.

*First*, and most importantly, the United States has no place "instruct[ing] state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). In fact, "it is difficult to think of a greater intrusion on state sovereignty." *Id.* If the Court were to grant relief based on the Government's view of West Virginia's law (in the face of a contrary construction by the State's chief election officer), the result would "conflict[] directly with the principles of federalism that underlie the Eleventh Amendment." *Id.*; *see also Bragg v.*

*W. Va. Coal. Ass'n*, 248 F.3d 275, 296 (4th Cir. 2001) (describing a "federal command to a State official to comply with the State's law" as "abhorrent to the values underlying our federal structure").

*Second*, the Government's reading is wrong. West Virginia Code Section 3-2-30(g) applies to "data files containing voter information," and it doesn't say those files can be provided unredacted. That Section also permits only sharing with "any state or local election official for the purpose of voter registration and election administration." W. VA. CODE § 3-2-30(g). It doesn't allow limitless sharing with the federal government or sharing for the purported purpose here.

And West Virginia Code Section 5A-8-22(a)(1) allows release of the private information only if "authorized by federal law or regulation." Even if Title III covered the voter registration list, no federal law here requires the release of private information. The Government points to Title III's nondisclosure requirement and argues that its "privacy protection only has meaning if the records covered by [Title III] include non-public information." Consol. Resp. at 34. But the Government makes this assumption without any basis in the text. It's much more likely that Congress meant what it said and wanted to prohibit the Government from disclosing "*any* record or paper produced pursuant to this chapter." 52 U.S.C. § 20704 (emphasis added). If Congress meant only private records, it would have said as much. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461-62 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says." (cleaned up)). And anyway, the statute speaks only to the federal government's obligations, not the State's.

*Third*, West Virginia law doesn't change just because other States "routinely share" the data the Government seeks "with a third party." Consol. Resp. at 23. Nor does that fact enlarge the scope of the Government's authority to demand production. The Government offers no reason

that it would, either. Whatever those other States do, West Virginia has made different judgments, under different laws.

Similarly, the Government's promises to "strictly abide by the statutory limitations in Section 304 and other federal privacy laws" are appreciated. Consol. Resp. at 34. As is the offer of a protective order. *Id.* But those promises don't amend West Virginia law to permit unredacted disclosure to trustworthy parties.

### V. The Government promises to protect privacy but has not complied with statutory requirements.

The Government seeks to sidestep compliance with federal privacy laws by claiming that such laws are "affirmative defenses" that "cannot form the basis for dismissing the Complaint." Consol. Resp. at 27. And remember: the Government says this is a summary proceeding, so if the defenses aren't able to be considered now, the Government's position would mean such defenses are never available. Fortunately, the Government is wrong, and the privacy-law defenses "clearly appear[] on the face of the complaint." *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). Thus, this Court is free to consider these defenses. And like the *Weber* court, this Court should find that the "DOJ's request for [West Virginia's] unredacted voter rolls violates" these federal privacy laws. *Weber*, 816 F. Supp. 3d at 1192.

Where the Government does address these laws, it falls short. It largely offers assurances about how the data will be handled in practice. But those assurances—even in the form of a protective order, *see* Consol. Resp. at 34—aren't a substitute for statutory prerequisites. The Government must follow the law *before* it undertakes a collection like the demand.

*First*, the Government says that it is "complying with the provisions of the Privacy Act." Consol. Resp. at 28. So the Government agrees that the Privacy Act applies to its request. If that's true, notice of this specific collection must appear in the federal register. *See* 5 U.S.C.

§ 552a(e)(4). It doesn't. Instead, the Government points to a number of *past* notices for different collections and revisions and assures the Court that the data will "be securely stored and not be subject to unauthorized dissemination or use." *See* Consol. Resp. at 28-29. But the Privacy Act demands more: a notice is required when a system of records is "establish[ed] or revis[ed]." 5 U.S.C. § 552a(e)(4). "[N]one of the [notices] identified give sufficient notice to the American public" about *this* collection. *Weber*, 816 F. Supp. 3d at 1194. Thus, the demand violates the Privacy Act.

*Second*, the Government takes a similar swing at portraying compliance with the E-Government Act. This time, it says that because West Virginia already maintained the list, the demand "is not initiating a new process whereby it is contacting individuals for information as contemplated" by the law. Consol. Resp. at 30. But it doesn't matter that West Virginia already kept this data; what's relevant is that the United States now seeks it. And again, the Government's argument is based on the idea that past compliance is enough because the produced list "would be kept on a system for which a Privacy Impact Assessment has been done." *Id.* Not true: the E-Government Act requires an assessment before "initiating a new *collection* of information," not the creation of a new storage site. Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921-22 (2002) (emphasis added). "Since the DOJ does not cite to an applicable [assessment], it has failed its requirements under the E-Government Act." *Weber*, 816 F. Supp. 3d at 1194.

*Third*, the Government claims that the Driver's Privacy Protection Act "prohibition is clearly not implicated in the present case" because the law has an exception "for use by any government agency … in carrying out its function." Consol. Resp. at 31-32 (quoting 18 U.S.C. § 2721(b)(1)). But this exception doesn't apply here. The Government "has not identified how the use of" over a million West Virginians' "driver's license numbers would help it understand

whether [West Virginia]" is complying with voter-list-maintenance requirements. *Weber*, 816 F. Supp. 3d at 1195; *see also Senne v. Vill. of Palatine*, 695 F.3d 597, 606 (7th Cir. 2012) (en banc) ("When a particular piece of disclosed information is not *used* to effectuate that purpose in any way, the exception provides no protection for the disclosing party."). Thus, the "request for this information violates the [Driver's Privacy Protection Act]." *Weber*, 816 F. Supp. 3d at 1195.

**VI. The Government concedes the First Amendment protects the information it seeks, yet it offers no authority for disregarding those protections.**

Finally, if Title III does grant such sweeping authority as the Government imagines, a new problem emerges: the statute itself would "impose an unconstitutional burden on the right to vote guaranteed by the First Amendment." *Benson*, 2026 WL 362789, at *4; *see also Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993). The Government agrees that "[w]ithout question, voting and registration implicate speech and actions protected under the First Amendment." Consol. Resp. at 32. Yet its response doesn't rebut *Benson*, *Greidinger*, or any other First Amendment authority. The Government simply waves the First Amendment away by saying that it can enforce HAVA and the NVRA, so it's "necessarily impl[ied]" that the Amendment's protections don't get in the way here. *See id.* But beyond allusions to practical concerns and the allegedly "plain[]" intentions of Congress, *see id.*, the Government offers no support for this position. Nor could it. Compelled disclosure of voters' personal information—including Social Security numbers, dates of birth, and driver's license numbers—could chill the willingness of citizens to register and vote. And as for what might be implied in the statutes, statutory mandates could never prevail over constitutional ones.

So even if the Court agrees with the Government on every other argument, the Court should follow *Benson* and "'avoid rendering [Title III] unconstitutional'" by declining "to read [the

statute] as requiring public disclosure of all personal information provided by prospective voters." *Benson*, 2026 WL 362789, at *4 (quoting *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019)).

**CONCLUSION**

The Court should dismiss the Complaint.

Respectfully submitted,

/s/ *Michael R. Williams*
Michael R. Williams (WV Bar # 14148)
*Solicitor General*
Caleb A. Seckman (WV Bar # 13964)
*Assistant Solicitor General*
West Virginia Attorney General's Office
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
Michael.R.Williams@wvago.gov
Caleb.A.Seckman@wvago.gov
Telephone: (304) 558-2021
Fax: (304) 558-0140

*Counsel for Defendant Kris Warner*

DATE: May 20, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KRIS WARNER, in his official capacity as West Virginia Secretary of State,<br><br>Defendant. | Civil Case No.: 2:26-CV-00156-TEJ |

**MOTION FOR ENTRY OF JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 58(d), the United States of America respectfully requests that this Court enter an order denying as moot all outstanding motions in this case and order the clerk to enter judgment. While the Court has not explicitly ruled on ECF Nos. 21, 23, 30, 35, 38, 40, 41, 43, 44, 48, 52, and 54, they have all been mooted by the Court's Memorandum Opinion and Order granting the Defendant's motion to dismiss. ECF 56. The clerk has informed the United States that judgment will not be entered until the Court rules on the outstanding motions.

Wherefore, the United States respectfully requests that the Court deny all outstanding motions as moot and order the clerk to enter a final judgment.

DATED: August 6, 2026,

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC SELL
Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ *Christopher J. Gardner*
Christopher J. Gardner
James T. Catania
Trial Attorney, Voting Section
Civil Rights Division
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
Christoper.Gardner@usdoj.gov
James.Catania@usdoj.gov
Attorneys for the United States

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KRIS WARNER, in his official capacity as Secretary of State for the State of West Virginia,<br><br>Defendant. | Civil Case No.: 2:26-CV-00156-TEJ |

**NOTICE OF APPEAL**

Plaintiff United States of America, by and through the Attorney General, appeals to the United States Court of Appeals for the Fourth Circuit from this Court's Memorandum Opinion and Order (ECF 56) granting the Defendant's Motion to Dismiss (ECF 24) and denying the United States' Motion to Compel (ECF 15) entered in this action on July 13, 2026.

DATED: September 9, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ERIC A. SELL
Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

*/s/ James Thomas Tucker*
JAMES THOMAS TUCKER
JOSEPH W. VOILAND
JAMES T. CATANIA
Trial Attorneys, Voting Section
Civil Rights Division
4 Constitution Square
Washington, D.C. 20002
Telephone: (202) 307-2767
Email: james.t.tucker@usdoj.gov

Attorneys for the United States

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

Respectfully submitted,

*/s/ James Thomas Tucker*
James Thomas Tucker